Josiah M. Daniel, III, SBT # 05358500
James J. Lee, SBT # 12074550
Paul E. Heath, SBT # 09355050
Rebecca L. Petereit, SBT # 24062776
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel: 214-220-7700
Fax: 214-220-7716
jdaniel@velaw.com; jimlee@velaw.com
pheath@velaw.com; rpetereit@velaw.com

**PROPOSED COUNSEL FOR THE DEBTOR**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § § | Case No. 14-35043 |
| SAMUEL E. WYLY, | § § | Chapter 11 |
| DEBTOR | § § § | |

## EXPEDITED MOTION FOR ORDER ON
## ESTATE ADMINISTRATION

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Samuel E. Wyly, the above-referenced debtor and debtor in possession (the

"Debtor" or "Sam") files this *Expedited Motion for Order on Estate Administration*

(the "Motion") to obtain an Order that, inter alia, confirms his authority to: (a) pay

his ordinary living and business expenses; and (b) continue to utilize Highland

Stargate Ltd. ("Highland Stargate"), in coordination with Lain, Faulkner & Co, P.C.

("LainFaulkner), for the express purpose of fulfilling his duties and obligations as a

debtor in possession. In support of the Motion, the Debtor respectfully submits the following:

## JURISDICTION AND PROCEDURAL BACKGROUND

1.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    On October 19, 2014 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy case (the "Case").

4.    Pursuant to Bankruptcy Code §§ 1107(a) and 1108, the Debtor is continuing to operate and manage his business as debtor in possession.

5.    Contemporaneously with the filing of this Motion, the Debtor filed the *Motion for Entry of an Order Scheduling an Expedited Hearing on First Day Motions and Applications Filed by the Debtor*, which includes a request to hear this Motion on an expedited basis.

## STATEMENT OF FACTS

6.    Unlike most Chapter 11 filings, the Debtor's necessity for filing this Case was not due to excessive current expenses over current revenues. Instead, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code due to the massive costs of investigations and then litigation brought by the Securities and Exchange Commission ("SEC") and the collection activity being pursued against the Debtor with respect to an interlocutory order of that court, as explained below. The

SEC's very large asserted claim amount is based upon a district court's estimate of tax amounts, but the IRS has not assessed any tax, creating great uncertainty and the need for relief under the procedures afforded by Chapter 11 of the Bankruptcy Code.  In addition, the Debtor has multiple other creditors and claims that need and deserve fair treatment.  While the Debtor has substantial assets, he does not have the ability to pay the full amount of all asserted claims at the present time; and resolution and possible monetization of his assets also requires the tools of Chapter 11.

7.    Sam is a resident, citizen, and businessman of Dallas, Texas. Born in 1934 in Lake Providence, Louisiana, he worked his way through Louisiana Tech University and then earned a Masters of Business Administration from the University of Michigan on a scholarship.  He came to Texas for boot camp at Lackland Air Force Base in San Antonio.  His business career began in Dallas in 1958 with a job in computer services at IBM and then became a manager with Honeywell's computer division.

8.    After those jobs, Sam began a now-lifetime of entrepreneurship, first creating a computing start-up company located at SMU with Sun Oil Company of Richardson as a major customer.  His companies created significant numbers of jobs and opportunities for many thousands of people—200,000 estimated by his biographer. His companies' growth fattened the 401(k) accounts of tens of thousands of employees. Companies he either founded or acquired and grew substantially    include    University    Computing,    Earth    Resources,    Bonanza

Steakhouses, Gulf Insurance, Sterling Software, Sterling Commerce, Michaels Stores, and Green Mountain Energy Company.

9.    Sam has also experienced some business failures, such as the Frost Bros. retail chain. Frost Bros. failed to reorganize in Chapter 11 and was liquidated during the mid-1980s oil and real estate crash in Texas that took down nine of the state's ten largest banks. Sam's companies Sterling Software and Michaels Stores survived this downturn.

10.    He tried, at great personal cost, to break up the Bell Telephone monopoly with a start-up named Datran, a "telephone company for computers" as it was characterized by Gene Bylinsky of Fortune magazine. Today, it is called the internet. That effort (1969-1976) lost $100 million of Sam's own and other people's money—half of which was recovered by his antitrust suit settled by the Bell monopoly after three and a half years.

