

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed August 24, 2015**

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 14-35043-BJH** |
| **SAMUEL E. WYLY,** *et al.* | § | **(Chapter 11)** |
| | § | **(Jointly Administered)** |
| **DEBTOR.** | § | |
| | § | **RELATED TO DKT. NO. 611** |
| | § | |
| | § | |

### MEMORANDUM OPINION AND ORDER

This dispute arises in the jointly administered bankruptcy cases of Samuel E. Wyly ("**Sam**") and his sister-in-law, Caroline D. Wyly ("**Dee**") (collectively, the "**Debtors**"). Dee was married to Sam's brother Charles J. Wyly, Jr. ("**Charles**") before he died in 2011. These bankruptcy cases were filed after the U.S. District Court for the Southern District of New York (the "**District Court**") entered an opinion and order granting equitable remedies against Sam and Charles' probate estate (the "**Probate Estate**") in an SEC civil enforcement action for securities fraud (the "**SEC Action**"). *SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014) (referred to in text

and citations as the "**Disgorgement Opinion**"). The Disgorgement Opinion explained that the amount to be disgorged was calculated based on the amount of federal income taxes avoided by Sam and Charles on securities held in certain trusts in the Isle of Man (the "**Offshore Trusts**").

On October 19, 2014, Sam filed a voluntary petition under chapter 11 of title 11 of the U.S. Code (title 11 will be referred to as the "**Bankruptcy Code**"). Dee filed her own bankruptcy case on October 23, 2014. The two cases are jointly administered as case number 14-35043, with Sam's bankruptcy case as the lead case.[1]

Both Sam and Dee have filed motions seeking an adjudication of their federal income tax liability by this Court pursuant to 11 U.S.C. § 505(a),[2] arguing that they have correctly reported and paid their taxes every year (the "**505 Motions**").[3] Sam's Mot. Bankr. Code § 505 to Determine Tax Liability, ECF No. 4; Dee's Amended Mot. Bankr. Code § 505 to Determine Tax Liability, ECF No. 516. The IRS filed proofs of claims in both bankruptcy cases seeking payment of tax and penalties based in part on the federal tax treatment of the Offshore Trusts as determined by the District Court in the Disgorgement Opinion. 14-35043 Proof of Claim 18-1 (asserting priority unsecured claims totaling $8,913,614.00 and general unsecured claims totaling $2,029,481,997.00

---

[1]  ECF numbers in this Memorandum Opinion and Order refer to the lead case's docket unless otherwise noted. Pursuant to the order for joint administration, proofs of claim in Dee's case were filed separately in the claims register for case number 14-35074.

[2]
> (1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.
> (2) The court may not so determine —
>> (A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title . . . .

11 U.S.C. § 505(a).

[3]  Dee has also filed an adversary complaint against the IRS seeking a determination of tax liability of the Probate Estate. *Wyly v. IRS (In re Wyly)*, No. 14-3160 (Bankr. N.D. Tex. Filed Dec. 19, 2014). An order granting Dee's unopposed motion to abate this adversary proceeding pending further order of this Court was entered on April 8, 2015. ECF No. 12.

against Sam's bankruptcy estate); 14-35074 Proof of Claim 11-1 (asserting priority unsecured claims totaling $50,063,484.00 and general unsecured claims of $1,189,602,317.00).

On May 29, 2015, the IRS filed this motion for partial summary judgment and supporting brief seeking to bind Sam and Dee to specific factual findings made by the District Court in the Disgorgement Opinion. United States' Mot. Partial Summ. J., ECF No. 611 (the "**IRS Motion**"); United States' Br. Supp. Mot. Partial Summ. J., ECF No. 612 (the "**IRS Brief**"). The IRS Motion is opposed by Sam, Dee, and the committee of unsecured creditors appointed in Sam's case (the "**Committee**"). Debtor's Resp. Mot. Partial Summ. J., ECF No. 672; Debtor's Br. Supp. Resp. Mot. Partial Summ. J., ECF No. 673 (collectively, "**Sam's Response**");[4] Debtor Caroline D. Wyly's Resp. Mot. Partial Summ. J., ECF No. 670 ("**Dee's Response**"); Official Committee Objection Mot. Partial Summ. J., ECF No. 669 (the "**Committee Response**"). The SEC filed a statement providing context and clarification about the Disgorgement Opinion. SEC's Statement Regarding Final J., ECF No. 689 ("**SEC Statement**"). The IRS filed a reply to the various responses. United States Reply, ECF No. 691 (the "**IRS Reply**"). The Court heard argument on the IRS Motion at a hearing held on July 24, 2015 (the "**Hearing**").

Because the Court concludes that the IRS has satisfied the elements of issue preclusion as explained more fully below, the IRS Motion will be granted.

## I.     BACKGROUND

In 2010, the SEC brought a civil enforcement action against Sam and Charles, among others, for violations of securities laws in connection with their transactions with the Offshore Trusts involving specific securities. When Charles died in 2011, Donald Miller, Jr., executor of the Probate Estate, was substituted as a defendant in the SEC Action over his objection. The

---

[4]    All pincites to Sam's Response refer to pages in his brief, ECF No. 673.

District Court bifurcated the SEC Action into a liability phase and a remedies phase. A jury trial was held in the liability phase from March 31 to May 7, 2014. On May 12, 2014, the jury returned a verdict for the SEC on nine counts of securities fraud.

As the SEC sought the equitable remedies of disgorgement and permanent injunction, the District Court held a bench trial for the remedies phase. The District Court issued opinions on multiple points of dispute in connection with the remedies phase, chief among which was the Disgorgement Opinion issued on September 25, 2014 that contains findings and conclusions related to the District Court's primary measure of the amount of disgorgement. A final judgment was entered by the District Court on February 26, 2015, ordering Sam to disgorge $198,118,825.16, ordering the Probate Estate to disgorge $101,238,418.53, providing an alternate measure of the amount of disgorgement in the event the primary measure is overturned on appeal, and granting injunctions against future violations of securities laws. IRS Br. Exh. 5 (the "**Final Judgment**"). The District Court denied a motion for judgment as a matter of law and for a new trial and closed the SEC Action on July 7, 2015. *SEC v. Wyly*, No. 10-CV-5760, 2015 WL 4103636 (S.D.N.Y. July 7, 2015).

The Disgorgement Opinion carefully sets forth the details of the creation and direction of the Offshore Trusts based on the jury verdict, undisputed facts, and the District Court's own factual findings. Disgorgement Opinion, 56 F. Supp. 3d at 410–24. A brief sketch of the system of trusts set up by Sam and Charles offshore is helpful to understand the SEC Action and the IRS's claims against these bankruptcy estates. Because some of these details are the very points to which the IRS seeks to apply issue preclusion, the Court will note when these details were found by the jury or the District Court rather than stipulated or admitted by Sam, Charles, and/or the Probate Estate.

Sam and Charles caused the Offshore Trusts and various subsidiary entities to be established between 1992 and 1996. *Id.* at 410. In the SEC Action and in these bankruptcy cases, the Offshore Trusts are typically divided into two categories: the "**Bulldog Trusts**"[5] and the "**Bessie Trusts**."[6] Sam and Charles settled all but one[7] of the Bulldog Trusts in 1992 for the benefit of their families and certain charitable organizations. *Id.* at 413–14. Nominally, each of the four Bessie Trusts were settled in 1994 and 1995 by a foreign citizen who made a gratuitous $25,000 contribution. *Id.* at 415. Sam and Charles transferred securities to the Offshore Trusts from 1992 to 1999 in exchange for annuities. *Id.* at 411. These securities were in the form of options and warrants in public companies for which Sam and Charles served as directors during part or all of the relevant time period. *Id.* The Offshore Trusts and subsidiary companies engaged in various transactions involving these securities, including exercising the options and warrants, between 1995 and 2005. *Id.*

In theory, these structures could be used to lawfully defer taxation on income related to these securities if Sam and Charles had given up control and beneficial ownership of the securities in exchange for annuities. *Id.* at 411–12. Using trusts in this way, even foreign trusts, is not inherently impermissible if the applicable rules are followed. The Disgorgement Opinion examines the applicable tax and securities statutes and regulations in detail. Sections 671 to 679 of Title 26 of the U.S. Code (the "**Tax Code**") and associated regulations set forth rules by which property held in a trust, including a foreign trust, must be treated as property of the grantor for tax purposes. Furthermore, Sam and Charles were obligated to comply with applicable securities laws

---

[5]   The Bulldog Trusts include the Bulldog Non-Grantor Trust, Lake Providence International Trust, Delhi International Trust, Pitkin Non-Grantor Trust, Castle Creek International Trust, and Plaquemines Trust. *Id.* at 414 n.97.

[6]   The Bessie Trusts include the Bessie Trust, La Fourche Trust, Red Mountain Trust, and Tyler Trust. *Id.* at 415 n.107.

