IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO. 14-35043 |
| | § | |
| SAMUEL EVANS WLY, et al. | § | (Chapter 11) |
| | § | |
| DEBTORS | § | JOINTLY ADMINISTERED |
| | § | |

# REPORT OF JOSHUA S. RUBENSTEIN
# EXPERT WITNESS FOR THE DEBTORS

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York  10022-2585
212-940-8800

**Government Exhibit**

1

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | Scope of the Engagement | 1 |
| II. | Statement of Appointment and Qualifications | 1 |
| III. | Statement of Conclusions | 3 |
| IV. | The Evolution of U.S. v. Offshore Trusts | 5 |
| | A. Operational Differences | 5 |
| | B. Format and Procedural Differences | 6 |
| | C. Investment Differences | 8 |
| V. | An Overview of the Evolution of the Grantor Trust Rules | 9 |
| VI. | The Bar's View of Code §679 During the Relevant Time Period – Interpretation of Foreign Trusts Having U.S. Beneficiaries | 11 |
| | A. 1976-1996 | 11 |
| | 1. Need for Clarity and Regulations | 12 |
| | 2. Despite Changes, Planning Opportunities were Still Suggested | 15 |
| | B. 1996/1997 | 16 |
| | 1. Overview of Changes | 16 |
| | 2. Status of Section 679 | 16 |
| | C. 2000 | 17 |
| | 1. Proposed Regulations are Published | 17 |
| | 2. Criticism of Proposed Regulations | 19 |
| | D. 2010 | 20 |
| VII. | The Bar's View of Code §674(c) During the Relevant Time Period - Interpretation of Power and Control | 21 |
| | A. Interpretation by the Tax Bar of the Independent Trustee Exception | 21 |
| | B. The "De Facto Control" Concept Was Thought to be Essentially Dead | 22 |

i

VIII.   The Bar's View of the Power to Remove and Replace Trustees During   the
        Relevant Time Period ..................................................................................24

        A.      The Tax Bar's Criticisms of Revenue Ruling 79-353 ...........................24

        B.      Planning After Rejection of Revenue Ruling 79-353............................26

IX.     The Bar's View of Protectors as "De Facto" Trustees During the   Relevant Time
        Period....................................................................................................27

X.      Day to Day Dealings with Offshore Trustees - Letters of Wishes &   Protectors.............28

XI.     The Bar's View of the Accommodation Grantors Rules During the   Relevant
        Time Period .............................................................................................31

        A.      Interpretation Prior to 1997 ..............................................................31

        B.      Post-1997 Interpretation and Planning Opportunities ...........................32

XII.    The Bar's View of Private Annuity Transactions During the Relevant   Time
        Period....................................................................................................33

XIII.   The Beneficiaries' Use of Trust Property Pre/Post HIRE Act ...........................34

ii

## I.    Scope of the Engagement

I have been retained as an expert witness for the Debtors in connection with the trial on the Debtors' *Motion Pursuant to Bankruptcy Code § 505 to Determine Tax Liability, If Any* [Docket No. 4]. The scope of my work is not to render an opinion with respect to the actions of the Debtors, but rather to assist the Court in assessing whether the actions were willful for the purposes of the assertion by the Internal Revenue Service (the "IRS") of the fraud penalties, and in evaluating the Debtors' reasonable cause defense to the assertion by the IRS of the failure to file penalties for Forms 3520, 3520-A and 5471, by providing an opinion as to how practitioners advised clients with respect to the application of the grantor trust rules to foreign trusts during the 1990's (the "relevant time period") and how foreign trusts, as opposed to domestic trusts, were drafted and administered at that time. Specifically, I have been asked to offer an opinion as to practitioners' views, during the relevant time period, concerning the interpretation and tax consequences of (i) foreign trusts having U.S. beneficiaries, (ii) a grantor's power and control over a trustee, (iii) the power to remove and replace trustees, (iv) the use of trust protectors, (v) the practice of communicating to trustees a settlor's wishes through letters of wishes and protectors or directly, (vi) the accommodation grantor rules, (vii) private annuity transactions, and (viii) beneficiaries' use of trust property.

A list of documents reviewed or considered in preparing this report is attached as Exhibit 1. All materials cited in the report are included in the Appendix of Materials accompanying this report.

## II.    Statement of Appointment and Qualifications

I am a partner of the law firm of Katten Muchin Rosenman LLP, chairman of the firm's national Trusts and Estates Department, the national Private Client Services Group and the national

Fiduciary Litigation Group. I have practiced law for more than 35 years, specializing in domestic and international trust and estate planning, administration and litigation, and I advised clients with respect to these issues during the relevant time period. As part of my practice of law, I provide advice concerning estate planning and the minimization of federal and state gift, estate and generation-skipping transfer taxes. I prepare wills, trusts and intra-family agreements, provide advice with respect to the administration of estates and trusts, and advise clients in contested matters involving estates and trusts. I have represented many corporate fiduciaries in connection with the creation and administration of trusts and the litigation that arises with respect thereto.

I hold memberships and offices in numerous bar associations and other organizations. I am an Academician of the International Academy of Estate and Trust Law, a Fellow of the American College of Trust and Estate Counsel ("ACTEC"), a member of the International Bar Association, the American Bar Association and the New York State Bar Association, and a Fellow of the New York Bar Foundation. I am a member of the Surrogate's Court Advisory Committee of the New York State Office of Court Administration. I also am a member of the professional advisory councils of numerous institutions, including the Museum of Modern Art, the Metropolitan Museum of Art, Columbia University, Columbia University Law School, Lincoln Center for the Performing Arts, the New York Philharmonic, Volunteers of Legal Service, Inc. and the Practicing Law Institute, among others.

I am the Treasurer of the International Academy of Estate and Trust Law and an officer of the Family Law Committee of the International Bar Association. I am a former Chairman of the Trusts and Estates Law Section of the New York State Bar Association and a former Chairman of the Legislation Committee of that Section. I am the immediate past Chairman of the

2

International Estate Planning Committee of ACTEC, past Chairman of the Committee on
International Estate Planning of the Probate and Trust Division of the American Bar Association,
past Chairman of the State Laws Committee of ACTEC and past Regent of ACTEC.

I have served as a consultant and an expert witness in numerous tax and state court cases, and
have authored various articles on both international and United States tax law and estate
planning, administration and litigation.  I have written and lectured extensively on estate
planning, administration and litigation subjects, as well as charitable giving and nascent
developments in the Trusts and Estates area.  My curriculum vitae, a copy of which is attached as
Exhibit 2, includes a list of the publications I have authored and the cases in which I have served
as an expert witness.

I received a J.D from Columbia University Law School in 1979, where I was a Harlan Fiske
Stone Scholar, and a B.A. in Greek and Latin from Columbia University in 1976.

Katten is being compensated at the same standard and customary hourly rates that Katten charges
its other clients for similar work.  My firm is being compensated at the rate of $1,175 per hour
for my services and at rates of $375 - $740 per hour for other professionals assisting on this
matter.

## III.    Statement of Conclusions

A.      Practitioners widely disagreed with respect to the application of the foreign grantor trust
rules during the relevant time period (see Section VI below).

3

B.      Practitioners did not believe during the relevant time period, and still do not believe, that a grantor's control over a trustee is subject to a facts and circumstances test (see Section VII below).

C.      Practitioners did not believe during the relevant time period, and still do not believe, that the mere threat of removal of a trustee has tax consequences in a properly drafted trust instrument (see Section VIII below).

D.      Practitioners did not believe during the relevant time period, and still do not believe, that the use of protectors has tax consequences to the trust's grantor or beneficiaries (see Section IX below).

E.      The communication to trustees of a settlor's wishes, including investment recommendations, through the use of letters of wishes and protectors or even directly was during the relevant time period, and remains, commonplace in the context of foreign trusts and is becoming more commonplace in the context of domestic trusts (see Section X below).

F.      The appropriate use of third party funded trusts was during the relevant time period, and remains, a viable planning opportunity in the context of both foreign and domestic trusts (see Section XI below).

G.      The sale of assets for a private annuity was during the relevant time period, and remains, a viable planning opportunity in the context of both foreign and domestic trusts (see Section XII below).

4

H.    The uncompensated use of trust property by trust beneficiaries was commonplace in the context of foreign trusts until 2010 and was and remains commonplace in the context of domestic trusts (see Section XIII below).

## IV.    The Evolution of U.S. v. Offshore Trusts

In order to aid the Court's understanding of the experience practitioners had with domestic trusts and offshore trusts during the relevant time period, a brief overview of the disparity between, and evolution of, domestic versus offshore trust law and procedure is included here.

The trust law and procedure of the U.S. and of most offshore financial centers (most of which are Commonwealth based)[1] have a common antecedent, both having derived from the trust law and procedure of England.[2] Trust law and procedure in the offshore financial centers, however, evolved more rapidly than in, and in different ways from, the U.S.  The disparity between the two systems was more significant during the relevant time period than today, as many states have since scurried to catch up to some of the developments that have been implemented offshore.

### A.    Operational Differences

U.S. trust law was late to develop a number of features developed by offshore trust jurisdictions (largely borrowed by the offshore world from the law of corporations) such as (i) limited liability (so that assets properly placed in trust could be exempt from the creditors of both the beneficiaries and the settlor), (ii) perpetual existence (so that trust assets, like corporate assets, could remain in trust for longer than the common law rule against perpetuities), (iii) the separation of the various roles historically played by trustees (so that administration, investment and distribution functions could each be performed by different persons), and (iv) no local

5

income taxation of resident trusts.  Americans during the relevant time period who wanted to create trusts that had these features had to go offshore in order to do so, until some states (though not always the state where one lived) gradually began to (i) repeal the so-called "Statute of Elizabeth," so that properly settled trusts could be exempt from the settlor's creditors, even though the settlor was a beneficiary, (ii) repeal their common law rule against perpetuities, so that trusts could last, depending upon the state, for 360 years, 1000 years, or even in perpetuity, (iii) enact directed trustee legislation, so that one person could hold legal title to the assets of a trust, but authority with respect to making investments and distributions could be vested in different persons, and (iv) repeal local (*i.e.* state level) income taxation of resident trusts.  A chart tracing the repeal of the "Statute of Elizabeth," the repeal of the common law rule against perpetuities, the enactment of directed trustee legislation and the repeal of income taxation of resident trusts by various states is attached as Exhibit 3.

### B.   Format and Procedural Differences

The format and procedure of U.S. and offshore trusts developed differently as well.  U.S. trusts developed in an environment of political stability, personal safety and security of information, so the terms of U.S. trusts tended to be specific and elaborate, both in terms of intended economic benefit and scope of investment authority, thereby limiting what would otherwise have been the absolute discretion of the trustees in these areas.  Offshore trusts, however, developed in large part to help high net worth individuals from around the world to protect their hard earned assets from confiscation by corrupt governments, military or individuals where they lived, and to maintain privacy to protect family members from pernicious actions of others, such as kidnapping, theft and extortion.  As a result, offshore trusts tended to have the most minimal of dispositive guidelines and the broadest possible investment discretion vested in the trustees, so

6

that the trustees were in fact the absolute owners.[3]  It was common to overrule historic concepts of investments that were prudent for trustees to invest in, permitting the riskiest and least diversified of investments, as such trusts were often intended to hold family operating assets or to engage in activities that would otherwise have been engaged in directly by the grantor. Because the trustees literally had no limitations on their distribution and investment authority (which was necessary in order to protect the grantor and his or her family), regular guidance from the settlor (which often came in the form of non-legally binding letters of wishes) and the beneficiaries (which often came in the form of input from or even directions by protectors) was common protocol (see further discussion in Section X below).

Another significant difference between U.S. and U.K. based (and, therefore, offshore) trust law is that while trustees of U.S. trusts normally in the first instance are liable for their actions as trustee only in their fiduciary, and not their individual, capacities, under all other U.K. based trust law, fiduciaries in the first instance are liable for their actions in both their fiduciary and individual capacities, with the result that trustees of non-U.S. trusts are almost always liable to the extent of their personal assets, as well as the assets of the trusts they administer.[4] Consequently, while it is common for individuals to act as trustees in the U.S., it is an extreme rarity for individuals to act as trustees in the offshore world.  Because grantors tend to have more trust in individuals (including specific individuals who work at institutions) than in institutions themselves, given that they could not appoint individuals as trustees of offshore trusts, it was common to appoint protectors to protect the trust assets and its beneficiaries from corporate trustees who either (i) became, or proved themselves to be, faithless, corrupt or incompetent (which was a hopefully unlikely but nonetheless potentially devastating risk) or (ii) who went out of business, were acquired by institutions with which the family was unfamiliar, or whose

employees who were key to the family relationship moved to other trust companies (which was a potentially less devastating but in practice quite common risk).[5]  In order to shield the identity of the beneficiaries in case the trust documents were seen, beneficiaries of offshore trusts frequently were not identified in the trust document at all, and in order to protect the identity of the settlor, sometimes the trustee would simply execute a trust deed unilaterally declaring that it held assets on trust.  It is also common for offshore trust companies to form subsidiary companies of offshore trusts for many reasons, including liability protection, privacy and tax planning,[6] and to appoint one or more of the wholly owned subsidiaries of the trust company or its trust professionals to act in one or more roles or capacities for the purpose of providing offshore fiduciary services to such entities, including acting as directors of companies or as council members of foundations.[7]

In all of the above instances with respect to format and procedure, here too it has recently become far more popular in the U.S. to borrow from the offshore world and to draft domestic trusts with amorphous terms and to utilize letters of wishes, protectors and declarations of trust.[8]

### C.     Investment Differences

In the U.S., until recently, it was the practice of most corporate trustees to utilize their own proprietary investment services.  This has long been considered a conflict of interest in the offshore world, as the trustee would have no independence to judge whether its investment products, by which it would earn an additional fee, were inferior to, or comparable with but more expensive than, those investment products offered by third party asset managers.  In most instances, it would be rare indeed for an offshore trust company to offer investment advice.  Consequently, virtually all offshore trustees need and solicit investment advice from third

8

parties, including asset managers and settlors and beneficiaries who have investment expertise. More recently, this has become the trend in the U.S. as well, with some trust companies having no proprietary products at all and simply delegating investment authority, and with other trust companies (specifically those that are subsidiaries of large financial institutions) who in fact have proprietary products nonetheless bowing to pressure and offering "open architecture," so that they bring in outside investment advice for some or all of the portfolio.[9]  As with the other trends, more recently almost every state, regardless of whether or not it has adopted directed trust legislation, has amended its Prudent Investor Act to allow (and even encourage) delegation by trustees of their investment function.[10]

## V.    An Overview of the Evolution of the Grantor Trust Rules

Because the grantor trust rules were not initially designed with foreign trusts in mind, a brief overview of the evolution of the rules is included here in order to assist the Court and provide context for their eventual application to foreign trusts.

From 1918 through 1921 and 1936 through 1981, top individual income tax rates were 70 percent or higher (and 90 percent or higher from 1944 through 1963).  High bracket income taxpayers began transferring assets to trusts, which were themselves taxpayers, so that some of their income could be taxed at the lower brackets of the trust or its beneficiaries.  Prior to 1946, the only way the government could tax trust income to the grantor at his or her presumably higher tax brackets was if the grantor retained sufficient access to or control over the trust funds so transferred to be treated as the owner for income tax purposes.  However, since the grantor's retention of control or access was determined by an analysis of the facts and circumstances, a flood of litigation resulted.  This case by case approach to the analysis was abandoned in 1946 by

9

the U.S. Treasury Department (the "Treasury") when it adopted the so-called "Clifford regulations," which formed the basis for the enactment of Internal Revenue Code (the "Code") sections 671 to 678, known as the "grantor trust rules," by Congress in 1954. The Clifford regulations were intended to set forth objective control and access tests to determine whether the trust's income would still be taxed to the grantor. Congress specifically stated in its enactment of the grantor trust rules that "the effect of this provision is to ensure that taxability of Clifford type trusts shall be governed solely by this subpart."[11] These rules were based upon an imbedded assumption that the grantor was always in a higher income tax bracket than the beneficiaries or the trust itself. Thus, because the rules were absolute, they sometimes worked against the government's favor when the grantor turned out not to be in a higher bracket, such as might, for example, be the case when the grantor retired after creating the trusts.

Another such instance in which the grantor trust rules regularly worked against the government's favor was when the grantor was in no tax bracket at all, because he was a nonresident alien not subject to U.S. income tax in the first place. Initially, this was simply a loophole in the grantor trust rules. Code sections were amended many times, as illustrated in Exhibit 4, to address the question of foreign grantors and U.S. beneficiaries, but it was not until 1996 that the treatment of a foreign person as an owner of a trust under the grantor trust rules was essentially repealed for most, but still not all, foreign grantor trusts. It is important to note that even today, it is possible for U.S. trust beneficiaries to receive tax-free distributions from foreign grantor trusts (primarily if the trusts are revocable by the foreign grantor or if the trusts were in existence in 1996 and are grandfathered). There thus remain policy reasons in certain instances even today to allow foreign trusts to be grantor trusts whose income is attributed to a grantor who is not a U.S. taxpayer.

## VI.    The Bar's View of Code §679 During the Relevant Time Period – Interpretation of Foreign Trusts Having U.S. Beneficiaries

Before 1976, offshore trusts created by U.S. persons for the benefit of U.S. beneficiaries offered those beneficiaries a vehicle for tax-free build-up of funds in a foreign jurisdiction, so long as the U.S. person did not retain the requisite control or powers over the trust under Code sections 671-678, as in effect from time to time, to make the trust a grantor trust.[12] A Bahamian trust, for example, set up by a U.S. person for U.S. beneficiaries, could accumulate both ordinary income and capital gain, without payment of any income tax, or, at most, a tax solely on any U.S. source income.  When the accumulated income was distributed, it became subject to certain throwback provisions resulting in a tax to the beneficiary, but, in the interim, largely or entirely tax-free income would have been compounding.

### A.    1976-1996

In 1976, Congress enacted Code section 679 to address foreign trusts that have one or more U.S. beneficiaries and the potential for such trusts' assets to accumulate income on a tax deferred basis for the benefit of U.S. beneficiaries.

As originally enacted, section 679 provided, among other things, that a foreign trust is a grantor trust if the trust was created by a "United States person" after May 21, 1974 and had a "U.S. beneficiary."  Under this new section, the U.S. grantor became taxable on all income "attributable to" the property transferred by the grantor to the trust.  The section was applicable notwithstanding the trust's irrevocability or that the grantor in fact retained no control over it at all.  It applied to both gratuitous transfers and sales or exchanges for fair market value, except (1) transfers by reason of the death of the grantor and (2) sales or exchanges at fair market value

11

where the transferor recognized the gain realized either at the time of the transfer or in accordance with the installment sales provision of Code section 453. Section 679 was intended to cover indirect, as well as direct, transfers.

A foreign trust was treated as having a "U.S. beneficiary" during any taxable year unless (1) no part of the income or corpus of the trust could be paid or accumulated for future distribution to a U.S. person, or, (2) upon termination during the taxable year, no part of the income or corpus could be paid to a U.S. person. The statute was clear that the presence or absence of a U.S. beneficiary was tested annually.

The term "U.S. beneficiary" was defined as a person to or for whom any portion of principal or income may be paid, accumulated or distributed upon termination including: (1) a U.S. citizen, resident, U.S. partnership, corporation or trust; (2) a foreign corporation if more than 50 percent of the total combined voting power of all classes of stock was owned or considered to be owned using certain attribution rules by a U.S. shareholder, (3) a foreign partnership in which a U.S. person was a partner, and (4) a foreign trust or estate with a U.S. beneficiary.

1.    **Need for Clarity and Regulations**

Practitioners believed that the language of section 679 was susceptible to multiple constructions and raised numerous interpretative problems. No final or even proposed regulations were issued during this 20 year time period (indeed, proposed regulations were not first introduced until 2000). The multitude of interpretative problems and the need for clarity were widely discussed by prominent tax practitioners at the time.[13] The Tax Section Committee on Income of Estates and Trusts of the New York State Bar Association in 1992 explicitly stated in a letter to the IRS that "the grantor trust provisions of section 679 import into the Internal Revenue Code the entire

12

new concept of taxing an individual on the income of a trust over which he retains no control. Under certain circumstances, it also subjects him to large potential tax liabilities as the result of actions of individuals over whom he has no control and of whose existence he may not even be aware. The provisions are already in effect for taxable years as to which the filing deadline has passed. Clearly, the issuance of regulations is a matter of highest priority."[14]  Some of the interpretative problems necessitating regulations and guidance included the following:

- **Who is a "U.S. beneficiary"**. Practitioners were unclear on the definition of a U.S. beneficiary. For instance, Edward J. P. Zimmerman (former Chairman, Committee on Income of Estates and Trusts ABA Section of Taxation) argued that the interest which a U.S. beneficiary may have is implicitly broad; there was no definition.[15]  The Tax Section Committee on Income of Estates and Trusts of the New York State Bar Association was concerned that the statute was susceptible to interpretation that any potential beneficiary of trust accumulations who is a U.S. person, no matter how remote or contingent his or her interest, would subject the grantor to the provisions of section 679 and stated "it may be appropriate for the regulations to exclude potential beneficiaries from consideration where their interests fall below some stated de minimis rule." [16]

- **Classifying a trust as foreign or domestic**. The sweeping tax consequences of section 679 made it essential for a grantor to be able to determine whether the trust to which he or she was transferring assets would be classified as a "foreign trust," yet the circular definition in Code section 7701(a)(31) provided no guidance, and there were no regulations thereunder. The matter was left to decision on a case by case basis.[17]  Indeed, the first definition of "foreign trust" was not enacted until 1996.

13

- **Transferor's status as a U.S. person:** It was very unclear how a transferor's status as a U.S. person was to be determined, whether the determination was to be made only once, at the time of the transfer, or on a year by year basis.[18]

- **Meaning of the term "attributable to":** In determining what portion of the trust the transferor is to be considered the owner, practitioners questioned what was meant in section 679(a)(1) by the phrase "the portion of such trust attributable…" to property transferred by a U.S. person. It was unclear whether section 679 applied if a grantor gratuitously added property to an existing trust that was funded through a sale or exchange of property. Practitioners repeatedly stated that regulations were needed to provide further detail as to how the portions of the trust "attributable to" property which is and is not subject to section 679 were to be determined.[19]

- **Items appearing in legislative history only:** There were a number of details regarding the application of section 679 that were set forth in the legislative history but which did not appear in the statute. The Tax Section Committee on Income of Estates and Trusts of the New York State Bar Association claimed that if these provisions were to be controlling, they should be embodied in regulations. These details included the following: (1) application of the section to indirect transfers to foreign trusts through entities in which a U.S. person has control or an interest, (2) application of the section to the guarantee by a U.S. person of loans to a foreign trust, (3) transfers to domestic trusts which subsequently become foreign trusts regarded as indirect transfers to foreign trusts, and (4) the inapplicability of the exclusion for sales or exchanges at fair market value if gain on the transfer to the trust was reported as an open transaction or as a private annuity.[20]

14

2.    **Despite Changes, Planning Opportunities were Still Suggested**

Since the language of section 679 raised numerous questions and since there were no cases, rulings or regulations providing further interpretative guidance, practitioners lacked clear guidelines when advising their clients in this area. Nevertheless, practitioners still advocated the use of foreign trusts having U.S. beneficiaries, especially with non-resident transferors who may or may not later move to the U.S.[21] In particular:

- A nonresident alien could create a grantor trust for the benefit of a U.S. beneficiary, which would allow the beneficiary to receive income free of U.S. income tax since the nonresident alien grantor would be treated as the owner of the foreign trust.

- A nonresident alien who anticipates becoming a U.S. person could form and fund a foreign accumulation trust prior to becoming a U.S. person to provide for either U.S. beneficiaries or nonresident alien beneficiaries.

Some practitioners, including Andrew H. Weinstein (a fellow of ACTEC), relying on the unclear nature of the term "attributable to," advised growing a foreign trust's assets through arms-length borrowing, whether in the form of a purchase money mortgage or a loan from a third party. The reasoning was that loan transactions qualified for the "sale exception" so that section 679 did not apply to the lender and, since the loan proceeds were not "attributable to" any of the existing trust assets, they were not treated as owned by the original transferor.[22]

15

B.    1996/1997

I.    Overview of Changes

The Small Business Job Protection Act of 1996 made significant changes to the definition and income tax treatment of foreign trusts and imposed additional reporting requirements intending to curb planning opportunities with foreign trusts.  The Taxpayer Relief Act of 1997 further clarified the 1996 amendments.

The key changes in 1996 included: (1) the introduction of an objective test for determining whether a trust is domestic or foreign; (2) changes to Code section 672(f) designed to decrease the likelihood that a foreign trust created or funded by a foreign person would be treated as a grantor trust (and thus taxed to the foreign grantor) if a beneficiary was a U.S. person; (3) changes to section 679 designed to (a) increase the instances in which a U.S. grantor would be taxed as the owner of a trust and (b) subject "sale" or "exchange" transactions to U.S. taxation by replacing the "gain recognition" exception of 679 with an exception for property transfers at "fair market value"; (4) changes to section 643(i) designed to treat certain loans and other indirect transfers from foreign non-grantor trusts to beneficiaries as distributions; and (5) changes increasing the scope of reporting of foreign trusts, requiring reporting of gifts by foreign persons to U.S. persons and imposing heavy penalties for noncompliance.

2.    Status of Section 679

Although section 679 was amended in 1996/1997 as outlined above, even the new legislation still left much to the Treasury and the IRS to cover in regulatory guidance,[23] and the IRS still had

16

not published regulations under section 679.  Over 20 years had passed since the provisions on

foreign trusts with U.S. beneficiaries were enacted, and the law was still unclear.

The definition of who is a "U.S. beneficiary" for purposes of 679 remained vague.  In fact, as

late as 2000, Carlyn McCaffrey (a former President of ACTEC) and Ellen Harrison (a former

chair of ACTEC's International Estate Planning Committee) suggested in their ACTEC Notes

article that since (1) a trust is treated as having as U.S. beneficiary in any year in which income

or corpus may be paid to or for the benefit of, or accumulated for future distribution to or for the

benefit of, a U.S. person, or in any year in which, if the trust terminates, any part of the income

or corpus could be paid to, or for the benefit of, a U.S. person and (2) the test for determining

whether a foreign trust has a U.S. beneficiary is done on a year to year basis, it should be

possible to structure a foreign trust with future U.S. beneficiaries that is not subject to section

679 so long as the U.S. beneficiaries could receive no trust distributions during the transferor's

life and no future distributions of income or principal accumulated during the transferor's life.[24]

## C.    2000

### 1.    Proposed Regulations are Published

In August of 2000, the Treasury finally proposed regulations under section 679.  The proposed

regulations provided the following: (1) an indirect transfer rule, whereby a transfer by a U.S.

person to a foreign person (an intermediary) followed by a transfer by the intermediary to a

foreign trust, will be considered an indirect transfer by the U.S. person to the foreign trust "if

such transfer is made pursuant to a plan, one of the principal purposes of which is the avoidance

of U.S. tax," (2) a constructive transfer rule, and (3) relevant to this opinion, definitions and

examples of who is " a U.S. beneficiary."

17

With regard to clarification as to who is a U.S. beneficiary, under the proposed regulations, a foreign trust that received property from a U.S. transferor will be treated as having a U.S. beneficiary unless during the taxable year both of the following tests are satisfied: (i) no part of the income or corpus of the trust may be paid or accumulated to or for the benefit of, either directly or indirectly, a U.S. person; and (ii) if the trust is terminated at any time during the taxable year, no part of the income or corpus of the trust could be paid to or for the benefit of, either directly or indirectly, a U.S. person.

The regulations further provided that, for purposes of applying these tests, income or corpus will be considered to be paid or accumulated to or for the benefit of a U.S. person if, directly or indirectly, income may be distributed to, or accumulated for the benefit of, a U.S. person, or corpus may be distributed to, or held for the future benefit of, a U.S. person.  This determination is to be made without regard to whether income or corpus is actually distributed to a U.S. person during that year, and without regard to whether a U.S. person's interest in the trust income or corpus is contingent on a future event.  The regulations provided a narrow exception with respect to certain contingent beneficiaries whose interests in the trust are so remote as to be negligible. Furthermore, a trust may be treated as having a U.S. beneficiary based on any written or oral agreements or understandings related to the trust, memoranda or letters of wishes, records that relate to the actual distribution of income and corpus and all other documents related to the trust. The proposed regulations were effective for transfers occurring after August 7, 2000.

Thus, after the publication of the proposed regulations, it finally became difficult, though arguably still not impossible, to structure a foreign non-grantor trust with any current, future or possible U.S. beneficiary.

18

2.    **Criticism of Proposed Regulations**

The proposed regulations were the subject of much criticism. Joseph Lipari and Quincy Cotton (renowned tax attorneys at Roberts & Holland LLP) stated in a 2001 article that the proposed regulations "are extensive, cast an extremely broad net, and raise interesting logistical issues for families whose members may take up and later relinquish residence in different countries at different times."[25] They argued that the regulations took an expansive view regarding trust income or assets being distributed to or accumulated for the benefit of a U.S. person. They further contended that this determination is made without regard to whether trust income or principal is *actually* distributed and without regard to whether an interest in the trust is contingent on a future event. Thus, whenever the possibility exists for the distribution of a trust's current income, accumulated income, or principal to a U.S. resident, all assets of the trust attributable to property from a U.S. transferor will be treated as owned by such U.S. transferor—notwithstanding the likelihood that all or most of the trust's income or principal will be distributed to non–U.S. resident beneficiaries. They claimed that under this expansive scope, application of section 679 cannot be avoided merely because the trust instrument provides that distributions will not be made to any U.S. person. The proposed regulations made multigenerational planning more difficult because including grandchildren as potential beneficiaries subjected the trust to the risk of their change of residence.

Similarly, an often cited commentator in a November 2, 2000 letter to the IRS submitted his written testimony prepared for the public hearing on the proposed regulations.[26] The commentator expressed his concern that the proposed regulations lacked clarity due to their departure from the clear and plain language of section 679, the legislative history and law. The commentator argued that in proposed regulation 1.679-2(a)(2), the word "benefit" is treated as if

19

it means beneficiary. The word beneficiary has long been defined by the IRS in regulations as an individual who has a current right to income (current or accumulated) or a current economic or legal interest in a trust or a present right to receive trust principal or income. He contended that proposed regulations added a new concept of looking into the future to see if corpus may possibly be distributed to, or held for the future benefit of, a U.S. person and that this concept violates the plain language of section 679, the legislative history[27] and other regulations issued by the IRS. The proposed regulations ignored the taxable year requirement found in three places in section 679(c), the requirements found in the legislative history and that the determination is made on an annual basis.

