**Figure 32: Little Woody LLC Bank of America Statement**

Bank of America, N.A.
P.O. Box 798
Wichita, KS 67201

Account Reference Information
Acc[redacted]
Tax ID Number: [redacted]
E 0 0 C Enclosures 0 50
Statement Period 028429
03/01/01 through 03/31/01

02999 001 SCM999 I 3 0

LITTLE WOODY, LLC
300 CRESCENT CT STE 1000
DALLAS TX 75201-7852

Customer Service:
Bank of America, N.A.
P.O. Box 798
Wichita, KS 67201
Toll Free 1.888.BUSINESS(1.888.287.4637)

Page 1 of 2

**Business Economy Checking**

**Account Summary Information**

| | | | |
|---|---|---|---|
| Statement Period | 03/01/01 through 03/31/01 | Statement Beginning Balance | 0.00 |
| Number of Deposits/Credits | 1 | Amount of Deposits/Credits | 4,500,000.00 |
| Number of Withdrawals/Debits | 7 | Amount of Withdrawals/Debits | 4,307,236.83 |
| Number of Deposited Items | 0 | Statement Ending Balance | 192,763.17 |
| Number of Enclosures | 0 | Average Ledger Balance | 796,201.41 |
| Number of Days in Cycle | 31 | Service Charge | 0.00 |

**Deposits and Credits**

| Date Posted | Amount | Description | Bank Reference |
|---|---|---|---|
| 03/02 | 4,500,000.00 | Funds Transfer Credit<br>Fdes Ntx 0001145 NBKA6Y3 | 945003021450067 |

**Withdrawals and Debits**

**Other Debits**

| Date Posted | Amount | Description | Bank Reference |
|---|---|---|---|
| 03/05 | 3,650,823.83 | Wire Type:Fed Out Date:010305 Time:1613<br>Fed Ref:003091 Seq:010305018493<br>Bnf:Stewart Title Of Asp Pmt Det:Stewart Title Of<br>Aspen Ac-2020 002275 Rfb= Bnf Bk:Alpine Glenwood S<br>P | 904003059018493 |
| 03/05 | 35.00 | Wire Transfer Fee | 904003050017015 |

72. The "sales" proceeds of $3,643,227.83 were wired by Stewart Title and were eventually transferred to an investment account in the name of Little Woody, Ltd.[111] On March 8, 2001, Marmalade, Ltd. received a wire of $3,643,227.83 from Stewart Title. (*See* Figure

[111] The difference between the amount due from buyer at closing of $3,650,823.83, and the amount paid to seller of $3,643,227.83, is likely closing fees charged by Stewart Title. Buyer(s) Final Closing Statement, DOJ_HST819120.

*In re* Samuel E. Wyly, *et al*.
Expert Report of Bruce G. Dubinsky
November 10, 2015

33.)[112] The next day, March 9, 2001, the same amount was transferred from Marmalade, Ltd. to Little Woody, Ltd. (*See* Figure 34: Marmalade Ltd. Bank of America Statement and Figure 35: Little Woody Ltd. Bank of America Statement.)[113] Four days later Little Woody, Ltd. transferred the sales proceeds along with the balance in the account up to that date, for a total of \$3,690,511.595 to an investment account. (*See* Figure 35 and Figure 37: Little Woody Ltd. Banc of America Investment Services Statement.)[114]

---

[112] Mamalade, Ltd. Bank of America 03/01/01-03/31/01. DOJ_MAR002217 (WYLYSEC00992560).

[113] Mamalade, Ltd. Bank of America 03/01/01-03/31/01, DOJ_MAR002219 (WYLYSEC00992562); Little Woody, Ltd. Bank of America 03/01/01-03/31/01, DOJ_HST092695 (WYLYSEC00120339).

[114] Little Woody, Ltd. Bank of America 03/01/01-03/31/01, DOJ_HST092695-DOJ_HST092696 (WYLYSEC00120339-WYLYSEC00120340); Little Woody, Ltd. Banc of America Investment Services, Inc. SECI00005238.

**Figure 33: Marmalade Ltd. Bank of America Statement**

**Bank of America**

Bank of America, N.A.
P.O. Box 798
Wichita, KS 67201

Account Reference Information
Ac[redacted]
B 0 0 C Enclosures 6 60
Statement Period 0016207
03/01/01 through 03/31/01

02099 001 SCM999 I 34 0

MARMALADE LTD
300 CRESCENT CT STE 1000
DALLAS TX 75201-7852

Customer Service:
Bank of America, N.A.
P.O. Box 798
Wichita, KS 67201
Toll Free 1.888.BUSINESS(1.888.287.4637)

Page 1 of 3

**Full Analysis Business Checking**

**Account Summary Information**

| | | | |
|---|---|---|---|
| atement Period | 03/01/01 through 03/31/01 | Statement Beginning Balance | 500,485.86 |
| umber of Deposits/Credits | 11 | Amount of Deposits/Credits | 4,113,547.27 |
| umber of Withdrawals/Debits | 12 | Amount of Withdrawals/Debits | 4,492,505.39 |
| | | Statement Ending Balance | 121,527.74 |
| un..er of Enclosures | 6 | Average Ledger Balance | 473,397.96 |
| umber of Days in Cycle | 31 | Service Charge | 0.00 |

**Deposits and Credits**

| Customer Reference | Amount | Description | Bank Reference |
|---|---|---|---|
| /01 | ✓10,416.00 | Wire Type:Book IN Date:010301 Time:0720 Orig:Maverick Capital General Llc Seq:010301000989 Pmt Det:Marmalade Ltd Mav Cap Ge N Llc Distribution | 904003019000989 |
| /05 | ✓5,634.06 | Wire Type:Book IN Date:010305 Time:1611 Orig:Maverick Fund USA Ltd Seq:010305018533 Pmt Det:Marmalade Ltd Bnf=marmal Ade Ltd B O RFB=0009903050101347 Obi=sender Maver Ick Fund USA Ltd | 904003059018533 |
| /07 | ✓4,680.15 | Wire Type:Book IN Date:010307 Time:1406 Orig:Maverick Levered L.P. Seq:010307012856 Pmt Det:Marmalade Ltd Bnf=marmal Ade Ltd B O RFB=0009903070100674 Obi=sender Maver Ick Levered Partn | 904003079012856 |
| /08 | ✓3,643,227.83 | Wire Type:Fed IN Date:010308 Time:1435 Fed Ref:000040 Seq:010308014009 Orig:02 Stewart Title 62 Pmt Det:Little Woody Ltd Ac-4771145423 Bbi=bank Of America Of Dallas, TX SE Nding Bank:Alpine Bk | 904003089014009 |

