Josiah M. Daniel, III, SBT # 05358500
James J. Lee, SBT # 12074550
Paul E. Heath, SBT # 09355050
Rebecca L. Petereit, SBT # 24062776
**VINSON & ELKINS LLP**
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel: 214-220-7700 Fax: 214-220-7716
jdaniel@velaw.com; jimlee@velaw.com
pheath@velaw.com; rpetereit@velaw.com
**COUNSEL FOR THE DEBTOR**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **Case No. 14-35043** |
| | § | |
| **SAMUEL EVANS WYLY, et al.** | § | **Chapter 11** |
| | § | |
| **DEBTORS** | § | **Jointly Administered** |

## DEBTOR SAM WYLY'S AMENDED APPENDIX SUPPORTING MOTION TO EXCLUDE OPINIONS OF BRUCE DUBINSKY

Per the Court's instructions, Samuel Evans Wyly (the "**Debtor**" or "**Sam Wyly**") respectfully files this amended appendix supporting his motion to exclude opinions of Bruce Dubinsky, to correct a scanning error in the original appendix:

| EXHIBIT | DESCRIPTION | PAGES |
|---------|-------------|-------|
| A | Expert Report of Bruce G. Dubinsky | 4-107 |
| B | Deposition of Bruce Dubinsky (November 19, 2015) | 109-155 |
| C | Tables of Contents for Dubinsky's Binder [Dubinsky Dep. Ex. 2 at 109-119] | 157-167 |

**1**

Dated: January 5, 2016

*/s/    James J. Lee*
Josiah M. Daniel, III, SBT # 05358500
James J. Lee, SBT # 12074550
Paul E. Heath, SBT # 09355050
Rebecca L. Petereit, SBT # 24062776
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel:  214-220-7700   Fax: 214-220-7716
jdaniel@velaw.com; jimlee@velaw.com
pheath@velaw.com; rpetereit@velaw.com

**COUNSEL FOR THE DEBTOR**

### CERTIFICATE OF SERVICE

I certify that, on January 5, 2016, a copy of the foregoing document was
served by the Electronic Case Filing system for the United States Bankruptcy Court
for the Northern District of Texas, which gives notice to all counsel of record.

*/s/ James J. Lee*

US 3939405

**2**

# Exhibit A

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| *In re* Samuel E. Wyly, *et al.* | Case No. 14-35043-BJH<br>(Chapter 11) |

**EXPERT REPORT OF BRUCE G. DUBINSKY
MST, CPA, CFE, CVA, CFF, MAFF
November 10, 2015**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

# TABLE OF CONTENTS

I.    Introduction ............................................................................................................. 1

   A.   Expert Background and Qualifications ........................................................... 1

   B.   Summary of Scope and Methodology.............................................................. 3

   C.   Summary of Opinions ..................................................................................... 4

II.   Background............................................................................................................. 5

   A.   Overview of Key Individuals .......................................................................... 5

      1.   Sam Wyly.................................................................................................. 5

      2.   Charles and Caroline D. Wyly ................................................................. 6

      3.   Evan Wyly ................................................................................................ 6

      4.   Donald Miller, Jr...................................................................................... 7

      5.   Michael French ........................................................................................ 7

      6.   Sharyl Robertson ..................................................................................... 8

      7.   Michelle Boucher...................................................................................... 8

      8.   Keeley Hennington ................................................................................... 9

      9.   Louis Schaufele ........................................................................................ 9

      10.  David Tedder ......................................................................................... 10

   B.   Brief Overview of the Transactions ............................................................. 10

III.  Expert Opinion #1: The Wyly Brothers established and controlled an elaborately complex
network of numerous offshore entities in known tax havens that engaged in a series of financial
transactions designed to avoid detection and taxation by the U.S. taxing authorities. ................. 12

   A.   Trusts and Foreign Corporations .................................................................. 13

   B.   Timeline ......................................................................................................... 15

   C.   Transactions .................................................................................................. 17

      1.   Sources of Funds ..................................................................................... 17

      2.   Uses of Funds.......................................................................................... 38

IV.   Expert Opinion #2: The Wyly Brothers' transactions involving transfers of stock, options,
warrants, and other property to their offshore controlled entities lacked true economic substance
and were structured in a manner to avoid paying U.S. individual income and gift taxes............. 65

   A.   Recommendations by the Wylys were always followed ................................. 67

B.  Questionable investments ................................................................................ 69

C.  Internal Wyly documents recognized tax issues .............................................. 70

D.  The Wylys retained ownership and the economic benefits of the offshore assets............. 71

E.  Decisions made to obfuscate tax liabilities from U.S. authorities ...................... 72

V.  Expert Opinion #3: The Wyly Brothers' original U.S. federal income tax filings from 1992 –
2013 were false and misleading and concealed the true nature and substance of the transfer of
stock options, warrants, and stock, and other transactions described above. ............................... 73

A.  False statements ........................................................................................... 74

  1.  Example 1 - Sam Wyly 1992 Gains from Sales of Publicly Traded Securities............ 74

  2.  Example 2 -   Sam Wyly 1996 Gains from Sales of Publicly Traded Securities........... 79

  3.  Example 3 - Sam Wyly 1996 Gains from Sales of Publicly Traded Securities............ 84

  4.  Example 4 - Charles Wyly 1999 Offshore Entity Income ............................... 89

  5.  Example 5 - Charles Wyly 2004 Offshore Entity Income ............................... 94

VI.   Conclusion ...................................................................................................... 98

Appendix A: Curriculum Vitae of Bruce G. Dubinsky .........................................................

Appendix B: Documents Considered...................................................................................

Appendix C: Tax Filing Examples ......................................................................................

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

# LIST OF FIGURES

Figure 1: Timeline of Wyly Offshore Tax Structure June 1991 – December 1994 ...... 15
Figure 2: Timeline of Wyly Offshore Tax Structure 1995 - 1997 ................................. 16
Figure 3: Timeline of Wyly Offshore Tax Structure 1998 - 2002 ............................... 16
Figure 4: Sam Wyly 1992 IOM Trusts ....................................................................... 18
Figure 5: Charles Wyly 1992 IOM Trusts ................................................................. 18
Figure 6: Sam Wyly Formation of 1992 Nevada Entities ........................................... 19
Figure 7: Charles Wyly Formation of 1992 Nevada Entities ..................................... 20
Figure 8: Sam Wyly 1992 Funding of Nevada Entities .............................................. 21
Figure 9: Charles Wyly Chart 1992  Funding of Nevada Entities .............................. 23
Figure 10: Sam Wyly 1992 Funding of IOM Entities ................................................ 24
Figure 11: Charles Wyly 1992 Funding of IOM Entities ........................................... 25
Figure 12: Charles Wyly 1996 IOM Entities ............................................................. 26
Figure 13: Sam Wyly 1996 IOM Entities ................................................................... 27
Figure 14: Charles Wyly Chart 1996 Funding of IOM Entities ................................. 28
Figure 15: Sam Wyly 1996 Funding of IOM Entities ................................................ 29
Figure 16: Charles Wyly 1996 Dissolution of Various IOM Trusts ........................... 30
Figure 17: Sam Wyly 1996 Dissolution of Various IOM Trusts ............................... 31
Figure 18: Charles Wyly 1999 Sale of Stock Options ............................................... 32
Figure 19: Charles Wyly 1999 Form 1040 ................................................................ 33
Figure 20: Sam Wyly 1999 Sale of Stock Options .................................................... 34
Figure 21: Sam Wyly 1999 Form 1040 ...................................................................... 35
Figure 22: Charles Wyly 2002 Form 1040 ................................................................ 37
Figure 23: Charles Wyly 2002 Form 1040 ................................................................ 38
Figure 24: Green Mountain Energy Resources LLC Subscription Agreement ........... 40
Figure 25: Chart of Ownership of Green Funding II LLC .......................................... 41
Figure 26: GMP Holdings Ltd. Deposits At Call ....................................................... 42
Figure 27: Green Funding II LLC Nations Bank Statement ....................................... 42
Figure 28: Charles Wyly 2002 $6,000,000 Loan ...................................................... 44
Figure 29: Little Woody LLC Ownership .................................................................. 46
Figure 30: Little Woody Creek Road Ltd. Bank of Bermuda Statement .................... 48
Figure 31: Little Woody Management Trust Bank of America Statement ................... 49
Figure 32: Little Woody LLC Bank of America Statement ........................................ 50
Figure 33: Marmalade Ltd. Bank of America Statement ............................................ 52
Figure 34: Marmalade Ltd. Bank of America Statement ............................................ 53
Figure 35: Little Woody Ltd. Bank of America Statement ......................................... 54
Figure 36: Little Woody Ltd. Bank of America Statement ......................................... 55
Figure 37: Little Woody Ltd. Banc of America Investment Services Statement ......... 55

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

Figure 38: Sotheby's Invoice ........................................................................................................ 57

Figure 39: Memo Dated 07/19/1996 from Trustee to Michelle Boucher .................................... 58

Figure 40: Memo Dated 07/24/1996 from Sam Wyly to Trustee ................................................ 60

Figure 41: Memo Dated 07/25/1996 from the Trustee to Michael French .................................. 61

Figure 42: Updated Sotheby's Invoice ....................................................................................... 62

Figure 43 Huntsman Gallery Invoice .......................................................................................... 63

Figure 44  Shari Robertson Recommendation to Trustee ........................................................... 64

Figure 45: 667,000 Sterling Software Options Exercised .......................................................... 75

Figure 46: CS First Boston Stock Sale Sheet ............................................................................. 76

Figure 47: Sam Wyly 1992 Form 1040 ...................................................................................... 77

Figure 48: Sam Wyly  1996 Schedule D .................................................................................... 79

Figure 49: Locke Ltd. Lehman Brothers Account Statement ...................................................... 80

Figure 50: Sam Wyly 1996 Form 1040 ...................................................................................... 81

Figure 51: Sam Wyly 1996 Schedule D ..................................................................................... 83

Figure 52: 900,000 Michaels Options Transferred ..................................................................... 85

Figure 53: Sterling Commerce Gain on Sale of Stock ................................................................ 86

Figure 54: Sam Wyly 2000 Schedule B ..................................................................................... 86

Figure 55: Sam Wyly 2000 Form 1040 ...................................................................................... 88

Figure 56: Roaring Creek 1999 Trial Balance ........................................................................... 90

Figure 57: Charles Wyly 1999 Schedule E ................................................................................ 91