11.    Sterling Software was sold for $4 billion in March 2000, just before the dot.com crash. Michaels Stores was sold for $6 billion in 2006, a year before the crash of 2008. A Michael's IPO investor paid 67¢ and received $44. In short, Sam did a good job for his investors, his employees, and the community.

12.    Sam has always had a substantial public profile. The press has covered his work and his entrepreneurship steadily and in detail since the 1960s. The record of the Debtor's business history is well documented and easily available in his biography, Beyond Tallulah, How Sam Wyly Became America's Boldest Big-Time Entrepreneur, by Dennis Hamilton, published in 2011, and additionally

in Sam's autobiography, 1,000 DOLLARS & AN IDEA, published in 2008 by Newmarket Press.

13. With the benefit of his half-century career in business and his experiences in public service, Sam has acquired in these later years the status of a public intellectual or, in today's lingo, a "thought leader." For example, in 2012 he published TEXAS GOT IT RIGHT!, which has been cited by the Dallas Federal Reserve Bank[1] and has been favorably reviewed and has engendered significant public policy debates within Texas and around the nation. It spells out why jobs and people are moving from California, New York, and Illinois to Texas and the southeastern and Rocky Mountain states. It has consistently been on Amazon.com's bestseller list in its category—ranked No. 5 as of last week. At present 850,000 copies of Sam's three books are in print, a number of which he has gifted to high school and college teachers. At present, he is close to publishing a significant book on the topic of immigration, to be titled THE IMMIGRANT SPIRIT: HOW NEWCOMERS ENRICH AMERICA. He is currently at work on another entrepreneurial book titled SOUL OF AN ENTREPRENEUR and ON TEXAS TWO, a follow-up to TEXAS GOT IT RIGHT!

14. In addition to writing and publishing, the Debtor is the owner of one of America's great independent book stores, Explore Booksellers in Aspen, Colorado; he purchased the building in 2008 in order to save it from demolition and development into condominiums, and he leases it to an entity that is owned by his

---

[1] PIA M. ORRENIUS ET AL, IMMIGRATION AND THE TRANSFORMATION OF THE TEXAS ECONOMY at 2 n.9 (Dallas Federal Reserve Bank, Nov. 2013).

wife and that conducts the book selling business.[2] Sam has promoted literacy and books for many years including as a member of the Aspen Writers' Foundation, the Texas Historical Society, and other literary and American history causes.

15. Sam has always generously contributed to charitable and public institutions, both those visible such as the Wyly Tower of Learning at Louisiana Tech, and the Sam Wyly Hall at the University of Michigan, but also to hundreds of efforts to educate and aid the young, the old, and the poor. His public spiritedness is reflected in his setting up, back in 1968, the Sam Wyly Foundation to help minority businessmen, which resulted in his eight years of work in public service as chairman of a Presidential Advisory Commission working on ways to help Presidents Nixon and Ford try to fulfill campaign promises of "Black Capitalism" at a time when fifty American cities were in crisis. He also helped to start the KERA educational TV channel in Dallas, and Jim Lehrer has told many audiences that, "Without Sam Wyly, there would be no *NewsHour*."

16. The Debtor does not currently serve as an officer or director of any public company, and has not since eight years ago, in 2006. In 2014, at age 80, the Debtor's occupations are, in summary, researching, writing, and publishing books on entrepreneurship, state and national history, and public policy, owning an independent book store, and managing his assets.

17. Over the past ten years, the Debtor has paid more than $200 million in federal income taxes. In 2013, his Medicare tax alone was $2.4 million. Over the

---

[2] Due to the financial distress caused by the defense of SEC claims discussed herein, the Debtor has previously put the bookstore property up for sale, reluctantly.

past five decades his federal taxes have averaged about a third of his income.  For more than the last ten years, the Debtor has endured and dealt with multiple tax agency and securities agency investigations and audits resulting from the offshore investments and transactions he and his deceased brother Charles Wyly[3] made two decades ago, namely the establishment of trusts on the Isle of Man ("IOM") and the transfer of stocks and stock options in exchange for annuities during the early and mid-1990s.

18.     As a result of these transactions, in 2004, the IRS opened an audit on the Debtor's tax returns, and it has opened an audit on every one of his tax years since then, now holding open ten years' worth of audits, with which the Debtor has always cooperated; but to date the IRS has not assessed any tax amount against him additional to his payment of taxes at the highest ordinary income rates on the cash received from the annuities.