[7]   The Plaquemines Trust was settled by the Bulldog Trust in 1995. *Id.* at 414 n.97.

and regulations. In filings with the SEC made throughout this period, Sam and Charles never disclosed beneficial ownership of the securities owned directly or indirectly by the Offshore Trusts. Sam and Charles maintained consistent positions with the IRS and the SEC with respect to their lack of ownership or control of securities held by the Offshore Trusts, and throughout the SEC Action continued to maintain that these positions were correct.

The jury in the SEC Action disagreed, at least as to the correctness of disclosures to the SEC. Throughout the relevant time period, Sam and Charles had been making investment recommendations to the trustees of the Offshore Trusts for the securities at issue. *Id.* at 410. "All of the [Offshore Trusts'] trustees' securities transactions were based on the Wylys' recommendations and the [Offshore Trusts'] trustees never declined to follow a Wyly recommendation." *Id.* The jury in the SEC Action concluded from this and other evidence at trial[8] that Sam and Charles beneficially owned the securities. *Id.* The jury found sufficient additional facts to establish Sam and Charles' liability for all elements of nine counts of securities fraud. *See id.* at 401 & n.1.

For her part, the District Court found the establishment of the Bessie Trusts particularly problematic. Statements in the four trust deeds that they were settled with $25,000 contributions from a foreign citizen were "admittedly false." *Id.* at 415. Two of the Bessie Trusts were each settled with the contribution of a "factual dollar bill" and a debt of $24,999 that was immediately cancelled, and the District Court doubted whether even the dollar bills were actually contributed. *Id.* The other two Bessie Trusts were settled with a $100 contribution by an individual whose

---

[8] Sam and the Probate Estate challenged the sufficiency of the evidence for this point, among others, in the motion for judgment as a matter of law or a new trial. The District Court denied that motion, explaining that the trial evidence sufficiently supported the jury finding of beneficial ownership. *SEC v. Wyly*, No. 10-CV-5760, 2015 WL 4103636, at *4 (S.D.N.Y. July 7, 2015). In addition to the Wylys' concession that they directed all of the trustees' investment decisions in the securities, the District Court also noted testimony that Sam had joked about firing the trustees if they acted independently. *Id.* at *3.

management company was hired to serve as trustee for some of the Offshore Trusts shortly thereafter. *Id.*

"Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014), *quoted in* Disgorgement Opinion at 402. After the liability phase of the trial ended in a jury verdict that Sam and Charles violated the securities laws, it remained for the District Court in the remedies phase to consider whether disgorgement was appropriate and in what amount. The District Court found it "logical to draw the inference that making misleading statements in SEC filings, or not making SEC filings at all, was part of the Wylys' plan to maintain the appearance of separation and independence from the foreign trusts" for tax purposes. Disgorgement Opinion at 413; *see also id.* at 412 (explaining the basis for inferring that the positon taken in SEC disclosures arose out of concern for "millions of dollars of tax savings"). The District Court ultimately concluded that the purpose of the securities fraud was "to maintain the secrecy of the offshore system and preserve their tax benefits." *Id.* at 430–31. As a result, and according to the District Court, the best measure of ill-gotten gains was a calculation of the amount of federal income taxes avoided by the securities fraud.[9] *Id.* at 431.

The District Court carefully explained that measuring a disgorgement remedy in this way was not the same as actually assessing or collecting tax liability. "As I previously held, 'this is *not* a civil action for the collection or recovery of taxes . . . . Rather, this is a civil action for securities law violations, the *remedy* for which is measured by the amount of taxes avoided' as a result of

---

[9]  A portion of the amount of disgorgement in the Disgorgement Opinion is based on ill-gotten gains from transactions in unregistered securities. This amount was calculated independent from the tabulation of avoided tax liability and is not at issue here.

the defendants' securities violations." *Id.* at 425 (omission in original) (quoting *SEC v. Wyly*, No. 10-CV-5760, 2013 WL 2951960, at *3 (S.D.N.Y. June 13, 2013)).

However, even though the disgorgement remedy was not an assessment of actual taxes owed by Sam or the Probate Estate, the Disgorgement Opinion rested its calculation of the amounts to be disgorged on findings and conclusions related to the tax attributes of the Offshore Trusts. *See id.* at 427–29.  The District Court recognized that although the jury found Sam and Charles liable for securities fraud due to their beneficial ownership of specific securities held in the Offshore Trusts, this did not, without more, mean that Sam and Charles should have paid additional taxes related to those securities.  These additional findings and intermediate legal conclusions reached by the District Court in the Disgorgement Opinion are those to which the IRS seeks to bind Sam and Dee, as will be discussed more fully below.  IRS Br. Ex. 2 (collecting sixty-four quotations from the Disgorgement Opinion to which the IRS seeks to apply issue preclusion here).

## II.    JURISDICTION

The district court of the Northern District of Texas has subject matter jurisdiction over the Debtors' bankruptcy cases pursuant to 28 U.S.C. § 1334, and this Court has authority to determine the amount or legality of tax and the allowance or disallowance of claims against the bankruptcy estates pursuant to 28 U.S.C. § 157(a), (b)(1), and (b)(2)(B), 11 U.S.C. § 505(a), and the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in the Northern District of Texas on August 3, 1984.  The 505 Motions are core proceedings, as is the IRS Motion.

Section 505(a)(1) is a "broad grant of jurisdiction" authorizing the bankruptcy court to determine certain tax issues, subject to explicit statutory exceptions and the bankruptcy court's discretion to abstain.  *In re Luongo*, 259 F.3d 323, 328–30 (5th Cir. 2001) (citing legislative history referencing the jurisdictional nature of § 505).  The language of § 505(a) was taken from one of

the jurisdictional provisions of the Bankruptcy Act as it existed when the Bankruptcy Code was drafted, Bankruptcy Act § 2a(2A) (1966), which is traceable directly back to the original version of the Bankruptcy Act, Bankruptcy Act of 1898, 30 Stat. 544, 563 § 64a, 1898.

Pursuant to the exception to jurisdiction codified in § 505(a)(2)(A), the bankruptcy court may not determine tax issues if they were "contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of" the bankruptcy case. 11 U.S.C. § 505(a)(2)(A). Sam argues that because this section does not apply to this contested matter, issue preclusion does not apply either.

For purposes of § 505(a)(2)(A), "a matter has been 'adjudicated' when a '[j]udgment of a court of competent jurisdiction' has been decreed." *In re Teal*, 16 F.3d 619, 621 (5th Cir. 1994) (alteration in original) (quoting *adjudicate*, *Black's Law Dictionary* 42 (6th ed. 1990)). Had a court of competent jurisdiction entered a judgment as to the amount or legality of taxes owed by the Debtors prior to the petition dates in these bankruptcy cases, this Court would be stripped of jurisdiction to hear and determine those questions. "Simply stated, § 505(a)(2)(A), a jurisdictional statute, is mandatory . . . ." *Id.* at 622. Here, no such judgment was entered prior to the applicable petition dates. Therefore, on this limited issue, the Court agrees with Sam that § 505(a)(2)(A) does not apply.

However, the Court cannot agree with Sam's further argument that § 505(a)(2)(A) is the sole method by which the preclusion doctrine can apply to tax determinations in bankruptcy court. *See, e.g.*, *id.* at 621–22 (analyzing both § 505(a)(2)(A) and traditional claim preclusion; *In re Hilal*, 2007 Bankr. LEXIS 3309, *7 (Bankr. S.D. Tex. 2007) (same). If Sam's reading of § 505(a)(2)(A) were correct, courts applying that subsection would never conduct a separate claim preclusion analysis, as they consistently do. Sam accurately points out that § 505(a)(2)(A)

"expresses in jurisdictional terms, traditional principles of res judicata, or claim preclusion." *Teal*, 16 F.3d at 621 n.3 (quoting a filing by the IRS in that case). However, the gatekeeping functions served by the jurisdictional bar do not displace ordinary claim preclusion. And, even if § 505(a)(2)(A) took the place of claim preclusion, there is no reason why it would also replace issue preclusion.

For all of these reasons, this Court has jurisdiction to consider whether issue preclusion applies here.