Final regulations were enacted on July 20, 2001 and, except as otherwise noted in the regulations, were effective for transfers after August 7, 2000.

### D.    2010

In 2010, Congress again felt the need to amend section 679 claiming that they were "clarifying" certain aspects of the law. The Hiring Incentives to Restore Employment ("HIRE") Act amended section 679 to provide explicitly in the statute that an amount is treated as accumulated for the benefit of a U.S. person even if such U.S. person is a contingent beneficiary and, in the setting of a discretionary trust, the trust shall be treated as having a U.S. beneficiary unless the terms of the trust specifically identify the class of persons to whom such distributions may be made, and none of the persons is a U.S. person during the applicable taxable year. Additionally, section 679 was amended to create a presumption that a foreign trust to which a U.S. person has transferred property will be treated as having a U.S. beneficiary unless the transferor proves, to the satisfaction of the Treasury, that under the trust's terms, no part of the income or principal of

20

the trust may be paid or accumulated during the taxable year to or for the benefit of the U.S. person, and if the trust were terminated during the taxable year, no part of the income or principal could be paid to or for the benefit of a U.S. person.

Practitioners at the law firm of McDermott Will & Emery commented that certain provisions of the HIRE Act claimed to clarify and, in fact, expanded when, for purposes of section 679, a foreign trust created by a U.S. donor should be treated as having a U.S. beneficiary.[28] Other practitioners argued that, based on statutory history and interpretations by regulations and other guidance, an inference that income will be treated as accumulated for a contingent beneficiary interest appears to be far-reaching and somewhat vague.[29] In any event, it was not until 2010 that the question of when a foreign trust would be a grantor trust by reason of having a U.S. beneficiary after the grantor's death was more or less resolved.

## VII.    The Bar's View of Code §674(c) During the Relevant Time Period - Interpretation of Power and Control

### A.    Interpretation by the Tax Bar of the Independent Trustee Exception

Code section 674(a) states that if the grantor or a non-adverse party, or both, control the enjoyment or disposition of trust property without the consent of an adverse party, the grantor will be treated as the owner of such property. The power to control enjoyment includes the power to sprinkle income or principal among individual beneficiaries. Because most trustees are non-adverse, almost every trust would be a grantor trust under this section but for the various exceptions that follow in sections 674(b), 674(c), and 674(d). Code section 674(c), which is titled "exception for certain powers of independent trustees," provides that independent trustees (without the approval or consent of any other person) can distribute, accumulate, or apportion

21

income, or pay corpus without causing income tax consequences to the grantor. Independent

trustees are defined in section 674(c) as individuals or entities other than the grantor and the

grantor's spouse and no more than half of whom are family members, employees, or other

subservient parties to the grantor or the grantor's spouse under section 672(c).[30]   The settlor's

attorney and accountant, who are not treated as employees of the settlor but as independent

contractors, are not considered related or subordinate parties under 672(c) and, therefore, are

categorically independent trustees.[31]

The tax bar did not understand independence to be determined by a facts and circumstances test

or whether the individual was paid by the settlor. Instead, independence was to be determined

solely by the statute.[32]   Accordingly, based on the language of the statute, practitioners advised

clients that a grantor could name one member of his family as a trustee along with a corporate

trustee and fall within the independent trustee exception because the grantor need only insure

that at least half of the trustees are not within the class of related and subordinate parties.[33]   Even

to this day, many trust agreements are drafted naming a family member as a trustee upon whom

the client relies and an independent third party as a trustee with the ability to make discretionary

distributions.

### B.     The "De Facto Control" Concept Was Thought to be Essentially Dead

For almost forty years, even if a grantor or a beneficiary had a significant amount of persuasive

influence over a trustee, estate planning practitioners felt comfortable advising clients to name

close relatives of grantors or beneficiaries as trustees of a trust without fear that a court would

later determine that the grantor or beneficiary should be treated as holding the powers of the

trustee because of the close relationship.[34]   Planners believed that the language of the

22

independent trustee exception of section 674(c) invites the grantor to use trustees who are independent within the statutory definition, notwithstanding that they are likely to be responsive to the grantor's wishes.  Examples include a grantor's lawyer, accountant or relative who is not on the proscribed list, such as a niece, nephew, or an in-law.  Even a professional fiduciary is likely to turn to the grantor for his special knowledge and views of the needs and circumstances of the beneficiaries to guide the trustee's exercise of discretionary powers over distributions.[35]

Planners felt comfortable naming close relatives, friends, attorneys and accountants as trustees based, in substantial part, on the Tax Court's opinion in *Estate of Goodwyn v. Commissioner*,[36] and the Supreme Court's position in *U.S. v. Byrum*,[37] because of the views expressed by those courts.  In the view of the Tax Court, the term power as used in Code section 674, refers to legally enforceable powers and not merely the persuasive control that a settlor may exercise over an independent trustee.[38]  Thus, in summarizing *Goodwyn* and the Tax Court's holding, Robert T. Danforth (a former practitioner and current professor of law) stated that whether or not the trustees acted in accordance with their fiduciary duties, because the trustees were at all times legally accountable for the settlor's decisions on their behalf, it was appropriate to treat the trustees as holding the investment and distribution powers, and not the settlor.[39]

Most practitioners noted that courts have generally been reluctant to attribute powers of a trustee to the grantor.[40]  Since *Goodwyn*, practitioners believed that apparent subservience (in a situation where there is a question of whether de facto control exists) was not by itself enough to make 674(c) inapplicable[41] and that the "de facto control issue may be essentially dead."[42]

23

## VIII.  The Bar's View of the Power to Remove and Replace Trustees During the Relevant Time Period

According to Steve Akers, Secretary Elect of ACTEC, the history of trustee removal powers and the ultimate concession from the IRS in Revenue Ruling 95-58 that trustee removal powers would not cause the remover to be treated as holding the trustee powers (so long as the remover had to appoint a successor who was not a related or subordinate party) is clear indication of the extent to which the courts and even the IRS agree that legally enforceable powers control, not the power to persuade (or even "brow beat") a trustee with the constant threat of removal.[43]

### A.    The Tax Bar's Criticisms of Revenue Ruling 79-353

Treasury regulation section 1.674(d)-2(a), which was adopted in 1956, provides that a grantor will not be treated as a trust owner, for income tax purposes, where the grantor has the power to replace a trustee due to death or resignation or where the grantor has the power to substitute another independent trustee.  Despite the fact that the power to remove or replace a trustee with an independent trustee clearly did not (and still does not) cause the grantor to be subject to income taxes on the trust's income, at times in history it was problematic for estate tax and gift tax purposes.

In 1979, the IRS surprised the legal profession with Revenue Ruling 79-353 which held that if the grantor retained the power to remove a trustee without cause and appoint a successor trustee other than himself, the trust property will be included in the grantor's gross estate.[44]  In effect, the IRS was arguing that a grantor's power to replace trustees, even when the grantor could not appoint herself or himself as the successor trustee, would influence the trustee (or the replacement trustee) to do the grantor's bidding.

24

Revenue Ruling 79-353 was widely criticized by the tax bar and practitioners.[45]  For federal

estate tax purposes, it had always been a basic concept that a trust grantor's retained right to

substitute himself as trustee in place of the acting trustee will result in the grantor being treated

as holding all of the trustee's powers.  Practitioners, including Frederick Keydel (a former

Regent, member of the Executive Committee and the Editorial Board of ACTEC), argued that

the authorities cited by the IRS in support of its holding were prior rulings and cases that did not

support the IRS's attempted expansion of the concept mentioned above beyond the situation

where the grantor could become the trustee and that such an expansion of the concept (1) was

implicitly contrary to Treasury Regulation section 20.2036-1(b)(3) and 20.2038-1(a)(3), and (2)

ignored a number of cases, including the Supreme Court's decision in *Byrum v. United States*,

that reached a contrary conclusion.  The important distinction between the specific retention of a

power or right and a possible de facto control over a trustee's exercise of discretion was simply

ignored (citing *Goodwyn*).[46]

Literally dozens of articles were written criticizing the Ruling, including an article published by

Jonathan Blattmachr (former ACTEC Regent), and virtually all major bar groups which

commented on such matters urged the IRS to withdraw the Ruling.[47]  The American Bar

Association adopted a recommendation[48] that Congress amend the Code to provide that: the

mere possession or retention by a decedent of a power to change a trustee of a trust to a person

other than the decedent shall not result in the inclusion of the assets of such trust in the gross

estate of a decedent retaining or possessing the power to change trustees.[49]  The ABA adopted

this recommendation not only because Revenue Ruling 79-353 was a misrepresentation of the

law applicable to the issue raised by the Ruling, but also because the Ruling ignored the weight

of judicial authority contrary to its holding and the state law fiduciary standards that (1) required

25

a trustee to exercise independent discretion, and (2) prevent a trustee from exercising his or her discretion arbitrarily, unreasonably, in bad faith or with improper motives.[50]  ACTEC also widely criticized the Ruling and participated in several meetings with IRS representatives about it.[51]

The Tax Court finally rejected the reasoning of the IRS's Ruling in *Estate of Vak v. Commissioner*[52] and *Estate of Wall v. Commissioner*[53] adopting the reasoning of ACTEC's *amicus* brief on the subject.  The court in *Estate of Wall* held that the decedent's right to replace the corporate trustee did not, in turn, encompass the right to exercise the trustee's powers and therefore the trusts were not included in the decedent's estate.  In reaching this conclusion, the court stated that the IRS's argument that the settlor could exercise the trustee's powers by threating to replace it was simply speculation and under established principles of law governing trusts, a trustee would violate his fiduciary duties if it acquiesced in the wishes of the settlor. The court in *Estate of Wall* relied on *Byrum* as authority for the proposition that a retained right "must be a legally enforceable power" and not one that is inferred or imputed.[54]

In 1995, by the issuance of Revenue Ruling 95-58, the IRS expressly revoked Revenue Ruling 79-353 in view of the decisions of the Tax Court in *Estate of Wall* and *Estate of Vak*.

### B.    Planning After Rejection of Revenue Ruling 79-353

Based on the fact that the IRS was not successful in arguing that the power to remove a trustee should cause trustee powers to be attributed to the grantor or beneficiary who possessed the removal power, and because the IRS finally conceded this point in Revenue Ruling 95-58, estate planners agreed that control means "legally enforceable control" as defined in a trust agreement and drafted trust agreements which provided a settlor and/or his spouse and/or a protector with

26

the ability to remove a trustee and substitute the trustee with an individual or corporate trustee who is neither related or a subordinate party, without the fear of causing an estate tax inclusion risk or grantor trust status.

## IX.    The Bar's View of Protectors as "De Facto" Trustees During the Relevant Time Period

As detailed in Sections IV and X of this Report, it has become common practice for draftspersons to name one or more persons as trust protectors who could remove and replace the trustee, modify the terms of the trust, make recommendations to the trustees and even have veto power over investment or distribution decisions, in order to help settlors feel more comfortable with moving large amounts of money to an irrevocable trust thousands of miles away with a corporate trustee.  The concept of the protector was designed to protect the trust and the interests of the beneficiaries (particularly after the settlor's death) by overseeing the actions of the offshore trustee who frequently had little to no connection with the settlor or the trust's beneficiaries.

Whether or not a trust protector is bound by a fiduciary duty has been the subject of numerous articles and, depending on the breadth of their powers, an argument could be made that protectors are "de facto" trustees.  However, even if the protector could be considered a "de facto" trustee, it was believed that a protector's status as a trustee would not cause grantor trust status to the settlor of the trust.

In March of 2009, the proposed Stop Tax Haven Abuse Act included a recommendation for the amendment of section 672 to insert a new subsection which stated that a grantor shall be treated as holding any power or interest held by any trust protector or trust enforcer or similar person

appointed to advise, influence, oversee, or veto the actions of the trustee.[55]   The proposed

changes to section 672, however, were never enacted.

X.    **Day to Day Dealings with Offshore Trustees - Letters of Wishes & Protectors**

Notwithstanding the many advantages of offshore trusts, settlors who set up such trusts in distant

foreign financial centers often want both to ensure that the corporate trustee is informed of their

reasons for setting up the foreign trusts in the first place and to safeguard against wrongdoing by

the trustee who has control over the trust assets.  Devices such as nonbinding letters of wishes

and trust protectors help in accomplishing both those goals.[56]

A letter of wishes (and more recently a memorandum of wishes) is a written communication

from the settlor to the trustee designed to offer the trustee of a wholly discretionary trust some

guidance in the exercise of discretion.  It can be immensely helpful to a trustee in ascertaining

the settlor's state of mind, objectives, and purposes in establishing the discretionary trust.[57]  The

non-binding letter is intended to be "personal" between the settlor and the trustee and is simply

meant to assist the trustee in the process of exercising his discretion but the discretion is the

trustee's and the letter of wishes does not form part of the trust's terms.[58]

Trusts drafted in the U.S. have traditionally been narrowly tailored and well defined in scope and

purpose, generally including a host of details that would more typically be found in a non-

binding letter of wishes for trusts drafted outside the U.S.[59] Thus, until recently, letters of wishes

have rarely been used in the U.S. in connection with the typical discretionary trust and there is

practically no substantive mention of, reference to or information on letters of wishes in

domestic reference material.  In the United Kingdom, and jurisdictions that follow English law,

28

letters of wishes are widely used as supplements to both wills and trusts and, while there is quite a bit of reference material and cases on the subject of letters of wishes, they mostly deal with whether beneficiaries have the right to see non-binding letters of wishes.[60]

In the offshore trust context, where the settlor has limited opportunity to discuss his wishes with the trustees in person and where the trustees have little knowledge of intricate family relationships, the letter of wishes can be an effective tool in familiarizing the trustees with the settlor's basic intentions in creating the trust. Such a letter of wishes can operate as part of the background to the exercise of discretion by a corporate offshore trustee in the same way that personal knowledge of a settlor's family or standard of living may guide a domestic individual trustee.[61]

The use of letters of wishes has been increasing due to the proliferation of multi-generational or perpetual trusts and the growth of multi-national families who are accustomed to the use of letters of wishes.[62] Settlors of dynastic foreign trusts, which are intended to last for many generations, often grant the trustees broad discretion over distributions, as circumstances can evolve and change dramatically over time. In such circumstances, non-binding precatory letters of wishes in which settlors can give instructions to future trustees regarding the management of the trust can be very useful.[63]

Indeed, in the offshore trust context, if not also the domestic context, regular communications and recommendations made to the trustees by the settlor and the beneficiaries is the norm. By way of example, in the Jersey case of *A Trustees v W et al* (Channel Islands case),[64] the court observed that "trustees can normally be expected to facilitate the wishes of the beneficiaries." And in *In the Matter of the Esteem Settlement,*[65] a leading offshore case dealing with the

29

question of settlor influence, the court held that "trustees exist for the benefit of beneficiaries and it is in our judgment very common that trustees will have perfectly properly acceded to all the requests of a settlor without in any way abdicating their fiduciary duties and responsibilities."

While, historically, the concept of a protector developed in offshore jurisdictions, protectors now form a part of mainstream tax planning in most jurisdictions that recognize trusts. The use of trust protectors in foreign trusts set up by Americans became particularly popular in the 1980's and 1990's in response to an eruption of litigation and increasing malpractice liability.[66] The concept of a protector who, at the very least, could remove and replace the trustee helped settlors feel more comfortable with moving large amounts of money to an irrevocable trust thousands of miles away and to safeguard against wrongdoing by the corporate trustee who was in absolute control of the property and with whom they had previously had little if any familiarity.[67] The office of protector was designed to protect the trust and the interests of the beneficiaries (particularly after the settlor's death) by overseeing the actions of the offshore trustee who had little to no connection with the settlor or the trust's beneficiaries.[68] While the settlor's non-binding letter of wishes could be ignored by the trustee, the trust protector can be given the power to override the trustee's decisions, as well as to remove the trustee and appoint a successor.[69] An added benefit of having a protector is the ability to circumvent the cost and delay of court approval when trustee removal was sought, as well as the ability to have flexibility in an irrevocable trust where a protector has the power to amend trust provisions to deal with changes in circumstances, including both factual circumstances (death, divorce, previously unknown children) and legal changes.[70] Often, the protector is vested with key powers that will allow the trust instrument to remain flexible as circumstances change over time.[71] Notably, a statutory definition of the concept of a protector was not introduced in the U.S. until 1997, when

30

it was first enacted by South Dakota.[72]  Today, a large number of states have adopted the concept

of trust protectors as illustrated in Exhibit 5.

## XI.    The Bar's View of the Accommodation Grantors Rules During the Relevant Time Period

### A.    Interpretation Prior to 1997

The term "grantor" is used extensively in relation to trusts but was not the subject of much

statutory guidance until proposed regulations were published in 1997.

Prior to the issuance of regulations, case law held that a grantor of a trust was the person whose

economic contributions created the trust.  Where the same person created and funded the trust,

that person was easily characterized as the grantor.  The answer was less straight forward where

the person who created the trust and the person who contributed funds to the trust were not the

same individual.

Certain cases held that if a settlor who created a trust funded it only nominally and other

individuals made large gifts to such a trust, the settlor was not the true grantor of the trust.  These

holdings were based on an analysis of (1) the facts and circumstances of the case and (2) the

amount of control the various transferors had over the transferred property.[73] Meanwhile, other

cases heard by the Ninth Circuit found that nominally funded trusts were valid and the person

who nominally funded the trust was the true grantor of the trust.

Since case law on nominal settlors was based on fact specific analysis and resulted in conflicting

holdings, and in the absence of rules or illustrative examples in regulations, practitioners had

little guidance in advising their clients in this regard.

31

## B.    Post-1997 Interpretation and Planning Opportunities

In 1997, proposed regulation section 1.671-2 was published and included a comprehensive definition of the term "grantor," providing rules and examples. Final regulations were enacted on July 5, 2000 and applied to any transfer to a trust, or transfer of an interest in a trust, on or after August 10, 1999.

The final regulations made it clear that if a person creates or funds a trust on behalf of another person, both persons will be treated as grantors of the trust but only the one making the gratuitous transfer could be treated as the trust's owner. Similarly, a person who is reimbursed for a gratuitous transfer will not be treated as the owner of any portion of the trust. An accommodation party is not a grantor.

That being said, even under the final regulations, there cannot be an accommodation or nominal grantor unless another taxpayer makes a gratuitous transfer to the trust or reimburses the accommodation/nominal grantor for a transfer that he or she made. Furthermore, where the person transferring property to a trust does not do so "gratuitously" but rather enters into a sale or exchange transaction with the trust for fair market value and does not retain or exercise legal control over the trust, the transferor will not be considered the grantor of the trust. Accordingly, to this day, practitioners still suggest the use of "cured trusts" or "safe trusts", that are set up by third parties, even with nominal funding, and which obtain the balance of their assets through arm's length sale or exchange transactions with clients.[74] It is not necessary for the third party transferor of the trust to have donative intent[75] so long as the transferor for good and sufficient reason made a gratuitous transfer to the trust.

32

## XII.   The Bar's View of Private Annuity Transactions During the Relevant Time Period

Private annuity transactions were regularly entered into during the relevant time period and are still being used today as estate planning devices.   At its most basic, an individual transfers property to a child (or other individual or entity such as a trust) who is not engaged in the business of issuing annuities in return for the child's/trust's promise to make annual payments to the transferor for life or a specified period.   There is no gift tax on the transfer so long as the property does not exceed the present value of the payments.   The IRS provides tables of the present value of private annuities for this purpose, and the interest factor used in applying the IRS tables changes monthly.   The principal benefits of a private annuity include: (1) removing assets from the annuitant's gross estate for federal estate taxes without the payment of gift tax while at the same time retaining a steady stream of income, (2) until 2006 when proposed regulations indicated that it would no longer be permissible, spreading the taxation of capital gains over the life expectancy of the annuitant when exchanging appreciating property for an annuity, and (3) delivering the appreciated property to the payor with a new basis.   According to a 2004 article in Los Angeles Lawyer, "if properly used, a private annuity may thus be the most powerful weapon used today to postponing income taxes, avoiding wealth management and investment worries and preserving a source of income."[76]

Throughout the years, the IRS heavily scrutinized private annuity transactions between family members, especially those transactions involving transfers through a trust.[77]   Using a trust exposed the transferor or seller to the potential IRS argument of having reserved a life estate (which might cause estate tax inclusion).   The determination as to whether a transferor entered into a valid transfer in exchange for a private annuity that would be respected versus a transfer

with a retained life estate was determined by an analysis of the facts and circumstances of the situation determined by the Tax Court and the Ninth Circuit in cases such as *Stern v. Commissioner*[78] and *Weigl v. Commissioner*.[79]

Despite the fact that there were cases holding against a taxpayer and characterizing a private annuity transaction as a retained life estate under certain circumstances, practitioners still advocated, and continue to advocate, their use with a trust under the right set of facts. For example, after the *Stern* case, tax practitioners in New York City argued that on balance, it appears that a taxpayer who takes care to match the value of the assets transferred and the annuity received, should have a reasonable chance of combining the annuity and a substantial degree of influence over trust administration without being subject to adverse tax consequences.[80] Similarly, in a 1998 article, a practitioner argued that despite concerns from the estate planning and tax communities, the private annuity can be an avenue to substantial tax savings and that private annuities have gotten a "bad rap" from inappropriate application and IRS publicity.[81] Furthermore, Edward P. Wojnaroski Jr. (an ACTEC fellow and author of Portfolio 805-3[rd], *Private Annuities and Self-Cancelling Installment Notes*) argues that "while the cases and rulings…clearly demonstrate potential pitfalls, these cases and rulings also point towards relatively uncharted harbors. Planners may employ several techniques to navigate the uncharted territory"[82] and avoid the transfer with a retained interest argument.

## XIII.  The Beneficiaries' Use of Trust Property Pre/Post HIRE Act

Up until 2010, it was widely accepted that loans of tangible property from a foreign trust to trust beneficiaries, including the rent-free use of a residence, art or yacht owned by a trust, posed no

tax issues. This is because there was no authority holding that a beneficiary's rent-free use of a residence or other assets owned by a trust was a constructive distribution to the beneficiary.[83]

Case law in fact held the opposite. In *Alfred I Dupont Testamentary Trust,*[84] the U.S. Tax Court held in 1976 that amounts paid by trustees for the maintenance and improvement of a residence would not be treated as distributions to the residuary beneficiary of the trust. In *Commissioner v. Plant,*[85] the Second Circuit Court of Appeals noted that trust income expended for the maintenance of a trust-owned house in which a trust beneficiary lived rent-free was not taxable as part of the beneficiary's income.

In 1996, section 643(i) was added by the Small Business Job Protection Act, treating a loan of cash or marketable securities made after September 19, 1995 from a foreign trust to a U.S. beneficiary as a distribution for income tax purposes. An earlier version of the legislation suggested treating the loan of tangible personal property, such as vacation homes, automobiles and boats, as a distribution.[86] However, this language was not included in the final code section. In 1997, IRS published Notice 97-34, discussing constructive distributions from foreign trusts to U.S. beneficiaries but was silent on the rent-free use of trust-owned assets. Since neither the Code nor the regulations addressed the use of trust property, practitioners concluded that use of trust property by a beneficiary was not a distribution.

In March of 2009, the proposed Stop Tax Haven Abuse Act included a recommendation for the amendment of section 643(i) to specifically include loans of property other than cash such as real estate, artwork, jewelry and other personal property.[87] This proposed amendment was never enacted.

35

Later that year, in October, a prior version of the Foreign Account Tax Compliance Act was first introduced as standalone legislation and, although not enacted, proposed and included a suggested amendment of Code section 643(i) to include, in addition to loans of cash and marketable securities, the uncompensated use of any trust property that is not cash or marketable securities as a distribution. But it was not until 2010 that section 643(i) was broadened by the provisions of the HIRE Act to provide that any use of foreign trust property after March 18, 2010 by a U.S. grantor, a U.S. beneficiary or any U.S. person related to such grantor or beneficiary will be treated as a distribution to such grantor or beneficiary equal to the fair market value of the use of the property. Thus, the amended provisions of section 643(i) created additional distinctions between the reporting and tax treatment of foreign non-grantor trusts as compared to their domestic counterparts.[88] Since this latest amendment, there have been numerous requests for further clarification and guidance as to the use of assets for which no rental market exists, the use of property over a de minimis amount and the simultaneous use of trust property by more than one person.[89] But it is clear that trust property is held for the benefit of beneficiaries and intended to be used by beneficiaries, that until 2010 there were no tax consequences to beneficiaries by reason of their uncompensated use of property held by foreign trusts, and that even today there are no tax consequences to beneficiaries by reason of their uncompensated use of property held by domestic trusts.[90]

JOSHUA S. RUBENSTEIN
November 10, 2015

36

[1] Examples of Commonwealth offshore trust jurisdictions include Bahamas, Barbados, Bermuda, British Virgin Islands, Cayman Islands, Gibraltar, Guernsey, Isle of Man and Jersey.

[2] *See* Ward L. Thomas and Leonard J. Henzke, Jr., *Trusts: Common Law and IRC 501(c)(3) and 4947*, 12 [Document included at Appendix 1]; 4C MO. PRAC., TRUST CODE & LAW MANUAL § 1:1 (2013 ed.) [Appendix 2]; Restatement (First) of Trusts Intro. Note (1935) [Appendix 3].

[3] *See* Richard C. Ausness, *The Offshore Asset Protection Trust: A Prudent Financial Planning Device or the Last Refuge of A Scoundrel?*, 45 DUQ. L. REV. 147, 154 (2007) [Appendix 4].

[4] *See Vanessa Schrum*, Trustee Liability Issues- Offshore, Discussion Paper 11th Annual International Estate Planning Institute, 12-13 (Appleby Global, March 2015) [Appendix 5]. There are certain protections provided by some offshore jurisdictions that have limited personal liability to some extent.

[5] *See* Jan Dash, Esq. and Herman W. Liburd, *The Role of Protectors in Offshore Trusts*, 4 (2003) [Appendix 6].

[6] *See* Cym H. Lowell, *Estate Planning in the International Arena, Basic Rules of U.S. Taxation for Inbound Foreign Investment*, THE AMERICAN LAW INSTITUTE (June 12, 1991) [Appendix 7].

[7] *See* Private Client Fiduciary Services (Channel Islands), Scale of fees and charges, RBC WEALTH MANAGEMENT (Nov. 2010) [Appendix 8].

[8] Jonathan C. Lurie and William R. Burford, *Drafting Flexible Irrevocable Trusts*, 33 ACTEC JOURNAL 86 (2007) [Appendix 9].

[9] Wilmington Trust, *The Use of Open Architecture by Corporate Trustees*, Oct. 28, 2015 [Appendix 10].

[10] *See* G. Bogert et al., *The Law Of Trusts And Trustees* § 556 [Appendix 11].

[11] H. REPT. NO. 1337 at A212, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. (1954) [Appendix 12].

[12] Michael A. Heimos, Esq., 854-4[th] T.M., *U.S. Taxation of Foreign Estates, Trusts and Beneficiaries, II. Foreign Trusts and U.S. Taxation: A Brief History* [Appendix 13], and Edward Zimmerman, *Using Foreign Trusts in the post-1976 Period: What possibilities remain?*, THE JOURNAL OF TAXATION, 12 (1977) [Appendix 14].

[13] Andrew Weinstein & Harold Bucholtz, *Despite Restrictions, Foreign Trusts Can Be Effective Tax Planning Devices*, 12 EST. PLAN. 94 (1985) [Appendix 15], and John A. Corry, *Letter to Office of Chief Counsel to the IRS*, NEW YORK STATE BAR ASSOCIATION TAX SECTION, (July 16, 1992) [Appendix 16].

[14] *Id.* at 29.

[15] Zimmerman, *supra* note 12.

[16] Corry, *supra* note 13, at 30; Zimmerman, *supra* note 12.

[17] Corry, *supra* note 13, at 29; Weinstein, *supra* note 13; *see also*, Cym H. Lowell, *International Estate Planning Considerations*, AMERICAN LAW INSTITUTE ALI-ABA COURSE OF STUDY, September 7, 1989 [Appendix 17].

[18] Weinstein, *supra* note 13.

[19] Weinstein, *supra* note 13, at 2 Corry, *supra* note 13; Zimmerman, *supra* note 12.

[20] Corry, *supra* note 13.

[21] Weinstein, *supra* note 13; Frank L. Chopin, *Use of Foreign Grantor trusts in Income and Estate Planning*, 21 U. MIAMI INST. ON EST. PLAN.12 (1987) [Appendix 18]; Egerton W. Duncan, *Use of Foreign Trusts by Nonresident Aliens*, 9 INTERNATIONAL TAX JOURNAL 113 (1982) [Appendix 19].

[22] Weinstein, *supra* note 13, 2-3.

[23] Berry et al., *Foreign Trusts and Gifts; It's Getting Warm Offshore — Part 2*, 8 J. Int'l Tax'n 405 (1997) [Appendix 20].

[24] McCaffrey et al., *U.S. Taxation of Foreign Trusts, Trusts with Non-U.S. Grantors and Their U.S. Beneficiaries*, 26 ACTEC NOTES 159 (2000) [Appendix 21].

37

[25] Joseph Lipari and Quincy Cotton, *Transfers to Foreign Trusts*, THE CPA JOURNAL 1, 1 (2001) [Appendix 22].

[26] Brian G. Dooley, *CPA Submits Testimony on Proposed Regs. on Transfers to Foreign Trusts*, (Nov. 2, 2000), www.taxnotes.com/imp/5441306 [Appendix 23].

[27] The Treasury countered criticisms of the proposed regulations in its preamble to the final regulations claiming that the commentators' arguments overlook the clear legislative intent underlying section 679 as provided in the legislative history. Legislative history is a term that refers to the documents that are produced by Congress as a bill is introduced, studied and debated. These legislative documents are often used by attorneys and courts in an attempt to determine Congressional intent or to clarify vague or ambiguous statutory language. All legislative documents are only persuasive legal authority.

[28] McDermott Will & Emery, *Hire Act: FATCA Provisions Affect Rules Governing Foreign Trusts and Reporting Requirements*, April 19, 2010 at 2 [Appendix 24].

[29] Lawrence H. McNamara Jr. CPA, TEP, *Scope of Foreign Trust Provisions in the HIRE Act*, The Tax Adviser, 5 (Nov. 1, 2010), http://www.thetaxadviser.com/issues/2010/nov/mcnamara-nov2010.html [Appendix 25].