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 34: Marmalade Ltd. Bank of America Statement**

**63**

**Figure 35: Little Woody Ltd. Bank of America Statement**

Bank of America

Bank of America, N.A.
P.O. Box 798
Wichita, KS 67201

Account Reference Information
[redacted]
E 0 0 C Enclosures 7 10
Statement Period 0017724
03/01/01 through 03/31/01

02699 001 SCM999 I 1 0
LITTLE WOODY LTD
300 CRESCENT CT STE 1000
DALLAS TX 75201-7852

Customer Service:
Bank of America, N.A.
P.O. Box 798
Wichita, KS 67201
Toll Free 1.888.BUSINESS(1.888.287.4637)

Page 1 of 3

Simple Analysis Business Checking

Account Summary Information

| | | | |
|---|---|---|---|
| Statement Period | 03/01/01 through 03/31/01 | Statement Beginning Balance | 47,283.76 |
| Number of Deposits/Credits | 2 | Amount of Deposits/Credits | 4,289,566.83 |
| Number of Withdrawals/Debits | 9 | Amount of Withdrawals/Debits | 3,812,109.77 |
| | | Statement Ending Balance | 524,740.82 |
| Number of Enclosures | 7 | Average Ledger Balance | 618,604.03 |
| Number of Days in Cycle | 31 | Service Charge | 6.17 |

Deposits and Credits

| Date Posted | Amount | Description | Bank Reference |
|---|---|---|---|
| 03/09 | 3,643,227.83 | Funds Transfer Credit Fdes Ntx 0001145 NBKOVW8 | 945003091450128 |
| 03/14 | 646,339.00 | Funds Transfer Credit Fdes Ntx 0001145 NBKOVW8 | 945003141450061 |

Withdrawals and Debits

**Figure 36: Little Woody Ltd. Bank of America Statement**

Bank of America

Bank of America, N.A.
P.O. Box 798
Wichita, KS 67201

Account Reference Information
Acco[redacted]
Tax [redacted]
B 0 0 C Enclosures 7 50
Statement Period 0017725
03/01/01 through 03/31/01

LITTLE WOODY LTD

Page 2 of 3

Simple Analysis Business Checking

Withdrawals and Debits - Continued

ther Debits

| Date | Amount | Description | Bank Reference |
|---|---|---|---|
| l/13 | 3,690,511.59 | Wire Type:Fed Out Date:010313 Time:1537 Fed Ref:002462 Seq:010313015489 Bnf:National Financial S Pmt Det:National Financia l Services Ac-066196 221 Bnf Bk:Chase N.c | 904003129015489 |
| l/. | 100,000.00 | Funds Transfer Debit Fdes Ntx 0001145 NBKA6Y3 | 945003221450093 |
| l/30 | 6.17 | Overdraft Interest Charge | |

**Figure 37: Little Woody Ltd. Banc of America Investment Services Statement**

Account Statement March 01, 2001 through March 31, 2001
See last page for important information about your brokerage account and this statement
Customer Name LITTLE WOO
[redacted]
INVESTMENT CONSULTANT
JOHN JONES

Banc of America Investment Services, Inc.™

**Activity Summary**

| | Debits | Credits |
|---|---|---|
| Beginning Balance | .00 | .00 |
| Total Securities Purchased | 3,698,126.43 | .00 |
| Income Received | .00 | 7,614.84 |
| Total Deposits | .00 | 3,690,511.59 |
| Ending Balance | .00 | .00 |

**Income Summary**

| | This Period | Year-To-Date |
|---|---|---|
| Taxable Dividends | 7,614.84 | 7,614.84 |
| Total Taxable Income | 7,614.84 | 7,614.84 |
| Total Income | 7,614.84 | 7,614.84 |

**Account Activity**

**Cash Account Activity**

| Settlement Date | Transaction | Description | Quantity | Transaction Amount | DR/CR |
|---|---|---|---|---|---|
| | | *** Opening Balance *** | | .00 | CR |
| 03-13-01 | YOU BOUGHT | NATIONS CASH RESERVES DAILY @ 1 | 3,690,511.59 | 3,690,511.59 | DR |
| 03-13-01 | WIRE TRANS FROM BANK | WR01265481 | | 3,690,511.59 | CR |
| 03-29-01 | REINVESTMENT | NATIONS CASH RESERVES DAILY REIN | | 7,614.84 | DR |

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

73. Thus, in this example, $3,643,227.83 of untaxed Wyly Brothers' funds from the accounts of an IOM entity was "invested" back into the U.S. through the "sale" of property owned by the Wyly Brothers.   This is another example of the deceptive methods employed by the Wylys to bring back money to the U.S. tax-free for their personal use.

### d.    Investment in Artwork – Cheryl Wyly

74. As another means to bring untaxed funds back into the U.S., the Wyly Brothers also purchased various pieces of personal property, including jewelry and artwork, through the use of offshore funds.  One such example was the purchase of a painting, entitled Noon Day Rest, in July 1996.