Figure 58: Charles and CarolineWyly 1999 Schedule D ........................................................... 92

Figure 59: Charles and Caroline Wyly 1999 Form 1040 ........................................................... 94

Figure 60: Quayle Ltd. 2005 Profit and Loss ............................................................................. 95

Figure 61: Charles Wyly 2004 Schedule E ................................................................................ 96

Figure 62: Charles Wyly 2004 Form 1040 ................................................................................. 97

## LIST OF TABLES

Table 1: Affiliated Offshore Entities of Sam and Charles Wyly ................................................ 14

## LIST OF APPENDICES

Appendix A: Curriculum Vitae of Bruce G. Dubinsky

Appendix B: Documents Considered

Appendix C: Tax Filing Examples

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

## I. Introduction

1. In April 2015, I was retained by the U.S. Department of Justice, Tax Division on behalf of their client, the Internal Revenue Service ("IRS"), to analyze and render expert opinions relating to a foreign tax avoidance scheme involving a series of complex financial transactions using dozens of offshore controlled entities implemented by Samuel E. Wyly ("Sam Wyly") and Charles Wyly (together, the "Wyly Brothers") from the period of 1992-2013 ("Relevant Time Period"). I was also asked to analyze the federal income tax returns and their accompanying forms and schedules filed by the Wyly Brothers with the IRS and opine as to the effect of the manner in which the Wylys reported (or omitted reporting) the transactions related to the foreign tax scheme on their income tax returns during the Relevant Time Period (in aggregate, the "Assignment").[1]

### A. Expert Background and Qualifications

2. I am the leader of Global Business Development & Strategy and a Managing Director in the Disputes & Investigations practice at Duff & Phelps, LLC[2] ("D&P"). My practice at D&P places special emphasis on providing forensic accounting and dispute analysis services to law firms litigating commercial cases, as well as corporations, governmental agencies, and law enforcement bodies in a variety of situations.

3. I earned a Bachelor's of Science Degree in Accounting from the University of Maryland, College Park, MD and a Master's in Taxation ("MST") from Georgetown University, Washington, D.C. I am a Certified Public Accountant ("CPA"), Certified Fraud Examiner ("CFE"), Certified Valuation Analyst ("CVA"), Certified in Financial Forensics ("CFF"), and a Master Analyst in Financial Forensics ("MAFF"), all in good standing, and was formerly licensed as a Registered Investment Advisor Representative.

---

[1] As used herein, with the exception of my qualifications, "I" and "me" mean myself personally or those Duff & Phelps, LLC employees working under my supervision.

[2] The conclusions and expert opinions rendered by me in this report are solely mine and not those of Duff & Phelps, LLC or any other professional working at Duff & Phelps, LLC or their related companies.

4.   I have been qualified and testified as an expert in various federal and state courts as an expert witness in the areas of forensic accounting and fraud investigations; bankruptcy; solvency; commercial damages; business valuations; investment practice and theory; Securities and Exchange ("SEC") matters, federal and state income taxation; abusive tax shelters; accounting ethics and standards; accounting malpractice; investment advisory issues; and a variety of other accounting, financial and tax matters.  Additionally, I have professional experience in the area of computer forensics and related computer investigations and have undergone training as a part of the fraud and forensic training as a CFE, a CFF, and a MAFF.

5.   A current and accurate copy of my curriculum vitae and listing of trial testimonies are attached hereto as Appendix A.

6.   The opinions and conclusions expressed herein are based upon my understanding of the facts in this case, as well as information gained during the course of D&P's performance of the Assignment.  Further, I relied upon my education, training and more than 32 years of professional experience, and my opinions and conclusions herein are stated to a reasonable degree of accounting certainty.[3]  The opinions and conclusions contained herein are solely mine and not those of D&P or any other professionals at the firm.

7.   As litigation service engagements performed by CPAs are deemed to be consulting services as defined by the American Institute of Certified Public Accountants ("AICPA"), my work on the Assignment was performed in accordance with the applicable standards as set forth in the Standards for Consulting Services established by the AICPA.  Further, as a result of having other relevant professional certifications, as more fully described herein, I adhered to the applicable standards of those governing organizations in the performance of my work in this matter and the rendering of these opinions.

---

[3] I have defined a "Reasonable Degree of Accounting Certainty" to mean that level of certainty that would likely be attained by a group of my professional peers, with the same or similar education, training and experience, given access to the same information, in reaching the same or similar conclusions.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

8.  This report is based upon the information available to me and reviewed to date. Federal Rule of Civil Procedure ("FRCP") 26 requires me to update this Report upon learning additional information that may impact the findings, conclusions or opinions stated herein. I specifically reserve the right to supplement this Report as necessary to comply with FRCP 26, and reserve the right to respond to any additional information obtained through discovery or issues raised by experts retained by the Debtors in this matter, if any. In addition, I reserve the right to prepare additional exhibits, charts, graphs, tables, demonstratives, and diagrams to summarize or support the opinions and analyses set forth in this Report.

9.  D&P is compensated for my time and the time of D&P's professionals expended on this matter under my direction and supervision at hourly rates ranging from $475 to $750 per hour. My hourly rate is $750 per hour. Compensation paid to D&P is not contingent in any way upon the outcome of this Case.

### B.   Summary of Scope and Methodology

10.  In the course of my analysis, I requested and was provided access to information including, but not limited to:

- Documents provided upon my request by Counsel;
- Documents produced by the Debtors in this matter;
- Deposition transcripts for persons deposed in this matter; and
- Trial transcripts, deposition transcripts, exhibits, and demonstratives produced in the course of the trial of the Wyly Brothers brought by the SEC in the Southern District of New York (the "SEC Case").[4]

11.  In addition to the information to which we were provided access, we obtained additional information where necessary to our work herein from publicly available sources.

12.  The work conducted by D&P in connection with the Assignment was planned, supervised, and staffed in accordance with applicable professional standards.

---

[4] *Securities and Exchange Commission v. Samuel Wyly, et al.*, 10-cv-5760 (SAS).

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

13. I conducted a detailed inspection and review of voluminous documents from a variety of sources including emails, tax returns, financial statements, deposition transcripts and exhibits, and publicly available documents. The materials I reviewed and considered in forming the opinions and conclusions made in this expert report include documents and other data referenced herein and listed attached hereto as Appendix B.[5]

### C.   Summary of Opinions

14. Over a two-decade period, Sam and Charles Wyly implemented a tax scheme that was designed to avoid detection by the IRS and to avoid paying hundreds of millions of dollars in taxes to the U.S. Treasury. Foreign trusts were established, foreign corporations were formed, trustees were hired, trust protectors were put in place, and highly valuable personally owned investment assets were moved offshore; all with the common goal of moving the Wylys' income offshore and then hiding it from U.S. tax authorities to avoid paying their proper U.S. tax obligations. Based on my training, education and experience, and the results of my analysis of the documents and data I have reviewed, I have concluded that:

- The Wyly Brothers established and controlled an elaborately complex network of numerous offshore entities in known tax havens that engaged in a series of financial transactions designed to avoid detection and taxation by the U.S. taxing authorities;

- The Wyly Brothers' transactions involving transfers of stock, options, warrants, and other property to their offshore controlled entities lacked true economic substance and were structured in a manner to avoid paying U.S. individual income and gift taxes; and

- The Wyly Brothers' original U.S. federal income tax filings from 1992 – 2013 were false and misleading and concealed the true nature and substance of the transfer of stock options, warrants, and stock, and other transactions described above.

---

[5] *See* discussion *infra* regarding scope of documentation reviewed.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

## II.    Background[6]

### A.    Overview of Key Individuals

#### 1.    Sam Wyly

15.    Sam Wyly was the leader of various Wyly family businesses.[7] He assisted in creating and investing in various companies that went public such as Michaels Stores and Sterling Software which spun off Sterling Commerce. In addition, Sam Wyly (along with his brother Charles, *see* discussion on Charles Wyly *infra*) created numerous offshore trusts and entities, to which he transferred stock options and warrants of his many public company holdings.  At various times he served on the board of directors of Sterling Software, Sterling Commerce, Michaels Stores, and Scottish Re.[8]  Sam has been married to Cheryl Wyly since 1994.

16.    The SEC initiated an investigation against the Wylys in 2005 surrounding alleged securities violations under U.S. securities laws and that investigation ultimately led to the case going to trial in 2014.[9]  There were many findings issued by the court as a result of the trial notably among them that offshore trusts established and maintained by the Wylys were in fact controlled by them and as such, were deemed to be grantor trusts for purposes of U.S. income tax and gift tax rules.[10]  Shortly after the court in the SEC Case levied a monetary judgment, Sam Wyly filed Chapter 11 bankruptcy.[11]  The IRS subsequently filed its proof

---

[6] My understanding of the factual background is based upon various sources of information including, but not limited to, pleadings in this case, deposition transcripts, documents produced by the parties in this matter, and publicly available documents.  This recitation of the factual background serves to provide only a background summary of the facts as I understand them.  It is my understanding that the factual foundation and predicates for the facts set forth in this section of my report will be laid by fact witnesses at trial and through other evidentiary materials and will form the factual predicate for any opinions contained herein that are based upon such facts.

[7] April 22, 2014 Trial Transcript from SEC Case – Vol. Day 10 1629:17-25.

[8] SEC Case Stipulation of Undisputed Facts at 1 and 2.

[9] The New York Times, *In S.E.C. Fraud Suit, Texas Brothers Stand Firm*, http://www.nytimes.com/2010/08/23/business/23wyly.html?_r=0 (last visited Nov. 4, 2015).

[10] 2014 U.S. Dist. LEXIS 135671 ("SEC Case Opinion") at 15 and 28; Reuters, *Texas Wyly Brothers Must Pay $299 Million in SEC Fraud Case: Judge*, http://www.reuters.com/article/2015/02/27/sec-wyly-idUSL1N0W03Y820150227 (last visited Nov. 9, 2015).

[11] SEC Case Opinion at 33; Reuters, *Texas Wyly Brothers Must Pay $299 Million in SEC Fraud Case: Judge*, http://www.reuters.com/article/2015/02/27/sec-wyly-idUSL1N0W03Y820150227 (last visited Nov. 9, 2015).