19.     Also in 2004, the SEC launched an investigation, and in 2005 the U.S. Senate Permanent Subcommittee on Investigations conducted a televised public inquiry into the Debtor's finances and published a report in 2005 that detailed the Debtor's financial transactions involving the offshore entities.  That report was followed five years later by the Civil Action against the Debtor and his brother[4] in 2010.  On fourteen counts of securities violations in connection with the IOM transactions, the SEC originally sought $1.4 billion, but after some rulings by the

---

[3] Charles Wyly died in an automobile accident on August 7, 2011.

[4] The SEC continued this litigation against Charles' probate estate.

District Court, the SEC ultimately sought a total of about $550 million[5] on nine counts. The Debtor has vigorously denied such allegations and any liability on such claims.

20. His legal expenses in dealing with these federal government investigations (they have interviewed and deposed about 200 people over more than ten years, and Sam has had to have a lawyer present, plus pay travel, accounting, and "expert witness" expenses). The cost to Sam has been about $100 million.

21. The first phase of the SEC's civil lawsuit[6] finally went to trial[7] from March 31 to May 7, 2014, and resulted in a jury verdict against the Debtor on nine counts. (Others, including averments of insider trading on $32 million were dismissed.) The nine counts ranged from failures to disclose to other regulatory violations.[8] Then, from August 4 to August 12, 2014, the District Court conducted an evidentiary hearing on the subject of remedies.

---

[5] "To put that in perspective, that's the amount the SEC got from Goldman Sachs in 2010, the largest penalty ever imposed on a Wall Street firm." *The Debtor Wyly's $550 Million Problem*, D MAGAZINE (Feb. 2014).

[6] The record of the Civil Action is largely publicly available, not only via PACER, but also in the very large number of published decisions that its four year course has generated. See *SEC v. Wyly*, 788 F. Supp. 2d 92 (S.D.N.Y. 2011); *SEC v. Wyly*, 2011 WL 3851129 (S.D.N.Y. Jun. 17, 2011); *SEC v. Wyly*, 2011 WL 2732245 (S.D.N.Y. Jul. 5, 2011); *SEC v. Wyly*, 2011 WL 3055396 (S.D.N.Y. Jul. 19, 2011); *SEC v. Wyly*, 2011 WL 3366491 (S.D.N.Y. Jul. 27, 2011); *SEC v. Wyly*, 2011 WL 3427193 (S.D.N.Y. Jul. 28, 2011); *SEC v. Wyly*, 2011 WL 3841591 (S.D.N.Y. Aug. 18, 2011); *SEC v. Wyly*, 2011 WL 4055408 (S.D.N.Y. Aug. 19, 2011); *SEC v. Wyly*, 860 F. Supp. 2d 275 (S.D.N.Y. 2012); *SEC v. Wyly*, 2012 WL 414457 (S.D.N.Y. Jan. 30, 2012); *SEC v. Wyly*, 950 F. Supp. 2d 547 (S.D.N.Y. 2013); *SEC v. Wyly*, 2013 WL 2951960 (S.D.N.Y. Jun. 13, 2013); *SEC v. Wyly*, 2014 WL 3401105 (S.D.N.Y. Jul. 10, 2014); *SEC v. Wyly*, 2014 WL 3739415 (S.D.N.Y. Jul. 29, 2014); *SEC v. Wyly*, 2014 WL 4792229 (S.D.N.Y. Sep. 25, 2014).

[7] The media observed that, after its defeat in its securities enforcement civil action against Mark Cuban of Dallas, this was a trial "[t]he SEC can't afford to lose." Loren Steffy, *Wyly Like a Fox: Sam Wyly v. the SEC*, TEXAS MONTHLY (June 2014).

[8] Specifically, the counts are: (1) Section 10(b) and Rule 10b-5 of the Exchange Act; (2) Section 17(a) of the Securities Act; (3) Section 13(d) and Rules 13d-1 and 13d-2 of the Exchange Act; (4) Section 14(a) and Rules 14a-3 and 14a-9 of the Exchange Act; (5) Section 16(a) and Rules 16a-2 and 16a-3 of

22.     On September 25, 2014, the District Court entered an interlocutory Opinion and Order that measured the amount the District Court held that the Debtor must "disgorge" by the amount of taxes the Court estimated that he avoided on profits realized on the sale of securities, plus a smaller amount representing 25% of profit on certain securities sold.  Altogether, the District Court held that "Sam Wyly must disgorge $123,836,958.76"[9] with "prejudgment interest for the 22 year entire period through December 1, 2014," as to be specifically calculated by the SEC.  On October 15, 2014, the SEC advised the District Court that it calculated the prejudgment interest to be $74,281,866.04, resulting in a total requested disgorgement award of $198,118,824.80.  The District Court also indicated that it would permanently enjoin the Debtor from any future violations.