## III. ANALYSIS

### A. Summary Judgment Standard

In deciding a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56, as made applicable by Fed. R. Bankr. P. 7056. In deciding whether a fact issue has been raised, the facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Berquist v. Washington Mut. Bank*, 500 F.3d 344, 349 (5th Cir. 2007). While courts must consider the evidence with all reasonable inferences in the light most favorable to the nonmovant, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A motion for summary judgment seeking to apply issue preclusion to a prior judgment turns on the substantive applicable principles of preclusion and "the adequacy of the moving papers to demonstrate that as to such principles there [i]s no genuine issue of fact." *Bros, Inc. v. W. E. Grace Mfg. Co.*, 261 F.2d 428, 430 (5th Cir. 1958) (Brown, J.). In *Bros*, the district court

granted summary judgment in favor of the plaintiff on the basis of claim preclusion.  The sole dispute between the parties in *Bros* on elements of claim preclusion involved whether the defendant was sufficiently in privity with the losing defendant in the prior suit.  *Id.*  The Fifth Circuit affirmed[10] because the plaintiff's motion rested on "positive, direct and factual" details sufficiently showing the requisite privity, but the defendants' papers were "almost exclusively preoccupied with the intrinsic merits of the case" and "attempted to set forth factual reasons why the [previous] judgment was not correctly decided," including the argument that it would be overturned on appeal.  *Id.* at 432.  As to the elements of claim preclusion, the *Bros* defendants denied "not the facts, but their legal sufficiency in the most general terms."  *Id.*  The Fifth Circuit found this to be a "pretended denial" of a properly supported motion for summary judgment.  *Id.* at 433.

Here, unlike in *Bros*, the Debtors vigorously dispute the legal sufficiency of the IRS Motion on several points they develop in detail.  Certainly neither of the Debtors has filed a "pretended denial."  But like the defendants in *Bros*, the Debtors have chosen to oppose the IRS Motion based only on their arguments that the facts as found by either the jury or the District Court are legally insufficient to support preclusion and that the legal conclusions contained in the Disgorgement Opinion are incorrect.  The Debtors pointed to no disputed material fact on any of the elements of issue preclusion itself.  The exhibits attached to Sam's Response are filings, opinions, and transcripts appearing on the docket in the SEC Action.  No evidentiary material was attached to Dee's Response.  Therefore, the primary question before the Court is whether the IRS Motion establishes that the IRS is entitled to partial summary judgment as a matter of law on all elements

---

[10]   More precisely, the Fifth Circuit reformed the district court's judgment in *Bros* as to an issue unrelated to summary judgment or preclusion, affirmed the judgment as reformed, and remanded for trial on the point for which the judgment was reformed.  261 F.2d at 433–34.

of issue preclusion. The correctness of the Disgorgement Opinion's legal conclusions is irrelevant. *Id.* at 433 n.4; *see also infra* note 13 and accompanying text.

Issue preclusion (or collateral estoppel)[11] binds a party to the determination of an issue that was litigated and lost in a prior judgment if four elements are met:

> First, the issue under consideration in a subsequent action must be identical to the issue litigated in a prior action. Second, the issue must have been fully and vigorously litigated in the prior action. Third, the issue must have been necessary to support the judgment in the prior case. Fourth, there must be no special circumstance that would render preclusion inappropriate or unfair.

*United States v. Shanbaum*, 10 F.3d 305, 311 (5th Cir. 1994).

Issue preclusion "secure[s] the peace and repose of society by the settlement of matters capable of judicial determination." *S. Pac. R.R. Co. v. United States*, 168 U.S. 1, 49 (1897), *quoted in* Wright & Miller, 18 *Fed. Prac. & Proc.* § 4416 (2d ed.). Issue preclusion protects both litigants and the courts from the burden of relitigating matters that were already conclusively decided. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 (1979). Due to the "obvious difference in position between a party who has never litigated an issue and one who has fully litigated and lost," issue preclusion can be raised nonmutually, by a party that would not itself be bound by the earlier judgment. *Id.* at 328. Preclusion doctrines "add certainty and stability to social institutions" which "generates public respect for the courts." *Sw. Airlines Co. v. Tex. Int'l Airlines*, 546 F.2d 84, 94 (5th Cir. 1977).

Sam and Dee dispute that any of the four elements of issue preclusion are established here, so the Court must consider each in turn. Dee has adopted Sam's arguments and confined her brief to the primary issue upon which the Debtors' positions differ: whether Dee has fully and

---

[11] The vocabulary for describing these doctrines is in transition. "Claim preclusion describes the rules formerly known as 'merger' and 'bar,' while issue preclusion encompasses the doctrines once known as 'collateral estoppel' and 'direct estoppel.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 n.5 (2008). The modern trend refers to issue and claim preclusion collectively as "res judicata," *id.*, though that term is also used only to mean claim preclusion.

vigorously litigated the issues raised in the SEC Action when she was not a defendant at the time the Disgorgement Opinion was issued. In all other respects, Sam's arguments are relied upon by Dee.

As noted above, Exhibit 2 attached to the IRS Brief includes a list of sixty-four issues determined in the SEC Action to which the IRS seeks to bind the Debtors. Sam's Response argues that preclusion is unnecessary for certain of the sixty-four issues to which the Debtors are willing to stipulate, but does not identify the specific issues to be obviated by stipulation. At the Hearing, counsel for Sam argued for the first time that certain of the sixty-four issues, taken individually, must be relitigated because they were not necessary to support the Final Judgment in the SEC Action. Presumably the points to which the Debtors would stipulate are not the same points the Debtors argue must be relitigated. But yet again, counsel for Sam could not identify the specific issues, or even examples of the type of issues, to which issue preclusion cannot be applied.

Summary judgment will not be defeated by "vague, conclusory assertions," and Fed. R. Civ. P. 56, as made applicable here by Fed. R. Bankr. P. 7056, "does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992); *see also Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) ("The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim."). Because neither of the Debtors pointed to a specific issue or group of issues among the sixty-four they believe should be analyzed separately for purposes of issue preclusion, the Court will not individually analyze each issue. It is clear from the arguments made in the filings and at the Hearing that the Debtors view the IRS Motion as all-

or-nothing rather than a la carte. The Court will do likewise and now turns to its analysis of the elements of issue preclusion.

### B.    Application of Issue Preclusion Here

#### 1.    *Identity of Issues*

Issue preclusion is defeated where the issues, legal standards, or policies underlying the legal standards in the earlier judgment differ from the second suit. *See Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 & n.1 (5th Cir.1991)) (citing *Recoveredge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir.1995)). In *Copeland*, the Fifth Circuit denied preclusion by distinguishing the facts and legal analysis relevant to bankruptcy plan confirmation from facts and analysis relevant to a contract claim. *Id.* In *Brister*, the Fifth Circuit reversed a district court's application of issue preclusion where the most persuasive evidence on an issue in the second suit was irrelevant to the allegedly precluding judgment on that issue. *See Brister*, 946 F.2d at 357.

Issue preclusion of tax matters is even more narrowly applied and is limited "to situations where the matter raised in the second suit is identical in all respects with that decided in the first proceeding and where the controlling facts and applicable rules remain unchanged." *Hibernia Nat. Bank v. United States*, 740 F.2d 382, 387 (5th Cir. 1984) (quoting *Comm'r v. Sunnen*, 333 U.S. 591, 599–600 (1948)); *accord Jones v. United States*, 466 F.2d 131, 133 (10th Cir. 1972) ("[C]ollateral estoppel is strictly and sparingly applied in tax cases involving liability for different years."). An intervening major change in tax law will defeat issue preclusion. *Montana v. United States*, 440 U.S. 147, 161 (1979) (limiting *Sunnen*); *see also Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1167 (5th Cir. 1981). Issue preclusion is further narrowed in tax litigation with the government because, unlike private litigants, the United States is not bound by nonmutual issue

preclusion. *United States v. Mendoza*, 464 U.S. 154, 162–63 (1984). In other words, issues determined in one taxpayer's favor do not bind the government in subsequent litigation with a second taxpayer not in privity with the first. *See Divine v. Comm'r*, 500 F.2d 1041, 1048–50 (2d Cir. 1974). This governmental exception to nonmutual issue preclusion is particularly justified in tax controversies due to the broad application and high complexity of the tax laws. *Id.*

But tax matters can be subject to issue preclusion, and in some ways can be uniquely suited for it. *See, e.g.*, *Gandy Nursery, Inc. v. United States*, 318 F.3d 631, 638–39 (5th Cir. 2003) (a finding of fraud as to 1985 through 1989 tax returns given preclusive effect as to fraudulent use of net operating losses carried forward to 1990 and 1991 tax years); *Hibernia*, 740 F.2d at 387 (depreciation deduction taken for 1970 tax year, the disallowance of which was upheld in a refund suit, precluded relitigation of depreciation deduction taken for 1971 through 1976 tax years).