[30] Edward Turley, Jr., *Section 674: Mr. Clifford's Enigmatic Progeny*, 9 HOUSTON LAW REV. 928(1972) [Appendix 26]; Stephen Akers et al., *Grantor Trusts*, BLATTMACHR ON INCOME TAXATION OF ESTATES AND TRUSTS 4–1, (2013) [Appendix 27]; Hudson A. Mead, *A primer in the Grantor Trust Rules*, 69 MICHIGAN BAR JOURNAL, 1152 (1990) [Appendix 28].

[31] Robert T. Danforth and Howard M. Zaritsky, 819-1st T.M, *Grantor Trusts: Income Taxation Under Subpart E, IV. Section 672: Definitions and Rules, A. "Adverse Party, "Nonadverse party," "Related or Subordinate Party"* [Appendix 29].

[32] *Id.*

[33] Herbert Baer, *Keeping Control of the Spray Trust Income Tax Problems*, THE TAX MAGAZINE 734 Nov. 1956 [Appendix 30]; Laura H. Peebles, *Tax Aspects of Choice of Trustee*, 31 ESTATE PLANNING JOURNAL 43, (2004) [Appendix 31].

[34] Steve R. Akers, *Resurrection of "De Facto Trustee" Concept- Securities Exchange Commission v. Wyly*, (Nov. 2014), www.bessemer.com/advisor [Appendix 32].

[35] David Westfall et al., *Effect of Power to Control Beneficial Enjoyment*, ESTATE PLANNING LAW AND TAXATION (1981) [Appendix 33].

[36] *Estate of Goodwyn v. Commissioner*, T.C. Memo. 1976-238 (1976) [Appendix 34].

[37] *U.S. v. Byrum*, 408 U.S. 125 (1972) [Appendix 35]; Westfall, *supra* note 35.

[38] *Tax Planning: Trusts and Income Taxes: Taxation of Grantor Trusts*, THE STANDARD FEDERAL TAX REPORTER (2015) [Appendix 36]; Howard M. Zaritsky, *The "Bad Facts Make Bad Law" Award for 2014: Grantor Deemed to Own Trusts by Use of Trust Protectors*, PROBATE PRACTICE REPORTER, (2014) [Appendix 37].

[39] Robert T. Danforth, *Rethinking the Law of Creditor's Rights in Trusts*, HASTINGS L.J. 287, 356 (2002) [Appendix 38].

[40] Steve R. Akers, *Trustee Selection; Retaining Strings Without Getting "Strung-Up"*, ADVANCED ESTATE PLANNING AND PROBATE COURSE (June 5, 2002) [Appendix 39].

[41] Virginia F. Coleman, *The Grantor Trust: Yesterday's Disaster, Today' Delight, Tomorrow's?*, (1996; reprinted in February 2001) [Appendix 40].

[42] Akers, *supra* note 40 at 18, citing *McCabe vs. U.S.*, 475 F.2d 1142 (Ct. Cl. 1973).

[43] Akers, *supra* note 34.

[44] Anthony P. Marshall, *The Power to Remove and Appoint Trustees*, 17 ACTEC NOTES 121, (1991) [Appendix 41].

38

[45] *See id.; see also*, Frederick R. Keydel, *Rev. Rul. 79-353 Unrestricted Rights to Substitute Trustees*, 7 PROBATE AND PROPERTY 6 (1993) [Appendix 42], and Jonathan G. Blattmachr, *IRS Revokes Rev. Rul. 79-353 But Leaves a Small Black Cloud Hanging*, 21 ACTEC NOTES 197 (1995) [Appendix 43].

[46] Keydel, *supra* note 45.

[47] Blattmachr, *supra* note 45.

[48] Lloyd Leva Plaine et al., 90 TNT 176-28 *ABA Members Make Suggestions for Simplifying Estate Tax Rules* (Section 2061 – Generation-Skipping Transfer Tax), TAX NOTES TODAY (August 1, 1990) [Appendix 44].

[49] Keydel, *supra* note 45, and 90 TNT 176-28 ABA Members Make Suggestions For Simplifying Estate Tax Rules. Tax Notes Today, August 24, 1990 [Appendix 45].

[50] *Id.*

[51] Frank S. Berall et al., *TC Okays Grantor's Power to Replace Independent Trustee*, 21 EST. PLAN. 67, (1994) [Appendix 46].

[52] *Estate of Vak v. Commissioner*, 973 F.2d 1409 (8th Cir. 1992) [Appendix 47].

[53] *Estate of Wall v. Commissioner*, 101 T.C. 300 (1993) [Appendix 48].

[54] *Id.*

[55] H.R. 1265, 111th Cong. (2009) [Appendix 49].

[56] Richard C. Ausness, *The Role of Trust Protectors in American Trust Law*, 45 REAL PROP., TR. & EST. L. J. 319 (2010) [Appendix 50].

[57] Alexander A. Bove, Jr., *The Letter of Wishes: Can We Influence Discretion in Discretionary Trusts*, 35 ACTEC JOURNAL 39 (2009) [Appendix 51].

[58] Giles Corbin and Bruce Lincoln, *Are Letters of Wishes Enforceable?* MOURANT OZANNES BRIEFING May 2012 [Appendix 52].

[59] Lurie, *supra* note 8.

[60] Bove, *supra* note 57.

[61] Lisa Jacob, *The Offshore Trust World*, 8 JUTA'S BUSINESS LAW 82 (2000) [Appendix 53].

[62] Pamela Lucina and Anne Cutler, *Understanding Settlor's Intentions, Letters of Wishes May Help*, WEALTH MANAGEMENT, April 21, 2014, http://wealthmanagement.com/print/highnetworth/ Understandingsettlorsintentions [Appendix 54].

[63] G. Warren Whitaker, *Classic Issues in Family Succession Planning*, PROBATE & PROPERTY 32 (2003) [Appendix 55].

[64] *In the Matter of the A and B Trusts*, [2012 (2) JLR 253] [Appendix 56].

[65] *In the Matter of the Esteem Settlement (Abacus (C.I.) Limited as Trustee), Grupo Torras S.A. and Culmer v. Al Sabah and Four Others*, [2003 JLR 188] [Appendix 57].

[66] Alexander A. Bove, Jr. *Exposing the Trust Protector*, TRUSTS & ESTATES (2012) [Appendix 58].

[67] Ausness, *supra* note 56.

[68] Stuart J. Kohn and Robert A. Romanoff, Trust Protectors In Depth, published in ALI CLE Estate Planning Course Materials Journal, June 2015 [Appendix 59].

[69] Ausness, *supra* note 56.

[70] Alexander A. Bove, Jr., *Selecting a Trust Protector*, TRUSTS & ESTATES (2013) [Appendix 60].

[71] Michael M. Gordon, *Directed Trusts, Trust Protectors, Private Trust Companies and Other Bells and Whistles*, 10TH ANNUAL INTERNATIONAL ESTATE PLANNING INSTITUTE, March 13, 2014 [Appendix 61].

39

[72] Kohn, *supra* note 68.

[73] Robert T. Danforth and Howard M. Zaritsky, 819-1st T.M., *Grantor Trusts: Income Taxation Under Subpart E, III.D. Identifying the Grantor, Indirect Transfers, and Reciprocal Trusts* [Appendix 62].

[74] Edward P. Wojnaroski Jr., 805-3rd T.M., *Private Annuities and Self-Cancelling Installment Notes, XI.D. Private Annuities and SCINS With Trusts Treated As Separate Taxable Entities* [Appendix 63]; Richard Oshins et al., *The BDIT, A Powerful Wealth Planning Strategy When Properly Designed and Implemented* [Appendix 64].

[75] Henry J. Lischer, Jr., 845-3rd T.M., *Gifts, III.B. Donative Intent Not Required to Establish a Taxable Gift* [Appendix 65].

[76] F. Bently Mooney Jr., *The Use of Private Annuities in Estate and Tax Planning*, LOS ANGELES LAWYER 12, 12 November 2004 (as previously mentioned, due to the proposed regulations, income tax deferral is no longer a benefit) [Appendix 66].

[77] Wojnaroski, *supra* note 74.

[78] *Stern v. Commissioner,* 747 F.2d 555 (9th Cir. 1984) [Appendix 67].

[79] *Weigel v. Commissioner,* 84 T.C. 1192 (1985) [Appendix 68].

[80] Warren Gorham Lamont et al., *Recent Developments May Expand The Use of Private Annuities, But Problems Still Exist*, 13 EST. PLAN. 106 (1986) [Appendix 69].

[81] Merrie Jeanne Webel, Attorney, *Private Annuity Passes Wealth to Family Members—Other than Uncle Sam*- By TAXATION FOR ACCOUNTANTS 68 August 1998 [Appendix 70].

[82] Wojnaroski, *supra* note 74, at 7.

[83] McCaffrey, *supra* note 24.

[84] 66 Tax Court 761 (1976), *aff'd* 74 Fed 2d 1332 (5th Cir. 1978) [Appendix 71].

[85] 76 F.2d 8 (1935) [Appendix 72].

[86] Kozusko Harris Duncan, *Developments Regarding Taxation of Use of Trust Property*, LEXOLOGY, November 12, 2009, http://www.lexology.com/library/detail.aspx?g=e8a1473d-e733-4566-b00f-1b78483d271f [Appendix 73].

[87] H.R. 1265, *supra* note 55.

[88] Jennie Cherry and George N Harris Jr., *Uncompensated Use of Foreign Trust Property: HIRE Act Treats as Trust Distribution, published in International Law Office*, INTERNATIONAL LAW OFFICE, June 24, 2010, http://www.internationallawoffice.com/Newsletters/Offshore-Services/USA/Kozusko-Harris-Vetter-Warch-LLP/Uncompensated-use-of-foreign-trust-property-HIRE-Act-treats-as-trust-distribution#uncomp [Appendix 74].

[89] Brit Geiger, *NYC Bar Comments on Issues Concerning Trusts Under FATCA*, TAX NOTES, June 17, 2011, http://www.taxnotes.com/imp/13798191 [Appendix 75].

[90] Cherry, *supra* note 88.

40

Documents and Materials Reviewed and Considered

| DESCRIPTION | IDENTIFIER |
|---|---|
| SEC v. Wyly – Deposition Transcript – David Bester Volume 1 5/8/12 and Volume 2 5/9/12 | |
| SEC v. Wyly – Deposition Transcript – David Harris Volume 1 5/10/12 and Volume 2 5/11/12 | |
| SEC v. Wyly – Deposition Transcript – Francis Webb Volume 1 7/11/12 and Volume 2 7/12/12 | |
| SEC v. Wyly – Deposition Transcript – Charles Lubar 9/13/12 | |
| SEC v. Wyly – Hennington Testimony 4/17/14, 4/18/14, 4/21/14 | |
| SEC v. Wyly – Statement of Interest of the United States 8/9/14 | Docket No. 448 |
| SEC v. Wyly – Opinion and Order 9/25/14 | Docket No. 476 |
| SEC v. Wyly – Final Judgment 2/26/15 | Docket No. 591 |
| In re Caroline D. Wyly – IRS Poof of Claim | Claim No. 11 |
| In re: Samuel Evans Wyly – IRS Proof of Claim | Claim No. 18 |
| In re: Samuel Evans Wyly – Motion for Summary Judgment 5/29/15 | Docket No. 611 |
| In re: Samuel Evans Wyly – Memorandum Opinion and Order 8/24/15 | Docket No. 789 |
| In re: Samuel Evans Wyly – United States' Objections and Responses to Samuel Evans Wyly's First Set of Interrogatories 8/12/15 | |
| In re: Samuel Evans Wyly – United States' Objections and Responses to Samuel Evans Wyly's Request for Production 8/12/15 | |
| In re: Samuel Evans Wyly – United States' Objections and Responses to Caroline D. Wyly's Request for Production 8/12/15 | |
| In re: Samuel Evans Wyly – United States' Objections and Responses to Caroline D. Wyly's First Set of Interrogatories 8/12/15 | |
| In re: Samuel Evans Wyly – Debtor's Amended Responses and Objections to United States' First Set of Interrogatories and Request for Production 7/27/15 | |
| In re: Samuel Evans Wyly – Debtor Caroline D. Wyly's Amended Responses and Objections to United States' First Set of Interrogatories and Request for Production 7/27/15 | |
| In re: Samuel Evans Wyly – Debtor's Responses and Objections to United States' Second Set of Interrogatories and Request for | |

1

Documents and Materials Reviewed and Considered

| | |
|---|---|
| Production 9/4/15 | |
| In re: Samuel Evans Wyly – Debtor Caroline D. Wyly's Responses and Objections to United States' Second Set of Interrogatories and Request for Production 9/4/15 | |
| Isle of Man Trust Documents | SWYLY000158-000188, 000193-000226, 000227-000258, 000740-000778, 000804-000841, 000862-000893, 000917-000948, 000986-000998, 000999-001044, 001250-001316, 001707-001741, 001748-001782, 0016396-0016452, 0016466-0016468; IFG-002737-002768, 103395-103430; WYLYSEC00629472-00629528; SECI00017242-00017275 |
| Letters of Wishes – Bulldog Non-Grantor Trust, Castlecreek Trust, Bessie Trust, LaFourche Trust, Bulldog Trust, Plaquemines Trust, Lake Providence Trust, Delhi Trust | JWLLP-SEC00224-00226, MF-SEC-RFP1-005087-005089; SWYLY003908-003909, 003914-003916, 003917-003919, 003922-003923, 015993, 015998-015999 |
| Hennington-Boucher Memo 7/2/03 | PX-1255 |
| Boucher-Hennington Memo 8/29/03 | PX-1260 |
| Meeting Notes 10/8/03 | PX-1273 |
| Meadows Owens Memos and Materials | SWYLY004700-004707, 004736-004754, 004760-004763, 004764-004765, 004767, 004768-004770, 004771-004775, 006216-006217, 006832-006835, 006839-006840, 006852-006861, 006894, 006898, 006904-006906, 006932-006939, 007074-007078, 007255-007260, 007263-007268, 007269-007279, 007330-007335, 007370-007376, 007503-007510, 007514-007525, 007557-007562, 007583-007597, 007608-007609, 007612, 007685-007712, 008156-008157, 008153-008155, 008206-008242, 008243-008247, 008248-008252, 008253-008256, 008257-008260, 008263, 008264, 008272-008273, 008274-008275, 008298-008301, 008305-008309, 008310-008312, 008326-008335, 008356-008366, 008351-008355, 008358, 008370-008371, 008367-008369, 008373-008376, 008377-008378, 008381-008393, 008401-008402, 008403-008405, 008406-008418, 008419-008431, 008432-008435, 008436-008438, 008439-008442, 008443, 008444-008447, 008462-008472, 008473-008477, 008481-008485, 008486-008496, 008556-008557, 008558-008559, 008562-008570, 008571-008574, 008665-008668, 008652-008662, 008669-008673, 008717-008718, 008737-008743, 008752-008755, 008777-008781, 008800-008805, |

Documents and Materials Reviewed and Considered

| | |
|---|---|
| | 008806-008807, 008835-008845, 009038-009041, 009055-009060, 009062-009067, 009077-009088, 009108, 009113-009117, 009150-009160, 009179-009180; 009181, 009183, 009192-009195, 009287-009296, 009408-009409, 009415-009460, 009472-009484, 009532-009544, 009545-009554, 009596-009597, 009598-009599, 009600-009602, 009628-009631, 009649-009655, 009682-009683, 009686, 009707, 009713-009718, 009736-009739, 009746-009751, 009752-009755, 009766-009767, 009807-009808, 009809, 009854-009855, 009885-009888, 009889-009892, 009914-009927, 009928-009939, 009940-009953, 009966, 009982-009991, 010007-010009, 011773-011783, 012256, 012874-012884, 012888-012900, 012902-012907, 012910-012915, 012924-012930, 012931-012937, 012938-012947, 012948-012964, 012965-012966, 012967-012971, 012972-012979, 012980-012994, 012997, 013113-013118, 013137-013150, 013152-013165, 013172, 016998-017013 |
| Tedder-Chatzky Memos and Materials | SWYLY001827-002009, 002026-002052, 002053-002056, 002057, 002087-002104, 002151-002166, 002167-002174, 002175-002195, 002196-002216, 002217-002236, 002619-002637, 002638-002656, 002657-002676, 002677-002695, 002696-002714, 002715-002733, 002734-002752, 002753-002771, 002772-002790, 002791-002809, 002810-002828, 002829-002847, 002848-002866, 002867-002885, 002886-002904, 002905-002923, 002924-002942, 002943-002961, 002962-002980, 003351-003366, 003367-003382, 003383-003399, 003400-003415, 003416-003432, 003655-003674, 003701-003710, 004121-004122, 004123-004127, 004142-004148, 004149-004152, 004353-004354, 004387-004414, 004511-004520, 004776-004791, 005326-005325, 006155-006196, 007772-007790, 007867-007885, 007886-007904, 008095-008116, 008136-008139, 010345-010364, 010352-010572, 010365-010385, 010386-010406, 010407-010427, 010428-010447, 010448-010467, 010490-010531, 010629-010633, 010634-010645, 010988-010998, 010999-011010, 011053-011077, 011079-011080, 011089-011091, 011092-011100, 011105-011106, 011107-011111, 011115-011117, 011124, 011126-011132, 011134, 011135-011178, 011179-011194, 011365-011367, 011369-011371, 011372-011376, 011377- |

Documents and Materials Reviewed and Considered

| | |
|---|---|
| | 011389, 011390,011406-011416, 011417-011419, 011420-011421, 011422, 011428, 011429-011442, 011443-011448, 011449-011450, 011451-011456, 011454, 011456-011457, 011458, 011459, 011460, 011461-011472, 011473-011515, 011516-011518, 011519-011520, 011521-011522, 011523-011524, 011525-011528, 011529-011531, 011532-011533, 011534, 011535, 011536, 011537, 011539, 011541, 011542-011543, 011544-011545, 011547-011546, 011548, 011549, 011550, 011551-011552, 011553, 011554-011555, 011556, 011557-011558, 011559-011561, 011562, 011563-011564, 011565-011567, 011568, 011569-011570, 011571,011572-011573, 011574, 011575, 011576-011577, 011578, 011579-011583, 011584-011597, 011586-011589, 011598-011601, 011602-011604, 011605-0116606, 011607-011608, 011609, 011610, 011611, 011612-011614, 011617-011618, 011619-011620, 011621, 011622-011624, 011625-011626, 011627-011628, 011629-011632, 011633, 011634-011638, 011639-011650, 011651-011653, 011654-011664, 011665-011670, 011673-011727, 011908-011928, 012367-012375, 013192-013208, 013251-013267, 013324-013342, 013409, 013410, 013432-013434, 013435-013439, 013440, 013755-013712, 013840-013881, 014045-014046, 014051-014052, 014062, 014063-014067, 014123-014143, 014144-014164, 014165-014185, 014186-014206, 014207-014227, 014228-014248, 014255-014276, 014301-014322, 016221-016244 |
| Michael French, Jackson Walker and Jones Day Memos and Materials | SWYLY002063, 002064-002069, 002075-002086, 004128-004131, 004134-004135, 004342, 005363-005366, 005367-005371, 005373-005375, 005392-005393, 005400-005401, 005402, 005466, 005493-005496, 006015-006016, 006017-006019, 006020, 006021-006024, 006025-006026, 006033-006044, 006644-006645, 006646-006648, 006651-006652, 006653-006654, 006661-06669, 007191-007194, 007196, 007207-007209, 007210, 007211-007212, 007662-007663, 007664-007665, 007666-007669, 007670-007673, 007674-007684, 008141-008152, 008158-008167, 008168-008171, 008172-008175, 008176-008178, 008181-008183, 009130-009132, 009210-009220,010621-010628, 010961-010962, 010965, 010963-010964, 010971, 010972-010974, 011118-011120, 011133, 013280-013282, 013285-013287, 013403-013408, |

Documents and Materials Reviewed and Considered

| | |
|---|---|
| | 013409, 013412-013415, 013416-013426, 013427, 013430-013431, 013441- 013442, 014047-014050, 014347-014352, 014353, 016385-016392. 016393. 016395. 016978, 016964-016971, 016972-016973, 016979-016984, 016985-016986, 016987; WYLYSEC01069517-WYLYSEC01069518 |
| Chamberlain Hrdlicka Memos and Materials | SWYLY016809-016815, 016816-016822, 016823-016829, 016830-016836, 016837-016843, 016844-016850, 017211-017216, 017217-017222, 017223-017229, 017230-017235, 017236-017241, 017242-017247, 017248- 017253, 017254-017259, 017260-017265, 017266-017271, 017272-017277, 017278-017284 |
| DeCastro West Memos and Materials | SWYLY007219-007232, 007233-007246, 016851-016864, 016865-016878, 016879-016892, 016893-016906, 016907-016920, 016921-016934, 016935-016948, 016949, 016962, 017285-017288, 017293-017296, 017300-017302, 017303-017305, 017306-017308, 017309-017311, 017315- 017317, 017318-017320, 017321-017323, 017324-017326, 017327- 017329, 017330-017332, 017333-017346, 017347-017359, 017360-017373, 017374-017386, 017387-017400, 017401-017414, 017415-017428, 017429-017441, 017442-017454, 017455-017467, 017468-017481, 017482-017495 |
| Morgan Lewis Memos and Materials | SWYLY012462, 012463-012464, 012465-012471, 012598-012600, 012601, 012606-012616, 012627, 012628, 012641, 012652-012654, 012655-012656, 012659, 012660, 012663, 016372-016378, 016379-016384, 016453, 016454-016459, 016460-016461, 016462-016463, 016464, 016471- 016472, 016476-016477, 016478-016479, 016481, 016482-016484, 016485-016491, 016492-016496, 016497-016498, 016500-016502, 016514, 016515, 016529, 016530-016534, 016535-016538, 016539-016540, 016541-016542, 016543-016546, 016547, 016548-016550, 016551-016552, 016553-016556, 016557, 016558-016561, 01656016563, 016564-016570 |
| Appendix of Materials to Report of Joshua S. Rubenstein, Expert Witness for the Debtors | |

5

## Joshua S. Rubenstein
## Curriculum Vitae

**Firm:**

Katten Muchin Rosenman, LLP
575 Madison Avenue
New York, New York  10022-2585
(212) 940-7150/phone
(212) 940-8545/hardcopy fax
(212) 940-7162/computer fax
joshua.rubenstein@kattenlaw.com

**Position:**

| Chairman: | National Trusts and Estates Department |
| | National Private Client Services Group |
| | National Fiduciary Litigation Group |
| Member: | Board of Directors |
| | Diversity Committee |
| Past Positions: | Managing Partner, New York |
| | Executive and Operating Committee |
| | Compensation Committee |

**College:**

Columbia University, 1976:  B.A.,
Magna Cum Laude, Phi Beta Kappa
Major:  Greek and Latin

**Law School:**

Columbia University, 1979:  J.D.,
Harlan Fiske Stone Scholar

**Bar and Court
Admissions:**

New York State:  February, 1980
New Jersey State:  October, 1980
U.S. District Court, Eastern
   District of New York:  May, 1980
U.S. District Court, Southern
   District of New York:  May, 1980
U.S. District Court, District of New Jersey:
   October, 1980
U.S. Tax Court:  August, 1986

**Faculty:**

Brooklyn Law School – Adjunct Professor
   Estate Planning, Spring 2005, Winter 2005, Spring 2006,
   Winter 2006, Spring 2007, Winter 2007, Spring 2008, Winter
   2008, Spring 2009 and Winter 2009

**Bar Association**
**Memberships:**    American Bar Association
  Real Property, Probate and Trust Law
   Section:  1980 to present
  Taxation Section:  1988 to present
American College of Trusts and Estate Counsel:
  1990 to present
Association of the Bar of the City of
  New York:  1987 to present
Internal Bar Association:
  2009 to present
International Academy of Estates & Trusts Law:
  1997 to present
New Jersey Bar Association
  Real Property and Probate Section:  1980 to present
New York State Bar Association
  Trusts and Estates Law Section:  1980 to present
Society of Trusts & Estates Practitioners:
  2002 to present

**Offices in Bar**
**Associations:**    American College of Trusts and Estates Counsel
  Fellow:  1990 to present
  Regent:  2006 to 2012
ACTEC Foundation
  Director:  2013 to present
Litigation Committee:
  Member:  2000 to 2003
State Laws Committee:
  Member:  1992 to present
  Chair:  2001 to 2003
Membership Committee:
  Member:  1994 to 2009
Program Committee
  Member:  2003 to 2009
Sponsorship Advisory Committee
  Member:  2008 to present
21st Century Estate Planning Task Force
  Member:  2008 to present
International Estate Planning Committee:
  Member:  2007 to present
  Chair: 2012 to 2015
International Membership Committee
  Member:  2011 to present
  Chair:  2012 to 2015
Planning Task Force

2

Member: 2014 to present

Advisory Committee on Relationships with the Executive and
the Legislative Branches of the New York State Bar
        Association Member: 1993 to 1997

American Bar Association
        Chair, International Estate Planning Committee of the
        Probate and Trust Division:  1999 to 2001

American Law Institute CLE's Estate Planning Advisory Panel
        Panel Member:  2012 to present

The International Academy of Estate and Trust Law
        Academician: 1997 to present
        Member, Executive Council:  2001 to present
        Treasurer: 2006 to present
        Member, United States Regional Committee: 2015

International Bar Association
        Officer, Family Law Committee
        Member:  2009 to present

New York State Bar Association
    Trusts and Estates Law Section
        Chair:  2000
        Chair Elect:  1999
        Secretary:  1998
        Treasurer:  1997
    Executive Committee:
        Member at Large:  1992 to 1994
    Liaison to Legislative Policy Committee:
        1995 to 1996
    Legislation Committee:
        Member:  1980 to present
        Vice Chair:  1988
        Chair:  1989 to 1991
    Ad Hoc Committee to Review the Proposals of the
        New York State EPTL Advisory Committee:
        Co-Chair:  1991 to 1994

    Special Committee to Review the
        Recommendation of the EPTL Advisory
        Committee to Eliminate the Elective
        Share Trust:

3

Member:  1991 to 1992

Special Committee to Reduce Estate and Gift Taxes
    Co-Chair:  1992 to 1997
Special Committee on Fiduciary Appointments
    Chair, Guardian Ad Litem Subcommittee:
    2004 to 2007
Special Legislative Liaison:  2001 to present
    Special Task Force on Outside Ownership of Law Firms:
    2011 to present

Society of Trust and Estate Practitioners
    Private Client Awards: Presiding Judge: 2011 to present

**Memberships and Offices in Other Organizations:**

Central Park Conservancy
    Professional Advisory Council:  2001 to present

Chess in the Schools
    Pro Bono Counsel:  2002 to present

City of Hope
    Member, National Advisory Committee
    Chair, New York Steering Committee:  1997 to present

Citywealth
    "Citywealth Offshore Awards" Judge 2011 to present

Columbia Law School
    Trusts, Wills and Estate Planning Advisory Council:
    1997 to present
    Member of Board of Visitors:
    2012 to present

Columbia University
    Planned Giving Advisory Committee:  1995 to present

Columbia University Health Sciences Professional Advisors'
    Circle:  1999 to present

"Fiduciary Accounting and Trust Administration Guide", Member,
    Attorney Advisory Board:  2000

Fiduciary Trust International
    Member, Trust Advisory Board:  1998 to present

4

Hadassah Estate Planning Seminar
    Faculty and Advisory Board:  1993 to present

International Wealth Advisors Forum
    Steering Committee:  2008 to present

The Irvington Institute for Medical Research
      Vice-Chairman:  2000 to 2003
      President:  1994 to 2000
      Co-President:  1993 to 1994
      Secretary:  1992 to 1993
      Treasurer:  1991 to 1992
      Director:  1991 to 2008
    Budget and Finance Committee:
      Chair:  1991 to 1992
    Portfolio Committee:
      Member:  1991 to 2003
    Retail Operations Committee:
      Member:  1992 to 2003
    Trusts and Estates Committee:
      Member:  1991 to 2003
    Patents Task Force:
      Chair:  1993 to 2003
    Search Committee
      Chair:  1993 to 1994
    Strategic Planning Committee
      Chair:  2001 to 2003

Jewish Board of Family and Children's Services
      Board of Trustees:  1992 to present
      Vice President:  1994 to 2008
    Executive Committee: 1994 to 2008
    Madeleine Borg Committee:
      Chair: 1994 to 2010
      Member:  1991 to present
    Legislative Committee:
      Member:  1991 to present
    Development Committee:
      Member:  1991 to present

5

Planned Giving Committee:
 Member:  1993 to present
Board Governance Committee:
 Member:  1994 to present

Journal of New York State Taxation
 Board of Advisors:  1990 to 1992

Legal Week, Trusts and Estate Advisory Board
 Member:  2003 to present

Lincoln Center for the Performing Arts
 Professional Advisors Council
  Member:  1997 to present

Matthew Bender Editorial Board
 Member:  2007 to present

Merrill Lynch Attorney Advisory Board
 Member:  2002 to present

Metropolitan Museum of Art
 Professional Advisors Council:  1999 to present

Museum of Arts & Design (formerly the American Craft Museum)
 Professional Advisory Committee:  2003 to present

Museum of Modern Art
 Professional Advisors Council
  Steering Committee:  1997 to present
  Director's Council:  2001 to present

New York Bar Foundation
 Fellow:  1992 to present

New York City Ballet
 Professional Advisory Committee
  Member:  2005 to present

New York Public Library
 Professional Advisory Committee
  Member:  2002 to present

No Name Discussion Group
 Member:  2011 to present

6

Office of Court Administration Advisory
    Committee on Surrogate's Courts:  1997 to present

Practicing Law Institute
    Estate Advisory Committee:  1993 to present

Rosenman & Colin/Katten Muchin Rosenman
        Chairman:  1998 to 2002
        New York Managing Partner: 2002 to present
    Associates Committee:
        Member:  1991 to 2002
    Associates Relation Committee:
        Member:  1989 to 1991; 1998 to 2002
    Executive and Operating Committee:  2002 to present
    Hiring Committee:  Member:  1988 to 2002
    Information Services Committee:
        Member:  1986 to 1988
    International Committee:  1997 to 2002
    Lateral Support Group:  1992 to 2002
    Management Committee:
        Member:  1994 to 1998; 1999 to 2002
    Marketing Committee:
        Member:  1998 to 2002
    Nominating Committee:
        Member:  1992, 1997
    Pro Bono AIDS Counseling Program:
        Coordinator:  1989 to 2002
    Senior Discussion Group: 2010 to present
    Social Events Liaison:  1992 to 2002
    Society of Trust and Estate Practitioners
        Member:  2002 to present
    Strategic Planning Committee:  1992 to 2002
    Summer Program Coordinator:  1989 to 1991
    Trusts & Estates Department Chairman:  1995 to 2002