75. On July 10, 1996, Cheryl Wyly attended an auction at Sotheby's auction house in London England, and purchased the painting for £155,500, as evidenced by the invoice addressed to her. (*See* Figure 38.)[115]

---

[115] Sotheby's Invoice dated 07/26/1996, IOM 37813.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 38: Sotheby's Invoice**



76.   However, a week after the purchase, on July 18, 1996, Michelle Boucher, protector of the
      IOM entity, Fugue Ltd., "recommended" to the trustee that Fugue Ltd. purchase this
      painting, and thus pay Sotheby's the £155,500.[116]   She also "recommended" that the
      painting be shipped to 8080 N. Central Expressway, Suite 1300, Dallas, Texas, the offices

---

[116] Facsimile from Michelle Boucher to Ronnie Buchanan dated 07/18/1996; PSI00119258 (MF-SEC-RFP1-004971). Fugue Ltd. is owned by the Bessie Trust.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

of the Wyly family business, Sterling Software, and Michaels Stores.[117] In one of the rare instances of a trustee questioning the Wylys, the trustee responded that the protectors were recommending the substitution of an income producing asset, for a non-income producing asset, to be purchased at 222% of the pre-auction estimated price.[118] The trustee requested confirmation of this request from a beneficiary. (*See* Figure 39.)

**Figure 39: Memo Dated 07/19/1996 from Trustee to Michelle Boucher**



77.    In an initial response to the trustee, the protectors ignored the trustee's request for confirmation from the beneficiaries, and instead Michael French submitted to the trustee language, taken from the Deed of Settlement of the Bessie Trust, attempting to establish

---

[117] April 7, 2014 Trial Transcript – Vol. Day 01 174:4 -11.
[118] Memo from Ronnie Buchanan to Michelle Boucher dated 07/19/1996, PSI00119265 (MF-SEC-RFP1-004972).

*In re* Samuel E. Wyly, *et al*.
Expert Report of Bruce G. Dubinsky
November 10, 2015

that the purchase of personal property was within the powers of the trustee.[119] The trustee did not find this to be an adequate response, and again, on July 22, 1996, reiterated the need for written confirmation that consideration had been given to the non-income producing nature of the asset.[120] The trustee, in good faith, on July 22, 1996, had $240,000 (approximately the U.S. equivalent of the £155,500), transferred to a holding account for the purchase of the painting.[121] Two days later, on July 24, 1996, Sam Wyly addressed a letter to the trustee stating that neither he nor his spouse would have any foreseeable need for the funds or income thereon that would be used to purchase the painting. (*See* Figure 40.)[122]

---

[119] Facsimile from Mike French to Ronnie Buchanan dated 07/19/1996, IOM 37820-IOM 37822. Also on July 19, 1996, Mr. Buchanan reached out to a colleague requesting advice on how to handle the matter as he did not wish to "offend" the Settlor (who is also a beneficiary under the trust and, incidentally, a very major client), IOM 37311.
[120] Memo from Ronnie Buchanan to Michelle Boucher dated 07/22/1996, PSI00117450 (MF-SEC-RFP1-004976).
[121] Transfer instructions dated 07/22/1996, Control Number 76634. Memo from Ronnie Buchanan to Michelle Boucher dated 07/23/1996, PSI00117449 (MF-SEC-RFP1-004977).
[122] Memo from Sam Wyly to Ronnie Buchanan dated 07/24/1996, PSI001192643 - 001192644 (MF-SEC-RFP1-004979).

**69**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 40: Memo Dated 07/24/1996 from Sam Wyly to Trustee**



78.    The trustee acknowledged the protector's response and subsequently requested that Sotheby's re-invoice the painting to Fugue Ltd. (*See* Figure 41 and Figure 42.)[123]

---

[123] Memo from Ronnie Buchanan to Michael French dated 07/25/1996, PSI00119262 (MF-SEC-RFP1004980). Letter from Barbara Wade to Roger Bell dated 07/25/1996, SECI00317374.

**70**

**Figure 41: Memo Dated 07/25/1996 from the Trustee to Michael French**

Michael C. French, Esq.,
Maverick,
8080 N. Central Expressway,
Dallas,
TX 75206.

Fax: 010 1 214 891 8245

July 25th, 1996.

thank you for your overnight fax. Your proposed letter will do very well.

I am sorry if we appeared excessively obdurate on this matter but, as you know, the legal responsibilities of a trustee are more onerous than those of a banker or portfolio manager.

This subject will, as it happens, be considered at a

**Figure 42: Updated Sotheby's Invoice**

SOTHEBY'S

34-35 New Bond Street, London W1A 2AA
Telephone: (0171) 493 8080 Telex: 24454 SPBLON-G
Telefax No: (0171) 409 3100
Registered at the above address. Reg. No. 874867
Client Account: 3021⁻1⁻4

Fugue Limited
Mr Ronald Buchanan Esq
C/o Lorne House Trust
Lorne House
CASTLETOWN
Isle of Man
IM9 1AZ

Buyer's Invoice
Please return top copy with payment
VAT Reg. No. 312 5492 63

Invoice Number LN64060728
Invoice Date 26 JUL 96
Sale Title BRITISH PAINTINGS
Tax Point: 26 JUL 96
Sale Date 10 JUL 96

| Lot No. | Hammer Price | VAT on Hammer Price Rate | VAT on Hammer Price Amount | Buyer's Premium | VAT On Buyer's Premium Rate | VAT On Buyer's Premium Amount | Total |
|---|---|---|---|---|---|---|---|
| 0126 | 140000.00 | | | 15500.00 | | | 155500.00 |
| | 140000.00 | | .00 | 15500.00 | | 0.00 | 155500.00 |

The following lot(s) have been sold under the margin scheme and input tax deduction has not been and will not be claimed by Sotheby's. No amount has been charged in lieu of VAT, on condition that Sotheby's are responsible for or have proof of exportation from the EU.

All payments must be made in Pounds Sterling — Total Due

ACCORDING TO OUR CONDITIONS OF BUSINESS, PAYMENT IS DUE IMMEDIATELY AND LATE PAYMENT WILL BE LIABLE TO INTEREST CHARGED AT 18.00 % PER ANNUM

BANKERS:- Barclays Bank plc
160 Piccadilly
London W1A 2AB
Account No.: 60163198
Sort Code: 20-67-59

Client Account 3021⁻1⁻4
Fugue Limited

Sale Title BRITISH PAINTINGS
Date 10 JUL 96

| Invoice No. | Date | Amount Due |
|---|---|---|
| LN64060728 | 26 JUL 96 | 155500.00 |

79. By re-invoicing the painting to Fugue Ltd. and having the responsibility of payment shifted to this offshore entity, the Wylys used offshore funds to pay for personal property they could then enjoy in the U.S.[124] This also demonstrates the level of control the Wylys actually had over the trust protectors as well as the trustees.