**13**

of claim against Sam Wyly in April 2015 for $2,038,395,611 representing back taxes, interest, and penalties.[12]

### 2.   Charles and Caroline D. Wyly

17.   Charles Wyly was involved in many of the same business ventures in which his brother, Sam Wyly, was also engaged. [13] As did his brother Sam, Charles Wyly similarly created numerous offshore trusts and entities, to which he transferred stock options and warrants of his many public company holdings. At various times he served on the board of directors of Sterling Software, Sterling Commerce, Michaels Stores, and Scottish Re.[14]

18.   The SEC initiated an investigation against the Wylys in 2005 surrounding alleged securities violations under U.S. securities laws and that investigation ultimately led to the case going to trial (*see* discussion *supra* at para. 16*).*[15] Charles Wyly died in a car accident in 2011.[16] A large monetary judgment was levied by the court in the SEC case.[17] Shortly after the judgment, Caroline D. Wyly, the widow of Charles Wyly, filed Chapter 11 bankruptcy.[18] The IRS subsequently filed its proof of claim against Caroline D. Wyly in April 2015 for $1,239,665,801 representing back taxes, interest, and penalties.[19]

### 3.   Evan Wyly

19.   Evan Wyly, son of Sam Wyly, joined the family business full-time in 1990 to assist in managing the family business portfolio, a portion of which eventually became known as

---

[12] IRS Proof of Claim for Samuel Evans Wyly, Case 14-35043-BJH11.
[13] April 22, 2014 Trial Transcript – Vol. Day 10 1629:17-25.
[14] SEC Case Stipulation of Undisputed Facts at 2.

[15] The New York Times, *In S.E.C. Fraud Suit, Texas Brothers Stand Firm*,
http://www.nytimes.com/2010/08/23/business/23wyly.html?_r=0 (last visited Nov. 4, 2015); SEC Case.
[16] The New York Times, *Charles Wyly Dies at 77; Amassed a Fortune With Brother*,
http://www.nytimes.com/2011/08/09/business/charles-wyly-dies-at-77-amassed-a-fortune-with-brother.html (last visited Nov 05, 2015.

[17] SEC Case Opinion at 33.
[18] Reuters, *Texas Wyly Brothers Must Pay $299 Million in SEC Fraud Case: Judge*,
http://www.reuters.com/article/2015/02/27/sec-wyly-idUSL1N0W03Y820150227 (last visited Nov. 9, 2015).
[19] IRS Proof of Claim for Caroline Wyly, Case 14-35074- BJH 11.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

Maverick Capital.[20] At various times he served on the board of directors of Sterling
Commerce, Sterling Software and Michaels Stores, and participated in the management of
Green Mountain Energy and Maverick Capital.[21]

### 4.    Donald Miller, Jr.

20.    Donald Miller, Jr. ("Donald Miller"), son-in-law of Charles and Caroline Wyly, joined the
family enterprise as early as 1982.[22] Shortly thereafter, he was employed at Michaels
Stores, and rose from lower level management to vice president of market development.[23]
He served on the board of directors at Michaels Stores starting around 1992.[24] Donald
Miller also served on the board of Sterling Software starting in 1993.[25] When Michaels
Stores was sold, he began working in the family office taking over the work of Charles
Wyly, overseeing various investments and the management of the office.[26]

### 5.    Michael French

21.    Michael French began working for the Wyly family in the early 1970's when he was a
securities lawyer at Jackson Walker.[27] In 1992, he became a consultant at Jackson Walker
and the personal lawyer of the Wyly family, serving as a consultant to Sterling Software
and Michaels Stores.[28] Beginning in 1995, he ceased consulting for Jackson Walker and
began consulting at Jones Day, where the Wyly family transferred their legal work. At
various times he served on the board of directors of Sterling Software, Michaels Stores, and
Scottish Re.[29] He was also the chief financial officer and president of Scottish Re.[30] French
served as a protector of the Wylys' Isle of Man ("IOM") trusts from their creation until

---

[20] May 1, 2014 Trial Transcript from SEC Case– Vol. Day 15 2644:7-25.
[21] May 1, 2014 Trial Transcript from SEC Case –; May 2, 2014 Trial Transcript – Vol. Day 16 2722:14-22; 2775:9-14; 2678:3-14.
[22] May 1, 2014 Trial Transcript from SEC Case – Vol. Day 15 2613:16-22.
[23] May 1, 2014 Trial Transcript from SEC Case – Vol. Day 15 2615:4-22.
[24] May 1, 2014 Trial Transcript from SEC Case – Vol. Day 15 2615:4-22 and 2617:14-16.
[25] May 1, 2014 Trial Transcript from SEC Case – Vol. Day 15 2617:11-19.
[26] May 1, 2014 Trial Transcript from SEC Case – Vol. Day 15 2618:18-25 and 2619:1-6.
[27] April 22, 2014 Trial Transcript from SEC Case – Vol. Day 10  1648:21-25.
[28] April 22, 2014 Trial Transcript from SEC Case – Vol. Day 10  1651:21-23 and 1652:3-5 and 1697:8-13.
[29] SEC Case Stipulation of Undisputed Facts at 2.
[30] SEC Case Stipulation of Undisputed Facts at 2.

7

**15**

shortly after French and the Wylys agreed to part ways in late 2000, at which point he was no longer the family lawyer or protector of the offshore trusts. [31]

22.   Michael French, who was initially a defendant in the 2005 SEC case, entered into a settlement agreement with the SEC prior to the trial.[32]

### 6.   Sharyl Robertson

23.   Sharyl Robertson joined the Wyly family office as a bookkeeper in the late 1970's. She worked for the Wylys for 20 years, working her way up to chief financial officer of the family office.[33] Upon leaving the Wyly family office, Sharyl Robertson became the chief financial officer of Maverick Capital and continued in that capacity for 15 years.[34] She also served as a protector of the IOM trusts from their creation until November 2004.[35]

### 7.   Michelle Boucher

24.   Michelle Boucher worked at Meespierson, a trust company in the Cayman Islands, as the client accountant responsible for the Maverick Fund, the first hedge fund founded by Charles and Sam Wyly in 1990.[36] She was approached by Sharyl Robertson around 1995 for a new position as chief financial officer of the Irish Trust Company (a Cayman Island entity established by the Wyly Brothers to provide administrative services to their various offshore trusts and companies). Michelle Boucher continued in this position until 2010, when her role changed to consultant. Throughout her time at Irish Trust Company, Michelle Boucher reported to Sharyl Robertson, Michael French, and later Donald Miller,

---

[31] SEC Case Stipulation of Undisputed Facts at 4 and 9. A "protector" is a person or group of people appointed to exercise powers affecting a trust and the interest of the beneficiaries. *See* "Are Trust Protectors Good or Bad?" LexisNexis Legal Newsroom Estate and Elder Law at: http://www.lexisnexis.com/legalnewsroom/estate-elder/b/estate-elder-blog/archive/2012/04/27/are-trust-protectors-good-or-bad.aspx (last accessed November 3, 2015).
[32] April 22, 2014 Trial Transcript from SEC Case – Vol. Day 10 1692:2-12.
[33] April 7, 2014 Trial Transcript from SEC Case – Vol. Day 1 148:7-24.
[34] April 7, 2014 Trial Transcript from SEC Case – Vol. Day 1 152:17-19 and 153:10-15.
[35] April 7, 2014 Trial Transcript from SEC Case – Vol. Day 1 178:14-21; SEC Case Stipulation of Undisputed Facts at 4 and 5.
[36] October 8, 2012 Deposition of Michelle Boucher 12:1-22. U.S. Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs; *Tax Haven Abuses: The Enablers, The Tools and Secrecy*, at 119.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

and Evan Wyly.[37] She became a protector of the IOM trusts in 2001.[38] She also served as a conduit, the person who communicated the Wylys' recommendations, between the protectors, Sharyl Robertson and Michael French, and the various IOM trustees.[39]

### 8.    Keeley Hennington

25.    Keeley Hennington assumed the role of tax manager of the Wyly family office in 1999.[40] Today, she is the chief financial officer of the Wyly family office, taking over the responsibilities of Sharyl Robertson. Presently she reports to Donald Miller, and Evan Wyly. While Keeley Hennington was never officially named a trust protector, she routinely communicated the Wylys' recommendations directly to Michelle Boucher and the trustees.[41]

### 9.    Louis Schaufele

26.    Louis Schaufele, a U.S. based investment broker, was a key facilitator of the Wyly enterprise's offshore tax scheme.  Among other activities, Louis Schaufele opened and administered U.S. securities accounts for the Wyly offshore entities, assisted in the exercise of Wyly-owned stock options, bought and sold U.S. securities on behalf of the Wylys, and helped the Wylys obtain loans.[42] While working for the Wylys, Louis Schaufele changed companies at which he worked three times, each time taking his relationship with the Wylys with him. From 1992 until 1995 he worked for Credit Suisse First Boston ("CSFB"), from 1995 until early 2002, he worked for Lehman Brothers, and finally from 2002 until 2004 he worked for Bank of America.[43]

---

[37] April 16, 2014 Trial Transcript from SEC Case – Vol. Day 6 987:4-7 and 988:3-5.

[38] April 16, 2014 Trial Transcript from SEC Case – Vol. Day 6 988:17-21

[39] April 7, 2014 Trial Transcript from SEC Case – Vol. Day 1 193:21-25 and 194:1-15.

[40] April 17, 2014 Trial Transcript from SEC Case – Vol. Day 7 1283:8-25 and 1284:1-7.

[41] April 17, 2014 Trial Transcript from SEC Case – Vol. Day 7 1296:17-25, 1297:1-24 and 1302:21-24.

[42] U.S. Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs; *Tax Haven Abuses: The Enablers, The Tools and Secrecy*, at 125.

[43] *Id*. at 125 and 203.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

### 10.  David Tedder

27.  David Tedder, a lawyer, was a partner at Pratter, Tedder and Graves and introduced the
Wylys to the offshore trust tax scheme through his presentation entitled, "Asset & Lawsuit
Protection Symposium" in June 1991.[44]  Tedder assisted the Wylys in setting up their 1992
trusts in the IOM using "non-grantor" trusts which were structured, at least on paper, to be
controlled through an "independent" trustee, rather than the Wylys.[45] The structure was
also built around the concept of being able to defer the Wylys' U.S. tax liabilities through
the use of private annuities.[46]  In 2005, Tedder was convicted and served a five year
sentence for "using his law license to help offshore gambling businesses conceal their
identities and income," for "conspiring to defraud the United Sates," and three counts of
money laundering.[47]

### B.  Brief Overview of the Transactions

28.  Beginning in approximately 1992, the Wyly Brothers entered into a series of orchestrated
transactions whereby they transferred hundreds of millions of dollars of income-producing
assets (options, warrants, *etc.*) that were originally owned by them personally to numerous
offshore foreign controlled entities.  In particular, the Wyly Brothers transferred millions of
dollars in U.S. stock options to offshore trusts, which were initially delivered in exchange
for future private annuity payments, but by 1998 were exchanged for cash.  The offshore
trusts were managed by trust companies and transaction "recommendations" by the Wylys
were provided to the trust companies through several "protectors."  While cloaked as mere
"recommendations" in fact, these directives were always followed (*see* discussion *infra* and
examples).