23.     Then on October 8, 2014, the SEC sent a letter and proposed order to the District Court requesting "an asset freeze, financial discovery, and an accounting of [the Debtor's] assets" and, additionally, an asset freeze covering not only the Debtor and his co-defendant, the probate estate of Charles Wyly, but also all of his "agents, servants, employees, family members, assigns, attorneys, or trustees," none of whom are parties in the Civil Action and against whom no claims have ever been asserted.

---

the Exchange Act; (6) Section 5 of the Securities Act; (7) Aiding and Abetting Violations of Section 13(a) and Rule 13a-1 of the Exchange Act; (8) Aiding and Abetting Violations of Section 14(a) and Rules 14a-3 and 14a-9 of the Exchange Act; and (9) Aiding and Abetting Violations of Section 13(d).

[9] *SEC v. Wyly*, No. 1:10-cv-05760-SAS, 2014 WL 4792229 at *23 (S.D.N.Y., Sep. 25, 2014). The District Court order also held that the probate estate of the Debtor's deceased brother "Charles Wyly must disgorge $63,881,743.97" plus prejudgment interest.

24.     The problem presented, and a principal cause of this Chapter 11 bankruptcy, is that the Debtor lacks the funds or assets sufficient to pay such disgorgement amount in full.  As the District Court observed, "By any reasonable measure, the disgorgement and prejudgment interest awarded in this proceeding [is] *staggering* and among the largest awards ever imposed against individual defendants."[10] The expense to the Debtor of legal fees and other significant costs of defending this massive litigation over more than four years, not to mention dealing with the IRS's investigations over more than ten years, has literally drained his financial resources.[11]   Moreover, the disgorgement amount is founded on an estimate of *taxes* that the District Court believed should have been paid by the Debtor, but with uncertainty as to whether and how such amounts, if truly owed, would in fact be paid over to, or credited by, the Internal Revenue Service ("IRS"), whose audits are pending and whose potential claim amounts are unknown.

25.     The Debtor has been compelled by these circumstances to initiate this Chapter 11 case in order to invoke the equitable claim-and-distributional provisions of bankruptcy law.  The purpose of the petition is not to avoid or sidestep the SEC's regulatory function, but consonantly to use the Chapter 11 process, as legally allowable and possible, to recover and administer all properties of his estate, domestic and possibly offshore, to maximize and monetize difficult assets, to pay the

---

[10] *Id.* at *23 (emphasis added).

[11] In addition, the recession of recent years has had a negative impact on his finances.

allowable[12] claims of *every* claimant, including the IRS and SEC. The Debtor intends to utilize the platform of Chapter 11 and the forum afforded by this Bankruptcy Court for substantial, and no doubt difficult, negotiations required for a complete resolution of all issues presented by this filing.[13] These are the good faith reasons motivating the Debtor's decision to file this Chapter 11 case.

26. Focusing on the largest claimant, the SEC: the District Court's disgorgement order is, in bankruptcy terms, a "claim," or asserted right to a payment, monetary or pecuniary in nature, and therefore its collection is stayed by the automatic stay. The SEC does not hold a final judgment,[14] and the Debtor intends to, and commits to the Court that he will promptly, engage in negotiations with the SEC about its asserted claim, and at the same time with the IRS about any claim to be asserted by it, and about the means for orderly distributions upon such claim or claims, pursuant to a plan. It will be necessary for any claim of the IRS to be resolved in connection with the resolution of the SEC claim, and in fact the

---

[12] Bankruptcy Code § 502(b) ("if objection to a claim is made, the court . . . shall determine the amount of such claim . . . as of the date of the filing of the petition, and shall allow such claim in such amount . . . to the extent that . . . such claim is []enforceable against the debtor and property of the debtor, under any agreement or applicable law . . . .").