Here, the District Court determined a variety of facts adversely to Sam and the Probate Estate in the Disgorgement Opinion, all of which support an adverse determination on a key issue raised in the IRS proofs of claim here: whether the Offshore Trusts should be treated as grantor trusts for federal tax purposes. The Disgorgement Opinion explicitly determined that the Offshore Trusts were grantor trusts by applying tax statutes, tax regulations, and tax court decisions to facts relevant to tax liability that were found either by the jury or the District Court. Disgorgement Opinion, 56 F. Supp. 3d at 424–29. The Disgorgement Opinion interpreted those statutes by reference to judicial doctrines developed in tax controversy matters. *Id.*

Sam distinguishes the District Court's *estimation* of the amount of tax liability avoided for purposes of determining the amount to be disgorged for securities fraud from this Court's determination of Sam's *actual* tax liability, and argues that the amount ordered to be disgorged should not control this Court's calculation of the amount of his actual tax liability. On this point,

the Court agrees. But the IRS does not seek issue preclusion as to the amount of Sam's actual tax liability, and agrees that the "actual amount of income taxes, gift taxes, interest, and penalties owed" must be tried before this Court. IRS Br. at 34. The IRS instead seeks to preclude both Sam and Dee from relitigating the underlying facts which led to the District Court's factual determination that the Offshore Trusts were grantor trusts for the purposes of federal tax law along with that ultimate fact. *Id.* at 29. That the IRS has assessed an amount of actual tax liability that differs from the amount estimated by the District Court in the SEC Action for purposes of disgorgement is plain from the IRS proofs of claim filed in these bankruptcy cases.

Though the Disgorgement Opinion is sufficient in itself to support the conclusion that certain issues decided in the SEC Action are the same issues requested to be given preclusive effect here, this conclusion is further supported by the District Court transcripts submitted by the SEC in the SEC Statement. In the opening argument of the remedies phase of the SEC Action, counsel for the Wylys argued that the District Court could not base the amount to be disgorged on an amount of avoided tax liability unless the SEC proved "that the Wylys owed more taxes than they paid in connection with the transactions undertaken by the [Offshore] Trusts." SEC Statement Ex. 2, at 2 (transcript of SEC Action, remedies phase, August 6, 2014). As the Wylys saw the tax issue in the SEC Action, the SEC had to "prove by a preponderance of the evidence that the taxes were, in fact, saved," and the tax expert for the Wylys would refute this point by explaining that, if the IRS had assessed a violation and litigated the issue, "the Wylys would have won. They would have owed no tax." *Id.* at 4.

An exchange between the parties in the SEC Action and the District Court shows that all agreed that they were litigating tax issues.

> MR. S. SUSMAN:     Of course, we think they have to prove that they would
> have owed a tax. Okay?

| | |
|---|---|
| THE COURT: | I think you're right. They have to prove they would have owed a tax. Otherwise, there's nothing to disgorge. There's no unjust enrichment. They don't end up with money they shouldn't have in their pocket. The SEC says, very simply, of course they should have been taxed, these transactions. This was a scheme to avoid taxes, and the scheme was carried out by violating the statutes and regulations issued by the SEC. |
| MR. S. SUSMAN: | I mean, again, it all turns on, do they owe the taxes or not. |
| THE COURT: | I have to agree with that. . . . I, in fact, suspect the SEC agrees with that. If there's no taxes owed, nothing to disgorge. Right, Ms. Fitzpatrick? |
| MS. FITZPATRICK: | It has to be an ill-gotten gain. |
| THE COURT: | Which means they have to owe the tax. |
| MS. FITZPATRICK: | Yes. |
| THE COURT: | The SEC agrees with you. |
| MR. S. SUSMAN: | That's what we're talking about, do they owe the tax. |
| THE COURT: | Correct. |
| . . . . | |
| THE COURT: | So I know the jury made certain findings and I must follow those findings, but I continue to make further findings, as I think you agree. Such as, whether these are ill-gotten gains, whether a tax is owed. The jury didn't pass on whether a tax is owed. I have to do that. |

*Id.* Furthermore, the disputes about crafting an offset to the disgorgement amount to avoid double-payment of tax liability only arose out of the common understanding of the parties and the District Court that the disgorgement remedy was based on the federal tax consequences of the Offshore Trusts, the exact issue now before this Court. *See SEC v. Wyly*, 10-CV-5760, 2015 WL 845713 (S.D.N.Y. Feb. 26, 2015) (resolving disputes about the consequences of subsequent tax liability).

In short, the District Court concluded that the Offshore Trusts were grantor trusts for federal tax purposes with respect to the income realized from the securities transactions at issue in the SEC Action, after considering the evidence presented and the relevant legal authorities, all in the context of estimating the amount of avoided taxes and thus the amount of ill-gotten gains from Sam's and Charles' securities fraud. Here, the IRS has filed proofs of claim for actual taxes owed

based, in part, on a calculation of the income tax that should have been paid if the Offshore Trusts had been treated as grantor trusts for federal tax purposes.

By their 505 Motions, the Debtors seek a determination of the amount of federal taxes owed by them and argue that their treatment of the Offshore Trusts as non-grantor trusts for reporting and payment of tax during the relevant years was appropriate.[12] Though this Court expects that it will need to resolve additional factual and legal disputes to properly determine the amount of the Debtors' actual tax liability, whether the Offshore Trusts should be treated as grantor trusts or non-grantor trusts with respect to specific securities transactions and specific tax years is identical to the issue that the District Court decided in the SEC Action. Thus, the first element of issue preclusion is satisfied.

### 2. *Fully and Vigorously Litigated*

The requirement that a matter be fully and vigorously litigated is an important difference between issue and claim preclusion. Unlike claim preclusion, which bars litigation of issues that could have been raised in connection with a prior judgment, issue preclusion is limited to issues that actually were determined by the prior court as the result of an adversarial process. The focus of this element is not on the fullness or vigorousness of the prior litigation but rather on whether the issue was "actually litigated." *See Hibernia Nat. Bank v. United States*, 740 F.2d 382, 387 (5th Cir. 1984). This factor is satisfied where "an issue is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined." *In re Keaty*, 397 F.3d 264, 271 (5th Cir. 2005) (quoting W. Moore et al., *Moore's Federal Practice* § 132.03 (3d ed. 1999). There is no requirement that the prior court had held a trial or evidentiary hearing. *Id.* at 271–72.

---

[12] Of course, this is the same argument made to the District Court in the remedies phase of the SEC Action, where Sam and the Probate Estate would have been found not to have received any ill-gotten gains measured by avoided taxes resulting from their securities fraud if they had persuaded the District Court that the Offshore Trusts were non-grantor trusts.

Moreover, the correctness of the prior determination is irrelevant to issue preclusion, and judgments retain preclusive effect despite pending appeals. *Reed v. Allen*, 286 U.S. 191, 201 (1932). As the Supreme Court explained in *Reed*, conditioning the application of preclusion on the correctness of the prior court's determination "would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of res judicata to avert." *Id.* Consequently, Sam's arguments as to the legal correctness of the District Court's application of tax law are misplaced. What matters is whether the grantor trust question was raised, was submitted for determination, and actually was determined by the District Court. As the record in the District Court action makes clear, the answer here is yes — the status of the Offshore Trusts as grantor or non-grantor trusts was raised, was understood by all parties to be submitted to the District Court for determination (as the exchange Mr. Susman had with the District Court and SEC counsel quoted above makes clear), and was actually determined by the District Court.[13]

Sam next argues that preclusion cannot rest on a decision that is "avowedly tentative." Sam's Response at 13 (first quoting *Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961); and then quoting Restatement (Second) of Judgments § 13 cmt. g (1982)). But rather than supporting Sam's point, both sources cut against Sam's argument that the Disgorgement Opinion is, in fact, avowedly tentative. *Lummos* explained that a decision is not

---

[13] Both Sam and the IRS quote language from the Supreme Court suggesting that preclusion should be withheld "if there is reason to doubt the quality, extensiveness, or fairness of procedures followed in prior litigation." *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979). That this language is dicta in the *Montana* opinion is abundantly clear from the surrounding text noting its irrelevancy to that decision. The two judicial opinions cited in *Montana* in support of this proposition involved the application of the *Younger* doctrine to prior state-level determinations. *Gibson v. Berryhill*, 411 U.S. 564, 578 (1973) (involving the preclusive effect of a state board "so biased by prejudgment and pecuniary interest that it could not constitutionally conduct hearings"); *Trainor v. Hernandez*, 431 U.S. 434, 470 (1977) (Stephens, J., dissenting). No party has argued that the District Court proceedings were so biased or tainted as to be constitutionally infirm, and the Court could locate no authority requiring it to condition issue preclusion on this Court's evaluation of the quality of a United States District Court's application of federal law to factual findings. The Second Circuit will decide if the District Court got it right, not this Court. Thus, this Court has not considered arguments relating to the merits of the District Court's decision.

tentative for preclusion purposes even where it is not yet appealable under 28 U.S.C. § 1291. The

Second Restatement comment quoted by Sam elaborates the issue as follows:

> [P]reclusion should be refused if the decision was avowedly tentative. On the other hand, that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion. The test of finality, however, is whether the conclusion in question is procedurally definite and not whether the court might have had doubts in reaching the decision.

Restatement (Second) of Judgments § 13 cmt. g (1982).

Here, Sam and the Probate Estate were fully heard on the issue of disgorgement — i.e.,

whether any tax was actually owed — and the District Court supported her decision with a detailed

and reasoned opinion. On July 7, 2015, the District Court denied a motion for judgment as a matter

of law or for a new trial filed by Sam and the Probate Estate. As to Sam, then, there is no question

that the District Court's conclusions were sufficiently litigated for purposes of issue preclusion.