TE/DEC Systems, Inc.
    Advisor Board Member:  1988 to 1994

Trusts & Trustees – Italian Edition
    Editorial Panel: 2005 to present

United Jewish Appeal-Federation of Jewish Philanthropies:
    Estates and Trusts Specialty Group of
    Lawyers Division:
        Chairman:  1989 to 1999

7

Specialty Groups Task Force of Lawyers Division:
     Member:  1989 to 1994
     Chairman:  1994 to 2002
Executive Committee of Lawyers Division:
     Member:  1994 to present

Warren's Heaton
  Editorial Board:
    Member:  2002 to present

**Awards:**        American Lawyer's Magazine:
  Best Lawyers in America for Trusts and Estates Law:
  2004 to present

Best Lawyers in America:  1992 to present

Best of the Best 2010: Trust and Estates Expert Guides,
  Published by Legal Media Group

Chambers USA: America's Leading Lawyers for Business
  "Leaders in their Field" award 2009

Citywealth "The Top 100 Wealth Advisors List", 2005 to present

Citywealth "International Top Tier", 2006 to present

Citywealth "Top U.S. Private Client Lawyer of the Year",
  December 2006

Citywealth "Top 20 Men in Private Wealth Management",
  2010 to present

Citywealth "Top 20 Lawyers", 2010 to present

Citywealth "Leading International Lawyers: North America", 2011

Citywealth "Editor's Choice Award" 2011

National Society of Fundraising Executives, N.Y. Chapter
  National Philanthropy Day Award:  1998

New York State Bar Association President's
  Pro Bono Service Award:  1991

New York State Bar Association Trust and
  Estate Law Section Executive Committee Award:  1992

8

New York State Bar Association Trust and
    Estate Law Section Executive Committee Award:  1995

New York State Bar Association Award for
    Repeal of New York State Gift and Estate Tax:  1998

New York Magazine:  Best Lawyers in New York, 1995 to present

Practice Law Company
    "Best of the Best", 2010 to present

Robb Report, Worth Magazine, "Top 100 U.S. Attorneys", 2005 to
    present

Selfhelp: Best Lawyer Award 2013

STEP Private Client Awards: Katten T&E Finalist 2007- Shortlist
    2010

STEP Private Client Awards: North American Private Client Team
    of the Year 2010-2011

UJA-Federation: 1993
    James H. Fogelson Award, Lawyers Division

UJA-Federation Honoree, Trust and Estates Attorneys
    Annual Dinner:  2001

Who's Who in American Law:  1990 to present

Who's Who in the East:  1992 to present

Who's Who in America:  1992 to present

Who's Who in the World:  1992 to present

The New York Area's Best Lawyers, ALM, New York Magazine:
    July, 2007 to present

**Books:**           LexisNexis AnswerGuide on New York Surrogate's Court Practice
                         Author 2004 to present

                    A Family's Guide to Wealth: Insights from Thought Leaders and
                    Pioneers
                         Contributing Author 2011

                    A Guide to International Estate Planning:  Drafting, Compliance,
                    and Administration Strategies

9

Contributing Author 2014

Legal Advisors to Wealthy Individuals – China Edition
    Contributing Author 2014

**Lectures:**          3 Stone Buildings
        Tainted Property – Global Litigation Conference, "US Themes
        and  Trends in Contentious Trusts & Estates Litigation", New
        York, NY, November 14, 2011

        Advanced Tax Institute (ATI)
        MACPA/MICPEL: "Estate Planning for Unmarried Partners:
        Detriment or Opportunity?", Baltimore, MD, November 4, 2009

        All Children's Hospital
        Estate Planners Day, "Planning for Life After Death", St.
        Petersburg, FL, February 9, 2011

        American Bankers Association
        1998 ABA/BMA Trust, Asset Management & Marketing
        Conference: "Ethical Issues Facing the Professional Fiduciary",
        New York, NY, February 2, 1998

        American Bar Association (ABA)
        Estate and Gift Tax Committee Meeting, "Estate Planning for
        Unmarried Couples:  Detriment or Opportunity?" New Orleans,
        LA, January 9, 2009
        Spring Symposium: "Estate Planning for People Living with
        Chronic Illness", Philadelphia, PA, May 7, 2010

        American Chamber of Commerce
        "Using Trusts in Commercial Transactions – US Income &
        Transfer Taxation of Migratory Individuals & of Foreign and
        Domestic Trusts", Milan, Italy, November 18, 2004

        American College of Trust and Estate Counsel (ACTEC)
        Summer Meeting: Panel Chair: "Planning for the Peripatetic
        Client", June, 1999
        Spring Meeting: "Posthumous Corporeal Rights:  Is There Sex
        After Death?"  March 3, 2000
        Spring Meeting: "Posthumous Corporeal Rights: Is There Sex
        After Death?" & "The Disposition of Human Remains and Post-
        Mortem Reproductive Issues", Puerto Rico, March 4, 2003
        Spring Meeting: "Planning for the New Biology", Rancho
        Mirage, CA, March 8, 2009

10

Summer Meeting: "Estate Planning for Unmarried
Partners: Detriment or Opportunity?", San Francisco, CA, June
25, 2009
Spring Meeting: "Estate Planning for Unmarried Couples:
Detriment or Opportunity?", Miami, FL, March 10-11, 2012
Fall Meeting: Panel Discussion – "Primer on Forced Heirship
and Cultural Differences", Washington, DC, October 20, 2012

American Heart Association
12th Annual Conference: "Pressing the Do-Over Button:
Strategies for Modifying Wills and Trusts After Formation",
New York, NY, April 26, 2012

American Institute of Certified Public Accountants (AICPA)
Lecture: "Estate Planning for Unmarried Couples – Detriment
or Opportunity", Las Vegas, NV, July 24, 2012

American Law Institute – American Bar Association (ALI-ABA)
Annual Advanced Course Study for Estate Planner, Litigator,
and Corporate Fiduciary Counsel: "Tax Considerations of
Settling Estate and Trust Disputes", 2004, 2005
13th Annual: "Using Tax Law to Resolve Estate & Trust
Disputes", Boston, MA, July 16, 2010
Pressing the Do-Over Button - Strategies for Modifying Wills
and Trusts after Formation", San Francisco, CA, March 22,
2012
ALI CLE Web based Program: "Estate Planning for Unmarried
Couples – Detriment or Opportunity", April 12, 2013

American Society of Appraisers
Business Valuation, 1994

Anti-Defamation League
Planned Giving CLE Seminar: "Estate Planning for Unmarried
Partners", New York, NY, September 23, 2009

The Appellate Division First and Second Judicial Departments and
The Office of Court Administration
"Estate Administration in New York", Brooklyn Law School,
June 21, 2005

Archdiocese of New York
12th Annual Law Seminar: Panel Speaker: "Postmortem Estate
Planning: How to Save an Estate", May 14, 1998
14th Annual Conference on Estate Planning: "Posthumous
Corporeal Rights: Is There Life After

11

Death?", October, 2003
15th Annual Conference on Estate Planning: "Tax
Considerations of Settling Estate and Trust Disputes",
October, 2004

Art Dealers Assoc. of America: Collectors' Forum Art & Taxes
    "Trusts and Estates Planned Giving Lecture", New York, NY
    December 4, 2002

Arthritis Foundation: Westchester Chapter
    "2002 New York State Legislative Session Changes
    Affecting Estate Planning and Administration",
    October 17, 2002
    "2003 New York State Legislative Session Changes Affecting
    Estate Planning and Administration", November 5, 2003

Arizona Estate Planners Council
    Estate Planners Day, "Estate Planning for Unmarried Couples",
    "Immediate Pre- and Post-Mortem Planning", "Planning for
    Life After Death", "Using Taxes to Settle Trusts and Estates
    Disputes", Tucson, AZ, January 21, 2011

 Association of the Bar of New York City/Surrogates Association
    "Elimination of New York's Estate and Gift Taxes",
    January 24, 2000
    "Posthumous Corporeal Rights: Is There Sex After Death?",
    May 18, 2000

Bank of New York, Private Client Services Division
    "IRS Policy & Practice Updates on GRATs, FLPs, and LLCs",
    February 4, 2003

Barr & Karrer Private Client Roundtable
   "Case Study "Planning Opportunities - Resolving Conflicts in
   Swiss/Us Cross Border Estates", Zurich, Switzerland, December
   13, 2011

Belle Capital Speaker Series
    Lecture: "Impact of Matrimonial Laws...", Zurich, Switzerland,
    December 11, 2012

Brooklyn Bar Association
    "Post-Mortem Estate Planning", 1993
    Legislative Update, 1993

Business Valuation Seminar

12

"Planning Opportunities After Chapter 14" New York, NY,
May 17, 1994

California State Bar Cross Border Conference
    "Using Trust in Commercial Transactions", June 15, 2006

Cavalry Hospital at Christie's
    "Trusts and Estates Planned Giving", March 25, 2003

Cambridge Institute
    Estate Planning and Administration in New York,
    1988, 1989, 1990, 1991

The Chase Manhattan Bank
    Panel Discussion: "Valuation: The Journey from Planning to
    Controversy", 1999
    Business Succession Planning Symposium: "Changes Affecting
    Estate Planning & Administration", October 12, 2000

Citibank
    Global Conference: Prudent Investor Standards, 1996
    Citi Private Bank Speaker Series: "Pressing the 'Do-Over'
    Button: Strategies for Modifying Wills and Trusts After
    Formation", New York, NY, April 4, 2012

City of Hope
    Forum of Investment Strategies: "Planned Giving", May 11,
    1995
    Program Chair: "The Psychology of Estate Planning and Wealth
    Transfer",  May 12, 1999

Columbia University
    The Columbia Club: "Living Trust or Traditional Will?  Which
    to Choose and Other Estate Planning Topics", & "Unique New
    York: Estate Planning Impact of Wills, Revocable Trusts and
    Taxes",  December, 1998
    Deans Luncheon: "Trust and Estates Profession", November 22,
    2011
    The Trustee's Business Session: "Wealth Conservation, Estate
    Planning and Planned Giving", October 12, 2012

Committee of Banking Institutions on Taxation
    29th Annual Tax Day: "Proposed Changes to Principal Income
    Act", November 5, 1998

13

Connecticut Bar Association
   Elder Law Section meeting: "Limited Conservatorship",
   February 11, 1997
   "Posthumous Corporeal Rights: Is There Sex After Death?",
   April 2, 2001

CPA Club of Manhattan
   Midtown - Estate Administration, 1990
   Uptown - Estate Administration, 1990, 1992, 1994
   Uptown - Probate vs. Revocable Trusts, 1995
   Uptown - Tax Apportionment, 1996
   Uptown - Repeal of N.Y. State's Gift and Estate Taxes, 1998

Essex County Estate Planning Council
   "Pressing the 'Do Over' Button:  Strategies for Modifying Wills
   and Trusts after Formation," May 13, 2014

Estate Planning Council of Eastern New York
 "Tax Update", Albany, NY, January 5, 2015

Estate Planning Council of New York
   Westchester County Estate Planning Council, 1992
   Estate Planners Day: "Current Developments and Legislative
   Proposals", Rockland County, NY May 11, 2001
   Estate Planners Day: "2001 New York State Legislative Session
   Changes Affecting Estate Planning and Administration", May
   17, 2002
   Estate Planners Day: "Posthumous Corporal Rights: Is there Sex
   After Death?", March 23, 2004
   "Happy New Year: What's Happening and What Do I Do?",
   Albany, NY, January 12, 2010
   Estate Planners Day: "Pressing the 'Do Over' Button", Albany,
   NY, January 22, 2013

Estate Planning Council of New York City
   "The Impact of Matrimonial Laws Upon International Estate
   Planning", New York, NY, January 28, 2015

Estate Planning Council of Lower Fairfield County
   "Estate Planning for Unmarried Partners: "Detriment or
   Opportunity?" Greenwich, CT, May 5, 2010

Faulkner & Gray
   The Practical Accountant's Estate Planning Practice Seminar,
   Washington, D.C., October, 1993

14

Florida Bar Association
  Transfer Tax Idols - Season 4: "Using Taxes to Settle Trusts and
  Estates Disputes", Palm Beach Gardens, FL, May 4, 2012

Florida Bar Trust Law Seminar & CLE Committee
  "Trust Law" & "Planning Under Decoupling", Tampa,
  November 3, 2005, and Miami, FL, November 4, 2005

Florida Institute of Certified Public Accountants
  Florida Institute on Federal Taxation: "Immediate Pre-Mortem
  and Post-Mortem Tax Planning Checklist", October 30, 1998

Foundation for Accounting Education
  Annual Conference: 1993
  Estate Planning Conference: "Planning in a Decoupled
  Environment", & "2005 New York State Legislation Session
  Changes Affecting Trust & Estate Law", July 13, 2006

Franklin Templeton Investment
  Panel Discussion: "Trust Business", June 6, 2006

Friends Seminary
  "Planned Giving", New York, NY, May 20, 2011

Greater Miami Jewish Federation
  Professional Advisory Committee: "Planning for Life After
  Death", Miami, FL, April 28, 2011

Greater New Jersey Estate Planning Council
  "Estate Planning in 2012 and Beyond", Paramus, NJ, June 12,
  2013

Hadassah
  Annual Estate Planning Seminar: 1993, 1994, 1995

Healthcare Chaplaincy
  "Ethical Considerations in Estate Planning and Administration",
  2005

Heckerling Institute
  40th Annual Institute: "The Nuts and Bolts of Changing the
  Situs of a Trust", Miami Beach, FL, January, 2006
  43rd Annual Institute: "Estate Planning for Unmarried Couples:
  Detriment or Opportunity?",  January, 2009
  44th Annual Institute: "Planning for Life After Death: Laws of
  Succession vs. the New Biology" & "Using Taxes to Settle
  Trust and Estate Litigation", Orlando, FL, January 26, 2010

15

46th Annual Institute: "Planning for the 'New Medium Sized'
Estate of $5 to $15 Million", "Pressing the 'Do-Over' Button:
Strategies for Modifying Wills and Trusts After Formation" &
"Pressing the Do-Over Button", Orlando, FL,
January 11-13, 2012
47th Annual Institute: "Going, Going, Gone: Immediate Pre- and
Post-Mortem Planning", Orlando, FL, January 15, 2013
49th Annual Institute: "Family Governance – Mumbo Jumbo or
Credo?", Orlando, FL, January 15, 2015
49th Annual Institute: "Planning for Life After Death: Laws of
Succession vs. the New Biology", Orlando, FL,
January 16, 2015

Hewitt School
   "Issues Arising from Advising the Super-Rich", New York, NY,
   January 28, 2014

Hofstra University School of Law
   "Estate Planning in 2011 and Beyond", New York, NY,
   March 21, 2011

Hottinger
   "Reporting Requirements and Navigating Regulatory Response
   to Financial Crisis", "Choice of Trustee: Individual, Corporate
   or Private Trust Company", "Trying to Insulate Estate Plans
   from Contest", "Using Taxes to Settle Trusts and Estates
   Contests", Paris, France, January 15, 2011
   "Basics of International Estate Planning", "United States
   Reporting Requirements", "Community Property Issues in non-
   Community States of the United States", Venice, Italy,
   February 3, 2012
   "Understanding How the Trust Structure Works for Brazilian
   Families", "The Pros and Cons of Wealth Planning Structures -
   Do they work for Brazilians?" & "Coming to and Leaving the
   U.S.?", Rio de Janerio, Brazil, October 25, 2012

Hudson Valley Estate Planning Council
   "Estate Planning for Unmarried Partners: Detriment or
   Opportunity?" April 28, 2010
   "Pressing the "Do-Over" Button:  Strategies for Modifying
   Wills and Trusts After Formation", Putnam County, NY,
   June 12, 2013

Human Resource Administration
   Division of AIDS Services Conference: 1993

16

Institute for Private Investors Forum
    Chair: "The Prudent Investor Act", May 21, 1997

International Academy of Estate and Trust Law (IAETL)
    "Corporeal Rights After Death", Sydney, Australia,
    1998, 1999
    Panel Chair: "Impact of Matrimonial Laws Upon International
    Estate Planning", Toronto, Canada, May, 1999
    "Estate Litigation Panel – U.S. Perspective", September, 2003
    "Community Property Issues in Non-Community Property
    States of the United States", May, 2005
    Panel Member: "Will Substitution Domestic and in Private
    International Law", Capetown, South Africa, February, 2008
    "Impact of Matrimonial Law Upon International Estate
    Planning", Mexico City, Mexico, May 25, 2011

International Bar Association (IBA)
    Annual Conference: "Big Money Divorces: Prenuptial and
    Postnuptial Agreements and Trusts - How Are They Treated in
    Divorce in Different Jurisdictions", Buenos Aires, Argentina,
    2008
    Annual Conference: "Coming and Going I:  Focus on Coming -
    Pre-immigration Strategies for the Private Client", Vancouver,
    British Columbia, October 4, 2010
    Annual Conference: "So you are married, but what marital
    regime and what impact on your tax and estate planning
    situation?", Dubai, India, October 31, 2011
    Annual Conference: Chairing: "Family Disputes Involving
    Trusts: from the errant beneficiary to the grantor giving it away
    in the wrong direction", Dublin, Ireland, October 2, 2012
    20th Annual International Wealth Transfer Practice Conference,
    Panel Session: "Tax, Succession and Family Planning for Same-
    Sex Couples – Has Marriage Solved Everything?", London,
    UK, March 2, 2015

IBC
    Conference: The Future of Trusts & Foundations: "The Future
    of the Trust and Estate Foundation: An International Focus on
    Alternative Constructs for Family Estate & Wealth Planning
    (Family Limited Partnership)", Jersey, UK, November 4, 2008
    Private Client Series: "Tax Considerations of Settling Estate and
    Trust Disputes", London, UK, October 13, 2009
    8th Annual International Trusts Congress: "Planning for
    International US Citizens", London, UK, December 2, 2009
    9th Annual International Trusts Congress: "Trust Planning for

17

International US & Latin American HNWIs", London, UK, December 2, 2010
3rd Annual Trust Litigation Symposium Panel Discussion: "Conflicts in Succession" London, UK, November 8, 2011
Transcontinental Trusts:  Bermuda Forum, "The Good, The Bad and The Ugly – Changes Coming to a Theatre Near You from the United States", Bermuda, April 28, 2015

International Trusts Congress
8th Annual: "Planning for International US Citizens", London, UK, December 2, 2009
9th Annual: "Trust Planning for International US & Latin American HNWIs", London, UK, December 2, 2010

International Trust and Private Client (ITPC) Conference
Panel: "International Trust Litigation and the Divorcing Spouse", Grand Cayman, Cayman Islands, October 5, 2012
Debate: "This House believes that the right to privacy is dead", Grand Cayman, Cayman Islands, October 2, 2015

International Wealth Advisors Forum
Panel Discussion: "Positioning of the Private Client Advisor", Versailles, France, May 1, 2008
"Here's Your Hat, What's Your Hurry? Expatriation as an Option for Uncertain Times", Barcelona, Spain, May 20, 2009
"Is Private Client Tax Planning Dead?", Vevey, Switzerland, September 2, 2010
"How Do You Pick Your Trustees?", Frankfurt, Germany, May 10, 2011
Panel Discussion: "Current Issues & Challenges Facing Family Offices", Hampshire, UK, May 8, 2012
"Property Regimes and Marital Claims", County Kildare, Ireland, May 9, 2013

Jewish Board of Family and Children's Services
Planned Giving Seminar, 1993

Jewish Community Federation of Greater Rochester
"Making Your Garden Grow: Estate Planning for All Seasons", June 25, 1998

18

JP Morgan Family Office Conference
  "Economic Tax and Planning Update", February 5, 2013

Kansas City Estate Planning Symposium
  "Estate Planning for Same-Sex and Unmarried Couples:
  Detriment or Opportunity?," Kansas City, MO, April 23, 2015

Katten Muchin Rosenman LLP
  Panel Discussion: "Client Services Standards", April 6, 2010
  FSG and Trust & Estates Seminar: "Estate Tax: What Does the
  Future Hold?", New York, NY, September 15, 2010

Leadership Gift & Estate Planning Seminar
  "Planned Giving" 1996

Legal Week Private Client Forum – Americas
  Chair, The Boulders, Arizona, January 30th – February 1, 2013
  Chair, Fairmont, Sonoma, California, February 5-7, 2014
  "Interviewing Brian Weber (FBI San Francisco Agent):  An
  audience with the FBI", February 5, 2014
  Co-Chair, El Mangroove, Costa Rica, February 4-6, 2015
  "The Best Is Yet To Come – A look At How The Private Client
  Advisor Role Has Developed Over The Years",
  February 6, 2015

Legal Week Private Client Forum - Asia
  Workshop: "Treaties, Trusts and Information", Panel
  Discussion: "Trust Litigation: Perils and Pitfalls", Lecture:
  "Basics of International Estate Planning", Singapore,
  October 12, 2010
  Interactive Focus Group: "US Reporting Requirements",
  Singapore,  September 6, 2011
  Lecture: "Encroaching US Regulations:  Reporting
  Requirements", Singapore, September 13, 2012

Legal Week Private Client Forum - Europe
  "Posthumous Corporeal Rights: Is There Sex After Death?"
  Lake Como, Italy, November 2003
  Focus Group Speaker: "Prenuptial Agreements & Inheritance
  Disputes", Lake Como, Italy, November 2004
  "Multinational Prenuptial Agreements, Separation
  Agreements and Divorce", Lake Como, Italy, November, 2006
  "United States: Family Partnerships and Insurance Models",
  Venice, Italy, November 2007

19

Panel Member: "Family Wealth and Business: Achieving Fair Process, Identifying Risk and Avoiding War", Lake Como, Italy, November, 2008
"The Conflict Between Trust and Matrimonial Law", Jersey, UK, October 2009
"Investment Volatility and Trustees' Exposure to Losses", & "Planning for Life After Death: Laws of Succession vs. the New Biology", Lake Como, Italy, November 14, 2009
Panel Member:  "Arrivals and Departures - Practical Requirements for Leaving One Country and Going to Another", Lake Como, Italy, November 11, 2010
Panel Member:  "Facilitating a Smooth and Successful Transition of Wealth to the Next Generation" & "Arrivals & Departures: Practical Requirements for Leaving One Country and Going to Another", Lake Como, Italy November 5, 2011
Panel Discussion: "The Role of Private Client Lawyers and Advisers in Protecting Wealth" & Plenary Session: "Privacy and the Private Client", Lake Como, Italy, November 15 & 16, 2012

Legal Week Trust & Estates Litigation Forum
Panel Discussion: "The Probate Process" & "Grounds For Contest: Capacity, Undue Influence & Improper Execution", Provence, France March 2  2007
Panel Discussion: "The Conflict between Trust and Matrimonial Law", Provence, France, February 29, 2008
Panel Discussion: "I am a Trustee, am I at Risk?" & Lecture: "Using Taxes to Resolve Trust & Estate Disputes", Provence, France, February 27, 2009
Panel Discussion: "Lessons from the Frontline", Provence, France, February 25, 2010
"Shock and Law: The Long Arm of the US Courts", Provence, France, March 4, 2011
Panel Discussion:  "Trusts and Trends", Provence, France, March 1, 2012
Panel Discussion:  "Can a Trustee Dodge the Bullet?", Provence, France, March 14, 2013
Panel Discussion:  "Interactive Panel Session:  Now you see it, now you don't - forfeiture and no-contest clauses", Provence, France, March 13, 2014
Panel Discussion: "The Trouble With People: Embarrassing Families", Provence, France, March 13, 2015

Maryland Advanced Tax Institute
Estate Planning, 1990

20

Maryland Association of CPAs
    Advanced Tax Institute: "Estate Planning for Unmarried
    Couples: Detriment or Opportunity?" Baltimore, MD,
    November 4, 2009

Minnesota State Bar Association
    38th Annual Probate & Trust Law Section Conference -
    Keynote Presentation: "Pressing the Do-Over Button" &
    Breakout Session: "Estate Planning for Unmarried Partners",
    St. Paul, MN, June 5, 2012

Morgan Guaranty Trust Company
    "Immediate Pre-Mortem and Post-Mortem Tax Planning
    Checklist", January 12, 2001

Museum of Modern Art
    "Conserving Your Wealth",  November 23, 1998,
     December 7, 1998
    "Tax and Estate Planning for the Young Collector",
    September 18, 2000
    "Wealth Conservation and Planned Giving for Art Collectors",
    September 15, 2005
    Contemporary Arts Counsel Legacy Program: "Wealth
    Conservation and Planned Giving for Art Collectors",
    June 3, 2010

Nassau County Bar Association
     "2002 New York State Legislative Session Changes Affecting
     Estate Planning and Administration",  September 19, 2002
     32nd Annual Estate Planning and Fiduciary Law Program
     "Estate Planning for Unmarried Couples: Detriment or
     Opportunity", Kiawah Island, SC, July 21, 2011

National Associations of Estate Planners & Council
     43rd Annual Conference: "Advanced Wealth Management &
     Legacy Planning Through Charitable Planning", Amelia Island
     Plantation, FL, November 2, 2006

New York City Social Work
    AIDS Network, 1992

New York Community Trust
    "The Repeal of N.Y. State's Gift and Estate Taxes:
    Key Practice Considerations in the Wake of Sweeping Reform",
    October 27, 1998

21

New York County Lawyer's Association
    Advanced Studies Program: 1991
    Estate Planning Program: "The Use of the Marital Deduction
    Credit Shelter Shares & Generation-Skipping",
    September 24, 1993
    "Understanding Federal Estate, Gift and Generation-Skipping
    Transfer Taxation", 1994, 1996 ("Tax Proceedings"), 1998,
    2000

New York Institute of Finance
    Estate Planning - Current Issues, 1989

New York Law Journal
    Seminars - Press
    "The Nuts and Bolts of Divorce Law", 1987
    "Valuation for Purposes of Estate Planning
    and Death", 1996

New York State Bankers Association
    52nd Annual Trust & Investment Conference: "Proposed
    Principal & Income Act", New York, NY, October 1 1998
    54th Annual Trust & Investment Conference: "Roundtable
    Discussion on Major T&E Initiatives", & "Recent
    Developments in Estate Planning", Saratoga Springs, CA,
    October 17, 2000
    59th Annual Trust & Investment Conference: "Tax
    Considerations of Settling Estate and Trust Litigation", Bolton
    Landing, NY, October 19, 2005

New York State Bar Association
    Trust & Estates Law Section
        Fall Program (Chairman): "Wills vs. Revocable Trusts",
        1991
        Winter Program: NYS Estate Tax Reform, 1991
        Spring Program (Panelist): Estate Tax Litigation,
        April 13, 1994
        Spring Program: Forms, 1996
        Fall Program (Co-Chair): Toronto, October 8-11, 1998
        Fall Program: "World Trade Center Disaster Emergency
        Relief Procedures", 2001
        Fall Program: (Panelist) Surrogate's Court Advisory
        Committee to OCA, September 11, 2003
        Spring Program: "Effective Legislative Advocacy",
        May, 2004

22

Summer Program: (Panelist) Surrogate's Court Advisory
Committee to OCA: Renunciation Amendments,
June 4, 2004
Fall Program: "Posthumous Corporeal Rights: Is There Sex
After Death?", Savannah, GA, October 14, 2004
Winter Program: "Changing Trust Situs", January 30, 2008
Spring Program: "Changing Trust Situs", March 20, 2009
Winter Program: "Pressing the Do-Over Button...",
January 22, 2013
Video Replay: "Estate Planning for Same Sex and
Unmarried Couples After DOMA", January 17, 2014
Winter Program:  "Estate Planning for Same Sex and
Unmarried Couples:  Detriment or Opportunity?", New
York, NY, January 29, 2014

Annual Sophisticated Trusts and Estates Institute (Chair)

1st Annual: Introduction and overview, November 20, 2003
2nd Annual: Introduction and overview , November  5, 2004
3rd Annual: "Community Property in Non-Community
Property States of the United States", November 17, 2005
4th Annual: Introduction and overview, November 16, 2006
5th Annual: Introduction and overview, November 8, 2007
6th Annual: Introduction and overview, November 21, 2008
7th Annual: Introduction and overview, November 19, 2009
8th Annual: Introduction and overview, November 18, 2010
9th Annual: Introduction and overview, November 17, 2011
10th Annual: Introduction and overview, November 8, 2012
11th Annual: Introduction and overview, November 7, 2013
11th Annual: "Estate Planning for Same-Sex and Unmarried
Couples", November 8, 2013
12th Annual: Introduction and overview,
December 11, 2014
12th Annual: "Pressing the Do-Over Button:  Strategies for
Modifying Wills and Trusts after Formation",
December 12, 2014

International Estate Planning Institute
2nd Annual: "Multinational Prenuptial Agreements, Separation
Agreements and Divorce", March 17, 2006

New York State Bar Association – Continuing Legal Education
Estate Planning and Will Drafting, 1985
Settling an Estate, 1989
Estate Tax Litigation, 1994

23

New York State Legislative Session
    "Changes Affecting Estate Planning and Administration",
    September 13, 2005

New York State Society of CPAs
    Estate Administration Conference, 1993, 1994
    1999 Legislative Changes, 1999

New York State Society of CPAs/Foundation for Accounting
    Education
     "Probate Administration", 1993, 1994
    "New York State Legislative Session Changes Affecting Estate
    Planning and Administration", 1999, 2003, 2005, 2006, 2010,
    2011
    "Current Estate and Tax Planning Developments", 2001, 2002,
    2004
    "Valuation, Taxation & Planning Techniques for Sophisticated
    Estates: Recent Developments", May 2, 2003
    "Immediate Pre-Mortem and Post-Mortem Tax Planning", July
    17, 2003
    "Planning in a De-Coupled Environment Plus New York State",
    New York, NY, July, 2005, 2006
    "Annual Legislative and Case Law Update", New York, NY,
    July 13, 2010

New York Tax Forum
    "Estate & Gift Taxes", 1991

New York Tax Study Group, Inc.
    "1997 New York State Legislative Changes Affecting Estate
    Planning", April, 1998
    "Immediate Pre-Mortem & Post-Mortem Tax Planning
    Checklist", June 2, 2008