[124] The Global Family Holding Report as of 02/28/01 for the Audubon (aka Fugue Ltd.) assets show the Noon Day Rest painting listed at a cost basis of $248,314.19, EYG01011.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

### e.    Investment in Artwork – Caroline Wyly

80.    A similar example of artwork purchased for the benefit of the Wylys, yet paid for by a
Wyly-established IOM entity, was a purchase by Caroline "Dee" Wyly. On February 11,
1997, Dee agreed to purchase four paintings from Huntsman Gallery of Fine Art for a
purchase price of $8,835. The invoice identified Dee as the purchaser; however it is
addressed to Soulieana Ltd. c/o Lorne House. (*See* Figure 43 Huntsman Gallery Invoice).[125]

### Figure 43 Huntsman Gallery Invoice



---

[125] Huntsman Gallery of Fine Art Invoice dated 2/11/1997, Confidential Pursuant to Section 24(d) 02030.

**73**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

81.   Soulieana Ltd. is a Charles Wyly IOM entity, established under the Tyler Trust.[126] A month

later, on March 3, 1997, Sharyl Robertson, protector of the Tyler Trust (Soulieana), sent to

Soulieana's trustees a "recommendation" that the artwork that Dee Wyly agreed to

purchase from Huntsman Gallery of Fine Art be paid for by Soulieana and that the funds be

wired from Soulieana. (*See* Figure 44  Shari Robertson Recommendation to Trustee

**Figure 44  Shari Robertson Recommendation to Trustee**



---

**74**

82. Once again, the Wylys transferred responsibility of personal purchases to their offshore
    entities and by doing so they were able to use untaxed offshore funds to purchase artwork
    for their personal enjoyment.

**IV.     Expert Opinion #2: The Wyly Brothers' transactions involving transfers of stock,
options, warrants, and other property to their offshore controlled entities lacked true
economic substance and were structured in a manner to avoid paying U.S. individual
income and gift taxes.**

83. In analyzing the economic substance of the transactions from a forensic accounting
    perspective, it is imperative to understand the true substance of each transaction as well as
    the various steps taken to effectuate the transactions. Generally, authorities overseeing
    accounting principles both domestic and international have long promoted the doctrine of
    substance over form—that, from an accounting perspective, the true economics of a
    transaction should take precedence over its documented form. Dating several decades ago
    (October 1973), a Study Group for the AICPA recommended that with respect to the
    qualitative characteristics of financial reporting, "The guidelines for reporting information
    should be expressed so that substance, not form, governs....The substantive economic
    characteristics, not the legal or technical form, should establish the accounting for
    transactions and other events."[127]

84. More recently, the AICPA issued auditing standard AU-C Section 550, which states that,
    for related parties: "...financial statements prepared in accordance with GAAP generally
    recognize the substance of particular transactions rather than merely their legal form."[128]
    This principle was reflected as well by the International Accounting Standards Board,
    which found that "If information is to represent faithfully the transactions and other events

---

[127] Report of the Study Group on the Objectives of Financial Statements, American Institute of Certified Public
Accountants, October 1973, p. 57 http://3197d6d14b5f19f2f440-
5e13d29c4c016cf96cbbfd197c579b45.r81.cf1.rackcdn.com/collection/papers/1970/1973_1001_TruebloodObjective
s.pdf.
[128] AU-C Section 550 – Related Parties at AU-C Section 550.A4.

65

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

that it purports to represent, it is necessary that they are accounted for and prepared in accordance with their substance and economic reality and not merely their legal form."[129]

85.    In the present matter, the Wyly Brothers orchestrated the formation of a highly complicated offshore infrastructure of related entities over a two-decade period designed to avoid and minimize paying U.S. individual income and gift taxes.  Upon close examination, the offshore structure was nothing more than a large group of foreign entities established at the behest of the Wylys and structured and window dressed to give the illusion that they were independent of the Wylys' control.  However, in reality, the true substance of the structure was that they all were completely controlled by the Wylys or their agents and were anything but independent.

86.    The concept of certain hallmarks or badges of tax fraud are instructive to review in assessing the offshore tax scheme in this case.  A few of the notable badges of tax fraud are the concealment of assets, using a device to hide income or assets, covering up sources of income and misrepresentation of the facts.[130]  As will be discussed in greater detail in this report, the offshore tax scheme implemented by the Wylys exhibited the characteristics of many of these badges of tax fraud.

87.    The documents that I have reviewed underscore that the mere legal form and structure of the offshore transactions belied the ultimate substance and purpose of the Wylys' activities: to avoid paying U.S. taxes and having the offshore structure discovered by U.S. taxing authorities.  The following examples provide some, but not all instances that support my

---

[129] Conceptual framework, IASB 1989: 35 – Qualitative Characteristics of Financial Statements, Reliability. *See also*, 1) FASB Statement of Financial Accounting Concepts No. 8, September 2010 at 27, which states, "Faithful representation means that financial information represents the substance of an economic phenomenon rather than merely representing its legal form.  Representing a legal form that differs from the economic substance of the underlying economic phenomenon could not result in a faithful representation."; and 2) Judge Scheindlin's discussion on "Substance Over Form," SEC Case Opinion at 21-22.  Furthermore, a similar understanding of economic substance is found in I.R.C. §7701, which states, "In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—(A) the transaction changes in a meaningful way (apart from federal income tax effects) the taxpayer's economic position, and (B) the taxpayer has a substantial purpose (apart from federal income tax effects) for entering into such transaction" at 14.
[130] *See* Section 2.702, 2015 U.S. Edition Fraud Examiners Manual, Association of Certified Fraud Examiners, Austin, Texas, (2015).  *See* also Internal Revenue Manual Section 25.1.6.3, Evidence of Fraud (Oct. 30, 2009).