29.  The Wyly Brothers allege that the majority of the trusts to which the U.S. stock options
were transferred were non-grantor trusts and, as such, the Wyly Brothers did not have

---

[44] Memo from Shari Robertson dated June 12, 1991, SEC Case PX 0008 at SECI00150278.
[45] David Tedder Memo, SWYLY004776 - SWYLY004791 at SWYLY004787.
[46] David Tedder Memo, SWYLY004776 - SWYLY004791 at SWYLY004789.
[47] *United States v. David Hampton Tedder*, 403 F.3d 836 (7th Cir. 2005).

control over the funds.[48]  As noted above, the Wylys assert that they simply provided "recommendations" to the trusts, but that the ultimate decision on actions taken by the trusts was beyond the Wylys' control.  As a result, when the stock options were exercised and the related underlying stock was sold over the more than two-decade period beginning in 1992, a significant portion of the income that was taxable personally to the Wyly Brothers was never reported and taxed by the U.S.  Despite not paying taxes on this income, these funds were then brought back into the U.S. by the Wylys through various means including their purchase of personal assets such as art, jewelry and real estate, as well as through a variety of investment vehicles.

30.  In August 2006, hearings were held by the U.S. Senate Permanent Subcommittee on Investigations, which also released a Minority and Majority Staff Report titled "Tax Haven Abuses: The Enablers, the Tools, and Secrecy" ("Subcommittee Report").[49]  Within the Subcommittee Report, many of the Wyly transactions I examined and described in my Report are explained in detail therein.

31.  Nearly four years later, in July 2010, the U.S. SEC brought a civil enforcement legal action against the Wylys, alleging "ten securities violations arising from a scheme in which the Wylys established a group of offshore trusts and subsidiary entities in the IOM, used those offshore entities to trade in shares of four public companies (the "Issuers") on whose boards the Wylys sat, and failed to properly disclose their beneficial ownership of that stock."[50]  This matter went to trial in the summer of 2014.  Ultimately, Judge Scheindlin (U.S. District Court for the Southern District of New York) found in favor of the SEC and concluded that Sam and Charles Wyly must disgorge, in aggregate, approximately $200 million and pay prejudgment interest resulting in total payments of nearly $300 million

---

[48] A grantor trust is used by the IRS to describe any trust over which the grantor or other owner retains the power to control or direct the trust's income or assets.  If the grantor retains control over or benefits from the trust, the income from the trust will be taxed to the grantor rather than to the trust. IRS Abusive Trust Tax Evasion Schemes-Questions and Answers at: https://www.irs.gov/Businesses/Small-Businesses-&-Self-Employed/Abusive-Trust-Tax-Evasion-Schemes-Questions-and-Answers (last accessed Oct. 28, 2015). *See also*, IRC § 671, 672, and 679.
[49] U.S. Senate Permanent Subcommittee on Investigations: "Tax Haven Abuses: The Enables, the Tools, and Secrecy," August 1, 2006.
[50] SEC Case Opinion at 1-2.



related directly to the securities violations.[51] As discussed *supra*, the court also found that the offshore trusts established by the Wyly Brothers were in fact grantor trusts.[52]

32.  In October 2014, Sam Wyly and Caroline D. Wyly, Charles Wyly's widow, filed for Chapter 11 bankruptcy.[53]

33.  In April 2015, the IRS filed proofs of claims against Sam Wyly and Caroline D. Wyly in U.S. Bankruptcy Court in Dallas claiming over $3 billion in back taxes, penalties, and interest on the income generated from the offshore trusts over the last two decades.[54]

34.  In this case, on August 24, 2015, Judge Houser of the U.S. Bankruptcy Court in Dallas found in favor of the U.S. and ruled that it was entitled to partial summary judgment as it pertains to the "specific enumerated findings in the Disgorgement Opinion relevant to the tax status of the Offshore Trusts" rendered by the U.S. district court in the SEC case. The bankruptcy court applied the doctrine of *collateral estoppel* as to the findings reached in the SEC Case that the foreign trusts were in fact grantor trusts, and as a result has concluded that the Wylys cannot re-litigate this issue in the present case.[55]

**III.  Expert Opinion #1: The Wyly Brothers established and controlled an elaborately complex network of numerous offshore entities in known tax havens that engaged in a series of financial transactions designed to avoid detection and taxation by the U.S. taxing authorities.[56]**

35.  As discussed above, the Wyly Brothers, through a series of self-initiated transactions, avoided tax payments to the U.S. government by hiding personal income generated through various transactions involving stock options and warrants in offshore foreign trusts. While the bankruptcy court, as a result of its *collateral estoppel* ruling, has left standing the

---

[51] *Id.* at 33.
[52] *Id.* at 15 and 28.
[53] Update 2-Texas investor Sam Wyly files for bankruptcy after losing SEC fraud case," Reuters at: http://www.reuters.com/article/2014/10/20/sec-wyly-idUSL2N0SF1WI20141020 (last accessed October 22, 2015).
[54] IRS Proof of Claim for Samuel Evans Wyly, Case 14-35043-BJH11; IRS Proof of Claim for Caroline Wyly, Case 14-35074- BJH 11.
[55] Memorandum Opinion and Order in the matter of *In re: Samuel E. Wyly, et al.*, Case No 14-35043-BHJ, August 24, 2015 and IRS Brief, Ex. 2 at 9. All discussion and opinions related to the offshore trusts are assumed herein to be "grantor" trusts despite the Wylys having titled them as "non-grantor" trusts.
[56] SEC Case PX 0008 at SECI00150278.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

findings in the SEC Case that the Wylys' offshore trusts were, in fact, grantor trusts (*i.e.*, as such all items of income are taxable to the Wylys personally), it is necessary to my conclusions in this report to explain and detail the sheer magnitude and complexity of the offshore scheme used by the Wyly Brothers.  The staggering number of entities, the layers of "protectors" and "trustees" and the overall complexity of the structures were purposefully designed in order to hide the Wylys' income from the U.S. taxing authorities. In fact, as will be described below, both Sam and Charles Wyly followed the same pattern of entity establishment, in the same locations, with the same structure of transactions, which is further evidence that this was a carefully crafted scheme to avoid taxes rather than for estate and/or asset protection as has been argued by the Wylys.  This section of my report, therefore, will provide details as to how those stock options were transferred offshore and how, through various means, the Wyly Brothers knowingly made use of those untaxed funds and brought them back to the U.S. through a variety of transactions.

### A.    Trusts and Foreign Corporations

36.    Collectively, beginning in 1992, the Wyly Brothers established 17 offshore trusts and 41 affiliated foreign corporations owned by these trusts.  A summary of these entities is provided in Table 1, below:

13



*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

## Table 1: Affiliated Offshore Entities of Sam and Charles Wyly[57]

| Sam Wyly | | Charles Wyly | |
|---|---|---|---|
| **Trust** | **Affiliated Offshore Entities** | **Trust** | **Affiliated Offshore Entities** |
| Bulldog Non-Grantor Trust | East Baton Rouge Ltd. (IOM), East Baton Rouge Ltd. (NEV), East Carroll Ltd. (IOM), East Carroll Ltd. (NEV), Locke Ltd. (IOM), Moberly Ltd. (IOM), Morehouse Ltd. (IOM), Morehouse Ltd. (NEV), Richland Ltd. (IOM), Richland Ltd. (NEV), Tensas Ltd. (IOM), Tensas Ltd. (NEV), West Carroll Ltd. (IOM), West Carroll Ltd. (NEV) | Pitkin Non-Grantor Trust | Roaring Creek Ltd. (IOM), Roaring Creek Ltd. (NEV), Roaring Fork Ltd. (IOM), Roaring Fork Ltd. (NEV), Little Woody Ltd. (IOM), Little Woody Ltd. (NEV), Maroon Ltd. AKA Rugosa Ltd. (IOM), Maroon Ltd. AKA Rugosa Ltd. (NEV) |
| Tallulah International Trust | | Woody International Trust | |
| Delhi Internation Trust | Greenbriar Ltd. (IOM) | Lincoln Creek Trust | |
| Lake providence International Trust | Sarnia Investments Ltd. (IOM) | Maroon Creek Trust | |
| Plaquemines Trust | East Baton Rouge Ltd. (IOM), East Baton Rouge Ltd. (NEV) | Castle Creek International Trust | Quayle Ltd. (IOM) |
| LaFourche Trust | Relish Ltd. (IOM), Devotion Ltd. (IOM) | Red Mountain Trust | Elegance Ltd. (IOM) |
| Bessie Trust | Newgale Ltd. (IOM), Yurta Faf Ltd. (IOM), Cottonwood I Ltd. (IOM), Cottonwood II Ltd. (IOM), Mi Casa Ltd. (IOM), Audubon Assets Ltd. AKA Fugue Ltd. (IOM), Rosemary's Circle R Ranch Ltd. (IOM), Spittin Lion Ltd. (IOM), Balch LLC (Cayman), Bubba LLC (Cayman), FloFlo LLC (Cayman), Katy LLC (Cayman), Orange LLC (Cayman), Pops LLC (Cayman) | Tyler Trust | Souliena Ltd. (IOM, Elysium Ltd. (IOM), Gorsemoor Ltd. (IOM), Jordan Way Ltd. (IOM), Little Woody Creek Ranch, Ltd. (IOM), Ramona Ltd. (IOM), Stargate Farms Ltd. (IOM) |
| Sitting Bull Trust | | | |
| Arlington Trust | | | |
| Crazy Horse Trust | | | |

---

[57] SEC Case Stipulation of Undisputed Facts. Attachment B; Subcommittee Report, Appendix 1. I note that the Bulldog Trust transferred East Carroll and East Baton Rouge to the Plaquemines Trust on April 5, 1995.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

### B.    Timeline

37.    As noted above and as will be described in greater detail below, the Wyly Brothers moved highly valuable personal investments offshore during three distinct time periods.  These investments (*i.e.,* the options and warrants) had huge inherent "in-the-money" built-in tax gains associated with them.  The initial informational meetings with David Tedder and the first transfer of stock options to offshore entities occurred from mid-1991 through December 1994. (*See* Figure 1).