[13] Important precedents or models for the Debtor's invocation of Chapter 11 in order to address claims and assets and resolving all issues by reaching settlements with principal parties including the IRS, regulatory agencies, and other claimants are the Chapter 11 cases of the Hunt brothers from back in 1988-1989. See *In re Nelson Bunker Hunt* and *In re William Herbert Hunt*, Bankruptcy Case Nos. 388-35726-HCA-11 and 388-35725-HCA-11, respectively, that were filed in this Bankruptcy Court and that resulted in consensually confirmed plans of reorganization, in about fifteen months, that were co-proposed by the debtors and by the settling parties, namely, the IRS, the Peruvian silver mining company, and other major claimants.

[14] Sam intends to appeal once an appealable judgment has been entered by the District Court.

determination whether or not the Debtor owes any additional tax amount,[15] which the Debtor is presenting to the Bankruptcy Court by a motion under Bankruptcy Code § 505, harmonizes with the resolution of the District Court's disgorgement order.[16]

27.    Moreover, the Chapter 11 case does not disadvantage the SEC because this Chapter 11 case is timely filed[17]; the Debtor will, with the assistance and oversight of his financial advisor, Dennis Faulkner and the firm of LainFaulkner, provide full information and continuous asset and financial monitoring and reporting to this Court, the SEC, the IRS, and other creditors; and all properties of the Debtor's bankruptcy estate are safeguarded in custodia legis with this Court and are protected by the automatic stay.   The Debtor commits to this Court to bargain for and work to create a fair plan that will recover and maximize the value of all estate assets, including the possible repatriation of offshore assets, and provide for the orderly treatment, resolution, and payment of all allowed claims from available and recovered properties.  Any possible repatriation of the corpus of

---

[15] The IRS has been auditing for more than ten years, but has not made any assessment or other presentation of a "bill" to be paid, additional to the tax amounts the Debtor has in fact paid each year.

[16] In footnote 205 of the Opinion and Order of September 25, 2014, the District Court wrote:

> *In the event there is a judicial determination* that contravenes the legal conclusions of this Opinion and Order-that is, *if another court determines that the IOM Trusts are in fact, tax-exempt non-grantor trusts*, defendants may pursue all available remedies in this Court, including a motion to vacate the final judgment under Rule 60(b) of the Federal Rules of Civil Procedure. But no such motion will be considered if the IRS, in exercising its discretion, chooses not to proceed with an administrative or civil action against the Wylys.

*SEC v. Wyly*, No. 1:10-cv-05760-SAS, 2014 WL 4792229 at *18 n.205 (S.D.N.Y., Sep. 25, 2014).

[17] The disgorgement opinion was entered September 25, 2014, by the District Court, which has scheduled a further evidentiary hearing to consider an alternative damages theory on behalf of the SEC on November 17, 2014.

the IOM trusts will present many difficult legal issues and will ultimately likely require the involvement of many persons and entities including, without limitation, the trust protector, trustees, beneficiaries and the IOM courts, together with this Bankruptcy Court.

28. Both the Debtor and his non-SEC creditors face a serious detriment in the alternative, and chaotic, pathway if, but for the automatic stay, the SEC were to unilaterally race to pursue its pecuniary and collection remedies in the District Court in New York through such non-statutory remedies and procedures as "asset freezes" and other steps to attempt to collect on its money judgment. The Chapter 11 process will be far fairer, more efficient, and more effective for all of creditors because "asset freezes" and any other SEC collection activities are not conducted pursuant to any statutory rules or any sort of established, objective, and fair priority and distributional scheme for paying non-SEC creditors (or even paying creditors at all)—in sharp contrast to the Chapter 11 pathway, where the well-defined and clearly understood rules of the Bankruptcy Code and the Bankruptcy Rules will bring everyone to the table and provide a clear, usable framework for the resolution of all sorts of difficult issues, and where the payment of SEC's claim, if it does not duplicate and overlap the IRS's claim, can be addressed in the claim-allowance-and-distribution process, of course without impairing the regulatory functions of the SEC.

29. Finally, the SEC has taken the position, and Disgorgement Order has stated, that the Debtor was and is – contrary to his long-standing intent and belief – a "beneficial owner" or "in control" of assets of the offshore trusts that are the focus

of the District Court Action. If the SEC were correct, then those trusts and their assets are or may be property of the Debtor's bankruptcy estate. The Debtor reserves all of his rights on this issue but assures the Court that he would not seek to exercise such control, if he were in fact to have any, without first seeking approval of this Bankruptcy Court. As a prudent debtor in possession, he must and does assert, and he gives notice to the SEC and all claimants, that, under the authority of Bankruptcy Code § 362 and case law such as *Brown v. Chesnut (In re Chesnut)*, 422 F.2d 298 (5th Cir. 2005), such property is property of the estate and is protected by the automatic stay from and after the filing of the Debtor's petition for proper administration in the Bankruptcy Court.