Dee, however, makes one final argument: that she has not had the opportunity to litigate

the issues decided in the Disgorgement Opinion because she was not a party to the SEC Action[14]

at the time the Disgorgement Opinion was rendered.[15] However, Dee has not identified any facts

or other evidence she would rely upon — but that were not presented by Sam or the Probate Estate

in the SEC Action — if she were permitted to relitigate these issues here. Nor did she point to any

disputed issues of material fact as to the quality of representation of the Probate Estate in the SEC

---

[14] Dee was made a party in the SEC Action as a relief defendant in an amended complaint filed on October 29, 2014. *See In re Wyly*, 526 B.R. 194, 196 (Bankr. N.D. Tex. 2015) (holding, in an earlier decision in this bankruptcy case, that adding Dee as a relief defendant in the SEC Action did not violate the automatic stay in Dee's bankruptcy case).

[15] The Committee argued in its brief that it is not bound to facts found in the Disgorgement Opinion either. At the Hearing, however, counsel for the Committee clarified that it is not seeking to relitigate facts found by the District Court, but instead wanted to make two points with respect to the IRS Motion: (i) the Committee's concern about the meaning of footnote 205 of the Disgorgement Opinion, and (ii) the likelihood that the Committee would object to parts of the IRS claim against Sam to the extent that it affects priority of payment. Hr'g Tr. 73–75 July 24, 2015, ECF No. 761. Because of this narrowing of the Committee's concerns, the Court need only address footnote 205, which it does *infra* at pp. 33–38, as the priority to be accorded to the IRS' claim against Sam was not, and could not have been, litigated in the SEC Action and will be litigated here when the 505 Motions proceed to trial.

Action. In fact, when specifically asked at the Hearing if she could identify any facts or other evidence she would rely upon if she were permitted to relitigate the issues here, her counsel said no, they were not contending that they had anything different to present or that Dee had any independent evidence to present that was not presented to the District Court in the SEC Action. Hr'g Tr. 65–69 July 24, 2015, ECF No. 761. Dee could only argue that "[t]here may be a difference in the way [Dee] would present" evidence or that she would present evidence arising from Dee's interactions with trusts after her bankruptcy case was filed.[16]  *Id.* at 67, 69.

With this background in mind, we turn to the general question of when nonparties in the prior suit will be bound by issue preclusion. Nonparties "generally ha[ve] not had a 'full and fair opportunity to litigate' the claims and issues settled in" the earlier suit. *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996). "It is a principle of general application in Anglo-American jurisprudence that one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." *Id.* at 884 (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)).

Nevertheless, certain types of proceedings "temper this basic rule" and thus bind nonparties. *Id.* For example, with sufficient notice, a discharge in bankruptcy affects the rights of creditors regardless of whether they participated in the case. Class actions bind class members who never appear in court. Bankruptcy and class actions were among the six situations specifically listed by the Supreme Court in which issue preclusion binds nonparties who are in sufficient

---

[16] Dee does not explain why evidence related to her own requests to trustees of the Offshore Trusts during her bankruptcy case would alter any of the issues determined in the Disgorgement Opinion. *Cf. Hibernia Nat. Bank v. United States*, 740 F.2d 382, 388–89 (5th Cir. 1984) (holding that a lease amendment in 1977 does not prevent issue preclusion from applying to tax years 1972 through 1976, but the amendment altered the issue to be determined as to the tax year 1977).

privity[17] with parties to a prior suit.  *See Taylor*, 553 U.S. at 893–95.  If any of those situations applies here, Dee can be bound to the facts found in the Disgorgement Opinion.

The IRS argues that Dee is in privity with Charles and the Probate Estate because she filed joint tax returns with Charles in all of the years at issue in the SEC Action.  But the IRS cites no case, and this Court has found none, in which a determination of an issue by one spouse of issues relevant to a joint tax return are binding on the other spouse simply due to their filing status.  *Taylor* does not list joint tax returns or joint and several liability among the situations in which nonparty preclusion is appropriate.  In fact, courts have regularly held that joint filing status, without more, is insufficient privity for preclusion purposes.  *See, e.g.*, *Kroh v. Comm'r*, 98 T.C. 383, 400 (1992).

However, "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit."  *Taylor*, 553 U.S. at 894 (quoting *Richards v. Jefferson Cty.*, 517 U.S. at 798); *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975).  Such circumstances include "suits brought by trustees, guardians, and other fiduciaries."  *Id.* (citing *Sea-Land Services, Inc. v. Gaudet*, 414 U.S. 573, 593 (1974)).  "[N]onparties may be collaterally estopped from relitigating issues necessarily decided in a suit brought by a party who acts as a fiduciary representative for the beneficial interest of the nonparties."  *Sea-Land Services*, 414 U.S. at 593–94.  "Federal courts have frequently cited *Chicago, Rock Island & Pacific Railway Co.* [*v. Schendel*, 270 U.S. 611 (1926)] in holding that a 'beneficiary is bound by a judgment properly maintained or defended' by an executor, administrator, or trustee."  *Milton H. Greene Archives, Inc. v. CMG Worldwide, Inc.*, 568 F. Supp. 2d 1152, 1172 (C.D. Cal. 2008), *aff'd sub nom. Milton H. Greene Archives, Inc. v.*

---

[17]  Courts typically use the term "privity" to describe the type of relationship needed to support nonparty preclusion.  The Supreme Court avoided using the word in *Taylor* to distinguish its holding from the holdings of courts that had interpreted privity more broadly.  *Taylor*, 553 U.S. at 894 n.8.  As *Taylor* makes clear, privity for some purposes is not privity for others.  *Id.* at 899 n.9.

*Marilyn Monroe LLC*, 692 F.3d 983 (9th Cir. 2012); *see generally id.* at 1170–76 (collecting cases, including Fifth Circuit cases, finding privity between estate beneficiaries and estate administrators); Restatement (Second) of Judgments § 41(1)(c) (1982).

Here, Dee "has a beneficial interest in 90% of the Probate Estate" of Charles Wyly. Debtor Caroline D. Wyly's Br. Supp. Mot. Determine Tax Liability Under § 505, ECF No. 248, at 1–2. Dee also argued that title in a decedent's property immediately vests in the devisees, legatees, or heirs. *Id.* at 11 & n.2 (quoting, *inter alia*, Tex. Prob. Code Ann. § 37).[18] And, when arguing in favor of this Court's jurisdiction to determine the tax liabilities of the Probate Estate, Dee emphasized the virtually complete alignment of interests between the Probate Estate and Dee's bankruptcy estate as follows:

> To the extent any creditor of the Probate Estate, such as the IRS, asserts a claim or initiates litigation against the Probate Estate, such a claim or action is the functional equivalent of a claim or action against the Debtor's bankruptcy estate. Whatever liability may be found against the Probate Estate essentially will amount to a finding of liability against the Debtor, who quite literally has a vested interest in the outcome of the dispute. Any claim or actions that results in a judgment against the Probate Estate is, for all practical purposes, a claim or action against the Debtor's bankruptcy estate.

*Id.* at 7.

Dee's interests were so aligned with the interests of the Probate Estate that she sought permission from this Court to use funds belonging to her bankruptcy estate to pay the fees of the Probate Estate's counsel and of an economic consulting firm hired to prepare expert reports and expert testimony in the SEC Action. Debtor Caroline D. Wyly's Application to Employ Susman Godfrey LLP as Special Counsel, ECF No. 208; Motion to Assume Executory Contract with

---

[18] The former Texas Probate Code has been repealed, effective January 1, 2014. Former § 37 of the Texas Probate Code is now codified in Tex. Est. Code Ann. § 101.001 (West 2014).

Compass Lexecon, ECF No. 147.[19] At the hearing on both motions, Dee's bankruptcy counsel emphasized the bankruptcy estate's financial interest in the outcome of the SEC Action with respect to the Probate Estate. Hr'g Tr. 107–11 Dec. 17, 2014, ECF No. 327 ("So the question here is whether or not — I view it as a very simple issue — can Mrs. Wyly use her money to protect her asset?").

Dee's counsel also pointed out that Dee was named in Charles' will as the original executor of his estate. *Id.* at 110 ("So we have Carolyn Denmon Wyly was the original executrix. She appears to have turned that down."). Donald Miller, Jr., who is Dee's son-in-law, was only appointed as independent executor of the Probate Estate after Dee declined to serve. *Id.* In other words, Dee had the actual opportunity to control the earlier litigation. She decided not to do so and turned that responsibility over to her son-in-law. That Dee trusts Mr. Miller to adequately represent her interests cannot be fairly questioned, as she sought this Court's approval to hire him to interface with her bankruptcy counsel in this case because of the complexity of the legal issues that will be raised, along with her age and lack of sophistication in dealing with such legal issues. Specifically, Dee sought to pay Mr. Miller over $200,000 annually in salary and benefits out of her bankruptcy estate to help her make important decisions here.[20] *See* Notice of Filing of Debtor's 2015 Second Quarter Budget, Ex. A, at 1, 4 n.42; Hr'g Tr. 103–04 March 18, 2015 (testimony of Dee's financial professional that Dee's sought to compensate Mr. Miller between $200,000 and $300,000 on annual basis).