New York University
    NYU Conference of Trust & Estates: "Tax Apportionment",
    April 30 & June 4, 1990
    Advanced Estate Planning Study Group: "1999-2000 New York
    State Legislative Developments", September 28, 2000

New York University Institute on Federal Taxation
    "Sophisticated Estate Planning", 1990
    "Transfer of Wealth Considerations", 1991
    "New Ideas in S Corporation Planning", 1991
    "Sophisticated Estate Planning", 1997
    "Finding the Right Estate Planning Tools", New York, NY,

24

October, 1997 & San Francisco, CA, November, 1997
"Estate Planning for Unmarried Partners", 2007
"Family Limited Partnerships: The Continuing Saga", 2007
"Estate Planning for Unmarried Partners", 2008

New York University Tax Study Group
Tax Allocation, 1993
S Corporations and Life Insurance, 1996

New York Women's Bar Association
Right of Election, 1992
1994 Legislative Update, 1994

Northern Trust
Annual Trust and Tax Forum: May 12, 2005
Global Wealth Alliance Group Meeting: "Choosing a Trustee",
September 29, 2010

North Carolina Bar Association
32nd Annual Estate Planning and Fiduciary Law Program:
"Estate Planning for Unmarried Partners: Detriment or
Opportunity?", Kiawah Island, SC, July 21, 2011

Notre Dame
25th Annual Tax and Estate Planning Institute: "Corporeal
Rights After Death", South Bend, IN, September 30, 1999
36th Annual Tax and Estate Planning Institute: "Wealth
Conversation and Planning Giving for Art Collectors ", "Recent
Wealth Transfer Developments", South Bend, IN, October 28,
2010

Pace University
Managing Multi-Forum Litigation, 1996

Paine Weber, Melville
"Basic Estate Planning for Stockbrokers", Long Island, NY,
July 19, 2000

Philadelphia Estate Planning Council
Union League Luncheon: "Planning for Life After Death: Laws
of Succession vs. The New Biology", Philadelphia, PA
February 21, 2012

Practicing Law Institute
Basic Will Drafting: 1988 & October 30, 1989
The Closely Held Business: 1992, 1993
Estate Planning, Administration and Probate Workshop for

25

Legal Assistants: 1985, 1986, 1987, 1988, 1989, 1990
Fundamentals of Estate Planning Under the New Tax Law:
1987, 1989
Preparation of the Federal Estate Tax Return: 1986
Basics of the Administration of New York Estates
    Speaker: 1985, 1987
    Chairman: 1988, 1990, 1991, 1992, 1994, 1995, 1996,
    1997, 1998, 1999, 2000, 2001, 2002
"Understanding Federal Estate, Gift and Generation-Skipping
Transfer Tax", February, 1993, 1998, 1999, 2000, 2001, 2002
"Immediate Pre-Mortem & Post-Mortem Tax Planning
Checklist", Summer, 2001
"Valuation, Taxation & Planning Techniques for Sophisticated
Estates - Recent Developments", 2003, 2004

Queens University of Charlotte
32nd Annual Estate Planners Day: "Planning for Life After
Death: The Ability to Control the Disposition of One's Remains
and the Posthumous Use of One's Genetic Material", Charlotte,
NC, May 20, 2010

Rady Children's Hospital
Annual Allied Professional Symposium, "Planning for Life
After Death", San Diego, CA, November 4, 2010

Roman Catholic Diocese of Brooklyn / Catholic Charities
14th Annual Conference on Estate Planning and Administration:
"Posthumous Corporeal Rights: Is There Life After Death?",
October 9, 2003
15th Annual Conference on Estate Planning and Administration:
"Tax Considerations of Settling Estate and Trust Disputes",
October 28, 2004

Rosenman & Colin
Briefing on Business and the Law – Estate Planning and
Administration, 1989
Speaker: "Retirement Benefits", January 23, 1997
"Determining Need for Living Trusts", NO DATE
"Federal Tax Considerations of Living Trusts", NO DATE
Tax Seminar, October, 2001
State of the Firm Address, 2006

26

Rosenman & Colin-Lawrence Graham
   Joint Tax Planning Seminar, London, UK, 1998

San Francisco Estate Planning Counsel
   "Estate Planning for Unmarried Partners", September 20, 2011

Seattle Estate Planning Seminar
   "Life After Death: Posthumous Corporeal Rights", October 1,
   2007

Selfhelp Community Services - Evelyn Frank Legal Resources
   "Planning for Life After Death", New York, NY,
   September 5, 2012,

Sioux Falls Estate Planning Council
   "Pressing the "Do Over" Button: Strategies for Modifying Wills
   and Trusts after Formation",  Sioux Falls, SD,
   February 20, 2014

Smith Barney Citigroup
   Transition Breakfast: "Estate Planning for Unmarried Couples",
   November, 2003

Society of Trust and Estate Practitioners (STEP)
   "U.S. Income And Transfer Taxation Of Migratory Individuals
   And Of Foreign And Domestic Trusts", London, UK,
   December 11, 2002
   "Made to Measure: A Fine Fit for the Family Fortune" St.
   Thomas, US Virgin Islands, May, 2003
    "Planning for Life after Death: The Ability to Control the
   Disposition of One's Remains and the Posthumous Use of One's
   Genetic Material", Geneva, Switzerland, June 7, 2006
   "Planning for Life after Death: The Ability to Control the
   Disposition of One's Remains and the Posthumous Use of One's
   Genetic Material", Zurich, Switzerland, February, 2007
   "Impact of Matrimonial Laws Upon International Estate
   Planning", San Francisco, CA, March 14, 2007
   "Basics of International Estate Planning", Rome, Italy,
   October 18, 2007
   "Impact of Matrimonial Law", Monaco, Spain,
   September 17, 2008
   "Impact of Matrimonial Laws Upon International Estate
   Planning", Miami, FL, April, 2009
   Panel Discussion: "The Patriarch is Dead… Long Live the
   Beneficiaries!!" & "Community Property Issues in Non-

27

Community Property States of the United States", Miami, FL,
June 11, 2010
"Community Property Issues in Non-Community Property
States of the United States", Chicago, IL, October 27, 2010
"The HIRE Act & FATCA: Detriment or Opportunity?",
St. Helier, Jersey, January 11, 2011
"Planning for Life After Death: The Laws of Succession vs. The
New Biology", Grand Cayman, Cayman Islands,
October 4, 2011
"Planning for Life After Death" Geneva, Switzerland,
December 15, 2011
"Planning for Life After Death" Tel Aviv, Israel, May 30, 2012
"Famous Family Contests: Lessons from the Land of
Litigation?", Grand Cayman, Cayman Islands,
February 12, 2013
"How Panama Complements the Swiss Wealth Management
Industry", Geneva, Switzerland, April 29, 2013
"Heads I Win, Tails You Lose:  Advising the Global Wealthy in
Times of Protracted and Unprecedented Political, Economic,
Cultural and Scientific Change" San Francisco, CA,
February 4, 2014
"Emerging Trends In Advising The Global Super Rich",
Bermuda, February 27, 2014
"Heads I Win, Tails You Lose:  Advising the Global Wealthy in
Times of Protracted and Unprecedented Political, Economic,
Cultural and Scientific Change", Chicago, IL, June 2, 2015

Southern Federal Tax Institute
    41st Annual Institute: "Choosing a Home for Your Trust",
    Atlanta, GA, September 22, 2006
    42nd Annual Institute: "Using Taxes to Resolve Estate and Trust
    Disputes", Atlanta, GA, October 5, 2007

Southern Nevada Estate Planning Council
    "Planning for Life After Death", Las Vegas, NV,
    January 24, 2008

Southwest Florida Estate Planning Council
    "Estate Planning for Unmarried Couples:  Detriment or
    Opportunity?", Sarasota, FL, February 7, 2012

State Bar of CA - International Law and Trusts & Estates Section
    Cross-Border Estate, Financial & Asset Planning Conference:
    "Using Trusts in Commercial Transactions", June 15, 2006

28

Suffolk County Bar Association - Surrogate's Court Committee
  "Repeal of New York State's Gift and Estate Taxes",
  February, 1998
  "Posthumous Corporeal Rights", April 27, 2005

Suffolk University Law School
  Conference: What You Need to Know About New Genetic
  Laws, "Posthumous Corporeal Rights: Is There Sex After
  Death?", May 18, 2001
  "Unmarried Partners: Money, Planning And Pleadings",
  April 4, 2003

State University of New York
  Binghamton Tax Institute: Estate Planning, 1990

Surrogate's Association of the State of New York
  Annual Conference: September, 2004
  LexisNexis *Answer Guide*: Book Presentation

Tax Discussion Group
  "Planning Opportunities in the Warning Months of 2010",
  New York, NY, October 25, 2010

Texas Bar CLE
  "Planning for Life After Death: The Ability to Control the
  Disposition of One's Remains and the Posthumous Use of
  One's Genetic Material", San Antonio, TX, June 25, 2010

Texas Tech University Law School
  Estate Planning & Community Property Law Journal Seminar:
  "Planning for Life After Death", Lubbock, Texas,
  February 18, 2011

Tulane University Law School
  58th Tulane Tax Institute: "Tax Planning for Unmarried
  Couples", October 30, 2009

UJA-Federation
  Annual Conference on Elder Law: "Planning for Professional
  Advisors", 1993
  Annual Estate, Tax and Financial Planning Conference: 1992,
  1993, 1994, 1995, 1998, 1999, 2000, 2001, 2002, 2003, 2004,
  2005, 2006, 2007
  Annual Westchester Estate, Tax and Financial Conference:
  1993, 1994, 1999
  Practical Aspects of Charitable Giving: "What's in the Mirror
  and What's Down the Pike: A Legislative Update", 1999

29

"New York State Legislative Update", May 13, 1999;
September 18, 2002; March 25, 2003; September 10, 2003;
March 22, 2006; June 7, 2006; February 13, 2008
"Don't Let Uncle Sam be a Beneficiary to Your Estate or Trust:
Working with Taxes in Dispute Resolution",
September 19, 2007
41st Sidney Kess Conference: "Estate Planning for Unmarried
Partners: Detriment or Opportunity?", New York, NY,
September 16, 2010
Annual CLE Event NYS Legislation Session: "Changes
Affecting Trusts and Estate Law", New York, NY,
November 28, 2012

UJA-Federation/Christies
   "1998 Update of New York State Legislative Activity",
   February 3, 1998
   "Estate Planning for Unmarried Partners" New York, NY,
   September 27, 2011

University of Kentucky
   Annual Estate Planning Conference: "Generation Skipping:
   Planning Needs for 1993 and Drafting with Consideration for
   Proposed Regulations", July 16, 1993

USC Gould School of Law 2007 Tax Institute
   "Using Taxes to Resolve Trust & Estate Disputes",
   January 22, 2007

U.S. Trust
   Estate Planning Seminar: "Tax Apportionment Clauses: Have
   You Named the Government as Your Beneficiary?",
   November, 1997

Volunteers of Legal Services
   Annual AIDS Coalition Conference, 1992, 1993, 1994

Washington State Bar Association
   52nd Annual Estate Planning Seminar: "Planning for Life After
   Death: Posthumous Corporeal Rights", Seattle, WA,
   October 1, 2007

Wells Fargo Private Bank
   Wells Fargo/Heckerling Breakfast Forum: "Planning for Life
   After Death: The Ability to Control the Disposition of One's
   Remains and the Posthumous Use of One's Genetic Material",
   New York, NY, March 2, 2010

30

The World of Trusts Planning and Management
  "U.S. Income Tax & Transfer Taxation of Foreign & Domestic
  Trusts", London, UK, June 4, 1997 & 1998

Yeshiva University
  "Estate Planning Secrets of the Rich and Famous",
  January 17, 2001

**Publications:**    Decision of Justice Elliott Wilk in Matter of John Donaghue,
  February 23, 1988

Estate Planning Magazine, "Factors that Affect the Estate Tax
  Treatment of Checks Written Prior to Death",
  November/December, 1988

Trusts & Estates Law Section Newsletter,
  "Chairperson's Corner", New York State Bar
  Association, Winter 1989

New York Times, "If You Own Something, You Should Get a
  Will", by Leonard Sloan, February 25, 1989

New York Times, "Talking Title Transfer", by Andre Brooks,
  September 17, 1989

Trusts and Estates Law Section Newsletter, New York State Bar
  Association, Legislation Column, 1989 to 1991

Trusts & Estates Law Section Newsletter,
  "Chairperson's Corner", New York State Bar Association,
  Spring 1990

Medical Economics, "Look at All the Ways to Turn Equity  Into
  Cash", by Brad Burg, July 23, 1990

New York Law Journal, "Summer Pro Bono, 1990", by Fay
  Ellman, August 20, 1990

Trusts & Estates Law Section Newsletter,
  "Chairperson's Corner", New York State Bar
  Association, Summer, 1990

Pro Bono Forum, Fall 1990 Trusts & Estates Law Section
  Newsletter, "Chairperson's Corner", New York State Bar
  Association, Fall, 1990

31

Journal of New York State Taxation, "New Law Overhaul New
York's Estate, Gift and GST Tax System", September, 1990

Journal of Taxation of Estates and Trusts, "Sweeping Changes in
New York's Estate, Gift and GST Taxes Will Trigger
Problems", Fall, 1990

New York State Bar Journal, "New York State Estate, Gift and
Generation-Skipping Transfer Tax Reform Part 1",
October, 1990

New York State Bar Journal, "New York State Estate, Gift and
Generation-Skipping Transfer Tax Reform – Part 2",
November, 1990

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Winter 1990

Executive Wealth Advisory, "Protect Yourself, Family and Assets
in Case of Your Incapacity", April 29, 1991

New York Law Journal, "Pro Bono Digest", February 20, 1991

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Spring 1991

New York Law Journal, "Observances Set to Commemorate Law
Day, 1991", April 30, 1991

State Bar News, New York State Bar Association, May, 1991

New York Times, "About New York:  To Poor Mothers with
AIDS, an Estate Lawyer Provides Dignity and Free Peace of
Mind", by Douglas Martin, June 26, 1991

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Summer, 1991

The Irvington Institute Report, The Irvington Institute for Medical
Research, Fall, 1991

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Winter, 1991

New York Times, "Talking Annuities",  by Andre Brooks,
January 12, 1992

32

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Spring, 1992

Medical Economics, "Mistakes Your Heirs Will Pay Heavily For",
by Brad Burg, June 1, 1992

Citibank Will Form, July, 1992

Volunteers of Legal Services, "New Standby Guardianship Law",
July, 1992

Trusts and Estates Law Section Newsletter, New York State Bar
Association, "Report of the Special Committee to Review the
Recommendation of the EPTL Advisory Committee to
Eliminate the Elective Share Trust", Summer, 1992

New York Times, "At the Bar", by David Margolick,
July 17, 1992

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Summer, 1992

Inc. Magazine, "A Guide to Trusts", August, 1992

Delta Airlines In-Flight Magazine, "Estate Planning: A Guide to
Trusts", August, 1992

New York Times, "Your Own Account:  New Wrinkles in Estate
Planning", by Mary Rowland, August 29, 1992

Dayton Daily News, "New York Puts New Wrinkles in Estate
Planning", by Mary Rowland, August 31, 1992

CCH, "Estate Planning Review", September 17, 1992

The Jewish Week, "Recent Events", September 25, 1992

The American Lawyer, "Midlevel Associates Survey",
September 25, 1992

Pro Bono Forum, "AIDS PROJECT", Fall, 1992

Medical Economics, "Are These The Best Guardians for Your
Assets", by Brad Bug, October 5, 1992

The Irvington Institute Report, The Irvington Institute for Medical
Research, Fall, 1992

33

New York State Bar Journal, "New Standby Guardian Law", November, 1992

Medical Economics, "Your Estate Plan: A Simple Checklist to Keep it Up to Date", by Brad Berg, November 2, 1992

New York Times, "Your Money: Asset Lists, Essential Adjuncts to Wills", by Andre Brooks, November 14, 1992

Medical Economics, "Some Things Shouldn't be Shared with Your Spouse", by Stan Luxenberg, November 16, 1992

Trusts & Estates Law Section Newsletter, "Chairperson's Corner", New York State Bar Association, Winter, 1992

State Bar News, "The New York Bar Foundation Elects New Fellows", December, 1992

The Jewish Week, "Lawyers Group to View Collectibles at Christie's Gala", January 15, 1993

Trusts & Estates Law Section Newsletter, "Chairperson's Corner", New York State Bar Association, Winter, 1993

New York Times, "Your Own Account:  Estate Planning in an Era of Change", by Mary Rowland, February 7, 1993

The Jewish Week, "Estate and Trusts Specialty Group Reception", March 19, 1993

"Conversations with Edyth", by Edyth Ross, March 31 & April 7, 1993 Cablevision South; March 30 & April 6, 1993, Cablevision North; and May 25 & June 1, 1993 TCI

New York Post, "Two Law Ladies Jaw Over Justice", April 5, 1993

Daily News, "Charlotte's Web", June 3, 1993

New York Times, "Your Own Account: Easing the Other Inevitability", by Mary Rowland, October 17, 1993

New York Times, "Disclaiming for the Kids' Sake", October 17, 1993

New York Times, "Your Own Account: Where an I.R.A. Doesn't Belong", by Mary Rowland, October 31, 1993

34

New York Times, "Your Own Account: Sharing A Family
    Business, Tax Free", by Mary Rowland, November 7, 1993

New York Times, "First of All, Get an Appraisal",
    November 7, 1993

The Dallas Morning News, "Your Own Account: Where an I.R.A.
    Doesn't Belong", by Mary Rowland, November 15, 1993

The Irvington Institute Report, The Irvington Institute for Medical
    Research, Fall 1993

Pro Bono Forum, "AIDS Project", Fall, 1993

New York Law Journal, "Today's News", December 1, 1993

The Jewish Week, "Manhattan This Week", December 24, 1993

Medical Economics "The Most Likely Tax Audit Isn't the One
    You Expect", by A.I. Schutzer, January 10, 1994

The Jewish Week, "In the News", January 21, 1994

Dental Practice & Finance, "The Most Likely Tax Audit Isn't the
    One You Expect", by A.I. Schutzer, March/April, 1994

The Irvington Institute Report, the Irvington Institute for Medical
    Research, Spring, 1994

New York Times, "Your Own Account: Family Values in Estate
    Planning:  Where Do You Draw the Limits?", by Mary
    Rowland, April 3, 1994

New York Times, Styles, "In Your Benefit Bonnet", by Bill
    Cunningham, April 3, 1994

New York Magazine, "Asphalt Green.  Real Fitness for Real
    People", April 18, 1994

Our Town, "Asphalt Green.  Real Fitness for Real People",
    April 7, 1994

35

New York Times, "Your Own Account: When a Power of
Attorney Fails", by Mary Rowland, April 17, 1994

Inc. Magazine, "Makeover", by Jill Andresky Fraser, May, 1994

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Spring, 1994

UJA - Federation Up Close, "Up Close Events", Vol. 1, No. 2,
Spring, 1994

The Irvington Institute Report, the Irvington Institute for Medical
Research, Spring, 1994

New York Times, "Your Own Account:  Who's Advising
Financial Advisors." by Mary Rowland, June 26, 1994

New York Times, "Adding Up an Estate", June 26, 1994

Modern Maturity, "Where an I.R.A. Doesn't Belong", by Mary
Rowland, July/August, 1994

New York Times, "Your Own Account: Keeping Assets Close to
Home", by Mary Rowland, August 7, 1994

New York Times, "Your Own Account: For Foreigners, a
Complex Tax Web", by Mary Rowland, August 14, 1994

New York Times, "Safeguard Evolves Into a Loophole", by Mary
Rowland, August 14, 1994

The American Lawyer, "Making Warhol Pay", by Vera Titunik,
September, 1994

New York Times, "Your Money: Q & A: Inheriting a House", by
Mary Rowland, September 10, 1994

New York Times, "Your Money: Q&A: Backyard Parking Lot",
by Mary Rowland, September 24, 1994

Jewish Board of Family and Children's Services Newsletter,
"JBFCS Elects New Officers", Fall, 1994

Irvington Institute Report, "Irvington Board Has New President",
Fall, 1994

36

Trusts and Estates Law Section Newsletter, New York State Bar
Association, NYSBA Trusts and Estates Law Section Survey,
Fall, 1994

New York Law Journal, "VOLS Marks 10 Years of Serving the
Poor", by Carl Deal, October 14, 1994

New York Times, "Your Own Account: Avoiding Pitfalls of
Trustees' Law", by Mary Rowland, November 6, 1994

New York Newsday, "Talking Turkey!  Law Firm Caught Up in
the Spirit", by Merle English, November 23, 1994

New York Times, "Your Own Account: Death Needn't Mean
Taxes on I.R.A.; Knowing Where the Money Goes", by Mary
Rowland, November 27, 1994

Medical Economics, "Should Your Practice Be a Limited Liability
Company?" by Brad Burg, December 12, 1994

New York State Bar Journal, "1994 New York State Legislative
Changes Affecting Estate Planning",  January, 1995

New York Magazine, "The Best Lawyers in New York", by Robin
Pogrobin, March 20, 1995

New York Times, "Spending It: The Importance of Who Owns
What", by Mary Rowland, March 26, 1995

Medical Economics, "Choose the Best People to Handle Your
Estate", by Diane Weber, May 8, 1995

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Summer, 1995

The Northeast Newsletter from City of Hope National Medical
Center, "Connections", May, 1995

Medical Economics, "The Biggest Financial Blunders Doctors
Make", by Brad Burg, June 12, 1995

New York Times, "New Rules Cut Estate Taxes For the Inheritors
of Houses:  Value of Tax-Free Assets Could Be Tripled", by Ian
Fisher, July 22, 1995

The Wall Street Journal, "Burden of Estate, Gift Taxes Is Likely to
Lighten - Your Matters", by Tom Herman, August 10, 1995

37

The Investment Advisor, "Pension Advisor: The Benefits of
Hindsight", by Mary Rowland, November, 1995

Medical Economics, "Moves to Make Before You're Sued", by
Brad Burg, November 13, 1995

The Newsletter of the Jewish Board of Family Children's Services,
"Law Firm Donates Food for Thanksgiving", Winter, 1995

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Winter, 1995

Carmody Wait 2d, vol. 26 - contributor, 1996

Jewish Week, "Dream Season - 'Special' patrons make holiday
wishes come true for emotionally troubled residents of
Hawthorne campus", by Jane Linker, January 12, 1996

New York State Bar Journal, "1995 New York State Legislative
Changes Affecting Estate Planning", January, 1996

New York Law Journal, "Children Thank Rosenman for Gifts",
February 9, 1996

At a Glance, Newsletter for the JBFCS Community, "Thanking
Friends", March, 1996

At a Glance, Newsletter for the JBFCS Community, "Starting a
Scholarship Fund", March, 1996

Our Town, "One Good Turn Deserves Another", March 3, 1996

New York Law Journal, "Compensation of Attorney/Executors -
Practitioners Often Caught Between Scylla and Charybdis",
April 29, 1996

The Irvington Institute Report, "NIH Director Speaks on 'Budget
and Biology' at Irvington Breakfast", Spring, 1996

New York Law Journal, "Legal Fees of Attorney/Fiduciaries",
April 29, 1996

Trusts & Estates Law Section Newsletter, "Chairperson's Corner",
New York State Bar Association, Spring, 1996

ACTEC Notes, "Standby Guardianship Legislation:  Preparing
Before the Tidal Wave Hits" Summer, 1996

38

Trusts and Estates Law Section Newsletter, New York State Bar
    Association, Chairperson's Corner, Summer, 1996

New York Magazine, "Payback Time in the Courthouse",
    September 9, 1996

Trusts and Estates Law Section Newsletter, New York State Bar
    Association, "Compensation of Attorney/Executors", Fall, 1996

Medical Economics, "Estate Planning: How Second Marriages
    Change the Rules", by Brad Burg, November 11, 1996

Modern Maturity, "Money - A Trustee to Trust - You Don't Have
    to Cry All the Way to the Bank", by Mary Rowland,
    November/December, 1996

Medical Economics, "The Seven Holes in Your Will", by Brad
    Burg, December 9, 1996

At a Glance, Newsletter for the JBFCS Community, Board
    Irvington Institute Report, "Awards Honors Scientist, Generous
    Donors", Winter, 1996

JBFCS Westchester Campus News, "$18,000 in Presents Given to
    Youngsters by Rosenman & Colin", Winter, 1996

JBFCS FYI, "Joshua Rubenstein: Preserving the Future",
    Winter, 1996

and Committee News, "Trustees Re-Elect Slate, Name a President-
    Elect", January, 1997

Matthew Bender, "Finding the Right Estate Planning Tools",
    LexisNexis, 1997

New York State Bar Journal, "1996 New York State Legislative
    Changes Affecting Estate Planning and Administration",
    January, 1997

Manhattan File, "A Letter from the Chairman and President of the
    Board", February, 1997

New York Magazine, "The Sex Doctor and the Toy Tycoon", by
    Rebecca Mead, February 3, 1997

39

Business Council of New York State Newsletter, "Florida May be a Fine Place for Lawyers to Meet,  But we Shouldn't Send New York's Wealth Down There for Retirement", by Daniel B. Walsh, February 21, 1997

Modern Maturity, "Transfer Assets, Go To Jail?" by Mary Rowland, March/April, 1997

The Irvington Institute Report, "Irvington Institute Awards Twelve Fellowships For The Class of 2000", Winter, 1997

The Irvington Institute Report, "Career and Industry Day Brings Together Fellows and Industrial Leaders", Winter, 1997

The Newsletter of the Jewish Board of Family & Children's Services, "Snapshots", Winter, 1997

Washington Post, "You Don't Have to Be Rich to Set Up Your Own Private Charitable Foundation",  January, 1998

New York State Bar Journal, "1997/1998 New York State Legislative Changes Affecting Estate Planning", January, 1998

Bloomberg Personal Finance, "Estate of Grace", by Mary Rowland, April, 1998

New York Observer, "Bernie Clair Targets Wildenstein Fortune for Estranged Wife", July, 1998

Medical Economics, "Leave Nothing to Chance in Your Will", September 7, 1998

New York Law Journal, "Estate and Gift Taxes Slowly Disappear", October 1, 1998

New York Banker, "Attendees rate NYBA's 52nd Annual Trust & Investment Conference 'Outstanding,'" November 18, 1998

Washington Post, "Giving a Lot, a Little at a Time",  December 20, 1998

New York Law Journal, "Today's News", December 30, 1998, Announcement of Appointment as Chair of Rosenman & Colin LLP

The Newsletter of the Jewish Board of Family & Children's Services, "Short Takes", Winter, 1998

40

Medical Economics, "Can You Spot a Phony Trust?  Don't Be Too
  Sure",  January 11, 1999

Crain's New York Business, "Executive Moves, Announcement of
  Appointment as Chair of Rosenman & Colin LLP",
  January 11-17, 1999

Crain's New York Business, "Branding Comes to the Bar",
  May 3-9, 1999

Bloomberg Personal Finance, "Estate Planning Just Got Grimmer",
  by Mary Rowland, July/August, 1999

New York Law Journal, "Advances in Medical Technology:
  Implications for Practitioners, Clients",  September 7, 1999

"Corporeal Rights After Death", Published in MCLE Publications
  manual, "Adoption & Reproductive Technology in
  Massachusetts", October, 1999

New York Law Journal, "100 Years of Change in Estate Planning
  Certain to Continue",  November 29, 1999

The American Lawyer  "Y2K Challenge", December, 1999

New York State Bar Journal, "1999 New York State Legislative
  Changes Affecting Estate Planning and Administration",
  December, 1999

Wall Street Journal, "Tax Report:  Hang in there, New Yorkers:  A
  Death Tax Will Soon Die", January 26, 2000

State Bar News, "Rubenstein Elected Chair of Trusts and Estates
  Section", January 26, 2000

Trusts and Estates Law Section Newsletter, "A Message from the
  Section Chair", Spring, 2000

Physicians Financial News, "Meeting Needs of Aging Parents",
  May 15, 2000

New York Times, "Daughters' Gift To the Modern", June 2, 2000

Long Island Newsday, "Giving New Life to Estate Planning",
  July 23, 2000

The Business Journal of Charlotte, NC, "Rosenman & Colin
  Expands Local Office", August 11, 2000

41

New York Law Journal, "'Boot Camp' Summer Program at
Howey Faces Skepticism", August 11, 2000

Aktuelle Juristische Praxis, "Neu US – Quellensteuervorshriften:
Schweizerischer Nachlass vs. 'US-Estate' aus der Sicht der US-
Steuerbehorden", January, 2001.