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

conclusion that the transactions lacked economic substance and were designed to avoid U.S. taxes.

### A.    Recommendations by the Wylys were always followed

88.    The process that was established by the Wylys related to the control of the foreign entities was the following:

- Sam or Charles Wyly would "recommend" a financial transaction to the trust protectors;

- The foreign trust "protectors" would pass this "recommendation" on to the trustee;

- The trustee would purportedly take the "recommendation" into consideration and decide whether or not to execute the transaction.

89.    Thus, in theory, the trustee appears to have ultimate and final dominion and control over the offshore funds and have the final decision making capacity as to the transactional activity in the Wyly trusts.  In reality, however, this was not true.  Control rested entirely with the Wylys.  As the district court found in the SEC Case, the Wyly trusts were grantor trusts since the Wyly Brothers had ultimate control over the offshore trusts and the assets they contained.  The bankruptcy court applied *collateral estoppel* to this finding (*see* discussion *supra*).  As a result, such trusts and the income derived therefrom under the grantor trust rules of the Internal Revenue Code were subject to U.S. taxation, reportable on the Wylys' individual income tax returns.  Despite the legal form of establishing the trusts as non-grantor trusts and the illusory administrative process of simply "recommending" transactions, the true economic substance was that the Wyly Brothers were in full control of their trusts actually making decisions that affected the economics of the trusts.

90.    According to testimony of Michael French, the "recommendations" made by the Wyly Brothers were always followed. During the SEC Case in 2014, Mr. French stated the following:

**77**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

> SEC: Okay. And that's what I want to talk about, the beneficial ownership for SEC
> reporting.  You knew the protectors were making recommendations to the trustees,
> right?

> French: Yes.

> SEC: You knew those recommendations were suggested to you by Sam Wyly and
> Charles Wyly, right?

> French: Yes.

> SEC: And you knew that in every instance you're aware of, the recommendation was
> followed by the trustees, right?

> French: As far as I knew, yes.[131]

91. The fact that the "recommendations" were always followed and were, therefore, actual
orders not recommendations, was further confirmed by Sam Wyly himself. In testimony in
district court, Sam Wyly stated:

> SEC: Okay. Do you dispute, Mr. Wyly, that the trustees followed every
> recommendation from the protectors?

> Sam Wyly: I don't dispute that, no.

> SEC: Do you dispute that the trustees never engaged in a securities transaction without
> a recommendation from the protectors?

> Sam Wyly: No.

> SEC: Do you dispute that every communication that the protectors made started with
> you or your brother Charles?

> Sam Wyly: No.

> SEC: Do you dispute that every recommendation that the protectors made to buy things
> that you or your brother wanted was followed by the trustees?

---

[131] April 23, 2014 Trial Transcript from SEC Case - Vol. Day 11 1920:16 - 25.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

Sam Wyly: No. [132]

92. Substantial additional testimony and documents support the court's finding that while on the surface, the Wyly Brothers were only providing "suggestions" to the trustees, they were fully in control and, as such, the substance (*i.e.*, the Wyly Brothers' orders) controlled the form (*i.e.*, the "recommendations"). This process was enforced for the sole purpose of retaining the fiction that these trusts were non-grantor trusts, designed to avoid paying taxes in the U.S.

## B.    Questionable investments

93. The formation of the offshore trust structure on its face, attempted to accomplish the goal of avoiding detection of numerous transactions and the ultimate goal of avoiding paying U.S. income and gift taxes. In fact, while a true non-grantor trust would provide complete authority over the management of the trust funds to the trustee, the Wyly Brothers in actuality disregarded the trustee's power. The trusts served only as a means to an end—the avoidance of U.S. taxes. Importantly, on rare occasions, the trustee of a Wyly offshore trust would actually question the "recommendation" made by one of the Wyly Brothers, noting that the "recommendation" did not make economic or business sense. The Wylys, however, dismissed the trustees' concerns and insisted that the trustees proceeded with the order. And that is exactly what then happened, the trustees followed the commands of their masters, the Wylys; clearly the Wylys were always in control.

94. For example, as was described in greater detail *supra*, Cheryl Wyly chose to purchase the painting Noon Day Rest in July 1996 from Sothebys. The payment for the artwork, however, was funded entirely by the Wyly offshore entity, Fugue Ltd. As previously noted, the trustee overseeing the funds to this entity responded to the recommendation regarding the substitution of an income producing asset, for a non-income producing asset, to be purchased at 222% of the pre-auction estimated price. [133] In the end, however, the Wylys controlled and the funds from the trust were used to purchase the painting. This is but one

---

[132] April 22, 2014 Trial Transcript from SEC Case - Vol. Day 10 1609:7 - 20.

[133] Memo from Ronnie Buchanan to Michelle Boucher dated 07/19/1996, PSI00119265 (MF-SEC-RFP1-004972).

**79**

of numerous examples of how the offshore trust infrastructure masked the true substance of the Wyly trusts, which vested full control with the Wylys while striving to make it appear that they did not have control so as to avoid paying U.S. taxes.

### C.    Internal Wyly documents recognized tax issues

95.   Documents that were distributed to the Wyly family, including Sam and Charles Wyly, disclose that the Wylys were clearly aware of the tax consequences of their offshore structure and knew from the beginning that by utilizing the offshore trust structure they were avoiding paying U.S. tax.  For example, a memo addressed to Sam Wyly regarding certain Computer Associate options, which was attached to an email from Keeley Hennington, the CFO of the Wyly family office, to Michelle Boucher on February 26, 2002, stated the following:

> There needs to be a good answer to the increase in shares from what was publicly represented during the CA proxy fight. I think that those watching this closely will raise this issue and there need to be an answer that does not jeopardize the offshore system.
>
> I think the concerns initially were to make sure that it did not appear that the trustees were taking any direction from you and using trust assets to benefit you personally.....
>
> ....I could see CA possibly making a big deal out of this if they think it would focus some of the attention away from them and cause problems for you.
>
> Our friendly IRS agent is still looming around and although he has verbally agreed to not look further at any foreign entities or trusts, I would not want to give him any fresh ammunition.[134]

---

[134] Email from Keely Hennington to Michelle Boucher, February 26, 2002, SEC/ITC0105444- SEC/ITC0105445 (emphasis added).