**Figure 1: Timeline of Wyly Offshore Tax Structure June 1991 – December 1994**



38.    The second wave of stock options transfers occurred largely in 1996, during which the Wyly Brothers, in aggregate, transferred nearly 1,350,000 Michaels Stores options, 2,650,000 Sterling Software options, and 4,600,000 Sterling Commerce options to offshore trusts. (*See* Figure 2).

15

**23**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 2: Timeline of Wyly Offshore Tax Structure 1995 - 1997**



39.  In addition to the transfer of an additional 2,625,000 Sterling Software options and 712,500
Sterling Commerce options to offshore trusts in 1999, the Wyly Brothers established
several key offshore entities beginning in 1998, such as Security Capital Trust and Security
Capital Ltd., which served as the conduit that facilitated the Wyly Brothers transferring
much of their income back to the U.S. without paying U.S. taxes.  (*See* Figure 3).

**Figure 3: Timeline of Wyly Offshore Tax Structure 1998 - 2002**



**24**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

### C.    Transactions

#### 1.    Sources of Funds

40.  The first step in the Wyly Brothers' scheme was moving highly valuable personal investments offshore.  As is shown in the timelines above, the U.S. personal income that would be recognized by the Wyly Brothers resulting from the exercise of their stock options and the simultaneous or subsequent sale of the underlying stock acquired as a result of the exercise of the options, was purportedly moved offshore as a result of the stock options being "assigned" to the foreign entities.  These transfers occurred in essentially three distinct periods: 1992, 1995-1996, and 1998-2002.  While the first two periods transferred options in exchange for private annuity agreements (which purportedly deferred the recognition of any U.S. tax liabilities), the third period of transfers were effectuated in exchange for cash.

#### a.    1992 Transactions

41.  Using information received from David Tedder, in early 1992, the Wyly Brothers each established offshore trusts in the IOM, which in turn, established numerous offshore subsidiaries.[58] (Figure 4 depicts those entities established by Sam Wyly; Figure 5 depicts those entities established by Charles Wyly).

---

[58] Memo from Shari Robertson dated June 12, 1991, SEC Case PX 0008 at SECI00150278.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 4: Sam Wyly 1992 IOM Trusts**



**Figure 5: Charles Wyly 1992 IOM Trusts**



*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

42. In addition to the offshore entities, the Wyly Brothers established ten Nevada corporations in early 1992.[59] Each of the Nevada corporations was titled with a name that was identical to the name of one of the newly formed offshore entities, which likely helped to avoid detection from the U.S. taxing authorities. For example, East Baton Rouge Ltd. in Nevada matched East Baton Rouge Ltd. in the IOM. (*See* Figure 6 and Figure 7).

**Figure 6: Sam Wyly Formation of 1992 Nevada Entities**



---

[59] East Baton Rouge Limited Articles of Incorporation  JWLLP- SEC02462- JWLLP- SEC02465; East Carroll Limited Articles of Incorporation  JWLLP- SEC02615- JWLLP- SEC02617; Little Woody Limited Articles of Incorporation JWLLP- SEC03041 - JWLLP- SEC03043; Maroon Limited Articles of Incorporation JWLLP- SEC03173 - JWLLP- SEC03175; Morehouse Limited Articles of Incorporation JWLLP- SEC02685 - JWLLP- SEC02686; Richland Limited Articles of Incorporation JWLLP- SEC02835 - JWLLP- SEC02837; Roaring Creek Limited Articles of Incorporation JWLLP- SEC02905 - JWLLP- SEC02907; Roaring Fork Limited Articles of Incorporation JWLLP- SEC03007 - JWLLP- SEC03009; Tensas Limited Articles of Incorporation JWLLP- SEC02527 -  Incorporation JWLLP- SEC02529; West Carroll Limited Articles of Incorporation JWLLP- SEC02760 - JWLLP- SEC02762; Stipulation of Undisputed Facts at 5.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 7: Charles Wyly Formation of 1992 Nevada Entities**



43.  Shortly after the Nevada entities were established, Sam Wyly transferred to these entities 485,000 call options and 100,000 warrants of Michaels Stores in addition to 667,000 call

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

options and 644,725 warrants of Sterling Software.[60]  In return, Sam Wyly received six

private annuity agreements that were valued at the time at $26,871,153.[61] (*See* Figure 8.)

**Figure 8: Sam Wyly 1992 Funding of Nevada Entities**



---

[60] JWLLP-SEC02477 – JWLLP-SEC02524 ("East Baton Rouge Limited 1992 Annuity Package") at JWLLP-SEC0249, JWLLP-SEC02500; JWLLP-SEC02647 – JWLLP-SEC02682 ("East Carrol Limited 1992 Annuity Package") at JWLLP-SEC02661; JWLLP-SEC02717 – JWLLP-SEC02757 ("Morehouse Limited 1992 Annuity Package") at JWLLP-SEC02737; JWLLP-SEC02867 – JWLLP-SEC02902 ("Richland Limited 1992 Annuity Package") at JWLLP-SEC02887; JWLLP-SEC02558 – JWLLP-SEC02612 ("Tensas Limited 1992 Annuity Package") at JWLLP-SEC02578, JWLLP-SEC02587; JWLLP-SEC02792 – JWLLP-SEC02832 ("West Carroll 1992 Annuity Package") at JWLLP-SEC02812; Stipulation of Undisputed Facts, Attachment B at 1 – 5.

[61] East Baton Rouge Limited 1992 Annuity Package at JWLLP-SEC02480; East Carrol Limited 1992 Annuity Package at JWLLP-SEC02650; Morehouse Limited 1992 Annuity Package at JWLLP-SEC02722; Richland Limited 1992 Annuity Package at JWLLP-SEC02873; Tensas Limited 1992 Annuity Package at JWLLP-SEC02563; West Carroll 1992 Annuity Package at JWLLP-SEC02797. For purposes of my opinions in this matter, I have accepted the Wylys' valuation values merely for illustrative and discussion purposes.  Accordingly, I am not opining one way or the other on the accuracy of the valuations described in my report.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

44.   Similarly, Charles Wyly transferred to the Nevada entities 375,000 call options of Michaels Stores and 333,000 call options and 338,864 warrants of Sterling Software.[62] In exchange, Charles Wyly received six private annuity agreements that were valued at the time at $15,091,664.[63]  (*See* Figure 9.)

---

[62] JWLLP- SEC02937- JWLLP- SEC03004 ("Roaring Creek Limited 1992 Annuity Package"), at JWLLP- SEC02957, JWLLP- SEC02965, JWLLP- SEC02977, 2988; JWLLP- SEC03205- JWLLP- SEC03266 ("Maroon Limited (Rugosa) 1992 Annuity Package")  at JWLLP- SEC03227, JWLLP- SEC03239, JWLLP- SEC03250; JWLLP- SEC03073- JWLLP- SEC03170 ("Little Woody Limited 1992 Annuity Package") at JWLLP- SEC03087, JWLLP- SEC03108, JWLLP- SEC03116, JWLLP- SEC03117, JWLLP- SEC03142, JWLLP- SEC03152; JWLLP- SEC02377- JWLLP- SEC02442 ("Roaring Fork Limited 1992 Annuity Package") at JWLLP- SEC02398; Stipulation of Undisputed Facts, Exhibit B at 6 – 8.
[63] Roaring Creek Limited 1992 Annuity Package at JWLLP- SEC02942; Maroon Limited (Rugosa) 1992 Annuity Package at JWLLP- SEC03208; Little Woody Limited 1992 Annuity Package at JWLLP- SEC03077; Roaring Fork Limited 1992 Annuity Package at JWLLP- SEC02383.

22

**30**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 9: Charles Wyly Chart 1992  Funding of Nevada Entities**



45.  By the end of April 1992, the Nevada corporations established by Sam and Charles Wyly
     assigned the private annuity agreement liabilities and the contributed options and warrants

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

to the IOM corporation bearing the same name as the Nevada corporation.[64]    (*See* Figure 10 and Figure 11.)

### Figure 10: Sam Wyly 1992 Funding of IOM Entities



---

[64] East Baton Rouge Limited 1992 Annuity Package at JWLLP-SEC02506); East Carrol Limited 1992 Annuity Package at JWLLP-SEC02674; Morehouse Limited 1992 Annuity Package at JWLLP-SEC02749; Richland Limited 1992 Annuity Package at JWLLP-SEC02894; Tensas Limited 1992 Annuity Package at JWLLP-SEC02600; West Carroll 1992 Annuity Package at JWLLP-SEC02824; Roaring Creek Limited 1992 Annuity ; Package at JWLLP-SEC02992 – 02994; Maroon Limited (Rugosa) 1992 Annuity Package at JWLLP- SEC03254 - JWLLP- SEC03255; Little Woody Limited 1992 Annuity Package at JWLLP- SEC03162 -  JWLLP- SEC03163; Roaring Fork Limited 1992 Annuity Package at JWLLP- SEC02434- JWLLP- SEC02436.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 11: Charles Wyly 1992 Funding of IOM Entities**



46. By the end of April 1992, the Wyly Brothers, in aggregate, transferred 960,000 Michaels
    Stores options, and 1,000,000 options and 983,589 warrants for Sterling Software to a
    combined ten IOM entities.[65]  Since the annuity liabilities initially issued by the Nevada
    corporations were transferred to the IOM entities along with the options and warrants, there
    were negligible remaining assets and apparently no active business operations in the
    Nevada entities.  In December 1996, all ten Nevada corporations were dissolved.[66]

---

[65] SEC Case Stipulation of Undisputed Facts at 5.
[66] *See* Certificates of Dissolution of the Nevada Corporations, WYLYSEC00528454 - WYLYSEC00528463.

25

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

47. Moreover, from 1992 until 1996, the options and warrants transferred to the offshore
entities were exercised. The resultant shares were then sold, generating net proceeds that
remained offshore totaling nearly $94 million for the Wyly Brothers.[67] No U.S. taxes were
paid on the resulting gain on these sales.

### b.    1996 Transactions

48. From mid-1992 through early 1996, the Wyly Brothers expanded the number of trusts and
entities established in the IOM. Specifically, over that time period Charles Wyly added
five trusts and nine offshore companies, while Sam Wyly established eight new trusts and
eighteen new offshore companies.[68] (*See* Figure 12 and Figure 13.)