## The Debtor's Business Operations and Ordinary Course Expenses

30.     The Debtor is an individual with significant business interests and assets, and included among such properties are cash balances in his bank depository accounts of approximately $12,590,000 as of the Petition Date. Subject to a potential right of setoff in favor of BBVA Compass Bank N.A. ("Compass"), these cash balances are not subject to any known liens or security interests; accordingly, there should not be any significant cash collateral issues for the Court to address and resolve.[18] The Debtor's projected cash receipts (after tax) for 2014 exceed approximately $6,800,000.[19]

---

[18] The Debtor maintains several depository accounts with Compass. Compass is also the mortgage lender to Explore Booksellers and Bistro Real Estate, LLC ("Explore"). Explore owns a property located at 221 E. Main Street, Aspen, Colorado that is presently listed for sale. A bookstore (owned by the Debtor's wife) is located on the property. The Debtor is the guarantor of the mortgage debt. Compass may assert that it has a right of setoff on the depository accounts based on the Debtor's guaranty obligation. In an abundance of caution, the Debtor will file a motion seeking authority to

31. During the course of this Case, the Debtor anticipates that the majority of his post-petition expenses will likely fall into the following three (3) broad categories:

 a) expenses for ordinary living and business expenses and to maintain estate assets including the payment of his allocable share of costs for Highland Stargate, the Wyly family office;

 b) expenses relating to the administration of this Case including professional fees and costs and fees payable to the United States Trustee (the "UST"); and

 c) expenses, professional fees and costs relating to the conclusion of Case No. 10-05760, the civil action pending in the United States District Court for the Southern District of New York styled *Securities and Exchange Commission v. Samuel Wyly, and Donald R. Miller, Jr., in his Capacity as the Independent Executor of the Will and Estate of Charles J. Wyly, Jr.* (the "Civil Action") and any appeal arising therefrom.

32. Of course many of the expenditures described in (b) and (c) will be subject to Court review under the provisions of Bankruptcy Code §§ 327, 330 and 331.

---

use cash collateral. The Debtor reserves all rights with respect to the characterization of his guaranty or any liens or setoff rights in favor of Compass.

[19] Additional funds may be received in excess of this projected amount and will be deposited in the debtor in possession accounts.

33.     Highland Stargate is the management company or "family office" that provides a broad range of financial, accounting, payroll, insurance management, tax, and record-keeping functions for the Debtor and many members of his and his deceased brother Charles Wyly's respective families.  Officed in the Crescent Court Building, Highland Stargate maintains a coordinated accounting and cash management system to manage the Debtor's personal and business expenses, including his cash, receivables, and payables.  Highland Stargate has managed the Debtor's family office for nearly twenty (20) years.

34.     On a quarterly basis, the Debtor pays in advance his projected, allocable share of the operating costs of Highland Stargate.  The Debtor has already funded these projected costs for the fourth quarter of 2014.  These costs include items such as office rent, overhead and payroll/benefits for the ten (10) Highland Stargate office employees.  Many of these employees have duties for all family members, while several just deal with the Debtor and his family.  The Debtor's allocable share of the estimated annual costs of Highland Stargate is approximately $1,200,000.

35.     Highland Stargate also:  (a) employs and handles the payroll for the Debtor himself and for several persons who work directly for the Debtor, including two (2) individuals who provide assistance to the Debtor with respect to his writing and publishing projects described above, and (b) facilitates payroll for one (1)

individual who provides domestic services to the Debtor.[20] The estimated annual cost for the persons described in this paragraph is approximately $525,345.

36. The Debtor pays most of his other ordinary course expenditures such as property taxes, maintenance and utilities, and personal expenditures directly through his bank accounts as administered by Highland Stargate.

## RELIEF REQUESTED

37. Under Bankruptcy Code §§ 363(c), 1108, and 1115, the Debtor is authorized to continue to operate his business, manage his assets, and use property of his bankruptcy estate in the ordinary course of business without notice, a hearing, or court approval (subject, of course, to any cash collateral issues).