---

[19] The Court denied both motions, pointing out that the Probate Estate should pay its own litigation expenses and finding no legal basis for a bankruptcy estate to assume an executory contract to which it was not a party. Hr'g Tr. 117, 127 Dec. 17, 2014, ECF No. 327. However, the Court suggested that Dee consider filing a motion seeking Court approval to loan the money to the Probate Estate if necessary. *Id.* at 127. No such motion was filed.

[20] The Court denied this particular expenditure at the hearing to approve Dee's budget for the second quarter of 2015.

Moreover, there can be no argument as to the qualifications of the Probate Estate's legal counsel in the SEC Action. The Probate Estate was represented by Susman Godfrey L.L.P., one of the finest litigation firms in the country.

In summary, Dee was to receive 90% of what remained in the Probate Estate after claims were paid from it. She points to no facts that, viewed favorably to her, reasonably support any deviation from the rule that an estate beneficiary is bound to an adverse judgment defended by the estate's executor. And, importantly, she has no new facts to add to the evidentiary record if the grantor/non-grantor trust issue was to be relitigated here. Therefore, the Court concludes that sufficient privity exists for issue preclusion purposes to bind Dee to adverse facts actually and necessarily determined in the SEC Action.

The second element of issue preclusion is satisfied as to both Sam and Dee.

### 3. *Necessary to Support the Prior Judgment*

Issue preclusion requires that the issue in the prior judgment to be given preclusive effect was "essential to the judgment," and "[i]f a judgment does not depend on a given determination, relitigation of that determination is not precluded." *Bobby v. Bies*, 556 U.S. 825, 834 (2009). "A determination ranks as necessary or essential only when the final outcome hinges on it." *Id.* at 835; *see also Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n.5 (1979) (issue must be "necessary to the outcome of the first action").

Sam argues that the federal tax status of the Offshore Trusts was not necessary to the Final Judgment. Sam's Response at 20–24. As Sam points out, neither the complaint nor the special verdict form returned by the jury in the SEC Action contained the phrase "grantor trust." Sam further argues that the District Court's alternative measure of damages independent of the tax status of the Offshore Trusts renders their tax status irrelevant to the Disgorgement Opinion. Even

more broadly, Sam argues that the Disgorgement Opinion was not necessary to the Final Judgment at all.

For the reasons explained below, this Court disagrees. The District Court entered the Final Judgment on February 26, 2015. ECF No. 591. The Final Judgment ordered Sam to disgorge $198,118,825.16 and ordered the Probate Estate to disgorge $101,238,418.53 as a result of the verdict for the SEC against Sam and the Probate Estate on nine counts of securities fraud. Sam's liability to the SEC included "$111,988,622.76 of disgorgement on transactions in registered securities calculated pursuant to the Court's September 24, 2014 Opinion and Order (ECF Nos. 476 and 481) [the Disgorgement Opinion]." Final Judgment at II. It also included interest on that amount along with disgorgement measured by transactions in unregistered securities plus interest. The Probate Estate's liability was similarly structured. It included $58,896,281.97 of disgorgement as calculated in the Disgorgement Opinion plus interest, along with an amount measured by transactions in unregistered securities plus interest. The Disgorgement Opinion explained that the $111,988,622.76 and $58,896,281.97 were calculated as a result of the District Court's legal conclusion that the Bulldog Trusts and the Bessie Trusts were grantor trusts under § 674 of the Tax Code. Disgorgement Opinion, 56 F. Supp. 3d at 429 n.218.

In sum, it is clear to this Court that the precise amount of money ordered to be disgorged in the Final Judgment in the SEC Action rests on the District Court's conclusion that the Offshore Trusts were grantor trusts for federal tax purposes with respect to the securities transactions at issue there. The Final Judgment explicitly cites the Disgorgement Opinion as the source of its calculation of the remedy. The Disgorgement Opinion generally, and the grantor trust determination specifically, cannot be said to be "incidental, collateral, or immaterial to that judgment." *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168 (5th Cir. 1981).

*Morse v. Commissioner*, cited by Sam, is distinguishable. 419 F.3d 829 (8th Cir. 2005), *aff'g* 86 T.C.M. (CCH) 673, 2003 WL 22853796 (2003). *Morse* held that the amount of restitution awarded to the IRS in a criminal trial does not bind the IRS on the amount of underpayment for tax liability, either under claim preclusion or issue preclusion. *See id.* at 833–34. In *Morse*, the Eighth Circuit explained that the amount of criminal restitution was not an element of the crime, and thus incapable of supporting issue preclusion. *Id.* at 834. The Tax Court decision affirmed in *Morse* explained that, in calculating the amount of restitution, the prior court did not "make ultimate findings of fact upon which estoppel could be grounded." 86 T.C.M. (CCH) 673, 2003 WL 22853796, at *6.

Here, the IRS is not seeking issue preclusion on the amount the District Court ordered to be disgorged, but instead on the antecedent findings involving underpayment of tax upon which it was based. Furthermore, unlike the judge ordering restitution in *Morse*, the District Court did make findings of fact and reach legal conclusions based on those facts during the remedies phase of the trial, specifically for the purpose of determining whether any tax was actually owed by Sam and the Probate Estate on the securities transactions at issue in the SEC Action.

Sam is correct that issues considered by a judge at the sentencing phase of a criminal trial are not given preclusive effect in subsequent civil proceedings. *See, e.g.*, *Hickman v. Comm'r*, 183 F.3d 535, 537–38 (6th Cir. 1999); *but see SEC v. Monarch Funding Corp.*, 192 F.3d 295, 304– 06 (2d Cir. 1999) (reversing issue preclusion based on findings from the sentencing phase of a criminal trial, emphasizing the differences between sentencing and a civil trial, but refusing to conclude that preclusion could never be based on an issue decided in criminal sentencing). But, the SEC Action was not a criminal trial. Liability was tried by a jury before equitable remedies were tried to the District Court, as prudence and precedent dictate, but both phases determined

disputed issues and were necessary to the Final Judgment. *Cf. Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 333–34 (1979) (quoting *Beacon Theaters, Inc. v. Westover*, 359 U.S. 500 (1959)). The District Court emphasized this precise point during the remedies phase of the SEC Action.

> [Y]ou know, we talked about this at the beginning of this trial. I said the defense seems to argue at time [sic] that there's no record beyond the liability phase of this trial, and that's not true. It's one continuous trial. Bifurcated, yes. I took a verdict first on the liability. Now, there's more evidence on the remedies phase. It's all part of the record.
>
> The record doesn't end the day the jury trial ended. So I know the jury made certain findings, and I must follow those findings, but I continue to make further findings, as I think you agree. Such as[:] whether these are ill-gotten gains, whether a tax is owed. The jury didn't pass on whether a tax is owed. I have to do that.

SEC Statement Ex. 3, at 5 (statement of the District Court on Aug. 6, 2014).

Preclusion applies to issues decided by a judge sitting in equity even where the subsequent claim is triable by jury. *Parklane*, 439 U.S. at 334–35. Issues need not be resolved by jury to have preclusive effect. *Id.*

Sam's final argument about the District Court's alternative calculation cuts against his argument that the primary disgorgement calculation was unnecessary.[21] The reason the District Court took great pains to distinguish and calculate the alternative measure of disgorgement is precisely because the grantor trust issue was so fundamental to the Final Judgment that reversal would invalidate the calculation of disgorgement of $111,988,622.76 by Sam and $58,896,281.97 by the Probate Estate. The District Court clearly explained that the alternative disgorgement

---

[21] This point must be distinguished from the line of cases dealing with a prior court's judgment resting on *either* of two alternate grounds. *See, e.g.*, *Hicks v. Quaker Oats Co.*, 662 F.2d 1158, 1168–72 (5th Cir. 1981); *see also Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 250–56 (3d Cir. 2006) (recognizing a circuit split on the issue). The prior judgment at issue in *Hicks* found that a promise was binding either because an actual contract was formed or because of promissory estoppel. *Hicks*, 662 F.2d at 1161–62. Where two issues are individually sufficient to support the prior judgment, and at least one but not both of the issues is necessary to support it, courts differ on whether issue preclusion is appropriate in subsequent litigation.