The Wall Street Journal, "A Change in Death & Taxes? Debating
the Options for an Estate-Tax Overhaul", February 26, 2001

New York State Bar Journal, "Notable Changes Affecting Estates
in the Year 2000 Reformed Wills and Trusts for Tax Purposes",
February, 2001

NYSBA Trusts and Estates Law Section Newsletter, "Trusts and
Estates Top Ten Dumbest Law", Spring, 2001

Lawyers Weekly USA, "Lawyers Struggling With Estate Plans as
Congress Mulls Change", April 16, 2001

New York Law Journal, "Attorneys Escape Offices in Doomed
Twin Towers", September 12, 2001

Newsday, "Death Certificates May Clog Process",
September 23, 2001

Chicago Tribune, "City Turns to Helping the Living",
September 27, 2001

Rosenman & Colin LLP, "World Trade Center Disaster
Emergency Relief Procedures", October, 2001

New York Times, "Jolted by September 11, Many Rush to Make
Wills", December 13, 2001

UJA Federation - NY
  "Legislative Action in 2001 Updated Accounting Concepts and
Made Procedural Changes", January, 2002

New York State Bar  Journal, "Legislative Action in 2001
Updated Accounting Concepts and Made Procedural Changes",
February, 2002

The Business Journal of Charlotte, NC,  "Law Firm Eyes a Local
Merger", March, 2002

42

Chicago Daily Law Bulletin, "Katten Names Mate in NYC:
  Rosenman", March 27, 2002

Bloomberg News, "Rosenman & Colin Joins Katten Muchin
  Zavis to Form New Law Firm", March 27, 2002

The Deal, "Katten Muchin Grabs Rosenman & Colin",
  March 27, 2002

New York Law Journal, "Rosenman & Colin Joins Forces with
  Katten Muchin", March 28, 2002

The Lawyer, "Rosenman-Katten Muchin Merger Creates New
  York-Chicago Giant",  April 8, 2002

New York Law Journal, "Impact on States of Federal Estate Tax
  Repeal", September 9, 2002

Crain's New York Business, "Marriage of Legal Minds", by
  Daniel Gross, September 23, 2002

Warren's Heaton Legislative and Case Digest, "Impact on States
  of Federal Estate Tax Repeal", October, 2002

The National Law Journal, "The Aftermath of Mergers Can be
  Layoffs, Departures", November 18, 2002

New York State Bar Association Journal, "Changes to Estate Laws
  in 2002 Affected Families of Terror Victims, Adoptions,
  Accountings and Trusts", November/December, 2002

The Wall Street Journal Sunday, "Readers Ask About Dividends
  and New York Property Taxes", by Tom Herman,
  December 22, 2002

The American College of Trust and Estate Counsel (ACTEC)
  Journal, "Impact on States of Federal Estate Tax 'Repeal'",
  Winter, 2002

New York State Bar Association Trusts and Estates Law Section
  Newsletter, "2002 New York State Legislative Session Changes
  Affecting Estate Planning and Administration", Winter, 2002

The New York Sun, "Estate Tax Quirk May Chase the Wealthy",
  by R.H. Sager, March 11, 2003

43

The Wall Street Journal, "Outlook for Estate-Tax Repeal In
    Congress During 2003 Dims", by Tom Herman,
    March 27, 2003

The Wall Street Journal, "Interest Rates, Bond Yields Aren't
    Always Connected", by Tom Herman, April 6, 2003

The Wall Street Journal, "Protect Your Family In Case of a
    Crisis", by Kathy Chu, August 31, 2003

Practical Accountant "Estate Planning – Pre-Mortem Review",
    September, 2003

The Wall Street Journal, "Estate Tax Changes for 2004",
    November, 2003

New York State Bar Journal, "State Budget Shortfall in 2003 Was
    Impetus Behind Many Changes Affecting Trusts and Estates",
    January, 2004

Wall Street Journal, "Use of Disclaimers in Estate Planning",
    February, 2004

Wall Street Journal, "Court Ruling Bolsters Estate Planning
    Tool",  May, 2004

Waste Age, "Family Value$", by Barry Shanoff, August 1, 2004

Wall Street Journal, "Kids! Hands Out of the Cookie Jar!
    Partnerships May Be Way for Parents to Keep Control of Hefty
    Custodial Assets", by Kathy Chu, August 11, 2004

Medical Economics, "How to Pick the Right Guardian and
    Executor; Last Will & Testament", by Vicki F. Brentnall,
    August 20, 2004

New York Law Journal, "Planning for Unmarried Couples", by
    Joshua S. Rubenstein, September 13, 2004

Legal Week: Global Edition, "Private Client: Marriage Guidance",
    by Joshua S. Rubenstein, November 25, 2004

Suffolk Lawyer "LexisNexis AnswerGuide New York Surrogate's
    Court Book Review", by Colleen F. Carew, Esq.

Robb Report, "Wealth Management: Sharing the Wealth",
    by Dean Foust, February 5, 2005

44

Warren's Heaton Legislative & Case Digest, "2005 New York
State Legislation Session Changes Affected Trust & Estate
Law", Volume 9, Number 5, October 2005

Medical Economics, "The Five Holes in your Will", by Brad Burg,
October 21, 2005

Citywealth UK online newsletter (advanced e-mail),
November 4, 2005

Citywealth UK online newsletter, November 7, 2005

Cosmetic Surgery Times, "The 5 Holes in Your Will", by Brad
Burg, May 1, 2006

Warren's Heaton Legislative and Case Digest, "2006 New York
State Legislation Session Changes Affecting Trust & Estate
Law", October, 2006

Citywealth, "Sue Laing—No Introduction Needed",
November 16, 2006

Family Office Exchange, "Offshore Trusts for U.S. Citizens and
Residents: Separating Myth From Reality", Fourth Quarter,
2006

Medical Economics, "Making a Will: Leave Nothing to Chance",
By Kathleen McKee, January 5, 2007

The STEP Journal Volume 15, Issue 4, "Life After Death", April,
2007

The Wealth Report/The Wall Street Journal, "The Rise of the
Postnup", by Robert Frank, June 6, 2007

Standby Guardianship Legislation: At the Midway Point, July 10,
2007

New York State Bar Association Journal Volume 79 No. 6,
"Planning Ahead", July/August, 2007

The Pittsburgh Post-Gazette, "Postnuptial Agreements Can Give
Estate Flexibility", by Gail Liberman and Alan Lavine, August
3, 2007

Investment News, "Fate of Estate Tax Worries Planning Lawyers",
by Sara Hansard, August 13, 2007

45

New York Daily News, "Helmsley Grandkids Face Uphill Fight to
    Break Will", by Jose Martinez, September 1, 2007

Wall Street Journal Law Blog: Post-Nuptial Agreements quote,
    June 20, 2007

New York University 66th Institute on Federal Taxation.  Chapter
    21: "Estate Planning for Unmarried Partners", ed. Matthew
    Bender, 2008

The Daily Telegraph (UK), "Mellon Sues Her Mother for £5m in
    Jimmy Choo Row", by Richard Edwards, January, 2008

New York Daily News, "Coma Teen's Mom Named Guardian –
    But Only for Suit", by William Sherman, January 15, 2008

FABSUGAR, "Fab Flash: Jimmy Choo Founder Tamara Mellon
    Sues Mom", January 24, 2008

Footwear News, "Choo Founder Mellon Sues Mother", by Liza
    Casabona, January 24, 2008

The New York Post: Page Six, "Stiletto Mom Feels $10M Heel",
    January 24, 2008

Vogue.com (UK), "Mellon on the Stand", by Leisa Barnett,
    January 24, 2008

The Portland Tribune, "Jimmy Choo founder files suit against
    mother", reporting by Jill Serjeant, editing by Dan Whitcomb,
    January 24, 2008

The Singapore Press, "Jimmy Choo founder files suit against
    mother", reporting by Jill Serjeant, editing by Dan Whitcomb,
    January 24, 2008

Yahoo! News, "Jimmy Choo founder files suit against mother",
    reporting by Jill Serjeant, editing by Dan Whitcomb,
    January 24, 2008

Beverly Hills Courier, "Jimmy Choo Lawsuit Pits Daughter Versus
    Mother", by Chris Sieroty, January 25, 2008

The Daily Mail (UK), "Jimmy Choo founder files £5million
    lawsuit against estranged mother", January 25, 2008

The Wall Street Journal: The Wealth Report Blog, "The Taxman
    Targets the Rich", by Robert Frank, January 30, 2008

The Los Angeles Times, "Jimmy Choo Exec in Legal Scuffle", by
      Martin Zimmerman, February 18, 2008

Citywealth, "Feature: A Look at Trusts", ed. Karen Jones,
      March, 2008

Citywealth, "Citywealth Magic Circle Awards 2008", ed. Karen
      Jones, May, 2008

The Lawyer, "Katten Vows to Expand London Presence", ed. Matt
      Byrne, June 2, 2008

Citywealth, "Feature: Pearls of Wisdom", ed. Karen Jones,
      October 8, 2008

Citywealth, "The Motor Industry Hits Crisis and Now Shipping",
      ed. Karen Jones, November, 2008

Citywealth, "The Sand Throwing Contests Begin", ed. Karen
      Jones, November, 2008

Wall Street Journal, "Obama's Tax Hikes: A Survival Guide for
      the Wealthy", November 4, 2008

Citywealth, News Alert: Rich Lister News, ed. Karen Jones,
      November 21, 2008

Trusts e Attivita Fiduciarie, "The U.S. Income and Transfer
      Taxation of Migratory Individuals and of Foreign and Domestic
      Trusts", ed. Maurizio Lupoi, November/December, 2008

Citywealth, "Katten Muchin Rosenman look into USA Estate, Gift
      and GST Tax crystal ball", ed. Karen Jones,  December, 2008

New York University 66th Institute on Federal Taxation, "Estate
      Planning for Unmarried Partners", by Matthew Bender,
      November/December

Private Wealth, "Lemonade Out of Lemons",
      December, 2008/January, 2009

The Family's Guide to Wealth: Insights from Thought Leaders and
      Pioneers, "In Trusts We Trust", 2009

Heckerling Institute on Estate Planning University of Miami
      School of Law Chapter 11: Estate Planning for Unmarried
      Partners by Joshua S. Rubenstein 2009

47

Kiplinger's Retirement Report, Cover Story: An Opportune Time
to Help Heirs, by Kathryn A. Walson, January, 2009

Private Asset Management:  "Unmarried Couples Should Solidify
Estate Plans", January 23, 2009

New York Times: "Study Estate Plans Before Laws Shift",  by
Deborah L. Jacobs,  February 26, 2009

Citywealth, "Josh Rubenstein, Katten Muchin Rosenman, New
York, gets a taste of Broadway in $200mn private family estate
deal", ed. Karen Jones, April, 2009

American Lawyer: "Five Firms Advising on Sale of Rodgers &
Hammerstein Catalog to Dutch Company",  by Brian Baxter,
April 22, 2009

The Am Law Daily:  "Five Firms Advising on Sale of Rodgers &
Hammerstein Catalog to Dutch Company", by Brian Baxter,
April 22, 2009

The Am Law Daily:  "Dealmakers of the Week: The Sound of
M&A", by Brian Baxter, April 24, 2009

Mergers and Acquisitions Reports:  "Rodgers & Hammerstein
Music Sold", by Avram Davis, April 27, 2009

New York Law Journal, "Five Firms Advise on Purchase of Rights
to Legendary Songs", April 30, 2009

New York Times:  "Adult Adoption a High-Stakes Means to an
Inheritance", by Deborah L. Jacobs,  May 21, 2009

Palm Beach Daily News, "Lawsuit: Warnings About Madoff
Unheeded", May 31, 2009

Palm Beach Daily News: "Madoff Investments Hurt Jack
Friedman Estate, Say Grandchildren Suing Trustees", by
Michele Dargan, May 31, 2009

Citywealth, "Update: Josh Rubenstein, Katten Muchin Rosenman
on Latin America", ed. Karen Jones, July 9, 2009

Investment News "Jackson Will Hits All the Right Notes",
July 12, 2009

New York Post's Page Six "Spitzer Spotted", September 13, 2009

48

Citywealth "Jersey Finance Celebrate As They Scoop a STEP
   Award", October, 2009

Dow Jones Newswires "Getting Personal: Prospects Are Dim for
   House Estate Tax Bill", December 4, 2009

Boomer Market Advisor "2010: A Good Year to Die?", by John
   Sullivan, December 30, 2009

J-Walk Blog, "2010: A Good Year To Die?", December 30, 2009

American Public Media – Scratch Pad, "Death and Taxes",
   December 30, 2009

WashingtonPost.com, "Death and Taxes", by Erza Klein,
   December 30, 2009

The Australian, "Rich Cling to Life to Beat Tax Man",
   December 30, 2009

MSN Money.com "Rich Cling to life to Beat Tax Man", by Laura
   Saunders, December 30, 2009

The Wall Street Journal, "Rich Cling to Life to Beat Tax Man", by
   Laura Saunders, December 30, 2009

Greg Mankiw's Blog, "The Temporarily Disappearing Estate
   Tax", December 30, 2009

Newsodrom.com, "The Temporarily Disappearing Estate Tax",
   December 30, 2009

Air America, "Rich Old People Plan to Die Next Year to Avoid
   Estate Tax", by Megan Carpentier, December 30, 2009

Daily Truffle, "Rich Cling to Life to wait out one-year halt to the
   estate tax starting Jan. 1", December 30, 2009

The Economist's Free Exchange Blog, "Hanging On",
   December 30, 2009

HedgeHogs, "Staying Alive, for Tax Purposes",
   December 30, 2009

Mother Jones, "Happy New Year, Geezers.  Please Die Soon",
   December 30, 2009

49

NPR.com, "Some Wealthy are Pushing to Live Another Day to
Avoid Estate Tax", by Mark Memmott, December 30, 2009

NYmag.com's Daily Intel, "Rich People Are Waiting Until the
Ball Drops to Die", December 30, 2009

Real Clear Politics "Rich Cling to Life to Beat Estate Tax",
December 30, 2009

Social Mode "Death and Taxes- a What is Man Follow Up",
December 30, 2009

Tax.com, "Don't Die Yet, Grandpa!", by Christopher Bergin,
December 30, 2009

WPIX.com, "Dodging the 'Death Tax'", December 30, 2009

Market Minds, "Tax Laws Encourage Euthanasia in 2010",
December 31, 2009

Mish's Global Economic Trend Analysis, "Tax Laws Encourage
Euthanasia in 2010", December 31, 2009

The Australian, "Death on Agenda as Tax Takes Break", by Laura
Saunders, December 31, 2009

CommentaryMagazine.com, "You think Death Taxes are Tricky
Now", by Jennifer Rubin, December 31, 2009

Luimbe.com, "Death Panels!", December 31, 2009

Shopfloor, "Death Tax to fall to 0 Percent, Uncertainty soars to
100 percent", December 31, 2009

"A Family's Guide to Wealth: Insights from Thought Leaders and
Pioneers" Editor: Kirby S. Rosplock, Ph. D. - Pages 166-176,
"In Trusts We Trust", by Joshua S. Rubenstein

Citywealth, "U.S. Update: Federal Estate and Generation-Skipping
Transfer (GST) Taxes", January, 2010

Freedom Works, " New Year Brings Life and Death Tax
Decisions", by Matthew Clements, January 2, 2010

The Globe and Mail, "Social Studies: A Daily Miscellany of
Information", by Michael Kesterton, January 4, 2010

50

Future of the Federal Estate Tax Blog, "Katten Muchin Rosenman
    LLP on the Federal Estate Tax", January 21, 2010

Daily Finance, "Casey Johnson and Ruth Lilly: A Tale of Two
    Heiresses, Tax Loopholes, and Tequila", by Sarah Weinman,
    January 28, 2010

Citywealth, Article on Expiration of Federal Estate Tax,
    January, 2010

Citywealth, "U.S. Government Acts Quickly to Help Haiti",
    February, 2010

The New York Times, "Saying 'No Thanks' to a Bequest",
    February 17, 2010

Expert Guides' The Best of the Best, "U.S. Update: Federal Estate
    and Generation-Skipping Transfer (GST) Taxes", March, 2010

Estate Planning, "Posthumous Control Over One's Remains and
    Use of Genetic Material", March, 2010

STEP Journal Volume 18 Issue 03, "All Change", Feature Article,
    March 15, 2010

Thomson Reuters, "HIRE Act Affects Foreign Trusts and Imposes
    Additional Requirements on U.S. Persons with Foreign
    Accounts", March 31, 2010

New York State Bar Association Journal, "2009 New York State
    Legislative Session Changes Affecting Trust and Estate Law",
    March/April, 2010

STEP Journal Volume 18 Issue 04, "Planning for Change",
    International Article, April, 2010

The Wall Street Journal, "Rock by Night, Life Insurance by Day",
    by Leslie Scism and Laura Saunders, April 3, 2010

STEP Journal, "Working With Uncertainty", US and Canada
    Focus Article, May, 2010

Advanced Estate Planning and Probate Course Book, "Planning for
    Life After Death", June, 2010

Investment News, "Ugly Battle Over Gary Coleman's Remains
    Provides a Lesson for Advisers", June 7, 2010

51

Forbes.com, "Prepare for the Return of the Estate Tax",
June 28, 2010

Trusts & Estates Magazine, "Estate Planning for Unmarried
Partners: Detriment or Opportunity?", July 2010

Wall Street Journal, "VOICES: Joshua Rubenstein, On Taxes in
the Twilight Zone", by Mike Millard, July 19, 2010

Trusts & Estates Magazine, "Scratching Your Head Over 2010
Estate Plans?", July, 2010

Trusts & Estates Magazine, Interview on 2010 Estate Plans,
August, 2010

The New York Times, "Devising Strategies While the Estate Tax
is in Limbo", by Deborah L. Jacobs, September 15, 2010

Private Asset Management, "The Future of the Federal Estate
Tax", September 29, 2010

Wall Street Journal: Quoted on Power of Attorney, October 3,
2011

Bloomberg BusinessWeek, "Wealthy Families' Living-Gift
Strategy", by Ryan J. Donmoyer, October 7, 2010

Forbes.com, "Estate of Confusion: Our Nation's Estate Tax Rules
Are...", by Hani Sarji, October 13, 2010

Bloomberg.com, "Rise of In Vitro Offspring Ignites Question of
Rightful Heirs", by Margaret Collins, October 15, 2010

Investment News, "Gifting on the Rise as Rich Look to Duck
Estate Tax", October 17, 2010

Forbes Blog, "Estate of Confusion: November 2010 Midterm
Elections Extend Estate Tax Suspense", by Hani Sarji, October
21, 2010

Investment News, "What Billionaires Would Have Owed",
October 28, 2010

Investment News, "Tax Tsunami on the Way", by Nancy Mandell,
November 1, 2010

Private Asset Management Newsletter, "The Future of the Federal
Estate Tax", November 1, 2010

52

Trust and Estates, "Congress and Estate Tax", by Joshua
Rubenstein, November 9, 2010

The wall Street Journal, quoted on Year-End Estate Planning,
November 20, 2010

Forbes Blog, quoted for article on changes to Estate Tax,
December 7, 2010

The Fiscal Times, "Estate Tax Change Threatens Obama's Tax
Compromise", by Tom Herman, December 16, 2010

The Wall Street Journal, "Taxing Year Brings a Less-Taxing
Year", by Laura Saunders, January 3, 2011

Probate & Property, "Chronic Illness: Practical Planning and
Drafting, Part 1", by Martin Shenkman and Joshua Rubenstein,
January/February 2011

Financial Post, "For Death and Taxes, Americans Shop Around",
by Alexis Leondis, March 2, 2011

Forbes, "Planning for Chronic Illness Is Not Just for the Elderly",
by Hani Sarji, March 27, 2011

Probate & Property, "Chronic Illness: Practical Planning and
Drafting, Part 2", by Martin Shenkman and Joshua Rubenstein,
March/April 2011

The Wall Street Journal, "The Federal Estate Tax", by Tom
Herman, June 5, 2011

Forbes Blog: Estate of Confusion issue "How To Cut State Death
Tax – Without Moving", by Hani Sarji July, 13 2011

California Lawyer: "The Prince of Rock", by Stan Sinberg,
August 3, 2011

Forbes: Money & Investing "Married, with Complications", by
Deborah L Jacobs, August 3, 2011

Investment News: "Gay Spouses Struggling for Benefits", by Liz
Skinner, May 28, 2012

Columbia Law School Magazine: "Joshua Rubenstein – The
Specialist", Spring 2012 issue

53

46th Annual Heckerling Institute on Estate Planning, University of Miami School of Law, LexisNexis/Matthew Bender: "Pressing the 'Do-Over' Button: Strategies for Modifying Wills and Trusts After Formation", June, 2012

Investment News article, "One way to beat the IRS: Leave the Country", July 17, 2012

Associated Press article, "Gay NYC Judge Challenges Father's Will", August 24, 2012

The New York Times, "Debevoise & Plimpton Drops Trusts and Estates Practice", by Peter Lattman, February 6, 2013

The AM Law Daily, "Unwanted at Debevoise, Trusts and Estates Team Lands at Loeb", by Sara Randazzo, March 18, 2013

Theories of Marital Property on the International Stage: Chapter 6

The American Lawyer, "Doubling Down on Private Client Practices" by Drew Combs, June 27, 2013

Trusts and Estates Law & Tax Journal, "US Reporting Requirements: The Long Arm of US Tax Law", October, 2014

Global Legal Group, "The International Comparative Legal Guide to Private Client 2015 - 4th Edition", December, 2014

Bernews, "Forum Highlights Bermuda for LatAm Business", February 23, 2015

Citywealth Weekly, "What could UK elections mean to the US wealthy? by Marcela Kunova, March 18, 2015

Bloomberg, "Trusts & Estates Lawyers Are Now Moneymakers: Business of Law", by Ellen Rosen, March 23, 2015

Legal Week, "People are allowed to be foolish and mean – trust lawyers debate the importance of capacity in succession planning", April 21, 2015

Morningstar, "Is Your Estate Plan Obsolete?", by Deborah L. Jacobs, May 5, 2015

Citywealth, "Art is too easy to trace to be used for bribes", by Marcela Kunova, June 4, 2015

54

Bloomberg BNA, "Eight Key Estate Planning Opportunities Arising from the Supreme Court's Decision on Same-Sex Marriage", by Joshua S. Rubenstein and Casey C. Verst, July 8, 2015

Forbes/Media & Entertainment, "The 13 Top-Earning Dead Celebrities of 2015", by Zack O'Malley Greenburg, October 27, 2015

Thomson Reuters Estate Planning Magazine, "Estate Planning Update for Same-Sex and Unmarried Couples", November 2015

**Television and Radio:**    CNBC News, "Money Talk", Ted David, March 4, 1993

NBC News, 11 P.M., Perri Peltz, March 20, 1994

CNBC News, "Money Wheel", Ted David, June 2 1994

MoneyCentral Radio, nationally-syndicated radio program focusing on personal finance issues "Key Mistakes People Make When Drawing Up and Maintaining an Estate Plan", January 30, 1999

Voiceamerica.com (Internet Radio Show), "Legal and Ethical Implications of Posthumous Procreation", November, 2003

NY1 News, "Experts Offer Tips On Wills And Estate Planning", July 14, 2004

Bloomberg TV December 30, 2009

WPIX "Dodging the Death Tax" December 30, 2009

Fox News January 4, 2010

New Hampshire Public Radio: Interviewed about the Rights of Frozen Embryos, November 9, 2010

ABC Chicago News – Interview about Mayor Daley, September 23, 2011

**Pro Bono:**    AIDS Counseling, South Brooklyn Legal Services

Central Park Conservancy

Columbia Health Sciences Center

55

Columbia University

Court Appointed Guardianships

Hadassah

Irvington Institute for Immunological Research

Jewish Board of Family & Children's Services

Lincoln Center for the Performing Arts

Metropolitan  Museum of Art

Museum of Art & Design

Museum of Modern Art

New York Philharmonic

New York Public Library

Practicing Law Institute

UJA-Federation

Volunteers of Legal Service Citiwide AIDS Council

**Expert Witness/**
**Consultant:**

*Grutman v. Goldman*, Index No. 9270/89
Supreme Court of the State of New York, New York County

*Margaret Scofield, et al. vs. Walter Newman*,
*et al. vs. Gruntal & Co., Inc.*, Index No. 92-21303
Supreme Court of the State of New York, Westchester County

*Disciplinary Committee vs. J.J. Borer,*
Supreme Court of the State of New York, Kings County

*Disciplinary Committee vs. Chaice,*
Supreme Court of the State of New York, New York County

*Doben, et al. v. Rosenblum, et al*., Index No. 112791/93
Supreme Court of the State of New York, New York County

*Estate of Louise Nevelson*, Index No. 103962/97
Supreme Court of the State of New York, New York County

56

*Williams vs. JP Morgan*, Index No. 00CIV6321
US District Court, Southern District of New York

*Kyle Krug, et al. vs Citibank, N.A, et al. vs. Citibank, N.A., et al. vs. Emmerson C. Krug, Jr., et al.*, Civil Action Number: CV 0402253
Circuit Court of Jefferson County, Alabama

*Estate of Estee Lauder*, Case No. 024649-08
United States Tax Court

*In Re: Samuel Evans Wyly, et al.*, Case No. 14-35043
United States Bankruptcy Court, Northern District of Texas, Dallas Division

**Guardian ad litem appointments:**

Estate of Huge Neu
Estate of Elmer Bobst
Estate of Bloomingdale
Citibank Common Trust Income Fund
Chase Common Trust Principal Fund
Bankers Trust Common Trust Income Fund
Bankers Trust Company Utility Fund
Cargill/MacMillan Family (appointed by courts of Bermuda and Switzerland for purpose of providing expert advice on U.S. taxation of foreign trusts)
Estate of Simon H Scheuer
Estate of Siadhal Sweeney
Gregory J. Colosi
John J. Smith
Trust f/b/o Patricia C. Gainey
Anna-Katrina Picard Lehrer
Katrina Francis
Todd Francis
Estate of Lucy Henderson

**Mediation appointments:**    Estate of Jack Tracy Herkamp
Estate of Richard L. Fisher
Estate of H.L. Hunt
Estate of Richard Rodgers

58

Trust Statute Exhibit

## (i) Enactment of Asset Protection Trust Statutes

| | |
|---|---|
| Alaska | 1997<br>Alaska Stat. 13.36.310, 34.40.120 |
| Delaware | 1997<br>Del. Code Ann. Tit. 12, 3570-3576 |
| Nevada | 1999<br>Nev. Rev. Stat. 166.010-166.170 |
| Rhode Island | 1999<br>R.I. Gen. Laws 18-9.2-1 – 18-9.2-7 |
| Missouri | 2004<br>Mo. Rev. Stat. 456.5-505 |
| Oklahoma | 2004<br>Family Wealth Preservation Act. Okla. Stat. tit. 31 Section 11 |
| South Dakota | 2005<br>S.D. Cod. Laws 55-16-1 – 55-16-17 |
| Tennessee | 2007<br>Tenn. Code Ann. 35-16-101 |
| New Hampshire | 2009<br>N.H. Rev. Stat. Ann. 564-D: 1-18 |
| Hawaii | 2010<br>2011 (further strengthened)<br>H.R.S. 554G |
| Virginia | 2012<br>Va. Code 64.2-745.1 and 64.2-745.2 |
| Ohio | 2013<br>Ohio Legacy Trust Act, Chapter 5816 of the Ohio Revised Code |
| Utah | 2013<br>2003 (prior statute generally thought to be unattractive)<br>Utah Code Ann. 25-6-14 |
| Wyoming | 2013<br>Qualified Spendthrift Trust: Wyo. Stat. 4-10-502 and 4-10-510-523 (2007)<br>APT: Wyo. Stat. 4-10-504 and 4-10-506(c) |
| Mississippi | 2014<br>Miss. Code Ann. 91-9-701 – 91-9-723 |

Trust Statute Exhibit

### (ii) Repeal of Rule Against Perpetuities Statutes

| | |
|---|---|
| South Dakota | 1983<br>Rule abolished in 1983. S.D. Cod. Laws 43-5-1, 43-5-8, 55-1-20. |
| Delaware | 1996<br>Common law rule repealed for any real or personal property interest held in trust. 25 Del. Code 503(a). The rule was repealed in 1986 and replaced with a 110 year rule. In 1995, it was repealed for personal property. Real property held in trust must be distributed no later than 110 years from the later of its purchase or its other acquisition by the trust. 25 Del. Code 503(b), effective July 18, 1996. |
| New Jersey | 1999<br>No interest created in real or personal property will be void by reason of the rule, and the common law rule is repealed, effective July 9, 1999. |
| Rhode Island | 1999<br>Rule abolished (effective July 3, 1999). Gen. Laws R.I. 34-11-38. |
| Alaska | 2000<br>Effective April 22, 2000, there is no rule applicable requiring the vesting of property interests. Alas. State. 34.27.051. |
| Pennsylvania | 2006<br>Rule abolished, effective July 7, 2006. 20 Pa. Con. State 6104, 6107.1. |
| Idaho | 2008<br>Rule repealed. Idaho Code 55-111, effective July 1, 2008. |
| Kentucky | 2010<br>Rule repealed for all interests in real or personal property. Ky. Rev. State 381.224, effective July 15, 2010. |

Alabama, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Montana, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, Oregon, South Carolina, Tennessee, Utah, Virginia, West Virginia and Wisconsin do not use the common law rule against perpetuities (stating that an interest is valid only if it must vest within a life in being plus 21 years), but instead have adopted USRAP. Under USRAP, an interest is valid if it actually vests either within a life in being plus 21 years or within 90 years. A number of the states substitute the 90 years with longer periods, for example Alabama substitutes 360 years for 90 years with respect to all property held in trust.

Illinois, Iowa, Maine, Maryland, Mississippi, Missouri, New Hampshire, New York, Ohio, Oklahoma, Texas, Vermont, Washington and Wyoming still apply variations of the common law rule.