**80**

96.  Furthermore, another internal memorandum from Keeley Hennington and Michelle
     Boucher dated July 2, 2003 informs the Wylys of the following issues:

     - Legal analyses performed by the law firm Morgan Lewis concluded that trusts
       were grantor trusts and should be taxed by the IRS;

     - An analysis of regulations and court decisions lead to a conclusion that the Wyly
       trusts are grantor trusts and should be taxed by the U.S.;

     - The annuity payments would bankrupt several of the IOM companies; and

     - Annuity payments would trigger an IRS audit.[135]

97.  If the offshore trusts were truly established primarily for legitimate non-tax purposes, and
     structured so the Wylys did not have control, the concerns raised by the Wyly family
     business should not have been an issue. Yet despite their concern, the Wylys retained the
     offshore infrastructure for more than a decade after these memorandums were written.
     While the July 2, 2003 memorandum even suggested a proactive resolution with the IRS,
     no such agreements were ever made. The Wylys continued to maintain the status quo and,
     despite the window dressed appearance that these entities were non-grantor trusts that
     should not be subject to U.S. taxation, the facts and substance of the offshore trust system
     is that the Wylys utilized their controlled offshore entities to avoid paying U.S. taxes.

     **D.    The Wylys retained ownership and the economic benefits of the offshore
             assets**

98.  The fact that the Wylys' offshore trust structure lacked economic substance comes down to
     a simple reality—experienced and wealthy businessmen, like the Wylys, do not give up
     control of their fortune. If the offshore trusts were truly and substantively non-grantor
     trusts and were established for legitimate non-tax reasons, the Wylys would have had no
     influence or control over the underlying assets. Yet, as detailed above, Sam and Charles
     Wyly continued to maintain control over their money and continuously directed the
     activities in the offshore entities (*i.e.*, used un-taxed money to purchase jewelry and art,

---

[135] Memo from Keeley Hennington and Michelle Boucher, July 2, 2003, WYLYSEC01112396-01112411.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

buy real estate and make investments).  The district court in the SEC Case confirmed this by stating:

> Reasonable and savvy businessmen do not engage in such activity unless it is profitable.  Of course it was profitable—by transferring property, including valuable options and warrants, to the trust, exercising the options and trading in secret, and using the proceeds to reinvest in other ventures, the Wylys were able to accumulate tremendous tax-free wealth.[136]

**E.    Decisions made to obfuscate tax liabilities from U.S. authorities**

99.    When Louis Schaufele, the Wylys' investment broker, began working at Bank of America in early 2002, he transferred the Wyly brokerage accounts with him from his previous firm. Upon opening the new accounts, Bank of America was required, under the 2001 Patriot Act, to verify the identity of their customers.[137] However, the Wylys resisted requests from the bank to provide the underlying beneficial ownership of the trusts, and demanded to have their identities kept from Bank of America, further demonstrating the lengths at which they went to avoid having their offshore structure detected by the IRS or other U.S. authorities.

100.    For example, in an email dated March 12, 2002, two Bank of America representatives were concerned about the bank's regulatory compliance related to the Know Your Customer (KYC) rules and discussed the new accounts established by Schaufele stating that Schaufele would not reveal the clients' name because "the family was extremely worried about being linked to these accounts."[138] However, Bank of America persisted and requested proof of identification for all corporate officers.[139] In response to this request, Bank of America was provided with only the identification of the trustees rather than of the underlying beneficiaries.[140] By withholding the beneficiary information from Bank of

---

[136] SEC Case Opinion at 28.
[137] Subcommittee Report, at 324.
[138] March 12, 2002 email from Carole Bonina to Cindy Kellen, BA 055983.
[139] March 15, 2002 email from Michele Crittenden to Anna Benbatoul, BA 055866.
[140] March 27, 2002 email from Cindy Kellen to Michele Crittenden, BA 055795.



America, the Wylys were able to continue to obfuscate from the IRS the true nature of the offshore foreign structure.

V.   **Expert Opinion #3: The Wyly Brothers' original U.S. federal income tax filings from 1992 – 2013 were false and misleading and concealed the true nature and substance of the transfer of stock options, warrants, and stock, and other transactions described above.**

101. According to 26 U.S. Code §61 ("Internal Revenue Code"), as well as the instructions to the Form 1040, the standard form that individuals submit to the IRS reporting annual income tax:

- Generally, you must report all income except income that is exempt from tax by law.

- You must report unearned income, such as interest, dividends, and pensions, from sources outside the U.S. unless exempt by law or a tax treaty.  You must also report earned income, such as wages and tips, from sources outside the U.S.[141]

102. The Wyly Brothers, however, through the creation and use of their controlled offshore trusts, attempted to shift income to their offshore entities and as a result did not properly report their income to the IRS. Instead, they excluded hundreds of millions of dollars in income and capital gains from their federal income tax returns for the years 1992-2013. Since the offshore trusts were grantor, not non-grantor trusts, with beneficial ownership and control tied directly back to Sam and Charles Wyly, all of the income purportedly derived from the property transferred (and/or gains and losses from the underlying securities once the stock options were exercised) to these controlled entities should have been reported on the relevant income tax returns beginning in 1992.  It was not.

103. As shown in the examples below, the original U.S. individual tax filings signed and filed under the penalties of perjury[142] by the Wyly Brothers were not only deficient, but were

---

[141] See 26 U.S. Code §61 and Instructions for Form 1040 (1992) at 13.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

false and misleading due to the extensive omissions detailed hereinafter.  While I am including only a few detailed examples below for demonstrative purposes, Appendix C attached to my Expert Report provides additional examples throughout the more than two-decade period of the omissions and inaccuracies included in the Wylys' tax filings.[143]

### A.    False statements

#### 1.    Example 1 - Sam Wyly 1992 Gains from Sales of Publicly Traded Securities

104.    On March 11, 1992, Sam Wyly, as the settlor, entered into a trust agreement with the IOM Bulldog Non-Grantor Trust.[144]   As discussed *supra*, 485,000 call options and 100,000 warrants of Michaels Stores and 667,000 call options and 644,725 warrants of Sterling Software were assigned to entities owned by the Bulldog Trust. During 1992, several of these options and warrants were exercised and the underlying securities sold. Yet, the income produced in these transactions was never reported to the IRS by Sam Wyly despite the fact that the Bulldog Trust was a grantor trust.  Since Sam Wyly was ultimately the beneficial owner of these assets, his tax filings should have reflected the income from the securities.  They did not.