#### Figure 12: Charles Wyly 1996 IOM Entities



---

[67] SEC Case Stipulation of Undisputed Facts, Attachment B.
[68] SEC Case Stipulation of Undisputed Facts.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 13: Sam Wyly 1996 IOM Entities**



49.    During the first quarter of 1996, the Wyly Brothers transferred, in aggregate, nearly 8.6

million stock options to the IOM entities.  Charles Wyly transferred 883,334 Sterling

Software options, 450,000 Michaels Stores options, and 1,600,000 Sterling Commerce

options.[69] Sam Wyly transferred 1,766,666 Sterling Software options, 900,000 Michaels

Stores options, and 3,000,000 Sterling Commerce options.[70] (*See* Figure 14 and Figure 15.)

---

[69] "Soulieana Limited 1996 Annuity Package" (WYLY 03938-WYLY 03948) at WYLY 03948; "Quayle Limited
1996 Annuity Package" (WYLYSEC01099566-WYLYSEC01099611) at WYLYSEC01099580; "Elegance Limited
1996 Annuity Package" (WYLYSEC01104391 - WYLYSEC01104405) at WYLYSEC01104405; "Elysium Limited
1996 Annuity Package" (WYLYSEC01099743- WYLYSEC01099845) at WYLYSEC01099786; SEC Case
Stipulation of Undisputed Facts at 5 and 6.
[70] "Devotion Limited 1996 Annuity Package" (WYLYSEC01102979- WYLYSEC01102993) at
WYLYSEC01102993; "Fugue Limited 1996 Annuity Package" (IFG-042584 – IFG-042649) at IFG-042649;
"Locke Limited 1996 Annuity Package" (WYLYSEC00615301 – WYLYSEC00615344) at WYLYSEC00615315;
"Sarnia Investments Limited 1996 Annuity Package" (SECI00046835- SECI00046854) at SECI00046837; "Yurtfa
FAF Limited 1996 Annuity Package" (WYLYSEC01099964 – WYLYSEC01099978) at WYLYSEC01099978;
"Moberly Limited 1996 Annuity Package" (WYLYSEC01103085 – WYLY01103099) at WYLYSEC01103098;
SEC Case Stipulation of Undisputed Facts at 5 and 6.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

In exchange, Charles Wyly received four private annuity agreements valued at $39,882,555 and Sam Wyly received six private annuity agreements valued at $78,457,070.[71]

**Figure 14: Charles Wyly Chart 1996 Funding of IOM Entities**



[71] Soulieana Limited 1996 Annuity Package at WYLY 03936; Quayle Limited 1996 Annuity Package at WYLYSEC01099568; Elegance Limited 1996 Annuity Package at WYLYSEC01104393; Elysium Limited 1996 Annuity Package at WYLYSEC01099774; Devotion Limited 1996 Annuity Package at WYLYSEC01102981; Fugue Limited 1996 Annuity Package at IFG – 042637; Locke Limited 1996 Annuity Package at WYLYSEC00615303; Sarnia Investments Limited 1996 Annuity Package at SECI00046837; Yurtfa FAF Limited 1996 Annuity Package at WYLYSEC01099966; Moberly Limited 1996 Annuity Package at WYLYSEC01103086.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 15: Sam Wyly 1996 Funding of IOM Entities**



50.   After the Wyly Brothers took identical steps to transfer the options to the offshore trusts,

two separate transactional steps were performed: 1) the options were subsequently

transferred to various offshore entities; and 2) the offshore entities that ultimately retained

the options issued annuities, backed by the options, in the name of Sam and Charles Wyly,

with the respective parent-owned trusts as agent for the annuitants.  By year-end 1996, the

trusts that initially received the options were dissolved.[72] (*See* Figure 16 and Figure 17.)

---

[72] *See, e.g.* 12/31/96 "General Assignment From the Maroon Creek Trust to the Settlor of the Maroon Creek Trust" (WYLYSEC01097775-77); 12/31/96 "General Assignment From the Sitting Bull Trust to the Settlor of the Sitting Bull Trust" (SECI00142233-35); 12/31/96 "General Assignment From the Crazy Horse Trust to the Settlor of the Crazy Horse Trust" (WYLYSEC01103017-19); 12/31/96 "General Assignment From the Woody International Trust to the Settlor of the Woody International Trust" (WYLYSEC00385704-06); 12/31/96 "General Assignment From the Tallulah International Trust to the Settlor of the Tallulah International Trust" (WYLYSEC00385570-72); 12/31/96 "General Assignment From the Arlington International Trust to the Settlor of the Arlington International Trust" (MP 00502-04); 12/31/96 "General Assignment From the Lincoln Creek International Trust to the Settlor of the Lincoln Creek Trust" (IOM-150812-14).

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 16: Charles Wyly 1996 Dissolution of Various IOM Trusts**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 17: Sam Wyly 1996 Dissolution of Various IOM Trusts**



51.    As noted above, during the first few months of 1996, the Wyly Brothers transferred
approximately 8.6 million stock options, in aggregate, from Michaels Stores, Sterling
Software, and Sterling Commerce to offshore entities.  During the subsequent years, the
majority of these options were exercised, with the resultant stock being sold for net
proceeds of approximately $220 million.[73]  No U.S. taxes were paid on the gains from these
sales.

<p style="text-align:center;">c.       1998 – 2002 Transactions</p>

52.    Unlike the transactions that occurred in 1992 and 1996, the transactions that were initiated
after 1998 involved the direct sales of options to offshore entities in exchange for cash.  For

---

[73] SEC Case Stipulation of Undisputed Facts, Attachment B.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

example, in September 1999, Charles Wyly sold 900,000 Sterling Software options and 250,000 Sterling Commerce options to IOM entities in exchange for $9.3 million.[74] The proceeds from these transfers were reported as income on Charles Wyly's 1999 U.S. Individual Income Tax Return Form 1040 ("Form 1040").[75] (*See* Figure 18 and Figure 19.)

**Figure 18: Charles Wyly 1999 Sale of Stock Options**



---

[74] SEC Case Stipulation of Undisputed Facts, Attachment B.
[75] Charles Wyly 1999 Form 1040. SECI00029033-SECI00029081 at SECI00029068.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 19: Charles Wyly 1999 Form 1040**



53.   Similarly, in September 1999, Sam Wyly sold 1,723,000 Sterling Software options and
      462,500 Sterling Commerce options to offshore entities in the IOM in exchange for $17.8
      million.[76] These proceeds were reported as income on Sam Wyly's 1999 Form 1040.[77]
      (*See* Figure 20 and Figure 21.)

---

[76] SEC Case Stipulation of Undisputed Facts, Attachment B.
[77] Charles Wyly 1999 Form 1040.

33

**41**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 20: Sam Wyly 1999 Sale of Stock Options**



*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 21: Sam Wyly 1999 Form 1040**



54. In March 2000, SBC Communications ("SBC"), a telecommunications company, acquired Sterling Commerce. As part of the acquisition, all outstanding options to purchase shares of Sterling Commerce were canceled. All option holders received cash based on the excess of the stock purchase price over the option price.[78] On January 11, 2001, SBC notified the Wylys that it was planning "to issue a Form 1099 to [their] trusts showing taxable income." The Wylys, through Boucher and Robertson, had Rodney Owens, a lawyer, write a memo to SBC explaining why a Form 1099 should not be issued.[79] Owens wrote that filing a Form 1099 is inappropriate because the IOM entity is a foreign corporation, and the

---

[78] SEC Case PX 9022 and PX 9023 (1/11/01 letters from John J. Stephens, vice president of taxes for SBC, to Sam and Charles Wyly).
[79] *See* SEC Case PX 9001 (1/23/01 email from Robertson to Boucher) and *see also* SEC Case PX 9024 (1/25/01 email from Boucher to Owens).

**43**

income from the purchase of the stock is not subject to U.S. taxation.[80] Ultimately, no Form 1099s were issued to the Wylys. The district court in the SEC Case found that this was done through "deceptive behaviors and affirmative misrepresentations."[81] The Wylys' actions in this regard (trying to avoid having a Form 1099 issued) were nothing more than an attempt to hide these transactions from detection by the IRS in order to avoid the disclosure of the entire offshore scheme. There would be no legitimate reason I can think of to want to prevent an entity from issuing a Form 1099 or any other IRS information return relating to the cash payment by SBC.

55.    In March 2000, Computer Associates International Inc., now known as CA, Inc. ("CA" or "Computer Associates"), acquired Sterling Software. The sale was accomplished through a $4 billion stock transaction in which Sterling Software shares and options were converted into a smaller number of Computer Associates shares and options. That meant, for example, that the 2.6 million Sterling Software stock options that had been "sold" to the four IOM corporations in 1999, were converted into a total of about 1.5 million Computer Associates stock options.

56.    In July 2000, Computer Associates announced that it would miss earnings estimates, and its stock price dropped dramatically.[82] By 2001, Sam had lost confidence in Computer Associates management; as a result, he launched two proxy contests, each calling for the resignation of Sanjay Kumar, Computer Associates CEO, and replacement of their board of directors.[83] In July 2002, after a series of private meetings between Sam Wyly and Sanjay Kumar, Sam agreed to end the proxy contests.[84] As part of the agreement, an additional 1.5 million Computer Associates options were issued to the Wyly Brothers, all of which were subsequently "sold" to offshore entities. In exchange, Charles Wyly received $1.3 million

---

[80] SEC Case PX 9025 (1/26/01 letter from Owens to Stephens).
[81] Docket #789 (Memorandum Opinion and Order); Docket #612-1, at App. 028, #36-37.
[82] Sam Wyly SEC Case Deposition (CA-NDTX000549 at 579).
[83] Sam Wyly SEC Case Deposition (CA-NDTX000549 at 584).
[84] Sam Wyly SEC Case Deposition (CA-NDTX000549 at 677-676, 680-683, 686-688, 697-98, 700-704, and 732 ).

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

while Sam Wyly received $2.5 million.[85]  These amounts were recorded as income on each of the Wyly Brothers' 2002 tax returns.[86] (*See* Figure 22  and Figure 23.)