38. However, given the size of this case, the Debtor's duty to protect and conserve bankruptcy estate property, the need for transparency and full disclosure, and the positions possibly to be taken by the SEC with respect to matters arising from the Civil Action, the Debtor has filed this motion in an abundance of caution in order to, among other things, obtain entry of an order from this Bankruptcy Court confirming his authority to make expenditures in accordance with the attached budget (the "Budget"). The Budget will govern the Debtor's expenditures for the next 90 days, subject to the right of the Debtor to seek modifications to the Budget and the opportunity for any creditor or other party in interest to file a subsequent objection to proposed expenditures set forth therein. At the end of such period, the Debtor will submit a request to extend the relief or a new Budget.

---

[20] As set forth below, the Debtor, in consultation with the Chief Financial Officer of Highland Stargate and LainFaulkner, will continue to evaluate employee-related issues.

39.     The Budget was prepared by Highland Stargate in consultation with the proposed financial advisor for the Debtor, LainFaulkner.[21]  Over the course of the next several weeks, the Debtor will be working with Highland Stargate and LainFaulkner to refine and reduce (where prudent) the amount of his expenses,[22] and the Budget will be modified accordingly. LainFaulkner will also be working with the Debtor and Highland Stargate to prepare the required statements, schedules, lists, and other documents required by Bankruptcy Rule 1007 within the time limits established by this Court.  Highland Stargate's historical knowledge and records will be invaluable in this endeavor.

40.     As noted above, the Debtor files this Motion purely in the interests of transparency and complete disclosure, in an abundance of caution, and in order to obtain an order confirming his authority to: (a) pay his ordinary living and business expenses; and (b) continue to utilize Highland Stargate, with the assistance and supervision of LainFaulkner, for the express purpose of fulfilling his duties and obligations as a debtor in possession.  The Debtor intends to work closely with the UST to make the transition to Chapter 11 as orderly as possible, including the opening of a new debtor in possession account(s) at an approved depository bank. Of course, the Debtor will comply with all other guidelines of the UST including the

---

[21] By separate application, the Debtor will seek to employ LainFaulkner as his financial advisors and accountants.

[22] The Debtor has been steadily reducing his expenses over the past several years and he will endeavor to continue to do so.  To provide just two examples, in 2012 Sam downsized both the square footage (to less than a quarter of what it had been, saving in excess of $1,000,000 per year) and the staff of the family office, and in September 2014, he sold his apartment in New York City.

filing of monthly operating reports (with the assistance and supervision of LainFaulkner) and the maintenance of all appropriate insurance.

## NOTICE

41. Notice of this Motion has been provided by e-mail, facsimile, or overnight delivery to: (a) the Office of the UST for the Northern District of Texas; (b) Compass; (c) the Dallas County Tax Office; (d) the Debtor's twenty (20) largest unsecured creditors; (e) those persons or entities that have formally appeared and requested service in the Case pursuant to Rule 9010(b) of the Bankruptcy Rules; and (f) all applicable government agencies to the extent required by the Bankruptcy Rules and the Local Rules, including, but not limited to, the IRS and the SEC.

## CONFERENCE WITH THE UNITED STATES TRUSTEE

42. Between the date hereof and the date of the hearing on this Motion, the Debtor intends to work closely with the UST to reach agreement related to the relief requested herein should the UST have objections or concerns.

## PRAYER

The Debtor respectfully requests that the Court enter an Order confirming the Debtor's authority to, inter alia, continue to (i) pay his reasonable living and business expenses as reflected in the attached Budget in the ordinary course of business, and (ii) continue to utilize Highland Stargate (in coordination with LainFaulkner) to process and pay the Debtor's ordinary course living and business expenses. The Debtor also requests such other and further relief to which he may be justly entitled.

Dated October 19, 2014

Respectfully submitted,

**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel: 214-220-7700
Fax: 214-220-7716

*/s/ Josiah M. Daniel, III*
Josiah M. Daniel, III, SBT # 05358500
James J. Lee, SBT # 12074550
Paul E. Heath, SBT # 09355050
Rebecca L. Petereit, SBT # 24062776
jdaniel@velaw.com; jimlee@velaw.com
pheath@velaw.com; rpetereit@velaw.com

**PROPOSED COUNSEL FOR THE DEBTOR**

## CERTIFICATE OF SERVICE

I certify that on October 19, 2014, a copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas.

*/s/ Josiah M. Daniel, III*
One of Counsel