Here, by contrast, the Final Judgment rests exclusively on the measure of disgorgement articulated in the Disgorgement Opinion, and the alternative calculation of disgorgement is entirely irrelevant unless the primary measure is reversed on appeal.

calculation is a nullity unless the primary calculation, which rested on the grantor trust determination, was reversed. *SEC v. Wyly*, 10-CV-5760, 2015 WL 845713, at *1 (S.D.N.Y. Feb. 26, 2015). That the District Court would craft an alternative measure of disgorgement is easily understood and explained. After investing years of work into finally adjudicating the SEC Action, the District Court simply hopes to avoid the need for a remand of the SEC Action to her if her primary holding is reversed on appeal.

There is no question in this Court's mind that the federal tax status of the Offshore Trusts was determined by the District Court in the SEC Action and that determination was necessary to the Final Judgment entered by the District Court. The necessity element is satisfied here.

### 4. *Fairness*

The fourth element of issue preclusion, whether its application would be fair and appropriate under the circumstances, is not always considered when issue preclusion is raised either defensively or by a party to the prior suit. *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1290 n.12 (5th Cir. 1995) (citing, *inter alia, Parklane Hosiery*, 439 U.S. at 326–32 (1979)). This element arose in *Parklane* as a safeguard against the perceived risks posed by nonmutual offensive issue preclusion, which allows defendants to be bound by prior adverse judgments even though the plaintiff was not a party to the prior suit.

Over time, some courts have recognized that altering the elements of issue preclusion depending on the procedural posture of the case adds unnecessary complexity to complex litigation. *Parklane* did not hold that defendants always use issue preclusion fairly as a matter of law, but instead recognized that greater unfairness could arise where nonmutual issue preclusion was raised by plaintiffs. *Parklane*, 439 U.S. at 330–31. In *Parklane*, there was no dispute that nonmutual issue preclusion had been raised offensively. When the parties dispute whether an

atypical posture for issue preclusion is offensive or defensive, as they do here, it makes more sense for the court to proceed to consider fairness than to analyze an issue that is ultimately irrelevant.

This is especially true because courts are split on how to distinguish defensive nonmutual issue preclusion from its offensive cousin in certain unusual procedural postures, such as where the earlier action is for damages and the second action seeks a declaratory judgment that damages are not owed.[22] *See Shader v. Hampton Improvement Ass'n, Inc.*, 217 Md. App. 581, 612–14 (Md. App. 2014), *aff'd*, 115 A.3d 185 (Md. 2015) (citing and quoting federal and state cases illustrating the split in how to apply *Parklane*). As the Supreme Court stated the rule, offensive issue preclusion "occurs when a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant has previously litigated unsuccessfully in another action against the same or a different party." *United States v. Mendoza*, 464 U.S. 154, 159 n.4 (1984). Some courts apply this rule strictly, looking merely at whether the party raising preclusion is the plaintiff or defendant in the later suit. *See, e.g.*, *Shader*, 217 Md. App. at 614–15. Other courts look at the substance of the action and context of the earlier judgment, holding issue preclusion to be offensive if raised against the party that was a defendant in the earlier suit, even if the prior defendant is a plaintiff in the current suit. *See, e.g.*, *Burlington N. R.R. v. Hyundai Merch. Marine Co.*, 63 F.3d 1227, 1232 n.4 (3d Cir. 1995) (holding that a declaratory defendant raised offensive nonmutual issue preclusion by seeking to bind the declaratory plaintiff to a prior adverse judgment in favor of an indemnity claimant).

---

[22] The nature of declaratory judgment actions often reverses the typical roles of the litigants, so that "[t]he plaintiff is seeking to establish a defense against a cause of action which the declaratory defendant may assert" in anticipated subsequent litigation. *Pub. Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 248 (1952). Federal courts must account for this reversal when applying the well-pleaded complaint rule for federal question jurisdiction. *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 19–21 (1983).

Here, the parties dispute whether issue preclusion is brought offensively or defensively and therefore whether this factor should apply. The IRS points to the 505 Motions — which seek a determination of the Debtors' actual tax liability — as commencing this dispute, making the IRS the defendants and thus their use of issue preclusion defensive. The Debtors argue that the 505 Motions simply sought finality, and that the true dispute as to tax liability was commenced by the proofs of claim filed by the IRS in these bankruptcy cases, analogizing proofs of claim to civil complaints. In short, each argues that the other is the true plaintiff.

Because none of the concerns articulated in *Parklane* are present here, the question of whether issue preclusion is applied offensively or defensively is ultimately irrelevant.[23] *Parklane* described four non-exclusive situations that would make nonmutual issue preclusion unfair: (i) when issue preclusion rewards a private plaintiff who could have joined the prior action; (ii) whether the seriousness of the first suit sufficiently motivated the defendant to litigate vigorously; (iii) whether the issue to be precluded was inconsistent with other prior decisions; and (iv) whether procedural opportunities would be available in the second suit that were unavailable in the first. *Parklane*, 439 U.S. at 330–32.

None of these problems arise here, just as none arose in *Parklane*. The IRS is not a private party that could have joined the prior action. The enormity of the remedy sought in the SEC Action clearly should have (and obviously did) motivate a serious and vigorous defense, both generally and specifically as to the tax issues upon which the amount of disgorgement ordered was predicated. The Debtors cite no other judicial determinations that contradict those made in the Disgorgement Opinion. Finally, there is no argument that the SEC Action was litigated in a forum

---

[23] When the Court noted at the Hearing that the distinction between offensive and defensive issue preclusion did not appear to be "terribly meaningful in the facts of this case," counsel for Sam conceded that the distinction was probably not meaningful. Hr'g Tr. 50 July 24, 2015, ECF No. 761.

that rendered Sam, Charles, or the Probate Estate "unable to engage in full scale discovery or call witnesses." *Cf. Parklane*, 439 U.S. at 331 n.15.  This Court applies the same procedural rules as does the District Court, thus creating no new procedural opportunities unavailable in the SEC Action.

The similarities between this case and *Parklane* are striking.  The two arguments raised against issue preclusion in *Parklane* were that nonmutual offensive issue preclusion was improper and that nonmutual preclusion of issues determined by a judge in support of an equitable remedy violated the Seventh Amendment.  In *Parklane*, the Supreme Court upheld the use of nonmutual offensive issue preclusion to prevent relitigation of issues determined in support of an equitable remedy for violation of federal securities laws, rules, and regulations in a civil enforcement action brought by the SEC in the Southern District of New York.  The Court pointed out that the party raising issue preclusion in *Parklane* likely could not have joined in the SEC's civil enforcement action, and that the seriousness of the SEC's allegations and the likelihood of subsequent suits were the SEC to win a judgment supported the holding that issue preclusion was not unfair.  Finally, the Court summarized "the strong support to be found both in history and in the recent decisional law of this Court for the proposition that an equitable determination can have collateral-estoppel effect in a subsequent legal action" and concluded that this proposition is unaffected by the evolution of preclusion doctrine since 1791.  *Parklane*, 439 U.S. at 335–37 (1979).

Here, as in *Parklane*, nonmutual issue preclusion has been raised to prevent relitigation of issues determined in support of an equitable remedy for violation of securities laws.  As in *Parklane*, the original action was a private enforcement action brought by the SEC in the Southern District of New York.  The parties can point to no facts that make issue preclusion in this case any less foreseeable or less fair than issue preclusion in *Parklane*.

Sam and the Committee argue that the IRS has taken the same "wait and see" attitude the Supreme Court was worried about in *Parklane*.  *Id.* at 330.  But the actual facts of *Parklane* are not distinguishable from the facts here where, like the plaintiff in *Parklane*, the IRS could not have joined in the SEC Action.  Sam and the Committee also complain that the IRS would have argued against issue preclusion here if the Disgorgement Opinion were unfavorable to the IRS' theory of the Debtors' tax liability.  Such hypotheticals are irrelevant.

Sam and the Probate Estate were represented in the SEC Action by some of the best litigators in the country for nearly five years.  The Court is advised that millions of dollars, if not over a hundred million dollars, was spent mounting the Wyly defense to the SEC's claims.  The jury, after over a month of trial, found that Sam and Charles (represented at the time of trial by the executor of the Probate Estate) had committed securities fraud.  After further evidentiary hearings, the District Court issued the Disgorgement Opinion and the Final Judgment.  To suggest now that it is somehow unfair to apply issue preclusion to the issues actually and necessarily determined in the SEC Action is unfathomable.  In fact, it is the reverse that would be unfair; it would be unfair for this Court to relitigate those issues that are relevant to the 505 Motions that were actually and necessary determined in the SEC Action.

### C.    Disgorgement Opinion Footnote 205

One final issue must be addressed, as it became apparent at the Hearing that the "linchpin" of the Debtors' arguments against the IRS Motion is footnote 205 of the Disgorgement Opinion, quoted below.  Hr'g Tr. 35 July 24, 2015, ECF No. 761.  The parties disagree over the meaning of this footnote.