Trust Statute Exhibit

### (iii) Enactment of Directed Trust Statutes

| | |
|---|---|
| Indiana | 1971<br>Ind. Code Ann. §30-4-3-9(a) |
| Colorado (investment decisions only) | 1977<br>Colo. Rev. Stat. §15-1-307 |
| Delaware | 1986<br>Del. Code Ann. Tit. 12, §3313 |
| Tennessee | 1987<br>Tenn. Code Ann. §§35-15-808(b), (e), 35-3-122 |
| Kentucky | 1996<br>Ky. Rev. Stat. Ann. §286.3-275 |
| South Dakota | 1997<br>S.D. Codified Laws Ann. §§55-1B-2(1), 55-1B-5 |
| Idaho | 1999<br>Idaho Code §15-7-501(2),(5) |
| Kansas | 2003<br>Kan. Stat. Ann. §58a-808(b) |
| New Mexico | 2003<br>N.M. Stat. Ann. §46A-8-808(B) |
| District of Columbia | 2004<br>D.C. Code Ann. §19-1308.08(b) |
| Utah | 2004<br>Utah Code Ann. §75-7-906(4) |
| Arkansas | 2005<br>Ark. Code Ann. §28-73-808(b) |
| Maine | 2005<br>Me. Rev. Stat. Ann. tit. 18-B, §808(2) |
| Nebraska | 2005<br>Neb. Rev. Stat. §30-3873(b) |
| South Carolina | 2005<br>S.C. Code Ann. §62-7-808(b) |
| Oregon | 2006<br>Or. Rev. Stat. §130.685(2) |
| Pennsylvania | 2006<br>20 Pa. Cons. Stat. §7778(b) |
| Texas | 2006<br>Tex. Prop. Code Ann. §114.003(b) |
| Virginia | 2006<br>Va. Code Ann. §64.2-770(B) |
| Alabama | 2007<br>Ala. Code §19-3B-808(b) |
| Florida (if directing person is not co-trustee) | 2007<br>Fla. Stat. §736.0808(2) |
| North Dakota | 2007<br>N.D. Cent. Code §59-16-08(2) |
| Ohio | 2007<br>Ohio Rev. Code Ann. §§5808.08(B), 5815.25(B) |
| Wyoming | 2007<br>Wyo. Stat. §§4-10-808(b), 4-10-715, 4-10-717–4- |

Trust Statute Exhibit

|  | 10-718 |
|---|---|
| Arizona | 2008<br>Ariz. Rev. Stat. Ann. §14-10808(B) |
| New Hampshire | 2008<br>N.H. Rev. Stat. Ann. §564-B:8-808(b) |
| Florida | 2008<br>Fla. Stat. §736.0703(9) |
| Nevada | 2009<br>Nev. Rev. Stat. §163.5549 |
| Vermont | 2009<br>Vt. Stat. Ann. tit. 14A, §808(b) |
| Georgia | 2010<br>Ga. Code Ann. §53-12-303 |
| Michigan | 2010<br>Mich. Comp. Laws §700.7809(4) |
| West Virginia | 2011<br>W. Va. Code §44D-8-808(b) |
| Missouri | 2012<br>Mo. Ann. Stat. §456.8-808(8) |
| North Carolina | 2012<br>N.C. Gen. Stat. §§36C-7-703(e1)(1), 32-72(d)(2)(a), 36C-8A-4(a) |
| Massachusetts | 2012<br>Mass. Gen. L. ch. 203E, §808(b) |
| Virginia | 2012<br>Va. Code Ann. §64.2-770(E) |
| Illinois | 2013<br>760 ILCS 5/16.3(f)(1) |
| Alaska | 2013<br>Alaska Stat. § 13.36.375(c) |
| Montana | 2013<br>Mont. Code Ann. § 72-38-808(2) |
| Oklahoma | 2014<br>Okla. Stat. Ann. tit. 60, §175.19 |

Trust Statute Exhibit

### (iv) States With No State Income Tax of Trusts

| | |
|---|---|
| Alaska | No income tax imposed on trusts. |
| Delaware | Imposes state income tax on a trust only to the extent any of the beneficiaries live in the state. 30 Del. C. §§ 1102(a)(12), (13), 1601(8); 2012 Del. Form 400-I at 1, 2; 2012 Del. Form 400 at 2. |
| Florida | No income tax imposed on trusts. Florida intangible personal property tax repealed for 2007 and later years. |
| Nevada | No income tax imposed on trusts. |
| New Hampshire | Imposes state income tax on a trust only to the extent any of the beneficiaries live in the state. N.H. Rev. Stat. Ann. §§ 77:1, 77:10; N.H. Code Admin. R. Ann. 902.07; instructions to 2012 N.H. Form DP-10 at 1; 2012 N.H. Form DP-10 at 4. |
| North Carolina | Imposes state income tax on a trust only to the extent any of the beneficiaries live in the state. N.C. Gen. Stat. §§ 105- 134.2(a)(3), 105-160.2; N.C. Admin. Code tit. 17, r. 6B.3718(a); instructions to 2012 N.C. Form D-407 at 1; 2012 N.C. Form D-407 at 2 |
| South Dakota | No income tax imposed on trusts. |
| Tennessee | Imposes state income tax on a trust only to the extent any of the beneficiaries live in the state. Tenn. Code Ann. §§ 67-2- 102, 67-2-110(a); instructions to 2012 Tenn. Form INC. 250 at 1, 3, 4. |
| Texas | No income tax imposed on trusts. |
| Washington | No income tax imposed on trusts. |
| Wyoming | No income tax imposed on trusts. |

Other states impose income tax on trusts based on (i) whether the trust is administered in the state, (ii) whether the trustee of the trust is a resident of the state, (iii) whether the trust is created by the Will of a resident of the state and (iv) whether the trust is created by a resident of the state.

5

Changes to Foreign Trust Law Sections 679 and 672

## (i) IRC Section 679

| YEAR | TEXT |
|---|---|
| 1976 | Tax Reform Act of 1976, effective for tax years ending after December 31, 1975<br><br>• After May 21, 1974, all foreign trusts created by US persons are grantor trusts if such trusts have a US beneficiary. Applies to trusts created before 1974 if there had been a transfer of property subsequent to May 21, 1974. The statute specifically provided as follows:<br><br>• 679 (a) Transferor Treated as Owner.—<br><br>  o (1) In general.—A United States person who directly or indirectly transfers property to a foreign trust shall be treated as the owner for his taxable year of the portion of such trust attributable to such property if for such year there is a United States beneficiary of any portion of such trust.<br><br>  o (2) Exceptions.—Paragraph (1) shall not apply—<br>    ▪ (A) To any transfer by reason of the death of the transferor.<br>    ▪ (B) To any sale or exchange of the property at its fair market value in a transaction which all of the gain to the transferor is realized at the time of the transfer and recognized either at such time or is returned as provided in section 453.<br><br>• (b) Trusts Acquiring United States Beneficiaries.—If (1) subsection (a) applies to a trust for the transferor's taxable year, and (2) subsection (a) would have applied to the trust for his immediately preceding taxable year but for the fact that for such preceding taxable year there was no United States beneficiary for any portion of the trust, then, the transferor shall be treated as having income for the taxable year (in addition to his other income for such year) equal to the undistributed net income (at the close of such immediately preceding taxable year) attributable to the portion of the trust referred to in subsection(a).<br><br>• (c) Trusts Treated as Having a United States Beneficiary—<br><br>  o (1) For purposes of this section, a trust shall be treated as having a United States beneficiary for the taxable year unless—<br>    ▪ (A) under the terms of the trust, no part of the income or corpus of the trust may be paid or accumulated during the taxable year to or for the benefit of a United States person, and<br>    ▪ (B) if the trust were terminated at any time during the taxable year, not part of the income or corpus of such trust could be paid to or for the benefit of a United States person.<br><br>  o (2) For purposes of paragraph (1), an amount shall be treated as paid or accumulated to or for the benefit of a United States person if such amount is paid to or accumulated for a foreign corporation, foreign partnership, or foreign trust or estate, and—<br>    ▪ (A) in the case of a foreign corporation, more than 50 percent of the total combined voting power of all classes of stock entitle to vote of such corporation owned (within the meaning of section 958 (a)) or is considered to be owned (within the meaning of section 958 (b)) by United States person is a partner of such partnership, or<br>    ▪ (C) in the case of a foreign trust or estate, such trust or estate has a United States beneficiary (within the meaning of paragraph (1)) |

Changes to Foreign Trust Law Sections 679 and 672

| 1996-1997 | The Small Business Job Protection Act of 1996 and the Taxpayer Relief Act of 1997-Rules effective after February 6, 1995 |
|---|---|
| | • Section 1903(a) of the Act amends Code Section 679(a)(2) to delete the requirement that a protected transfer must be one in which gain is recognized. Instead in now excepted "any transfer of property to a trust in exchange for consideration of at least the fair market value of the transferred property. For purposes of the preceding sentence, consideration other than cash shall be taken into account at its fair market value." |
| | • Section 1903(a) of the Act adds a paragraph to section 679(a) providing that for purposes of determining whether a transferor who is a grantor or a beneficiary of the trust or a person related to a grantor or beneficiary has received fair market value for the transfer, certain obligations are not taken into account. The obligations that are to be disregarded are:<br>(a) Except as provided in regulations, any obligation of the trust, of any grantor, beneficiary of the trust or of any person related to such grantor or beneficiary; and<br>(b) To the extent provided in the regulations, any obligation guaranteed by the trust or by any person described in clause (a) above. Related persons are those persons with the type of relationship that results in the disallowance of losses under Code Section 267 or Code 707 (b) plus the spouses of those family members that are described in Code Section 267 (c)(4). When principal payments are made on obligations that have been disregarded, the portion of the trust attributable to the grantor is adjusted. |
| | • Section 1903(c) amended Code 679(a) to provide that a foreign person who transfers property to a foreign trust and becomes a US person within five years of such transfer shall be treated for purposes of the Code as if she had transferred to the trust, on the date she became a US person, that portion of the trust's property that is attributable to her transfer within such five-year period. |
| | • Section 1903(c) of the Act amends Code Section 679(a) to provide that the expatriation of a domestic trust to which a US person has made a transfer is treated as a transfer to the trust by US persons of the portion of the trust property attributable to her transfers. |
| | • Section 1903(d) of the Act amends Code Section 679(c) to provide that a beneficiary is not to be treated as a US beneficiary if she was a foreign person at the time of the transferor's transfer to the foreign trust and did not become a US person for five years thereafter. |
| 2000-2001 | Proposed Regulations on August 7, 2000 and Final Regulations on July 20, 2001-Effective August 7, 2000 for IRC Section 679 |
| 2010 | Hiring Incentives to Restore Employment (HIRE) Act of 2010 |
| | • Section 531. Clarifications with respect to Foreign Trusts which are treated as having a US beneficiary:<br>  ○ (a) In General- Paragraph (1) of section 679(c) is amended by adding at the end the following: 'For purposes of subparagraph (A), an amount shall be treated as accumulated for the benefit of a United States person even if the United States person's interest in the trust is contingent on a future event.'<br>  ○ (b) Clarification Regarding Discretion To Identify Beneficiaries-Subsection (c) of section 679 is amended by adding at the end the |

2

Changes to Foreign Trust Law Sections 679 and 672

following new paragraph: (4) Special Rule In Case of Discretion to Identify Beneficiaries- For purposes of paragraph (1)(A), if any person has the discretion (by authority given in the trust agreement, by power of appointment, or otherwise) of making a distribution from the trust to, or for the benefit of, any person, such trust shall be treated as having a beneficiary who is a United States person unless—

(A) the terms of the trust specifically identify the class of persons to whom such distributions may be made, and
(B) none of those persons are United States persons during the taxable year.

o  (c) Clarification That Certain Agreements and Understandings Are Terms of the Trust- Subsection (c) of section 679, as amended by subsection (b), is amended by adding at the end the following new paragraph: '(5) Certain Agreements and Understandings as Terms of the Trust- For purposes of paragraph (1)(A), if any United States person who directly or indirectly transfers property to the trust is directly or indirectly involved in any agreement or understanding (whether written, oral, or otherwise) that may result in the income or corpus of the trust being paid or accumulated to or for the benefit of a United States person, such agreement or understanding shall be treated as a term of the trust.'

- SEC. 532. Presumption that Foreign Trust has United States Beneficiary.
  o  (a) In General- Section 679 is amended by re-designating subsection (d) as subsection (e) and inserting after subsection (c) the following new subsection:'(d) Presumption That Foreign Trust Has United States Beneficiary- If a United States person directly or indirectly transfers property to a foreign trust (other than a trust described in section 6048(a)(3)(B)(ii)), the Secretary may treat such trust as having a United States beneficiary for purposes of applying this section to such transfer unless such person—
    ▪  '(1) submits such information to the Secretary as the Secretary may require with respect to such transfer, and
    ▪  '(2) demonstrates to the satisfaction of the Secretary that such trust satisfies the requirements of subparagraphs (A) and (B) of subsection (c)(1).'

- SEC. 533. Uncompensated Use of Trust Property.
  o  Subsection (c) of section 679 is amended by adding at the end the following new paragraph: '(6) Uncompensated Use of Trust Property Treated as a Payment- For purposes of this subsection, a loan of cash or marketable securities (or the use of any other trust property) directly or indirectly to or by any United States person (whether or not a beneficiary under the terms of the trust) shall be treated as paid or accumulated for the benefit of a United States person. The preceding sentence shall not apply to the extent that the United States person repays the loan at a market rate of interest (or pays the fair market value of the use of such property) within a reasonable period of time.'

Changes to Foreign Trust Law Sections 679 and 672

## (ii) Changes to 672 Related to Foreign Trusts

| YEAR | TEXT |
|------|------|
| **1990** | The Revenue Reconciliation Act of 1990<br>• Pub. L. No. 101-508, §11343, added section 672(f). Under section 672(f), a foreign trust that has a U.S. beneficiary and that would have been a grantor trust under the ordinary grantor trust rules (sections 671–678), but for the grantor being a foreign person, would be treated as owned by the trust's U.S. beneficiary, to the extent that the U.S. beneficiary has made prior gifts to the foreign grantor |
| **1996-1997** | The Small Business Job Protection Act of 1996 and the Taxpayer Relief Act of 1997- Rules effective after February 6, 1995<br>• Section 1904(a) of the Act amends Code Section 672(f) to read as follows: '(f) Subpart Not to Result in Foreign Ownership-<br>   o (1) In general.—Notwithstanding any other provision of this subpart, this subpart shall apply only to the extent such application results in an amount (if any) being currently taken into account (directly or through 1 or more entities) under this chapter in computing the income of a citizen or resident of the United States or a domestic corporation.<br>   o (2) Exceptions.—<br>      ▪ (A) Certain revocable and irrevocable trusts.—Paragraph (1) shall not apply to any portion of a trust if—(i) the power to revest absolutely in the grantor title to the trust property to which such portion is attributable is exercisable solely by the grantor without the approval or consent of any other person or with the consent of a related or subordinate party who is subservient to the grantor, or (ii) the only amounts distributable from such portion (whether income or corpus) during the lifetime of the grantor are amounts distributable to the grantor or the spouse of the grantor.<br>      ▪ (B) Compensatory trusts.—Except as provided in regulations, paragraph (1) shall not apply to any portion of a trust distributions from which are taxable as compensation for services rendered.<br>   o (3) Special rules.—Except as otherwise provided in regulations prescribed by the Secretary—<br>      ▪ (A) a controlled foreign corporation (as defined in section 957) shall be treated as a domestic corporation for purposes of paragraph (1), and<br>      ▪ (B) paragraph (1) shall not apply for purposes of applying section 1296.<br>   o (4) Recharacterization of purported gifts.—In the case of any transfer directly or indirectly from a partnership or foreign corporation which the transferee treats as a gift or bequest, the Secretary may recharacterize such transfer in such circumstances as the Secretary determines to be appropriate to prevent the avoidance of the purposes of this subsection.<br>   o (5) Special rule where grantor is foreign person.—If—(A) but for this subsection, a foreign person would be treated as the owner of any portion of a trust, and (B) such trust has a beneficiary who is a United |

Changes to Foreign Trust Law Sections 679 and 672

| | | |
|---|---|---|
| | | States person, such beneficiary shall be treated as the grantor of such portion to the extent such beneficiary has made (directly or indirectly) transfers of property (other than in a sale for full and adequate consideration) to such foreign person. For purposes of the preceding sentence, any gift shall not be taken into account to the extent such gift would be excluded from taxable gifts under section 2503(b). |
| | o | (6) Regulations.—The Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the purposes of this subsection, including regulations providing that paragraph (1) shall not apply in appropriate cases. |
| **2000** | | <u>Regulations</u><br>Only July 5, 2000, the IRS promulgated regulations defining who the grantor is for purposes of the grantor trust rules, applies to transfers to trusts or transfers of interests in trusts on or after August 10, 1999 |

Trust Protector Exhibit

Trust Protector Statutes

| | |
|---|---|
| South Dakota | 1997<br>Approved March 19, 1997<br>SDCL § 55-1B-1 |
| Idaho | 1999<br>Idaho Code Ann. 15-7-501 |
| Kansas | 2002<br>K.S.A. 58a-808 (adopted from the UTC) |
| Iowa | 2002<br>Effective April 5, 2002<br>I.C.A. § 637.603 (reference to trust protector) |
| Alaska | 2003<br>Alaska Stat. 13.36.370 |
| Nebraska | 2003<br>Neb.Rev.St. § 30-3873 (adopted from the UTC) |
| New Mexico | 2003<br>Effective July 1, 2003<br>N. M. S. A. 1978, § 46A-8-808 (adopted from the UTC) |
| Wyoming | 2003<br>Effective July 1, 2003<br>W.S.1977 § 4-10-710 |
| District of Columbia | 2004<br>DC ST § 19-1308.08 (adopted from the UTC) |
| Arkansas | 2005<br>Effective September 1, 2005<br>A.C.A. § 28-73-808 (adopted from the UTC) |
| Maine | 2005<br>18-B M.R.S.A. § 808 (adopted from the UTC) |
| Oregon | 2005<br>O.R.S. § 130.685 (adopted from the UTC) |
| Pennsylvania | 2006<br>Effective November 6, 2006<br>20 Pa.C.S.A. § 7778 |
| Alabama | 2007<br>Effective January 1, 2007<br>Ala.Code 1975 § 19-3B-808 (adopted from the UTC) |
| Florida | 2007<br>West's F.S.A. § 736.0808 (adopted from the UTC) |
| Rhode Island | 2007<br>Effective July 6, 2007<br>§ 18-9.2-2. Definitions |
| North Dakota | 2007<br>Effective August 1, 2007<br>NDCC, 59-16-08 (adopted from the UTC) |
| Arizona | 2009<br>Effective January 1, 2009<br>Arizona Rev. Stat. § 14-10818 |

Trust Protector Exhibit

| | |
|---|---|
| Vermont | 2009<br>July 1, 2009<br>14A V.S.A. § 808 (adopted from the UTC) |
| Nevada | 2009<br>Effective October 1, 2009<br>Nev. Rev. Stat. Ann. 163.5547 |
| West Virginia | 2011<br>Effective June 10, 2011<br>W. Va. Code, § 44D-8-808 (adopted from the UTC) |
| Hawaii | 2011<br>Effective July 1, 2011<br>HRS § 554G-4.5 |
| North Carolina | 2012<br>Effective June 11, 2012<br>N.C.G.S.A. § 36C-8A-1, § 36C-8-808 |
| Virginia | 2012<br>Effective July 1, 2012<br>VA Code Ann. § 64.2-770 (adopted from the UTC) |
| Massachusetts | 2012<br>Effective July 8, 2012<br>M.G.L.A. 203E § 808 (adopted from the UTC) |
| Missouri | 2012<br>Effective August 28, 2012<br>R.S. Mo. 456.8-808 |
| Michigan | 2012<br>Effective December 28, 2012<br>M.C.L.A. 700.7103 |
| Illinois | 2013<br>Effective January 1, 2013<br>5/16.3. Directed trusts |
| Ohio | 2013<br>Effective March 27, 2013<br>R.C. § 5808.08 (adopted from the UTC) |
| Utah | 2013<br>Effective May 14, 2013<br>U.C.A. 1953 § 22-7-106 (reference to trust protector) |
| Connecticut | 2013<br>Adopted November 7, 2012, Effective July 1, 2013<br>CT R PROB Rule 1 (defines trust protector) |
| Tennessee | 2013<br>Effective July 1, 2013<br>T. C. A. § 35-15-1201 |
| Montana | 2013<br>Effective October 1, 2013<br>72-38-808. Powers to direct (adopted from the UTC) |
| Delaware | 2014<br>12 Del.C. § 3313 |

Trust Protector Exhibit

| Kentucky | 2014<br>KRS § 386B.8-080 (adopted from the UTC) |
|---|---|
| South Carolina | 2014<br>Effective January 1, 2014<br>Code 1976 § 62-7-1005A |
| Mississippi | 2014<br>Effective July 1, 2014<br>§ 91-8-808. Powers to direct (adopted from the UTC) |
| New Hampshire | 2014<br>Effective July 1, 2014<br>N.H. Rev. Stat. § 564-B:12-1201 |
| Wisconsin | 2014<br>Effective July 1, 2014<br>701.0818. Trust protectors |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| | § | |
| IN RE: | § | CASE NO. 14-35043 |
| | § | |
| SAMUEL EVANS WYLY, et al. | § | (Chapter 11) |
| | § | |
| DEBTORS | § | JOINTLY ADMINISTERED |
| | § | |

# APPENDIX OF MATERIALS TO THE
# REPORT OF JOSHUA S. RUBENSTEIN
# EXPERT WITNESS FOR THE DEBTORS

KATTEN MUCHIN ROSENMAN LLP
575 Madison Avenue
New York, New York  10022-2585
212-940-8800

# Trusts: Common Law and IRC 501(c)(3) and 4947

By Ward L. Thomas and Leonard J. Henzke, Jr.

*Exempt Organizations-Technical Instruction Program for FY 2003*

# Trusts:  Common Law and IRC 501(c)(3) and 4947

By Ward L. Thomas and Leonard J. Henzke, Jr.

# Overview

**Purpose**

The Service published a lengthy and sophisticated discussion of trusts, with particular detail on split-interest trusts, in "Trust Primer," 2001 EO CPE 79. This office, however, continues to receive requests from EO examination and determination specialists for basic legal information on trusts.  This article will discuss common-law and federal tax definitions, distinctions, and rules regarding trusts, with a focus on charitable trusts and IRC 501(c)(3), and some discussion of IRC 4947.

**In this article**

This article contains the following topics:

| Topic | See Page |
| --- | --- |
| Overview | 1 |
| Basic Legal Rules Regarding Trusts and IRC 501(c)(3) | 3 |
| What is a trust? | 4 |
| Who are the parties to a trust? | 5 |
| Can a trust exist without assets? | 7 |
| Can a trust exist without a trustee? | 8 |
| How many trustees are required? | 9 |
| Does a trust have to be registered with the State? | 10 |
| When does a trust begin to exist for IRC 508(a) purposes? | 11 |
| How are courts involved in the regulation of trusts? | 12 |
| Can a trust exist without beneficiaries?  (cy pres) | 14 |
| Can a trust exist without a written document? | 16 |
| Can a trust carry on business? | 17 |
| Are there special tax rules for trusts? | 18 |
| How do private trusts differ from charitable trusts? | 19 |
| How does trust income differ from trust principal? | 21 |
| How does a beneficiary's income interest differ from a remainder interest? | 22 |
| Can a revocable trust qualify under IRC 501(c)(3)? | 23 |
| How does an inter vivos trust differ from a testamentary trust? | 24 |
| What is a community trust? | 25 |

*Continued on next page*

*Exempt Organizations-Technical Instruction Program for FY 2003*

## Overview, Continued

**In this article, continued**

| Topic | See Page |
|---|---|
| What is a non-exempt charitable trust? | 26 |
| What is a split-interest trust? | 27 |
| Can a split-interest trust qualify under IRC 501(c)(3)? | 28 |
| Why are 4947 trusts treated like private foundations? | 29 |
| Can a non-exempt charitable trust apply for 501(c)(4) status and avoid the 4947 rules? | 30 |
| When does the application of IRC 4947(a)(1) to a non-exempt charitable trust begin? | 31 |
| When does the application of IRC 4947(a)(2) to a split-interest trust begin and end? | 33 |
| Can charitable trust assets be used to pay estate settlement expenses? | 34 |

2

# Basic Legal Rules Regarding Trusts and IRC 501(c)(3)

**Introduction**  The following Q&As discuss basic definitions, distinctions, and rules regarding trusts and IRC 501(c)(3).  Much of the discussion focuses on State common law concepts regarding trusts.

- State law creates legal interests and rights; federal tax law designates what interests or rights, so created, shall be taxed.  <u>Morgan v. Commissioner,</u> 309 U.S. 78, 80 (1940).

- The law in any particular State may differ from a general rule discussed below, so it may sometimes be necessary to refer to the law in the particular State involved.  There is no uniform or model law of trusts adopted by most States, although a few uniform laws relating to certain aspects of trusts have been widely adopted.

# What is a trust?

| | |
|---|---|
| **Kind of organization** | Trusts are one of the major forms of organization for federal tax purposes, along with corporations, partnerships, and governmental units. |
| **Restatement definition** | The Restatement (Second) of Trusts (1959) (hereafter "Restatement") § 2 defines a trust generally as |

> a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.

| | |
|---|---|
| **Regs definition** | Reg. 301.7701-4(a) defines a trust as |

> an arrangement created either by will or inter vivos declaration whereby trustees take title to property for the purpose of protecting and conserving it for the beneficiaries under the ordinary rules applied in chancery or probate courts . . . . Generally speaking, an arrangement will be treated as a trust under the Internal Revenue Code if it can be shown that the purpose of the arrangement is to vest in trustees responsibility for the protection and conservation of property for beneficiaries who cannot share in the discharge of this responsibility and, therefore, are not associates in a joint enterprise for the conduct of business for profit.

| | |
|---|---|
| **Differences** | The regulations emphasize the non-business character of the activity; thus a trust for State law purposes may be treated as a corporation or partnership for federal tax purposes. |

- However, both definitions emphasize a relationship among several parties.

4

## Who are the parties to a trust?

**Parties**  Trusts are defined in terms of parties (grantor, trustee, beneficiary) and relationships pertaining to the trust property.

**Grantor**  Every express trust has one or more grantors who contribute the property to the trustee and state the terms of the trust. The grantor is deemed a substantial contributor/disqualified person with respect to the trust, under IRC 507(d)(2)(A). Other names for the grantor include:

- creator
- donor
- founder
- settlor
- Trustor

**Trustee**  The trustee or trustees receive the property and hold it for the benefit of one or more beneficiaries.

- The trustee is the legal owner of the property but must use it for the benefit of the beneficiaries. As a fiduciary, he owes the beneficiaries duties of loyalty and care.

- The trustee may be an individual or organization. Restatement § 378. Trust companies and banks specialize in acting as trustees in addition to conducting banking and loan business.

- The grantor and trustee ordinarily may be the same person, and may create the trust by declaring that he holds certain property in trust. Restatement § 349(a). The sole trustee and sole beneficiary may not be identical, because the purpose of a trust is to separate the legal and equitable interests. Restatement § 115.

**Beneficiary**  The beneficiary, also known as the cestui que trust, is the beneficial or equitable owner of the property. The beneficiary is said to have the "use" of the property, and can appeal to the court for an accounting or replacement of the trustee to ensure proper use of the property. See Black's Law Dictionary (5th Ed. 1979), "use."

*Continued on next page*

*Trusts: Common Law and IRC(c)(3) and 4947–page A -5*

*Exempt Organizations-Technical Instruction Program for FY 2003*

## Who are the parties to a trust?, Continued

**Property**                Alternative names for the property transferred to the trust are the:

- Capital
- Corpus
- Estate
- Principal
- Res

6

# Can a trust exist without assets?

**Assets required**    By definition, a trust is a legal relationship with regard to property. Thus, the common-law rule is that a trust does not exist without a res. Am. Jur. 2d "Trusts" § 47. The res may be of nominal value (e.g., $1).

- A charitable trust may be created by a transfer (inter vivos or by will) by the owner (or a person with a power of appointment) of property to another person to hold the property upon a charitable trust. Restatement § 349.

- Alternatively, the owner may simply declare that he holds his property upon a charitable trust--no transfer of title is necessary. Id.

- A promise to transfer property to the trustee does not create a trust unless the promise is enforceable as a contract. Id.

- A trust that lists no assets in its Form 1023 balance sheet should be required to cite the proper State law that it nonetheless exists as a valid trust under State law.

*Exempt Organizations-Technical Instruction Program for FY 2003*

# Can a trust exist without a trustee?

**Trust still exists**   Trustees may die, resign, become incompetent, or be removed as trustee by the court for cause (e.g., mismanagement). See <u>Am. Jur. 2d</u> "Trusts" § 254. If a trust loses its trustees, the court will appoint others--a trust will not fail for lack of a trustee, unless the settlor manifests a contrary intent. <u>Restatement</u> § 388, 397. Similarly, if a transfer of property to trust is ineffective only because no trustee is named in the instrument of conveyance or the trustee is dead or incapable of taking title, a charitable trust is created. <u>Restatement</u> § 353(2).

- If a trust loses all of its trustees during the application process, the determination specialist should ordinarily wait until the new trustees are appointed before recognizing exemption, to ensure that the trust will in fact continue. Also, as discussed below, the number and identity of the trustees could be a material factor in determining whether the trust serves a private interest.

8

# How many trustees are required?

**Single trustee may be permissible,**

A single trustee is all that is required of trusts under State law, although a typical arrangement for a charitable trust is a governing board of several trustees that makes decisions by majority rule. Restatement § 383. Rev. Rul. 66-219, 1966-2 C.B. 208, held that a 501(c)(3) organization is not precluded from exemption merely because the creator of the organization (if a trust) is either the sole or controlling trustee or merely because the organization is controlled by one individual.

**But not recommended**

In the case of a single-trustee organization claiming public charity status, however, the lack of oversight inherent in such situation is a very unfavorable fact (private foundations are subject to strict prohibitions against self-dealing under IRC 4941).

- Sole corporate trustees are less objectionable (e.g., in the context of testamentary trusts), except where the trustee plans to do business with itself or related entities with the trust's funds.

- Even three-member boards have been held to present a problem where there are other unfavorable facts. See, e.g., Church of Ethereal Joy v. Commissioner, 83 T.C. 20 (1984) (three-member, self-perpetuating board provides an obvious opportunity for abuse of the claimed tax-exempt status).

- A large, community-based board of trustees is a favorable fact in determining whether the trust is operated exclusively for charitable purposes and is (or may reasonably be expected to be) publicly supported. See, e.g., Rev. Rul. 69-545, 1969-2 C.B. 117; Regs. 1.170A-9(e)(3)(v) and (5)(ii) and 1.509(a)-3(d)(3)(i).

# Does a trust have to be registered with the State?

**No State filing**  Unlike corporations, LLCs, or limited partnerships, trusts generally do not file their governing instrument with the State to become legal.  However, a will that includes a testamentary trust is filed with the court as part of the will probate process.

- A few States have adopted Article VII of the Uniform Probate Code, which requires the trustees of all trusts to register in the court of the principal place of administration of the trust.  The Uniform Probate Code imposes penalties on the trustee for failure to register but does not invalidate the trust.

- The trust instrument usually indicates the State law under which the trust is organized.  If it doesn't, the determination specialist should ascertain the State law, and get a representation from the trust that it is properly organized under the State law, particularly if there is doubt as to the validity of the trust.

- Like other nonprofit organizations, trusts must keep orderly financial books and records, and minutes of meetings and decisions/resolutions by their trustees.  See IRC 6001; Rev. Rul. 59-95, 1959-1 C.B. 627

10

*Exempt Organizations-Technical Instruction Program for FY 2003*

# When does a trust begin to exist for IRC 508(a) purposes?

**Sometimes it matters**

To be exempt from the date of organization, an organization must file its Form 1023 Application within 15 months from the end of the month in which it was "organized." Reg. 1.508-1(a)(2).

- While there is liberalized late filing relief under Reg. 301.9100-2 and -3, it still sometimes matters when a trust was organized.

  - The regulations define an organization as organized when it becomes described in IRC 501(c)(3) but do not otherwise define when a trust is organized.

**Testamentary trust**

The Service wrestled with this issue in GCM 38529 (Oct. 6, 1980). The GCM recommended that for purposes of IRC 508(a), a testamentary trust be considered organized as of the earlier of:

1. The date of the first distribution of corpus to the trustee, or

2. The date the decedent's estate is considered terminated for tax purposes.

Counsel rejected the idea that the time of application of IRC 4947(a) should control for IRC 508(a) purposes, and reasoned in part that the tax imposed under subchapter J "shall apply to the income of estates or of any kind of property held in trust." Reg. 1.641(a)-1.