105.    For example, on April 15, 1992, Sam Wyly assigned 667,000 Sterling Software options to East Carroll, an entity owned by the Bulldog Trust.[145]  One month later, these options were exercised.[146]  The options had an exercise price of $6.25 and on the day they were

---

[142] The signature line on Form 1040 states the following: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete." U.S. Individual Income Tax Return Form 1040.  In fact, all of the tax returns that I examined were signed by Sam and Charles Wyly respectively.

[143] Due to the complicated nature of the Wylys' income tax returns, there may be other examples of items that were reported in a false and misleading manner that I have not detailed in this report or the appendix hereto, but nonetheless support my opinions in this regard.

[144] March 11, 1992 Trust Agreement of the Bulldog Non-Grantor Trust, SW-IDR01-0000000002 – 0000000036.  As noted above, despite the fact that the name of the trust included the words "Non-Grantor," the Court has applied *collateral estoppel* to the fact that the Wylys' offshore trusts were grantor trusts. *See*, *In re Wyly*, No. 14-35043-BJH (Bankr. N.D. Tex. Aug. 24, 2015).

[145] Private Annuity Agreement between Sam Wyly and East Carroll Limited, JWLLP- SEC02649 – 02659; Assignment of Non-Statutory Stock Options, JWLLP-SEC02661, Consent to Transfer of Non-Statutory Stock Options, JWLLP- SEC02663 – 02665.

[146] CS First Boston Stock Sale Sheet, CSFB 0004076.

exercised the fair market value was $17.125.[147] Ordinary income should have been reported on the difference between the exercise price and the fair market value (*i.e.*, $17.125-$6.25 = $10.875). The difference of $10.875 times the number of shares, 667,000, would have resulted in ordinary income of $7,253,625.[148] (*See* Figure 45, which is an internal document that shows the market value at date of exercise and the calculated ordinary income.)

**Figure 45: 667,000 Sterling Software Options Exercised**

| Options Exercised | Date | # options | MV at date of exercise | gain/(loss) vs mkt at ann valn | gain/(loss) vs Strike Price | strike price paid |
|---|---|---|---|---|---|---|
| SSWO | | | | | | |
| Sterling Software Optn exp May 1, 1994 strike $6.25 | 04/15/92 | 667,000 | | | | |
| Exercised Options | 05/12/92 | 667,000 | 17.125 | (1.750) | 10.875 | 6.250 |
| Total dollars | | | 11,422,375 | (1,167,250) | 7,253,625 | 4,168,750 |
| balance | | | | | | |

Source: WYLYSEC01102043

106. In addition to the ordinary income resulting from the exercise of stock options, capital gain or loss should have been reported when these stocks were then sold. For example, on November 27, 1992, 149,300 shares with a basis of $17.125 were sold at a fair market value of 19.251. This resulted in a short-term gain of $317,352.08 (*i.e.*, $19.251-$17.125 = $2.126; $2.13 x 149,300 = $317,352.08).[149] (*See* Figure 46, a November 1992 CS First Boston stock sale sheet showing the Sterling Software sale.)

---

[147] Internal document showing private annuity details at WYLYSEC01102043.

[148] I was provided with numerous binders from the IRS that contain income and gift tax determinations as well as penalty calculation schedules for both Sam and Charles Wyly for the years 1992 – 2013. I define these herein as "IRS Binder- Schedules." IRS Binder- Schedule S-1, Year: 1992 Gains from Sales of Publicly Traded Securities attributable to Samuel E. Wyly.

[149] Internal document showing private annuity details at WYLYSEC01102043; Trading activity for November 1992 at CSFB0004082; IRS Binder Schedule S-1, Year: 1992 Gains from Sales of Publicly Traded Securities attributable to Samuel E. Wyly.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

### Figure 46: CS First Boston Stock Sale Sheet



CSFB0004082

107. In aggregate for <u>all</u> transactions that were exercised in 1992, 1,896,725 stock options were exercised, and of those exercised options 902,000 shares of stock were sold from the Bulldog trust.[150] Thus, in total in 1992, Sam Wyly failed to report a total of $18,500,500 of ordinary income and a net $709,075 of short-term capital gains.[151] Had this income been included on the 1992 Form 1040 of Sam Wyly, his total "Wages, salaries, tips, etc." would have been $19,245,461 ($744,961 as previously reported plus $18,500,500) thereby making total Adjusted Gross Income $22,203,803 ($3,703,303 as previously reported plus $18,500,500).[152] (*See* Figure 47: Sam Wyly 1992 Form 1040.)  This is but one example of the Wylys' failure to report income; similar omissions occur every year for nearly two decades.

---

[150] Internal document showing private annuity details at WYLYSEC01102042-01102048; IRS Binder- Schedule S-1, Year: 1992 Gains from Sales of Publicly Traded Securities attributable to Samuel E. Wyly.

[151] IRS Binder- Schedule S-1, Year: 1992 Gains from Sales of Publicly Traded Securities attributable to Samuel E. Wyly.  Although $709,075 of additional short-term capital gains are added, the short-term capital loss carryforward from 1991 was greater than this amount, therefore, the capital loss of ($3,000) remains unchanged.