### Figure 22: Charles Wyly 2002 Form 1040



| T S EMPLOYER'S NAME | AMOUNT PAID | FEDERAL TAX WITHHELD | STATE TAX WITHHELD | CITY SDI TAX W/H | FICA TAX | MEDICARE TAX |
|---|---|---|---|---|---|---|
| TCOMPUTER ASSOCIATES | 1,325,838. | 510,429. | | | 5,264. | 19,225. |
| TOTALS | 1,325,838. | 510,429. | | | 5,264. | 19,225. |

---

[85] *See, e.g.*, 7/29/02 emails between Ms. Hennington and CA (SEC_ED00010321-25).
[86] Sam Wyly 2002 Form 1040.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 23: Charles Wyly 2002 Form 1040**



57.  I understand that the options that were transferred to the offshore entities expired without being exercised.[87] However, the Wylys, as investors and prudent businessmen, would have anticipated achieving significant appreciation from the underlying securities of the options upon exercise. Had that occurred, the offshore tax scheme was designed to avoid reporting the resulting gains upon eventual sale of the securities by the offshore entities; a key step in their overall tax scheme.

### 2.    Uses of Funds

58.  Once the transactions were executed by the Wylys to move the income producing assets and their embedded gains offshore, as described above, Sam and Charles Wyly then employed various mechanisms to bring back these monies to the U.S. tax-free for their personal use. In fact, the Wyly Brothers used the following general transactions as a means of "investing" the offshore funds back into the U.S.:

---

[87] Subcommittee Report, at 185.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

- Pass-through loans,

- Investments in Wyly businesses (including investment funds),

- Investments in real estate, and

- Purchases of personal property such as jewelry and artwork.

59.  The following sections provide just a few of the numerous examples of the types of transactions executed by the Wyly Brothers to bring back the untaxed funds to the U.S.  In total, the Wyly Brothers "invested" at least $600 million of untaxed funds back into the U.S. using the offshore entities.[88]

### a.  Investment in Green Mountain Energy Resources LLC

60.  Green Mountain Energy Resources LLC ("Green Mountain") was founded in 1997 with the mission of using "the power of consumer choice to change the way power is made."[89]  In brief, Green Mountain partners with utilities in offering renewable energy products to customers and businesses.[90]  By August 2004, the "Total Family Offshore" fair market value of the Wyly Brothers' investments in Green Mountain totaled nearly $180 million.[91]

61.  One instance of the Wyly Brothers' funding of Green Mountain through offshore money occurred in February 1999.  On February 17, 1999, Green Funding II, LLC, incorporated in Texas, entered into an investor subscription agreement with Green Mountain for the purchase of 500,000 shares of Green Mountain at a per share price of $20.  That is, Green Funding II, LLC was to purchase $10,000,000 in Green Mountain shares. (*See* Figure 24.)

---

[88] Subcommittee Report, at 113.
[89] Green Mountain Energy website at www.greenmountainenergy.com (last accessed 7/30/2015).
[90] *Id.* n. 89.
[91] Family Offshore investment values as of 8/31/04, Control number 7067221 (Bates number PSI_ED0087701).

**Figure 24: Green Mountain Energy Resources LLC Subscription Agreement[92]**



62.   Green Funding II, LLC is an entity majority owned by GMP Holdings Ltd., a Delaware
incorporated company.   GMP Holdings Ltd., in turn, was owned by Wyly offshore
entities, namely the IOM entities Elegance, Devotion, Dormund, Greenbriar, Little Woody,
Locke, Morehouse, Richland, Roaring Creek, Roaring Fork, and Rugosa.[93]   (*See* Figure 25.)

---

[92] Green Mountain Energy Resources LLC Accredited Investor Subscription Agreement, February 17, 1999.
SECI00241380- SECI00241383.
[93] *See* fax from Michelle Boucher, Irish Trust Company (Cayman) Ltd., to Chris Butner, Jones Day, April 15, 1999.
JDSEC-54575-JESEC-54577 at JDSEC-54577.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 25: Chart of Ownership of Green Funding II LLC**



63.    While Green Funding II, LLC is a Texas-incorporated company, its funding for the
$10,000,000 Green Mountain stock purchase was derived from the Wyly offshore parent
companies.  Specifically, $5,000,000 was transferred from Greenbriar Limited in the IOM
to GMP Holdings Ltd. on February 17, 1999; $3,000,000 was transferred from Little
Woody Ltd. in the IOM to GMP Holdings Ltd. on February 17, 1999; and $2,000,000 was
transferred from Rugosa Ltd. in the IOM to GMP Holdings Ltd. on February 17, 1999.[94]
These funds were then transferred to Green Fund II, LLC between February 17 and
February 18, 1999, which forwarded the funds to Green Mountain shortly thereafter for the
purchase of the 500,000 shares.[95] (*See* Figure 26 and Figure 27.)

---

[94] Fax from Greenbriar Ltd. to Lehman Brothers, February 16, 1999. CC 021711.  Fax from Little Woody Ltd. to
Lehman Brothers, February 17, 1999. CC 022314.  Fax from Rugosa Ltd. to Lehman Brothers, February 17, 1999.
CC 016545.
[95] GMP Holdings Ltd. Deposits at Call. QBT/SEC-000137. Green Funding II, LLC Nations Bank statement 2/1/99-
2/28/99. SECI00189657-00189658. General Ledger detail for Green Funding II, LLC as of April 28, 1999.
SECI00189638.

## Figure 26: GMP Holdings Ltd. Deposits At Call

**DEPOSITS AT CALL**

From: 01/01/1990 To: 10/01/2006

GMP HOLDINGS LTD. - CLOSED

A/C No. 199100
U.S.Dollars
Page 3 of 5

| Value Date | Description | Debit | Credit | Balance |
|---|---|---|---|---|
| 09/02/1999 | Total Maturity B79F/T: Queensgate Bank & Trust | | 555,004.70 | 561,082.53 |
| 09/02/1999 | Roaring Creek Limited | 26,877.46 | | 534,205.07 |
| 09/02/1999 | Wire Transfer Charges | 130.00 | | 534,075.07 |
| 09/02/1999 | Locke Limited | 487,731.40 | | 46,343.67 |
| 09/02/1999 | Roaring Fork Limited | 40,395.84 | | 5,947.83 |
| 13/02/1999 | Fax Charges | 10.00 | | 5,937.83 |
| 13/02/1999 | Telephone Charges | 21.56 | | 5,916.27 |
| 16/02/1999 | B/O Greenbriar Limited | | 5,000,000.00 | 5,005,916.27 |
| 17/02/1999 | Green Funding 2 LLC | 5,000,000.00 | | 5,916.27 |
| 17/02/1999 | Wire Transfer Charge | 50.00 | | 5,866.27 |
| 17/02/1999 | B/O Little Woody Limited | | 3,000,000.00 | 3,005,866.27 |
| 17/02/1999 | B/O Rugosa Limited | | 2,000,000.00 | 5,005,866.27 |
| 18/02/1999 | Green Funding 2 LLC | 5,000,000.00 | | 5,866.27 |
| 18/02/1999 | Wire Transfer Charge | 50.00 | | 5,816.27 |
| 22/06/1999 | Maples and Calder | 3,438.62 | | 2,377.65 |

## Figure 27: Green Funding II LLC Nations Bank Statement

**NationsBank**

NationsBank, N.A.
P.O. Box 831547
Dallas, TX 75283-1547

H

Account Reference Information
[redacted]
E 0 S C Enclosures 1 50
Statement Period
02/01/99 through 02/28/99

GREEN FUNDING II LLC

Page 2 of 2

**Full Analysis Business Checking**

**Withdrawals and Debits**

**Checks**

| Check Number | Amount | Date Posted | Bank Reference |
|---|---|---|---|
| 14 | 8,018.41 | 02/26 | 813008330777026 |

**Other Debits**

| Date Posted | Customer Reference | Amount | Description | Bank Reference |
|---|---|---|---|---|
| 02/17 | | 5,000,000.00 | Wire Type:Fed Out Date:990217 Time:1417 Fed Ref:003845 Seq:990217009154 Bnf:Green Mountain Ener Pmt Det:Green Mountain E Nergy Resources,Ll Ac-01 Bnf Bk:Chittenden Tr Burl | 904002179009154 |
| 02/19 | | 8,000,000.00 | Wire Type:Fed Out Date:990219 Time:1010 Fed Ref:001625 Seq:990219003603 Bnf:Green Mountain Ener Pmt Det:Green Mountain E Nergy Resources,Ll Ac-01 Bnf Bk:Chittenden Tr Burl | 904002199003603 |

Daily Ledger Balances

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

64.    Thus, $10,000,000 of untaxed Wyly Brother income from the accounts of IOM entities was able to be "invested" back into the U.S. through the purchase of Green Mountain shares. This is but one example of the Wylys' strategy of hiding their funds in order to avoid paying U.S. taxes.

### b.    Pass-through Loan

65.    In addition to investing in companies such as Green Mountain, another method of bringing back offshore funds to the U.S. was through the use of purported loans. In the fall of 2002, the offshore structure was used to loan $6,000,000 of untaxed offshore dollars to Charles Wyly. According to a September 25, 2002 e-mail from Michelle Boucher, the plan was structured to loan $6,000,000 to Charles using loans between multiple offshore corporations, including Security Capital.[96] (*See* Figure 28: Charles Wyly 2002 $6,000,000 Loan for the structure.)

---

[96] September 25, 2002 email from Michele Boucher at IOM-149264.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 28: Charles Wyly 2002 $6,000,000 Loan**



66. As shown above, Elysium loaned $6,000,000 to Gorsemoor, Gorsemoor loaned $6,000,000 to Security Capital, and Security Capital loaned $6,000,000 to Charles. The loan to Gorsemoor was approved at the September 27, 2002 Meeting of the Directors of Elysium.[97] The funds were transferred on September 27, 2002, and arrived in Gorsemoor's account on September 30, 2002.[98]

67. The Promissory Note between Gorsemoor and Security Capital was effective October 1, 2002.[99] Gorsemoor transferred $6,000,000 to Security Capital in two installments, $1,600,000 on September 30, 2002 and $4,400,000 on October 2, 2002.[100]

---

[97] September 27, 2002 Board Minutes at IOM-149765.
[98] September 27, 2002 wiring instructions from Elysium at IOM-165641; Gorsemoor Bank of Bermuda September 2002 account statement at IOM-181824.
[99] Promissory Note between Gorsemoor and Security Capital at IOM-151608 - 151612.
[100] Gorsemoor Bank of Bermuda September 2002 account statement at IOM-181824.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

68.  At the October 1, 2002 Meeting of the Board of Directors of Security Capital, Security
Capital approved a $6,000,000 loan to Charles at an interest rate of 4.9% per annum. The
loan was to be paid in full on September 30, 2012.[101] On October 15, 2002, Security
Capital transferred $6,000,000 to Charles Wyly. As of December 2011, neither Charles nor
any of the other parties had repaid any of the $6,000,000 in principal.