In reading the Disgorgement Opinion, this Court was initially struck by the language in footnote 205 that appears to contemplate the possibility that a later court might reach a different

conclusion on the issue of whether the Offshore Trusts were valid non-grantor trusts. To an explanation that the remedy calculated in the Disgorgement Opinion would not lead to a duplicitous recovery — because the IRS should credit any amounts disgorged against any amounts subsequently determined to be owing to the IRS — the District Court appended the following footnote, quoted in its entirety below:

> In the event there is a judicial determination that contravenes the legal conclusions of this Opinion and Order — that is, *if another court determines that the IOM Trusts are in fact, tax-exempt non-grantor trusts*, defendants may pursue all available remedies in this Court, including a motion to vacate the final judgment under Rule 60(b) of the Federal Rules of Civil Procedure. But no such motion will be considered if the IRS, in exercising its discretion, chooses not to proceed with an administrative or civil action against the Wylys.

Disgorgement Opinion, at 62 n.205 (emphasis added) ("**footnote 205**").

Clearly the Debtors (and the Committee) were similarly struck by footnote 205. Sam quoted footnote 205 in his 505 Motion filed on the same day as his bankruptcy petition. Mot. Bankr. Code § 505 to Determine Tax Liability, ECF No. 4, at 12 n.16. Dee quoted footnote 205 in her original 505 Motion as well. Dee's Mot. Bankr. Code § 505 to Determine Tax Liability, ECF No. 247, at 4. In the 505 Motions and at the Hearing, the Debtors argued that footnote 205 evidences the District Court's expectation that the grantor/non-grantor trust issue would be relitigated in another court and, therefore, issue preclusion should not apply.

Courts regularly craft orders with carefully defined scope so that dicta is not given preclusive effect elsewhere. This Court gives careful attention to the intent of other courts to control the effects of their orders, whether such orders bind the Court, the parties, or are merely persuasive precedent. If the District Court had intended for the facts determined and issues decided in the Disgorgement Opinion to be given no preclusive effect by subsequent courts, like this Court,

that would be an important equitable consideration weighing against granting the IRS Motion. So, this Court has pondered the meaning and purpose of footnote 205 at length.[24]

Sam provides several explanations for why he believes that the District Court intended to limit the preclusive effect of the Disgorgement Opinion and Final Judgment, most of which boil down to the District Court harboring uncertainty about the tax aspects of her decision.[25] However, this Court sees nothing in the Disgorgement Opinion, either in footnote 205 or elsewhere, that in any way acknowledges that the District Court thought she may have decided the relevant tax issues incorrectly. On the contrary, in the text immediately prior to footnote 203, the District Court refutes the argument made by Sam and the Probate Estate that the District Court would be unable to resolve "novel and complicated" tax issues, explaining that "[t]his case, like many others litigated before th[e District] Court, involves statutory interpretation and application of common law doctrines." Disgorgement Opinion, 56 F. Supp. 3d at 426; *see also* 426 n.203 (quoting the

---

[24] Unfortunately, this Court cannot simply ring up the District Court and ask her what she meant by footnote 205, as that would be an impermissible ex parte contact. While the parties cannot call her either, Sam or Dee could file a motion asking the District Court to elaborate on the meaning of footnote 205. If they were to do so, and if the District Court were willing to provide further clarification, this Court would be willing to entertain a motion to reconsider based upon the additional explanation provided by the District Court. Otherwise, the Court will interpret the Disgorgement Opinion as all lawyers are trained to interpret opinions: by carefully reading what was written and the context in which it was written.

[25] "The District Court anticipated that another court could disagree with its tax analysis, and thus made specific provision for the vacating of its Judgment in such event." Sam's Response at 2 (citing footnote 205). "[I]n [f]ootnote 205 of the Disgorgement Opinion, the District Court specifically recognized that the determinations in the Disgorgement Opinion would likely be revisited, including the District Court's determination that the [Offshore] Trusts were grantor trusts, and invited a motion to vacate by the Wylys should that occur." *Id.* at 7. "The Disgorgement Opinion was avowedly tentative. It states: [quoted text of footnote 205]" *Id.* at 13. "The District Court essentially gave the government a choice — . . . [to] pursue a new action against the Wylys for actual taxes due and assume the risk that the determinations in the Civil Action would be revealed to be mistaken under the tax law in such a new action." *Id.* at 12–13. "The District Court's express acknowledgment that the tax determinations in the Civil Action might be incorrect is highly unusual and alone should be dispositive of the collateral estoppel issue." *Id.* at 14.

> Like the District Court's acknowledgment that "another court" might disagree with the grantor trust analysis (and the District Court's clear signal that it would defer to any tax analysis performed by any other court), the alternative disgorgement measure reflects the District Court's uncertainty regarding whether it even had the right to engage in the tax-based analysis at all.

*Id.* at 18.

IRS's statement of interest in support of the District Court's application of the Tax Code and associated regulations). Furthermore, it would be unusual for the District Court to reach a decision on the preclusive effect of determinations made in the Disgorgement Opinion, which is usually left to the subsequent court to decide, particularly when there is no express analysis of any of the elements of issue preclusion.

On the other hand, the SEC — in support of the IRS Motion — argues that the purpose of footnote 205 is to refute the argument made by counsel to Sam and the Probate Estate that disgorgement predicated on a determination that tax was owed would allow the United States double recovery of taxes if the IRS assessed a deficiency. SEC Statement at 9–12. In support of this view, the SEC quite convincingly refers to the very text to which footnote 205 was appended:

> [D]efendants argue that calculating disgorgement based on unpaid taxes creates the potential for duplicative recovery or conflicting orders because the Wylys are currently under an IRS audit covering some of the years of the securities fraud. As I mentioned earlier, any amounts disgorged in this case should be credited towards any subsequent tax liability determined in an IRS civil proceeding as a matter of equity.[205]

Disgorgement Opinion, 56 F. Supp. 3d at 426–27 (footnote call number in original).

The SEC further points to a different opinion in which the District Court resolved a different dispute about the meaning of footnote 205 between the parties to the SEC Action. SEC Statement at 15–16. The District Court explained that even if the IRS concluded that no additional tax was owed, and barring reversal on appeal, the Final Judgment would stand and no refund would be forthcoming. *See SEC v. Wyly*, 10-CV-5760, 2015 WL 845713, at *2 (S.D.N.Y. Feb. 26, 2015). Furthermore, the District Court repeated her point in the Disgorgement Opinion that if the IRS seeks a determination of actual taxes owed and additional amounts are determined to be owing, those amounts should be offset against any amounts ordered to be disgorged and actually paid by Sam and/or the Probate Estate (in excess of the amount ordered to be disgorged for transactions in

unregistered securities) in order to avoid a double-payment of taxes by Sam and/or the Probate Estate.  *Id.*

This Court reads the language of the Disgorgement Opinion to support the SEC's reading of footnote 205, and cannot conclude that the District Court intended to prevent the Disgorgement Opinion from having preclusive effect.  Sam reads footnote 205 to express the certainty that a subsequent court *must* relitigate the grantor/non-grantor trust tax issues because he reads the remainder of the Disgorgement Opinion to resolve issues in a way that "might be incorrect" and is "avowedly tentative."  *See supra* note 25.  On the contrary, the Disgorgement Opinion consistently uses declarative statements, such as the following: "I conclude that both the Bulldog and Bessie Trusts were grantor trusts under Section 674 . . . ."  Disgorgement Opinion at 428; *see generally* IRS Br. Ex. 2 (collecting statements made in the Disgorgement Opinion to which the IRS seeks issue preclusion).  Footnote 205, by contrast, makes conditional statements: "In the event . . ." it begins, and goes on to use "if" twice and "may" once in two sentences.  It does not even promise to vacate the Final Judgment if all of the conditions are met, instead merely offering to consider such a remedy.  Viewed in this light, if any of the Disgorgement Opinion is "avowedly tentative" at all, it is footnote 205.

In sum, the Debtors point to no clear expression of the District Court's alleged intent that the findings contained in the Disgorgement Opinion would not be binding on Sam and the Probate Estate (and their privies) in subsequent litigation with the IRS on issues actually and necessarily litigated in the SEC Action.  This Court is reluctant to conclude that a two-sentence footnote contains such meaning.  As noted previously, years of effort and expense went into making the record that supports such factual determinations, and barring reversal on appeal, this Court believes

it appropriate to accord issue preclusion to those findings that are relevant here as the IRS has requested.

## IV.    CONCLUSION

There is no disputed issue of material fact relevant to the elements of issue preclusion to be applied here, and the IRS is entitled to partial summary judgment as a matter of law as to the specific enumerated findings in the Disgorgement Opinion relevant to the tax status of the Offshore Trusts.  These specific findings are listed in the IRS Brief, Ex. 2.

Accordingly, the IRS Motion is hereby **GRANTED**.

**SO ORDERED.**

### END OF MEMORANDUM OPINION AND ORDER ###