**Inter vivos trust**

The reasoning of GCM 38529 appears applicable to inter vivos trusts as well. They should be considered organized as of their initial funding e.g., the date of the first distribution of corpus to the trustee.

*Exempt Organizations-Technical Instruction Program for FY 2003*

# How are courts involved in the regulation of trusts?

| | |
|---|---|
| **Reformation of instrument** | A trustee (particularly of a testamentary trust) may need to go to court to change the trust terms in order to comply with IRC 501(c)(3) or 508(e). |

- Courts will permit a reformation if compliance with the original terms is impossible, illegal, or (owing to circumstances not anticipated by the settlor) would substantially impair the accomplishment of the purposes of the trust. Restatement § 381.

- Examiners and determination specialists should be aware of this possible requirement when asking trustees to make changes in the trust document.

| | |
|---|---|
| **Other court proceedings** | Courts are involved in the administration of trusts in many other ways. |

- Trustees (particularly of testamentary trusts) may be required to account to the court for their administration of the trust, both periodically and upon termination.

- Beneficiaries may sue for an accounting or to replace the trustee. Restatement §§ 387, 391.

- The trustee may voluntarily account to the court for the court's approval and the trustee's own protection. Restatement § 260.

- Trustees may bring legal proceedings to receive instructions from the court on the proper course of action. Restatement § 394.

| | |
|---|---|
| **Chancery** | Legal proceedings involving the administration of trusts are usually proceedings in chancery. Am. Jur. 2d "Trusts" § 324. |

- Trusts, with their separation of legal and equitable property interests, arose under English law. Historically, England had two court systems, courts of law and courts of equity or chancery. Law courts applied fixed rules, whereas the equity courts applied more flexible principles of justice based on considerations of equity or fairness. Law courts handled claims for money or property, whereas equity courts handled questions whether a person should be required to do certain acts, and under what conditions. Most States have abolished the separate courts of law and chancery, but many vestiges of the separate systems remain. Restatement § 2 Comment f.

*Continued on next page*

12

## How are courts involved in the regulation of trusts?, Continued

**Chancery, continued**

- By statute, the State court of jurisdiction for trusts is often a special court known as Probate, Surrogate, or Orphan's Court. <u>Black's Law Dictionary</u>, "probate court." These courts have jurisdiction over probate of wills and administration of trusts and estates, as well as cases involving guardianships and minors.

# Can a trust exist without beneficiaries?  (cy pres)

| | |
|---|---|
| **Hypothetical** | Suppose that a charitable trust is established to benefit X Hospital and has no contingency plan if X Hospital goes out of existence.  Suppose X Hospital does go out of business.  Was the trust charitable initially?  Is the trustee now required to terminate the trust and return the property to the grantor? |
| **Trustor's intent and cy pres** | A primary rule of judicial interpretation of trusts is to determine and honor the trustor's intent at the time of creating the trust.  <u>Am. Jur. 2d</u> "Trusts" § 35.  In some cases, a particular charitable purpose stated in the trust instrument may become impossible, impracticable, illegal, or accomplished.  If the court determines that the settlor had a more general charitable purpose, it may direct the application of the property to some charitable purpose which falls within the settlor's general charitable intention.  <u>Restatement</u> § 399. This is the doctrine of cy pres ("as near as possible"). |

- In the case of X Hospital, the cy pres doctrine will be applied, and the court may direct the property to be applied to another hospital unless the trust terms provide otherwise.  <u>Restatement</u> § 399 Comment o.  However, the State laws are not uniform in the application of the cy pres doctrine.

| | |
|---|---|
| **Application of cy pres** | The cy pres doctrine may apply in determining whether a trust's assets are dedicated by operation of law to an exempt purpose.  Rev. Proc. 82-2, 1982-1 C.B. 367, as updated by <u>Exempt Organizations Technical Guidelines Handbook</u> IRM 7.8.2.3.3.6.4.1 (Feb. 23, 1999), sets forth guidelines for determining whether and under what circumstances States would apply the doctrine for this purpose. |

- If the cy pres doctrine does not apply, then the trust instrument must expressly provide for dedication of the assets to charitable purposes upon dissolution.  Reg. 1.501(c)(3)-1(a)(4).

- In many cases, the IRS must determine whether the settlor had a general charitable intent, which may not be easy to determine.  The case law of the particular State is highly relevant. One guideline is that courts are more likely to find a general charitable intention where the particular charitable purpose fails down the road than at the outset of the trust.  <u>Restatement</u> § 399 Comment i.  For an example of the application of cy pres, see GCM 39377 (Sept. 28, 1984).

*Continued on next page*

14

*Exempt Organizations-Technical Instruction Program for FY 2003*

## Can a trust exist without beneficiaries? (cy pres), Continued

**Application of
cy pres,
continued**

- The taxpayer bears the burden of proof on this matter and should furnish a written legal opinion of counsel. EO agents may wish to seek guidance from EO Rulings & Agreements. In cases of doubt, the taxpayer should be required to amend the trust instrument to provide for the permanent dedication of assets for charitable purposes in the event that a beneficiary fails or the trust terminates.

*Exempt Organizations-Technical Instruction Program for FY 2003*

# Can a trust exist without a written document?

| | |
|---|---|
| **Express vs. implied trust** | Yes, but it will not pass the 501(c)(3) organizational test. |

- An "express" trust, also known as a "direct," "technical," or "voluntary" trust, is declared in express terms (either oral or written) by the grantor.

- "Implied" trusts (including "constructive" or "involuntary" trusts and "resulting" trusts) are equitable remedies imposed by courts to prevent unjust enrichment. <u>Am. Jur. 2d</u> "Trusts" § 163.

  - A court may impose a "constructive" trust upon the holder of property acquired through fraud, mistake, or undue influence. <u>Am. Jur. 2d</u> "Trusts" § 160.

  - A "resulting" trust in favor of the grantor generally arises where a trust fails - the trustee must hold the property for the grantor or his estate. <u>Restatement</u> § 411.

| | |
|---|---|
| **501(c)(3) organizational test** | Since a written instrument with certain terms is required under the organizational test (Reg. 1.501(c)(3)-1(b)(2)), only an express written trust will pass muster under IRC 501(c)(3). |

- The trust instrument ordinarily is signed by either the grantor or both the grantor and trustee. A copy of the signed document will satisfy the requirements of Rev. Proc. 90-27, 1990-1 C.B. 514, Section 5.05(6).

| | |
|---|---|
| **Document title** | The written document governing the trust typically is given one of the following titles, although no title is necessary: |

- agreement
- declaration
- deed
- indenture
- instrument
- will/testament (for testamentary trust)

16

# Can a trust carry on business?

**May conduct business**

Trusts are generally not precluded under State law from conducting business, if authorized to do so under the terms of the trust instrument.  Am. Jur. 2d "Trusts" § 349.

- A trust may qualify under IRC 501(c)(3) even though it conducts business activity, whether related or unrelated.

- However, corporations are the usually the preferred form for conducting business, for liability purposes.  The trustee of a charitable trust is personally liable for torts committed in the course of administration of the trust if the trustee was personally at fault, and personally liable on contracts unless the contract provides otherwise.  Restatement §§ 402, 403.  The tort and contract creditors can also reach the trust property.  Id.  The trustee generally may receive indemnification from the trust.  Am. Jur. 2d, "Trusts" §§ 397, 454.

*Exempt Organizations-Technical Instruction Program for FY 2003*

# Are there special tax rules for trusts?

**EO matters**

Yes. In the EO area, it is necessary in some cases to determine whether the entity in question is taxable as a trust.

- Exempt trusts are taxed on UBTI like taxable trusts, and the trustees are similarly responsible for payment. See IRC 511(b) and Reg. 1.511-3(a).

- There are special tax rules for nonexempt charitable trusts and split-interest trusts (as defined in IRC 4947).

- Some IRC 501 exemptions are not available to trusts (e.g., IRC 501(c)(2)). A few exemptions are limited to trusts (most notably, 401(a) trusts exempt under IRC 501(a)).

**Tax classification of entity**

An organization is classified as a business entity (corporation or partnership) rather than a trust for tax purposes if it conducts business for the profit of its owners. Reg. 301.7701-4(a).

- The holding of stocks and bonds and the passive rental of real estate are not considered the conduct of business for this purpose.

- Trusts are subject to a special tax regime under subchapter J of the Code, different from corporations/associations and partnerships, so the distinction under IRC 7701 is important for taxable entities.

18

# How do private trusts differ from charitable trusts?

| | |
|---|---|
| **Introduction** | IRC 501(c)(3) requires that an organization's purposes be exclusively charitable. The tax laws derive from common-law distinctions between charitable and private trusts. |
| **Private trust – definite beneficiaries** | A private trust requires a beneficiary that is definitely ascertained at the creation of the trust or definitely ascertainable within the period of the rule against perpetuities. Restatement § 112. The members of a definite class of persons can be the beneficiaries of a private trust, but the members of an indefinite class generally cannot be. Restatement §§ 120, 122. |
| **Charitable trust – indefinite beneficiaries** | By contrast, a cardinal rule of a charitable trust is that the persons who are to benefit must be a sufficiently large or indefinite class that the community is interested in the enforcement of the trust. Restatement § 375. A charitable trust (sometimes referred to as a "public" trust or in some cases a "governmental" trust) holds its property for a charitable purpose. Restatement § 348; Black's Law Dictionary, "trust," "governmental trusts." |

- The law defining a charitable purpose arose from the common law of trusts (and "uses", the historical antecedent of trusts), as trusts were the primary form of charitable organization in the past. Thus, legal treatises on trusts (e.g., by Scott and Bogert) are widely cited as to the definition of a charitable purpose. The 501(c)(3) prohibition against purposes contrary to law or public policy also derives from the common law of trusts. See Rev. Rul. 75-384, 1975-2 C.B. 204. Ordinarily the principles applicable to charitable trusts are applicable to charitable corporations. Restatement § 348 Comment f.

| | |
|---|---|
| **Limited vs. unlimited term** | Another distinction between private and charitable trusts is their term. Under the common law, private trusts have a limited term, whereas charitable trusts may exist forever. Restatement § 365. |

- Private trusts are ordinarily subject to the common law rule against perpetuities, which prohibits the granting (at the time the trust becomes irrevocable) of an interest in property that will not necessarily vest within a time limited by a life or lives in being (including actual periods of gestation for the unborn) plus 21 years. Revocable Inter Vivos Trusts, 468-2nd Tax Management A-10. The rule has been modified or abolished by statute in some States. Id.

*Continued on next page*

*Exempt Organizations-Technical Instruction Program for FY 2003*

## How do private trusts differ from charitable trusts?, Continued

| | |
|---|---|
| **Government enforcement** | Another distinction is that the State (usually by the Attorney General) may enforce a charitable trust but not a private trust. Restatement, Charitable Trusts Introductory Note. |
| **Split interests and reformation** | A trust may have both charitable and private interests. Although it would not qualify under IRC 501(c)(3) (see discussion below regarding split-interest trusts), a court might allow the trust to be reformed into one wholly charitable and one wholly private trust so as to allow for exemption for the charitable trust. |
| **Single vs. multiple trusts** | In some cases, a single document (e.g., a will) may create several trusts, depending on the creator's purpose as determined by the words used in the document. |

- Terms referring to several trusts, funds, or estates, and requiring segregation of funds, may indicate the intention to create several trusts. Am. Jur. 2d, "Trusts" § 27.

- However, multiple trusts arising from a single document may be treated as one for tax purposes to prevent abuses. See, e.g., IRC 643(f); cf. TAM 200047048 (June 22, 2000).

20

*Exempt Organizations-Technical Instruction Program for FY 2003*

# How does trust income differ from trust principal?

**Introduction**  In some situations, federal tax law defines income. In others, federal tax law incorporates by reference the State trust law definition.

**State law looks to definition in instrument**  A trust's "income" must be distinguished from its principal. Allocation of trust assets between principal and income affects the rights of the beneficiaries, as discussed below. Principal and income are, to a large extent, defined by the trust instrument.

- As of January 2000, 41 States had adopted some version of the Uniform Principal and Income Act. The latest (1997) version of the Act defines "principal" as property held in trust for distribution to a remainder beneficiary when the trust terminates, and "income" as money or property that the trustee receives as current return from a principal asset. Act Section 102. In allocating receipts and disbursements to or between principal and income, Act Section 103 sets forth the following hierarchy of rules:

  (1) allocate according to the terms of the trust

  (2) allocate according to the provisions of the Act

  (3) allocate to principal

**Federal tax definitions**  Federal tax and State trust law concepts of income may differ substantially.

- The Internal Revenue Code sets forth its own definition of gross and taxable income (IRC 61 and 63).

- It taxes ordinary income differently from capital gains, and has its own definition of capital assets (and "adjusted basis" used to compute capital gain or loss). IRC 1001 and 1221.

- However, the State law definition of income sometimes comes into play in calculating the taxable income of trusts under subchapter J. See IRC 643(b). Depending on the context, references to "income" in other parts of the Code and regulations may refer to State law income, particularly where used in conjunction with the terms "principal" or "corpus."

# How does a beneficiary's income interest differ from a remainder interest?

**Income vs. remainder interest**

A trust does not qualify under IRC 501(c)(3) if any of its "income" or "lead" beneficiaries or "remainder" beneficiaries ("remaindermen") are not charitable. However, if the income interests have expired and the remainder interests are wholly charitable, then the trust may qualify under IRC 501(c)(3). Thus, agents should understand the difference between income and remainder interests.

- The income beneficiary typically has a right to the trust income (or a fixed percentage of the assets) for the period of his interest. The trust may provide the trustee with discretion to transfer principal to the income beneficiary as well.

- The interest of an income beneficiary runs for a stated period, typically the life of the beneficiary (such interest is known as a "life estate," and the beneficiary as a "life tenant"). The remainder beneficiary is entitled to the remaining property at the end of the income beneficiary's interest.

- The income beneficiary is said to have a "present interest" in the trust during the period of his interest, and the remainder beneficiary a "future interest" during such period.

- If the future interest is fixed, it is "vested"; if it depends on some preceding condition (other than the passage of time or death of the income beneficiary), it is "contingent." See Black's Law Dictionary, "beneficiary," "income beneficiary," "remainder," and "vested."

22

*Exempt Organizations-Technical Instruction Program for FY 2003*

# Can a revocable trust qualify under IRC 501(c)(3)?

| | |
|---|---|
| **Inurement to private individual** | A revocable trust ordinarily cannot qualify for exemption under IRC 501(c)(3). |

- Rev. Rul. 66-259, 1966-2 C.B. 214, held that a trust which provides for the reversion of principal upon termination to the creator or his estate does not qualify, because upon reversion, any gains derived from investing the principal would flow to the individual.

- If, however, the grantor were itself a 501(c)(3) organization or a governmental unit, then the grantor's power to revoke and receive back the assets would be permissible, as such organizations are not regarded as private shareholders or individuals.

| | |
|---|---|
| **Definition: "revocable"** | A "revocable" or "reversionary" trust is an inter vivos trust in which the grantor has reserved to himself or another person the right to revoke the trust and have the trust assets returned to the grantor or some third party. Revocable Inter Vivos Trusts, 468-2nd Tax Management A-1. |

| | |
|---|---|
| **Express vs. implied right** | The general rule is that a settlor cannot revoke a trust unless he reserved a power to revoke. Restatement § 330. Usually the power of revocation (or the irrevocability) is expressly stated. |

- A power of revocation is implied where the phrase "until otherwise directed" immediately follows a grant of power, and where the trustor has the right to demand any or the whole of the money settled in trust, at any time, for any use that he might make of it. Am. Jur. 2d, "Trusts" § 31.

- If there is no statement as to revocability but the trust instrument has an express dissolution clause dedicating the assets to charitable purposes in accordance with Reg. 1.501(c)(3)-1(b)(4), then the trust may be regarded as irrevocable, absent State law to the contrary.

| | |
|---|---|
| **Lapse of power upon death** | A grantor's power to revoke a trust ordinarily lapses upon his death, unless the applicable law allows the grantor to revoke by his will and he did so. Thus, a revocable trust ordinarily becomes irrevocable upon the grantor's death. Am. Jur. 2d, "Trusts" § 98. |

# How does an inter vivos trust differ from a testamentary trust?

| | |
|---|---|
| **Introduction** | EO agents may see both inter vivos and testamentary trusts in exemption applications and examinations. Different tax rules may apply depending on the kind of trust involved. |

| | |
|---|---|
| **Matter of timing** | The difference is when the trust takes effect. |

- A testamentary trust does not become operative until the grantor's death. A testamentary trust is executed as part of a will and must meet the requirements of a will, including admission into probate court. <u>Restatement</u> § 357.

- An inter vivos trust, also known as a "living" or "lifetime" trust, becomes operative while the grantor is alive. <u>Black's Law Dictionary</u>, "trust." An inter vivos trust is often used as a will substitute to avoid the probate process, which often entails publicity, expense, and delay.

| | |
|---|---|
| **Uniform Testamentary Additions to Trusts Act** | The distinction is blurred somewhat by the Uniform Testamentary Additions to Trusts Act (the 1991 version has been adopted in 15 States). Unless the testator's will provides otherwise, the Act treats as a non-testamentary trust (and thus like an inter vivos trust) a trust that is created concurrently with a will in a separate written instrument and that becomes established at the testator's death. |

- The Act reverses the common-law rule (see <u>Restatement</u> § 360) that treated such a trust as testamentary.

- The Act allows for "pour-over" trusts, which receive their property at the grantor's death under a will provision.

24

*Exempt Organizations-Technical Instruction Program for FY 2003*

# What is a community trust?

**Kind of publicly supported organization**

Community trusts typically qualify for exemption under IRC 501(c)(3). A community trust is a term used in the regulations defining publicly supported organizations under IRC 170(b)(1)(A)(vi). See Regs. 1.170A-10 through 13.

- A community trust historically is a group of separate trusts or funds subject to some control by a governing body of community representatives, with a purpose to collect, invest, and distribute funds for the benefit of the community.

- If the group of funds meets the applicable requirements, the group is treated as a single entity for tax purposes. See Regs. 1.170A-10 and 11(i).

# What is a non-exempt charitable trust?

| | |
|---|---|
| **IRC 4947(a)(1)** | IRC 4947(a)(1) treats a trust as described in IRC 501(c)(3) for purposes of chapter 42 and IRC 507, 508(d) and (e), and 509 if all of the following conditions are met: |

1. the trust is not exempt under IRC 501(a) (i.e., it is not recognized as exempt, though it would be recognized under IRC 501(c)(3) if it applied)

2. all the interests/beneficiaries are charitable

3. a charitable deduction was allowed to donors to the trust (or to the trust itself under IRC 642(c) in distributing or setting aside amounts for charity--Reg. 53.4947-1(b)(1)(i))

A trust that meets these conditions is known as a non-exempt charitable trust or NECT.

| | |
|---|---|
| **Deduction allowed regardless of IRC 508(a)** | Assuming that the other requirements for an income, gift, or estate tax charitable deduction are met, a contribution to an NECT is not disallowed as a charitable deduction on the ground that the NECT has not met the IRC 508(a) notice requirement by filing a Form 1023 Application. |

- The various charitable deduction provisions are all subject to IRC 508(d). IRC 508(d)(2)(B) generally denies a charitable deduction for a contribution to an organization in a period for which it is not exempt under IRC 501(c)(3) for failure to timely file an application.

- However, NECTs are excepted from the 508(a) notice requirement. See IRC 4947(a)(1) and Reg. 1.508-2(b)(1)(i)(a) and (viii). Peek v. Commissioner, 73 T.C. 912 (T.C. 1980) held that IRC 508(a) barred a deduction to an NECT, but the parties (involving a pro se litigant) and court apparently overlooked the above-cited Code and regulation.

| | |
|---|---|
| **Private foundation status** | If the trust does not qualify as a public charity, then it is treated as a private foundation for the purposes set forth above. NECTs also must file an information return under IRC 6033(d)(1). |

- IRC 509(a)(3) is usually the most viable public charity alternative. A non-exempt charitable trust may apply to the Service for a ruling on 509(a)(3) status under Rev. Proc. 72-50, 1972-2 C.B. 830.

- If the trust must amend its instrument to qualify under IRC 509(a)(3), then it is considered a PF until it terminates under IRC 507. Rev. Rul. 76-92, 1976-1 C.B. 160.

*Exempt Organizations-Technical Instruction Program for FY 2003*

# What is a split-interest trust?

| | |
|---|---|
| **Introduction** | Split-interest trusts were treated at length in "Trust Primer," 2001 EO CPE at 84-94. A brief review of the rules is provided here. |
| **Definition** | A split-interest trust is essentially a trust with both charitable and non-charitable beneficiaries. The term is a term of art in the Code and regulations referring to certain trusts described in IRC 4947(a)(2) that have both (1) assets for which a charitable deduction was allowed for income, estate, or gift tax purposes and (2) unexpired noncharitable interests. |
| **Private foundation status** | Split-interest trusts are treated as private foundations for many of the same purposes as NECTs are so treated. |

- Unlike NECTs, split-interest trusts are conclusively deemed to be private foundations.

- However, IRC 4942, and in most cases IRC 4943 and 4944, do not apply.

- Also, the private foundation rules do not apply to amounts payable to any non-charitable income beneficiaries, segregated amounts for which a charitable deduction was not allowed, and amounts transferred in trust before May 27, 1969.

| | |
|---|---|
| **Kinds of split-interest trusts** | There are two kinds of split-interest trusts: charitable remainder trusts (the most common), and charitable lead trusts. |

- A pooled income fund, which may be regarded as a kind of charitable remainder trust subject to its own special rules, is also subject to IRC 4947(a)(2).

## Can a split-interest trust qualify under IRC 501(c)(3)?

**Not exempt**    No.  A trust with any non-charitable interests or beneficiaries is not organized and operated exclusively for charitable purposes - it benefits private interests, and a part of its net earnings inure to private shareholders or individuals.  See, e.g., Rev. Ruls. 66-259, 1966-2 C.B. 214 (trust providing for reversion of principal on termination to creator not exempt under IRC 501(c)(3)); Rev. Rul. 69-256, 1969-1 C.B. 151 (trust that makes annual payments to charities and pays fixed sum for perpetual care of testator's burial lot not exempt under IRC 501(c)(3)); and Rev. Rul. 69-279, 1969-1 C.B. 152 (trust that pays fixed percentage of income annually to settlor with balance to charity not exempt under IRC 501(c)(3)).

- A distinction is to be made between such a trust, where the non-exempt interest is specified under the terms of the trust or is a charge against its general assets, and a 501(c)(3) organization's acceptance of an income-producing asset either:

    1. subject to a reserved life estate in the transferor, or

    2. in exchange for an annuity payable only out of income and corpus of the asset transferred--acceptance of such an asset is permissible.  Rev. Rul. 69-176, 1969-1 C.B. 150.

**Matter of timing**    However, for charitable remainder trusts, the issue is a matter of timing. When the noncharitable interests have expired, such a trust may qualify under IRC 501(c)(3), and typically will apply for 501(c)(3) exemption if it plans on continuing to hold its charitable interests in trust (rather than liquidating and distributing its remaining assets to other 501(c)(3) organizations).  See Reg. 53.4947-1(b)(1)(ii), Example (2).

# Why are 4947 trusts treated like private foundations?

| | |
|---|---|
| **Prevent tax avoidance** | If NECTs and split-interest trusts were not subject to many of the requirements and restrictions imposed on private foundations, it would be possible for taxpayers to avoid these restrictions by the use of nonexempt trusts instead of private foundations.  To forestall this possibility, IRC 4947 generally imposes the same requirements and restrictions applicable to private foundations, with certain exceptions for split-interest trusts.  S. Rep. No. 552, 91st Cong., 1st Sess. 93-94 (1969); Reg. 53.4947-1(a). |

# Can a non-exempt charitable trust apply for 501(c)(4) status and avoid the 4947 rules?

**Prevent tax avoidance**

No. An NECT may not be recognized as exempt under IRC 501(c)(4), particularly where such recognition would allow the trust to avoid treatment as a private foundation. Private foundations existing as of Oct. 9, 1969 also may not avoid private foundation status by claiming 501(c)(4) status. See Reg. 1.509(b)-1(a); GCM 37485 (March 30, 1978); TAM 9730002 (Jan. 7, 1997).

- Charitable trusts generally have the option of applying for exemption under either IRC 501(c)(3) or 501(c)(4), or applying for 501(c)(4) status for the period for which IRC 508(a) bars 501(c)(3) exemption. See Rev. Rul. 80-108, 1980-1 C.B. 119.

- However, contributions to 501(c)(4) organizations are generally not deductible as charitable contributions (with exceptions for veterans' organizations and volunteer fire departments), and IRC 642(c) is not applicable to exempt organizations.

- By definition, an NECT is a trust for which a charitable deduction has been allowed. Congressional intent underlying IRC 4947 would be frustrated if 501(c)(4) exemption were recognized, because the trust would no longer be non-exempt under IRC 501(a), and thus would enjoy the benefits of charitable deductions without the burdens.

30

# When does the application of IRC 4947(a)(1) to a non-exempt charitable trust begin?

| | |
|---|---|
| **Introduction** | These rules are a bit complicated. They depend partly on whether the trust will continue on as a charitable trust, as opposed to winding up and distributing all of its assets. |
| **Inter vivos charitable trusts** | A trust created as an inter vivos charitable trust, for which a deduction is allowed, is subject to IRC 4947(a)(1) from the date of its creation. Reg. 53.4947-1(b)(1)(ii), Example (1). |
| **Testamentary trusts that do not wind up** | A testamentary trust that will continue on as a charitable trust and not distribute all of its assets is subject to IRC 4947(a)(1) as of the grantor's death. Reg. 53.4947-1(b)(2)(i). |
| **Charitable remainder and revocable trusts that do not wind up** | If a charitable remainder trust or revocable trust that becomes irrevocable on the grantor's death will continue on as a charitable trust and not distribute all of its assets, it is subject to IRC 4947(a)(1) after a reasonable period for administration/settlement. |

- Settlement duties may include collection of assets, payment of debts, taxes, and distributions, and determination of the rights of the subsequent beneficiaries. Reg. 53.4947-1(b)(2)(iv), (vi).

- For the revocable trust, IRC 4941 may apply if the requirements of Reg. 53.4941(d)-1(b)(3) are not met.

- As discussed above, in appropriate circumstances, which may include trust instrument changes, certain charitable trusts (with IRC 509(a)(1) and/or 509(a)(2) remaindermen and which continue to operate as charitable trusts) may qualify as public charities under IRC 509(a)(3). See Rev. Proc. 72-50, 1972-2 C.B. 830. IRC 509(a)(3) non-exempt trusts are not subject to the private foundation requirements imposed on non-exempt trusts that are described as private foundations under IRC 4947(a)(1).

*Continued on next page*

## When does the application of IRC 4947(a)(1) to a non-exempt charitable trust begin?, Continued

**Estates and trusts that wind up**

If an estate is required to wind up and distribute all of its net assets to charitable beneficiaries (or to other trusts for them), then it is subject to IRC 4947(a)(1), if at all, only after a reasonable period for administration/settlement. It remains subject to IRC 4947(a)(1) until final distribution of the assets.

- The same rule applies to a revocable trust that becomes irrevocable on the grantor's death, a testamentary trust, and a charitable remainder trust, when such trusts are required to wind up and distribute all of their net assets to charity. Reg. 53.4947-1(b)(2)(ii), (iii), (v); Reg. 1.641(b)-3(a) and (b).

32

# When does the application of IRC 4947(a)(2) to a split-interest trust begin and end?

| | |
|---|---|
| **Newly created split-interest trusts** | A newly created split-interest trust is treated as having amounts for which a deduction was allowed, and is thus subject to IRC 4947(a)(2), even if the deduction was allowed only at a later date. Reg. 53.4947-1(c)(1)(ii). |

- The date of creation is the later of (1) the time property is first transferred to the trust, or (2) the earliest time that the grantor trust rules under IRC 671 et seq. (which treat grantors or others as the owner of the trust) do not apply. Reg. 1.664-1(a)(4).

| | |
|---|---|
| **Testamentary trusts that do not wind up** | A testamentary trust that will continue on as a split-interest trust and not distribute all of its assets is subject to IRC 4947(a)(2) as of the grantor's death. Reg. 53.4947-1(c)(6)(i). |

| | |
|---|---|
| **Estates and trusts that wind up** | As with NECTs, a reasonable period of administration or settlement is often allowed before IRC 4947(a)(2) takes effect. |

- If an estate, a revocable trust that becomes irrevocable on the grantor's death, or a testamentary trust is required to wind up and distribute all of its net assets to both charitable and non-charitable beneficiaries (or to other trusts for them), then it is subject to IRC 4947(a)(2) only after a reasonable period for administration/settlement, until final distribution to the last remaining charitable beneficiary. Reg. 53.4947-1(c)(6)(ii) and (iv).

- If a revocable trust that becomes irrevocable on the grantor's death will continue on as a split-interest trust and not distribute all of its assets, it is similarly subject to IRC 4947(a)(2) after a reasonable period of settlement. IRC 4941 may apply if the requirements of Reg. 53.4941(d)-1(b)(3) are not met. Reg. 53.4947-1(c)(6)(iii).

| | |
|---|---|
| **Termination of 4947(a)(2) status** | 4947(a)(2) status ends for a charitable lead trust upon final payment to the charitable beneficiary, because the trust no longer retains amounts for which a charitable deduction was allowed. Reg. 53.4947-1(e)(2), Example (2). |

- A similar rule would apply to charitable remainder trusts that wind up and distribute their assets within a reasonable period of settlement. For other charitable remainder trusts, 4947(a)(2) status would end, and 4947(a)(1) status begin, after the reasonable period of settlement.

## Can trust assets be used to pay estate settlement expenses?

**In general**    The use of charitable funds for the private purposes of the grantor generally results in inurement or private benefit. In addition, such use raises IRC 4941 self-dealing and IRC 4945 taxable expenditure issues. Thus, EO agents should insure that estate administration expenses are borne by the proper parties - copies of the trust instrument, probate accounting, or court order may be necessary in cases of doubt.

**Trustee's lien**    In some cases, however, a charitable trust may receive an advance distribution from an executor or trustee, subject to a lien imposed by State law for unknown or contingent expenses of the estate or trust.

- The Service has permitted the charitable trust's disbursement of such funds back to the executor or trustee in appropriate circumstances where the probate court has approved the transfer. See, e.g., PLR 9826040 (March 30, 1998); Restatement § 249(2).

34