[152] Sam Wyly 1992 Form 1040, SECI00099759; IRS Binder- Schedule S-1, Year: 1992 Gains from Sales of Publicly Traded Securities attributable to Samuel E. Wyly.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

## Figure 47: Sam Wyly 1992 Form 1040

### Original

| | | | | | |
|---|---|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | | | 7 | 744,961. |
| 8a | Taxable interest income. Attach Schedule B if over $400 | | | 8a | 2,022,754. |
| b | Tax-exempt interest income (see page 15). DON'T include on line 8a | 8b | | | |
| 9 | Dividend income. Attach Schedule B if over $400 | | | 9 | 236,174. |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes from worksheet on page 16 | | | 10 | |
| 11 | Alimony received | | | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | | | 12 | 2,103,882. |
| 13 | Capital gain or (loss). Attach Schedule D | | | 13 | -3,000. |
| 14 | Capital gain distributions not reported on line 13 (see page 15) | | | 14 | |
| 15 | Other gains or (losses). Attach Form 4797 | | | 15 | -4. |
| 16a | Total IRA distributions | 16a | b Taxable amount (see page 16) | 16b | |
| 17a | Total pensions and annuities | 17a | b Taxable amount (see page 16) | 17b | |
| 18 | Rents, royalties, partnerships, estates, trusts, etc. Attach Schedule E | | | 18 | -921,864. |
| 19 | Farm income or (loss). Attach Schedule F | | | 19 | - |
| 20 | Unemployment compensation (see page 17) | | | 20 | |
| 21a | Social security benefits | 21a | b Taxable amount (see page 17) | 21b | |
| 22 | Other income. List type and amount - see page 18 | | | 22 | |
| 23 | Add the amounts shown in the far right column for lines 7 through 22. This is your total income ► | | | 23 | 4,182,903. |
| 24a | Your IRA deduction from applicable worksheet on page 19 or 20 | 24a | | | |
| b | Spouse's IRA deduction from applicable worksheet on page 19 or 20 | 24b | | | |
| 25 | One-half of self-employment tax (see page 20) | 25 | | | |
| 26 | Self-employed health insurance deduction (see page 20) | 26 | | | |
| 27 | Keogh retirement plan and self-employed SEP deduction | 27 | | | |
| 28 | Penalty on early withdrawal of savings | 28 | | | |
| 29 | Alimony paid. Recipient's SSN ► SEE S   1 | 29 | 479,600. | | |
| 30 | Add lines 24a through 29. These are your total adjustments ► | | | 30 | 479,600. |
| 31 | Subtract line 30 from line 23. This is your adjusted gross income. If this amount is less than $22,370 and a child lived with you, see page EIC-1 to find out if you can claim the "Earned Income Credit" on line 58 ► | | | 31 | 3,703,303. |

17

Form 1040 (1992)

**Adjusted**

| | | | |
|---|---|---|---|
| 7 | Wages, salaries, tips, etc. Attach Form(s) W-2 | 7 | 19,245,461 |
| 8a | Taxable interest income. Attach Schedule B if over $400 | 8a | 2,022,754. |
| b | Tax-exempt interest income (see page 15). DON'T include on line 8a | 8b | |
| 9 | Dividend income. Attach Schedule B if over $400 | 9 | 236,174. |
| 10 | Taxable refunds, credits, or offsets of state and local income taxes from worksheet on page 16 | 10 | |
| 11 | Alimony received | 11 | |
| 12 | Business income or (loss). Attach Schedule C or C-EZ | 12 | 2,103,882. |
| 13 | Capital gain or (loss). Attach Schedule D | 13 | -3,000. |
| 14 | Capital gain distributions not reported on line 13 (see page 15) | 14 | |
| 15 | Other gains or (losses). Attach Form 4797 | 15 | -4. |
| 16a | Total IRA distributions | 16a | b Taxable amount (see page 16) | 16b | |
| 17a | Total pensions and annuities | 17a | b Taxable amount (see page 16) | 17b | |
| 18 | Rents, royalties, partnerships, estates, trusts, etc. Attach Schedule E | 18 | -921,864. |
| 19 | Farm income or (loss). Attach Schedule F | 19 | |
| 20 | Unemployment compensation (see page 17) | 20 | |
| 21a | Social security benefits | 21a | b Taxable amount (see page 17) | 21b | |
| 22 | Other income. List type and amount – see page 18 | 22 | |
| 23 | Add the amounts shown in the far right column for lines 7 through 22. This is your total income ▶ | 23 | 22,683,403 |
| 24a | Your IRA deduction from applicable worksheet on page 19 or 20 | 24a | |
| b | Spouse's IRA deduction from applicable worksheet on page 19 or 20 | 24b | |
| 25 | One-half of self-employment tax (see page 20) | 25 | |
| 26 | Self-employed health insurance deduction (see page 20) | 26 | |
| 27 | Keogh retirement plan and self-employed SEP deduction | 27 | |
| 28 | Penalty on early withdrawal of savings | 28 | |
| 29 | Alimony paid. Recipient's SSN ▶ SEE S. | 1 | 29 | 479,600. |
| 30 | Add lines 24a through 29. These are your total adjustments ▶ | 30 | 479,600. |
| 31 | Subtract line 30 from line 23. This is your adjusted gross income. If this amount is less than $22,370 and a child lived with you, see page EIC-1 to find out if you can claim the "Earned Income Credit" on line 56 ▶ | 31 | 22,203,803 |

17                                                              Form 1040 (1992)

108. Due to a large short-term capital loss carryforward from 1991, the $709,075 short-term capital gain would have been fully offset.[153] However, this unreported short-term capital gain would reduce this loss carryforward for the following tax year. Had the $709,075 short-term capital gain been reported, the short-term capital loss carryforward would have only been ($524,323) and not ($1,233,398) as was reported on Schedule D.[154] (*See* Figure 48.)

---

[153] A capital loss carryforward is the net amount of capital losses that are not able to be deducted in the current year, due to maximum loss restrictions. These losses are able to be carryforward and applied to future year's tax returns. Future capital gains can be netted with carryforward losses. *See, in general*, IRS Topic 409-Capital Gains and Losses.

[154] Sam Wyly 1992 Form 1040, Schedule D at SECI00099767 - SECI00099768. Capital gains and losses are reported on Schedule D of the personal tax return.