### c.    Investment in Real estate

69.  Another practice repeatedly used by the Wyly Brothers to bring back untaxed offshore
funds was the purchase of real estate in the U.S. Both brothers purchased ranches for use
by their respective family members. One such ranch was the LL Ranch purchased for
Charles Wyly's family. The LL Ranch, at 1137 Little Woody Creek, is a 26 acre lot located
in one of Aspen's most desirable neighborhoods.[102]  The property was initially purchased
in 1996 for $1,575,000 in the name of Little Woody, Ltd., a Nevada limited partnership.[103]
In 2001, the property was "sold" to Little Woody, LLC, a Colorado limited liability
company.[104] This "sale" to Little Woody, LLC (as described in greater detail below),
ultimately enabled the Wylys to bring back to the U.S. at least $3,650,823.83 of untaxed
funds from offshore entities, which is representative of their deceptive practices.[105]

70.  Little Woody, LLC was a Colorado entity, managed by Charles Wyly before his death,
whose sole member is The Little Woody Management Trust.[106] The Little Woody

---

[101] Promissory Note between Gorsemoor and Security Capital at IOM-151608.

[102] Uniform Residential Appraisal Report, November 28, 2000. BA 143701-BA 143745.
[103] Deed of Trust, September 13, 1996. BA 144144-BA 144148. Articles of Incorporation of Little Woody Ltd. JWLLP- SEC03041-JWLLP-SEC03043.
[104] Real Estate Contract of Sale, March 5, 2001. DOJ_HST819041- DOJ_HST819052.
[105] Based on an 8/12/1999 memo from Shari Robertson to Rodney Owens, the Wylys had been planning this "sale" of property for some time. The name of the entity was insignificant, as it was described "<tbd>", or to be determined. IFG-103500.
[106] Operating Agreement of Little Woody, LLC. BA 060679-BA 060701.

Management Trust is owned 1% each by the daughters of Charles Wyly and 98% by an offshore entity, named Little Woody Creek Road Ltd.[107] (*See* Figure 29.)

### Figure 29: Little Woody LLC Ownership



71.  The funds used by Little Woody, LLC for this "purchase" can be traced to offshore funds from Little Woody Creek Road Ltd., an IOM entity. On March 2, 2001, $4,500,000 was transferred from Little Woody Creek Road, Ltd. to Little Woody Management Trust, which became its opening deposit (*see* Figure 30 and Figure 31).[108] On the same day Little Woody Management Trust transferred $4,500,000 to Little Woody, LLC, which was also its opening deposit (*see* Figure 31 and Figure 32).[109] On the day of settlement, March 5,

---

[107] The Little Woody Management Trust Agreement. Control Number 152527 (TT – 010400) and Memorandum of Association and Articles of Association of Little Woody Creek Road Limited, IRS-IOM-CW-000013548- IRS-IOM-CW-000013573.
[108] Little Woody Creek Road, Ltd. Bank of Bermuda 02/17/01-03/02/01,IOM-154642. Little Woody Management Trust Bank of America 03/01/01-03/31/01, SECI0013492.
[109] Little Woody, LLC Bank of America 03/01/01-03/31/01, BA 117479.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

2001, Little Woody LLC wired $3,650,823.83 to Stewart Title for the purchase funds at settlement. (*See* Figure 32.)[110]

---

[110] *Id.* at FN 109.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

## Figure 30: Little Woody Creek Road Ltd. Bank of Bermuda Statement

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 31: Little Woody Management Trust Bank of America Statement**



*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 32: Little Woody LLC Bank of America Statement**



72. The "sales" proceeds of $3,643,227.83 were wired by Stewart Title and were eventually
transferred to an investment account in the name of Little Woody, Ltd.[111] On March 8,
2001, Marmalade, Ltd. received a wire of $3,643,227.83 from Stewart Title. (*See* Figure

---

[111] The difference between the amount due from buyer at closing of $3,650,823.83, and the amount paid to seller of
$3,643,227.83, is likely closing fees charged by Stewart Title. Buyer(s) Final Closing Statement, DOJ_HST819120.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

33.)[112] The next day, March 9, 2001, the same amount was transferred from Marmalade, Ltd. to Little Woody, Ltd. (*See* Figure 34: Marmalade Ltd. Bank of America Statement and Figure 35: Little Woody Ltd. Bank of America Statement.)[113] Four days later Little Woody, Ltd. transferred the sales proceeds along with the balance in the account up to that date, for a total of $3,690,511.595 to an investment account. (*See* Figure 35 and Figure 37: Little Woody Ltd. Banc of America Investment Services Statement.)[114]

---

[112] Mamalade, Ltd. Bank of America 03/01/01-03/31/01. DOJ_MAR002217 (WYLYSEC00992560).

[113] Mamalade, Ltd. Bank of America 03/01/01-03/31/01, DOJ_MAR002219 (WYLYSEC00992562); Little Woody, Ltd. Bank of America 03/01/01-03/31/01, DOJ_HST092695 (WYLYSEC00120339).

[114] Little Woody, Ltd. Bank of America 03/01/01-03/31/01, DOJ_HST092695-DOJ_HST092696 (WYLYSEC00120339-WYLYSEC00120340); Little Woody, Ltd. Banc of America Investment Services, Inc. SECI00005238.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 33: Marmalade Ltd. Bank of America Statement**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 34: Marmalade Ltd. Bank of America Statement**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 35: Little Woody Ltd. Bank of America Statement**

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 36: Little Woody Ltd. Bank of America Statement**



**Figure 37: Little Woody Ltd. Banc of America Investment Services Statement**

55

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

73.   Thus, in this example, $3,643,227.83 of untaxed Wyly Brothers' funds from the accounts
of an IOM entity was "invested" back into the U.S. through the "sale" of property owned
by the Wyly Brothers.   This is another example of the deceptive methods employed by the
Wylys to bring back money to the U.S. tax-free for their personal use.

### d.      Investment in Artwork – Cheryl Wyly

74.   As another means to bring untaxed funds back into the U.S., the Wyly Brothers also
purchased various pieces of personal property, including jewelry and artwork, through the
use of offshore funds.  One such example was the purchase of a painting, entitled Noon
Day Rest, in July 1996.

75.   On July 10, 1996, Cheryl Wyly attended an auction at Sotheby's auction house in London
England, and purchased the painting for £155,500, as evidenced by the invoice addressed
to her. (*See* Figure 38.)[115]

---

[115] Sotheby's Invoice dated 07/26/1996, IOM 37813.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 38: Sotheby's Invoice**



76. However, a week after the purchase, on July 18, 1996, Michelle Boucher, protector of the IOM entity, Fugue Ltd., "recommended" to the trustee that Fugue Ltd. purchase this painting, and thus pay Sotheby's the £155,500.[116]   She also "recommended" that the painting be shipped to 8080 N. Central Expressway, Suite 1300, Dallas, Texas, the offices

---

[116] Facsimile from Michelle Boucher to Ronnie Buchanan dated 07/18/1996; PSI00119258 (MF-SEC-RFP1-004971). Fugue Ltd. is owned by the Bessie Trust.

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

of the Wyly family business, Sterling Software, and Michaels Stores.[117] In one of the rare instances of a trustee questioning the Wylys, the trustee responded that the protectors were recommending the substitution of an income producing asset, for a non-income producing asset, to be purchased at 222% of the pre-auction estimated price.[118] The trustee requested confirmation of this request from a beneficiary. (*See* Figure 39.)

**Figure 39: Memo Dated 07/19/1996 from Trustee to Michelle Boucher**



77. In an initial response to the trustee, the protectors ignored the trustee's request for confirmation from the beneficiaries, and instead Michael French submitted to the trustee language, taken from the Deed of Settlement of the Bessie Trust, attempting to establish

---

[117] April 7, 2014 Trial Transcript – Vol. Day 01 174:4 -11.
[118] Memo from Ronnie Buchanan to Michelle Boucher dated 07/19/1996, PSI00119265 (MF-SEC-RFP1-004972).

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

that the purchase of personal property was within the powers of the trustee.[119] The trustee

did not find this to be an adequate response, and again, on July 22, 1996, reiterated the

need for written confirmation that consideration had been given to the non-income

producing nature of the asset.[120]  The trustee, in good faith, on July 22, 1996, had $240,000

(approximately the U.S. equivalent of the £155,500), transferred to a holding account for

the purchase of the painting.[121] Two days later, on July 24, 1996, Sam Wyly addressed a

letter to the trustee stating that neither he nor his spouse would have any foreseeable need

for the funds or income thereon that would be used to purchase the painting. (*See* Figure

40.)[122]

---

[119] Facsimile from Mike French to Ronnie Buchanan dated 07/19/1996, IOM 37820-IOM 37822. Also on July 19, 1996, Mr. Buchanan reached out to a colleague requesting advice on how to handle the matter as he did not wish to "offend" the Settlor (who is also a beneficiary under the trust and, incidentally, a very major client), IOM 37311.

[120] Memo from Ronnie Buchanan to Michelle Boucher dated 07/22/1996, PSI00117450 (MF-SEC-RFP1-004976).

[121] Transfer instructions dated 07/22/1996, Control Number 76634. Memo from Ronnie Buchanan to Michelle Boucher dated 07/23/1996, PSI00117449 (MF-SEC-RFP1-004977).

[122] Memo from Sam Wyly to Ronnie Buchanan dated 07/24/1996,  PSI001192643 - 001192644 (MF-SEC-RFP1-004979).

*In re* Samuel E. Wyly, *et al.*
Expert Report of Bruce G. Dubinsky
November 10, 2015

**Figure 40: Memo Dated 07/24/1996 from Sam Wyly to Trustee**



78.   The trustee acknowledged the protector's response and subsequently requested that
Sotheby's re-invoice the painting to Fugue Ltd. (*See* Figure 41 and Figure 42.)[123]

---

[123] Memo from Ronnie Buchanan to Michael French dated 07/25/1996, PSI00119262 (MF-SEC-RFP1004980).
Letter from Barbara Wade to Roger Bell dated 07/25/1996, SECI00317374.

**68**