

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 29, 2016**

*Barbara J. Houser*

**United States Bankruptcy Judge**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | **CASE NO. 14-35043-BJH-11** |
| | § | |
| **SAMUEL EVANS WYLY, et al.,** | § | **(Jointly Administered)** |
| | § | |
| **DEBTORS.** | § | **Related to ECF Nos. 1249, 1252** |
| | § | **& 1260** |

### <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are cross motions for partial summary judgment filed by the Securities

and Exchange Commission (the "**SEC**") and debtor Sam Wyly ("**Sam**"),[1] and a motion for partial

---

[1] More specifically, the: (i) SEC's Motion for Partial Summary Judgment on Objection to Exemptions Claimed by Samuel Wyly [ECF No. 1249], brief in support [ECF No. 1250], and supporting appendix [ECF No. 1251], and Sam's Response to the Government's Motion for Partial Summary Judgment on Certain of his Claims of Exempt Properties [ECF No. 1293], and (ii) Sam's Motion for Partial Summary Judgment on Certain of his Claims of Exempt Properties Listed on Amended Schedule C [ECF No. 1260], brief in support [ECF No. 1261], and supporting appendix [ECF No. 1262], and the SEC's Response to Sam Wyly's Motion for Partial Summary Judgment on Certain of his Claims of Exempt Properties Listed on Amended Schedule C [ECF No. 1295] and supporting brief [ECF No. 1296]. The Official Committee of Unsecured Creditors (the "**Committee**") also filed an objection to Sam's Motion for Partial Summary Judgment and supporting brief [ECF Nos. 1297, 1298], while the Internal Revenue Service (the "**IRS**") filed a joinder in the SEC's objection to Sam's Motion for Partial Summary Judgment [ECF No. 1299].

summary judgment filed by the SEC against debtor Caroline D. Wyly ("**Dee**") [2] (collectively, the "**Motions for Partial Summary Judgment**"). A hearing on the Motions for Partial Summary Judgment was held before this Court on June 13, 2016 (the "**Hearing**").[3] The Motions for Partial Summary Judgment regarding Sam's claimed exemptions were taken under advisement at the conclusion of the Hearing. However, the Court granted the SEC and Dee leave to file post-Hearing briefs regarding the effect of Dee's prepetition contribution of the Roaring Fork Annuity (defined below) to a separate legal entity on the SEC's Motion for Partial Summary Judgment against her. Simultaneous post-Hearing opening briefs were filed on June 20, 2016, and simultaneous post-Hearing responsive briefs were filed on June 24, 2016. Thus, all of the Motions for Partial Summary Judgment are now ripe for ruling.

## I.      SUMMARY JUDGMENT STANDARD

In deciding a motion for summary judgment, a court must determine whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56, as made applicable by FED. R. BANKR. P. 7056. In deciding whether a fact issue has been raised, the facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. *Berquist v. Washington Mut. Bank,* 500 F.3d 344, 349 (5th Cir. 2007). A court's role at the summary judgment stage is not to weigh the evidence or determine the truth of the matter, but rather to determine only whether a genuine issue of material fact exists for trial. *Peel & Co., Inc. v. The Rug Market,* 238

---

[2] More specifically, (i) the SEC's Motion for Partial Summary Judgment on Objection to Exemptions Claimed by Caroline Wyly [ECF No. 1252], brief in support [ECF No. 1253], and supporting appendix [ECF No. 1254], and (ii) Dee's Response to the SEC's Motion for Partial Summary Judgment on Exemptions [ECF No. 1294].

[3] A copy of the Hearing transcript may be found at ECF No. 1322. The Court cites to the Hearing transcript as Hr'g Tr., while the pin cites are page:line-page:line.

F.3d 391, 394 (5th Cir. 2001) ("the court must review all of the evidence in the record, but make no credibility determinations or weigh any evidence") (citing *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 135 (2000)); *see also U.S. v. An Article of Food Consisting of 345/50 Pound Bags*, 622 F.2d 768, 773 (5th Cir. 1980) (the court "should not proceed to assess the probative value of any of the evidence...."). While courts must consider the evidence with all reasonable inferences in the light most favorable to the non-movant, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pylant v. Hartford Life and Acc. Ins. Co.,* 497 F.3d 536, 538 (5th Cir. 2007) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"After the movant has presented a properly supported motion for summary judgment, the burden then shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Segue Software Inc.,* 232 F.3d 473, 477 (5th Cir. 2000) (internal citation omitted). However, where "the burden at trial rests on the non-movant, the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Miss. River Basin Alliance v. Westphal,* 230 F.3d 170, 174 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

On cross-motions for summary judgment, the court must review each party's motion independently, and view the evidence and inferences in the light most favorable to the non-moving party. *Cooley v. Housing Auth. of the City of Slidell*, 747 F.3d 295, 298 (5th Cir. 2014).

## II.    JURISDICTION AND VENUE

The District Court for the Northern District of Texas has subject matter jurisdiction over the debtors' jointly-administered bankruptcy cases (collectively, the "**Cases**" and individually, the

"**Case**") under 28 U.S.C. § 1334.  Venue of the Cases is proper in this district under 28 U.S.C. § 1408(1).  Moreover, the objections to the debtors' claimed exemptions are core proceedings under 28 U.S.C. § 157(b)(2)(B) (determination of exemptions).

The Cases and all core and non-core proceedings in the Cases have been referred to this Court under the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984.  The objections to exemptions are contested matters under Federal Rule of Bankruptcy Procedure 9014.  As such, this Court may make findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, as made applicable to this core proceeding by Federal Rule of Bankruptcy Procedure 9014(c).

### III.    JUDICIAL NOTICE AND LAW OF THE CASE

In January 2016, this Court held a multi-week bench trial in the Cases on the debtors' motions to determine the tax liability owed by each of them to the IRS, as well the debtors' objections to the proofs of claim filed by the IRS in the Cases (the "**Tax Trial**").  Prior to the Tax Trial, Sam, Dee, and the IRS entered into lengthy and detailed stipulations of fact that were filed on the Court's docket in the Cases [ECF No. 1040] (the "**Joint Stipulations**"), which the Court ultimately adopted in its Memorandum Opinion entered on May 10, 2016 [ECF No. 1247] (the "**Tax Memorandum Opinion**").[4]  The Tax Memorandum Opinion contains findings of fact and conclusions of law directly relevant to the objections to exemptions and the Motions for Partial Summary Judgment.

---

[4] The Tax Memorandum Opinion may also be found at 2016 WL 3098200 (Bankr. N.D. Tex. May 10, 2016).  As of the date of this Memorandum Opinion, however, the Tax Memorandum Opinion is in advance sheet format and does not contain final pagination.  Thus, for ease of reference, the Court will cite to the pagination reflected on the copy of the Tax Memorandum Opinion available via PACER.

Accordingly, and with the agreement of the parties,[5] the Court takes judicial notice of the Joint Stipulations and the relevant findings of fact and conclusions of law set forth in the Tax Memorandum Opinion. *See Meador v. First Security Nat'l Bank,* 100 F.Supp.2d 433, 435 (E.D. Tex. 2000) (court may take judicial notice of its own judgments); *see also Sherman v. Greenstone Farm Credit Services, ACA,* 2011 WL 2038573, at *3 n.6 (N.D. Tex. May 24, 2011) ("Note that, in determining the merits of the Plaintiff's MSJ and the Defendant's MSJ, the Court also has discretion to take judicial notice of all documents filed in the Action.") (citing *Goldberg v. Craig (In re Hydro–Action, Inc.),* 341 B.R. 186, 188 (Bankr. E.D. Tex. 2006); FED. R. EVID. 201(b), (f)). Indeed, upon entry of the Orders liquidating Sam's[6] and Dee's[7] respective tax liability, the findings of fact and conclusions of law in the Tax Memorandum Opinion became the law of the case and will not be reconsidered here. *See Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) ("As most commonly defined, the doctrine of the law of the case posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (internal citations and quotations omitted)); *Gochicoa v. Johnson*, 238 F.3d 278, 291 (5th Cir. 2000) ("With regard to factual matters, this doctrine applies only to issues actually decided and does not apply to *obiter dicta*.") (citing 18 James Wm. Moore et. al., Moore's Federal Practice § 134.20[3], at 134-45 (3d ed. 1999) ("The doctrine does not apply to statements made by the court in passing, or stated as possible alternatives.")).

---

[5] Indeed, Sam has asked that this Court take judicial notice of the Tax Trial and all other proceedings that have been held in the course of his Case. *See* Sam's Brief in Support of his Motion for Partial Summary Judgment [ECF No. 1261] at ¶ 7 & n.6. And the SEC cites to the Tax Memorandum Opinion throughout its brief filed in support of its Motion for Partial Summary Judgment. *See* Memorandum in Support of the SEC's Motion for Partial Summary Judgment [ECF No. 1250].

[6] Order Determining Tax Liabilities of Debtor Samuel Wyly [ECF No. 1356].

[7] Order Determining Tax Liabilities of Debtor Caroline D. Wyly [ECF No. 1357].

## IV. FACTUAL AND PROCEDURAL HISTORY

### A. Sam Wyly

As found in the Tax Memorandum Opinion, on July 30, 2010, the SEC sued Sam and his brother, Charles Wyly ("**Charles**"),[8] among others, for securities fraud in connection with certain securities transactions undertaken by various offshore trusts and offshore corporations that Sam and Charles caused to be established. Tax Memorandum Opinion at 29; *see SEC v. Wyly et al.*, Case No. 10-5760-SAS (S.D.N.Y.) (the "**SEC Action**"). Following a jury trial on the liability phase and a bench trial on the remedies phase of the SEC Action, the District Court for the Southern District of New York (the "**SDNY Court**") entered judgment against Sam and the probate estate of Charles, who died in 2011, for $123,836,958.75 and $63,881,743.97, respectively, plus prejudgment interest (the "**SDNY Judgment**").[9] Tax Memorandum Opinion at 3 & n.7-8; SEC Appx. [ECF No. 1251-4] at 00293-00304. On October 19, 2014, Sam filed his Case here. Soon thereafter (on October 23, 2014), Dee filed her Case here. As noted previously, the Cases are being jointly administered.

Sam filed his Amended Schedules of Assets and Liabilities [ECF No. 472] with this Court on February 27, 2015. In his Amended Schedule C—Property Claimed as Exempt—Sam listed the various assets he claimed as exempt under Texas law. Those relevant here are (i) Sam's home located at 3905 Beverly Drive, Dallas, Texas 75205 (the "**Beverly Property**"), which Sam values at $12,147,482 and claims $12,066,339.82[10] as exempt under Texas Property Code §§ 41.001,

---

[8] Dee is Charles' widow.

[9] *SEC v. Wyly*, 56 F.Supp.3d 394, 434 (S.D.N.Y. 2014) ("For the foregoing reasons, Sam Wyly must disgorge $123,836,958.76 and Charles Wyly must disgorge $63,881,743.97. The Wylys shall also pay prejudgment interest for the entire period of the fraud through December 1, 2014, calculated in accordance with this Opinion and Order."). Sam's bankruptcy schedules list the judgment, including prejudgment interest, at $198,118,825.16. *See* Sam's Amended Schedule F [ECF No. 472] at p. 88 of 94.

[10] Sam arrives at this figure by deducting 2014 real property taxes from the estimated value of the property ($12,147,482 - $81,142.18 = $12,066,339.82). Sam's Amended Schedule C [ECF No. 472] at p. 70 of 94.

.002, and .005, and (ii) the future payments Sam is to receive (the "**Offshore Annuity Payments**")

from the so-called private annuity agreements Sam entered into that were then assigned to the Isle

of Man ("**IOM**") corporations identified below (the "**Annuity Agreements**"),[11] which Sam claims

as fully exempt under Texas Insurance Code § 1108.051:

| Annuity Obligors | Scheduled Value[12] |
|---|---|
| West Carroll Ltd. | $ 6,562,293.00 |
| Morehouse Ltd. | $ 6,717,331.00 |
| Richland Ltd. | $ 7,874,756.00 |
| Yurta Faf Ltd. | $ 7,014,605.00 |
| Locke Ltd. | $69,183,748.00 |
| Moberly Ltd. | $55,920,630.00 |
| Audubon Ltd. | $40,352,520.00 |
| Devotion Ltd. | $39,783,583.00 |
| Sarnia Ltd. | $15,965,481.00 |
| East Carroll Ltd. | $0.00 |
| Tensas Ltd. | $0.00 |
| East Baton Rouge Ltd. | $0.00 |

*See* Sam's Amended Schedules [ECF 472], Schedule C at p. 73 of 94; Schedule B at p. 4 of 94;

Exhibit B-10 to Schedule B at p. 52 of 94.[13]  As explained in the Tax Memorandum Opinion and

---

[11] Sam is only arguing that future Offshore Annuity Payments are exempt.  He is not arguing that annuity payments that are already due, or have been paid and deposited into his debtor-in-possession account, are exempt.  *See* Sam's Response to the Government's Motion for Partial Summary Judgment [ECF No. 1293] at 8.  Copies of the underlying Annuity Agreements and Amendments to Annuity Agreements, other than that issued by Yurta Faf Limited (IOM), may be found in the Appendix submitted by the SEC.  *See* SEC Appx. [ECF 1251] at 0030-0215.

[12] As explained in Sam's Amended Exhibit B-10 to Amended Schedule B [ECF No. 472] at p. 52 of 94: "The above annuity agreements are currently valued on the balance sheet at the actuarial value reflecting payments for Sam Wyly's life expectancy.  The last valuation date was 12/31/13.  Subject to further valuation based on a review of the underlying assets held by the above annuity payor which could be substantially less than the above values.  Terminates on date of death."

[13] As explained in more detail below, Sam forgave the annuity obligations previously owed by East Carroll Ltd. (IOM), Tensas Limited (IOM), and East Baton Route Limited (IOM) prior to filing for bankruptcy protection.  Thus, those annuity obligations were not property of the estate on the day Sam filed his bankruptcy petition and may not be claimed as exempt.  *See* 11 U.S.C. § 522(b)(1).

briefly below, the Annuity Agreements were entered into as part of a complex offshore structure that Sam caused to be established in the IOM starting in 1992.[14]

As found in the Tax Memorandum Opinion, Sam and/or Charles established 16 offshore trusts and 38 offshore corporations (32 in the IOM and six in the Cayman Islands), each of which was owned by one of the 16 offshore trusts that were established in the IOM.  Tax Memorandum Opinion at 59.[15]  As relevant here, and as found in the Tax Memorandum Opinion, Sam settled his initial IOM trusts in 1992, including the Bulldog Non-Grantor Trust ("**Bulldog IOM Trust**"), Lake Providence International Trust ("**Lake Providence IOM Trust**"), and Delhi International Trust ("**Delhi IOM Trust"**).  *Id.* at 59-61.  As found in the Tax Memorandum Opinion, the following IOM corporations are wholly-owned by the Bulldog IOM Trust: West Carroll Limited ("**West Carroll Limited (IOM)**"), Morehouse Limited ("**Morehouse Limited (IOM)**"), Richland Limited ("**Richland Limited (IOM)**"), Locke Limited ("**Locke Limited (IOM)**"), Moberly Limited ("**Moberly Limited (IOM)**"), East Carroll Limited ("**East Carroll Limited (IOM)**"), Tensas Limited ("**Tensas Limited (IOM)**"), and East Baton Rouge Limited ("**East Baton Rouge Limited (IOM)**").  *Id.* at 60.  And, as found in the Tax Memorandum Opinion, Sarnia Investments Limited ("**Sarnia Investments Limited (IOM)**") is a wholly-owned corporation of Lake Providence IOM Trust.  *Id.* at 60-61

In 1994 and 1995, as found in the Tax Memorandum Opinion, additional trusts were established at Sam's direction by foreign citizens in favor of Sam and his family.  Specifically, on February 2, 1994, Keith King, a resident of the IOM, settled the Bessie Trust in the IOM ("**Bessie IOM Trust**"), *id.* at 61*,* which owns the following IOM corporations, among others: Yurta Faf

[14] A more detailed explanation of these various entities and the related transactions may be found at pages 59-74 of the Tax Memorandum Opinion.
[15] Exhibit B to the Memorandum Opinion is a chart depicting Sam's overall offshore system that was submitted as an agreed demonstrative exhibit by Sam, Dee, and the IRS at the Tax Trial.

Limited ("**Yurta Faf Limited (IOM)**") and Audubon Asset Limited (f/k/a Fugue Limited) ("**Audubon Limited (IOM)**"), *id.* at 62.  Then, as also found in the Tax Memorandum Opinion, on July 18, 1995, the La Fourche Trust ("**La Fourche IOM Trust**") was settled in the IOM by Shaun Cairns, an IOM resident, *id.* at 64, which, as relevant here, owns Devotion Limited, an IOM corporation established on July 18, 1995 ("**Devotion Limited (IOM)**"), *id.* 65.

As found in the Tax Memorandum Opinion, once the Wylys' offshore system had begun to be established, Sam and Charles undertook a series of complex annuity transactions in order to get substantial amounts of their wealth offshore in the IOM.  *Id.* at 70.  Specifically, as found in the Tax Memorandum Opinion, in 1992 and 1996, Sam and Charles entered into multiple transactions whereby they transferred securities that they had earned from Sterling Software, Inc. ("**Sterling Software**"), Sterling Commerce, Inc. ("**Sterling Commerce**"), and Michaels Stores, Inc. ("**Michaels Stores**") in exchange for private annuities.  *Id.*

For example, and as found in the Tax Memorandum Opinion, in 1992, Sam transferred 375,000 options to purchase stock in Michaels Stores to East Baton Rouge Ltd. (Nevada), a newly formed entity that he caused to be formed and that had no assets or liabilities until the annuity transaction was undertaken, in exchange for an unsecured private annuity payable to himself.  *Id.* at 71.  Also as found in the Tax Memorandum Opinion, immediately thereafter, East Baton Rouge Ltd. (Nevada) transferred the options and the obligation to pay the private annuity to East Baton Rouge Limited (IOM), an IOM corporation that Sam caused to be formed and that had no assets or liabilities prior to the transfer of the options and the private annuity obligation to it.  *Id.*  As found in the Tax Memorandum Opinion, East Baton Rouge Ltd. (Nevada) was wholly owned by East Baton Rouge Limited (IOM), which was wholly owned by the Bulldog IOM Trust.  *Id.*  And, as found in the Tax Memorandum Opinion, Sam did five more similarly structured private annuity

transactions in 1992, using five different Nevada and IOM corporations which he caused to be formed for that purpose. *Id.*

As found in the Tax Memorandum Opinion, the structure of Sam's private annuity transactions changed in 1996, although those transactions were equally complex for no apparent business reason. *Id.* For example, and as found in the Tax Memorandum Opinion, on December 29, 1995, Sam assigned 650,000 options to purchase stock of Sterling Software to Crazy Horse IOM Trust, a foreign trust he settled, which trust then assigned the options to Locke Limited (IOM), an IOM corporation wholly owned by the Bulldog IOM Trust, in exchange for an unsecured private annuity payable to Crazy Horse IOM Trust. *Id.* As found in the Tax Memorandum Opinion, Crazy Horse IOM Trust was then terminated, the effect of which was to put the right to receive the annuity payments to Sam who was the grantor of the now-liquidated Crazy Horse IOM Trust. *Id.* at 71-72. As found in the Tax Memorandum Opinion, Sam did five more similarly structured annuity transactions in 1996, using different IOM entities. *Id.* at 72.

After deferring receipt of his annuity payments, and as found in the Tax Memorandum Opinion, Sam began receiving annuity payments on some of the annuities in 2004 and on others in 2007. *Id.* To date, and as found in the Tax Memorandum Opinion, in exchange for approximately $105 million worth of options, Sam has received—and paid tax on—approximately $282 million in annuity payments. *Id.* However, as also found in the Tax Memorandum Opinion, Sam has forgiven approximately $60,972,221 in annuity payments from three IOM corporations (and agreed to forego all future annuity payments from those corporations)[16] and does not expect to receive approximately $70,544,877 in annuity payments currently due (or any further annuity

---

[16] These corporations are (i) Tensas Limited (IOM), of which Sam forgave $14,913,153.13 in annuity payments, (ii) East Baton Rouge Limited (IOM), of which Sam forgave $20,947,937.97 in annuity payments, and (iii) East Carroll Limited (IOM), of which Sam forgave $25,111,130.26 in annuity payments. *See* Tax Memorandum Opinion at 73 & n.357.

payments) from another four IOM corporations,[17] because all of those corporations have been rendered insolvent financing the Wyly family's lifestyle and domestic business interests, thereby enabling the remaining Wyly wealth to remain offshore untaxed. *Id*. at 72-73. And, as found in the Tax Memorandum Opinion, the annuity payments to Sam only commenced after the Wylys admittedly learned of serious potential risks associated with their offshore system and/or when it became apparent to them that the offshore system would likely come under public scrutiny through some combination of (i) the filing of certain disclosures their then tax lawyers recommended they file with the IRS regarding potential problems with the positions they had taken on prior filed tax returns, (ii) an IRS audit, (iii) an impending Senate subcommittee investigation of them and tax haven abuses in general, and (iv) investigations of securities fraud allegations against them by, among others, the SEC. *Id.* at 73-74.

Further, as found in the Tax Memorandum Opinion, Sam and Charles structured the IOM corporations that were liable to make the annuity payments in such a manner that they could manipulate whether annuity payments would be made due to the planned illiquidity or insolvency of the IOM corporations, including by moving funds between the various IOM and affiliated Cayman corporations and deciding when loans would be repaid (as discussed below). *Id.* at 113. As found in the Tax Memorandum Opinion, while the IOM corporations owing annuity obligations to Sam and Charles were provided stock options worth at least the value of the annuities they issued, by 2003, Sam and Charles were advised that several of those corporations had insufficient assets to fulfill those annuity obligations, *id.* at 113-114, and their insolvency was a virtual certainty, unless the Wylys infused these corporations with additional funds from other IOM or

---

[17] *See* Sam's Amended Schedule B, Exhibit B-16 [ECF No. 472] at p. 55 of 94 (listing Moberly Limited (IOM) with a value of $16,519,813, Locke Limited (IOM) with a value of $9,932,801, Audubon Limited (IOM) with a value of $43,085,167, and Yurta Faf Limited (IOM) with a value of $1,007,096). However, at the Tax Trial, Sam testified he was not expecting any further payments from those entities at all. Tax Tr. Trans. 2941:1-8 (Sam).

Cayman corporations, something that they had done in the past and continued to do from time to time. *Id.* at 114. For example, and as found in the Tax Memorandum Opinion, in 2007, Audubon Asset Limited (IOM) borrowed money from three affiliated Cayman corporations to pay the $5,793,464 annual annuity payment owed to Sam and Moberly Limited (IOM) borrowed $8 million from Morehouse Limited (IOM) to pay the $8 million annual annuity payment owed to Sam. *Id.* But, nothing in the Tax Trial record explains why loans were sometimes made to fund annuity payments due to Sam but loans were not always made. *See id.*

Given that this Court found in the Tax Memorandum Opinion that nothing happened offshore unless Sam or Charles "wished" for it to happen, the Court reasonably inferred in the Tax Memorandum Opinion that Sam "wished" that certain letters proposing that certain annuity obligations due to him be forgiven be sent to him. *Id.* at 114-115. So, as found in the Tax Memorandum Opinion, Sam "wished" for the offers to forgive the annuity receivables to be sent to him and he then accepted the offers he caused to be made. *Id.*

As noted previously, and while their annuity obligations to him were not forgiven prepetition, four other IOM corporations could not fulfill their annuity obligations to Sam by the time he filed his Case here in October 2014. As specifically found in the Tax Memorandum Opinion, and as noted previously, Audubon Asset Limited (IOM) owed Sam $43,085,167, Moberly Limited (IOM) owed Sam $16,519,813, Yurta Faf Limited (IOM) owed Sam $1,007,096, and Locke Limited (IOM) owed Sam $9,932,801 in annuity payments on the petition date. *Id.* at 115. According to Sam's testimony at the Tax Trial and as found in the Tax Memorandum Opinion, no payment is realistically expected from these four IOM corporations.[18] *Id.*

---

[18] Oddly, despite testifying that he excepted no future annuity payments from these four IOM corporations, Sam listed the annuity obligations owing by them as exempt on his Amended Schedule C with the following corresponding values: (i) Audubon Asset Limited IOM, $40,352,520, (ii) Moberly Limited (IOM), $55,920,630, (iii) Yurta Faf

As found in the Tax Memorandum Opinion: (i) Audubon Asset Limited (IOM) is not in a position to make the annuity payments it owes to Sam because its assets have been invested in illiquid assets like art or its indirect interest in real estate in Texas and/or Colorado being enjoyed by a Wyly family member(s), *id.* at 116; (ii) Moberly Limited (IOM) is unable to make annuity payments to Sam because it loaned its money to Greenbriar Limited (IOM) and no payments are due from Greenbriar Limited (IOM) for years, *id.* at 115-116; and (iii) Locke Limited (IOM) is illiquid due to $11 million in loans it made to other IOM entities that remained outstanding as of 2013, while its annuity liability to Sam was valued at $59,183,748, *id*. at 116.

As found in the Tax Memorandum Opinion, the only credible inference to make from the evidentiary record at the Tax Trial is that Sam "wished" for (i) the assets that Audubon Asset Limited (IOM) purchased to be purchased, (ii) Moberly Limited (IOM) to loan money to Greenbriar Limited (IOM) and he dictated the terms of that loan, and (iii) the loans that Locke Limited (IOM) made to be made. *Id.* at 116-117. And, as found in the Tax Memorandum Opinion, if Sam "wished" for assets of one or more of the offshore entities to be sold so that his annuity payments could be made, that would happen too. *Id.* But, as found in the Tax Memorandum Opinion, Sam did not "wish" for that to happen because that might require a Wyly family member to give up his/her use and enjoyment of a house, a piece of art, jewelry, or other items of property and, of course, would cause Sam to pay tax on the annuity payment he then received, while the net receivable after tax would be available to pay to his creditors with allowed claims here. *Id.*

As found in the Tax Memorandum Opinion, from Sam's perspective, it was much better to have non-collectable annuity receivables and leave the bulk of the IOM structure in place offshore, making it much more difficult for his creditors with allowed claims here to collect on those claims.

---

Limited (IOM), $7,014,605, and (iv) Locke Limited (IOM), $69,183,748. Sam's Amended Schedule C [ECF No. 472] at p. 52 of 94.

*Id.* at 117.  And, as found in the Tax Memorandum Opinion, in total, Sam has forgiven $60,972,221 in annuity obligations, and will not collect another $70,544,877 in annuity obligations—all because Sam "wished" for that to be the outcome.  *Id.*

### B.    Dee Wyly

The facts underlying the issue before the Court on summary judgment with respect to Dee's claimed exemptions are simpler.  As found in the Tax Memorandum Opinion, while using fewer entities, a similarly complex offshore system was established by Dee's husband, Charles, at the same time that Sam's offshore system was established.  *Id.* at 67.  Specifically, from 1992-1995 Charles settled several trusts in the IOM, including the Pitkin Non-Grantor Trust ("**Pitkin IOM Trust**") in March 1992.  *Id.*  As found in the Tax Memorandum Opinion, one of the IOM corporations owned by Pitkin IOM Trust was Roaring Fork Limited ("**Roaring Fork Limited (IOM)**").  *Id.*  And, like Sam, in 1992 and 1996, Charles transferred options and warrants that he had earned from Sterling Software, Sterling Commerce, and Michaels Stores offshore in exchange for private annuities issued to either Dee or him.  *Id.* at 67-70.  Roaring Fork Limited (IOM) was one of the IOM corporations that entered into an annuity agreement with Dee prepetition.  Joint Stipulation ¶ 149.

Dee filed her Amended Schedules of Assets and Liabilities [ECF No. 351] with the Court on January 6, 2015.  On her Amended Schedule C—Property Claimed as Exempt—Dee listed "Roaring Fork Limited annuity as a result of ownership in Stargate Investments, Ltd." with an exempted value of $10,994,451 under Texas Insurance Code § 1108.051 (the "**Roaring Fork Annuity**").  In its Motion for Partial Summary Judgment as to Dee's claim of exemption of the Roaring Fork Annuity, the SEC made similar arguments to those they made regarding Sam's claim of exemption of the Offshore Annuity Payments.

However, from the Court's perspective, there is a threshold issue that must be addressed as to Dee's claim of exemption of the Roaring Fork Annuity—*i.e.*, can an individual debtor claim property as exempt that they no longer own or that they have transferred the right to receive payments under to another entity? The answer to this question seems obvious, but must be addressed prior to reaching the SEC's arguments in support of its Motion for Partial Summary Judgment, as the resolution of this threshold issue may dispose of Dee's alleged right to claim the Roaring Fork Annuity as exempt property in her Case as a matter of law.

Specifically, as the parties' stipulated in the Joint Stipulations and as found in the Tax Memorandum Opinion, about 15 years prior to her bankruptcy filing, Dee contributed the Roaring Fork Annuity to Stargate Investments, Ltd. ("**Stargate Investments (Texas)**"), a limited partnership she and Charles owned. Tax Memorandum Opinion at 277; Joint Stipulations ¶ 161 ("Effective October 15, 1999, Charles Wyly and [Dee] Wyly transferred to Stargate Investments, Ltd., a Texas limited partnership ('Stargate Investments (Texas)') formed on October 15, 1999, all the private annuities they had received."). Thus, at the Hearing, the Court questioned how Dee could claim the Roaring Fork Annuity as exempt when she had transferred it to Stargate Investments (Texas) prepetition, who now owns the right to receive all payments previously due to Dee under it.

Because this issue was raised by the Court at the Hearing, it had not been briefed by the parties, who asked for the opportunity to brief it following the Hearing, which the Court permitted. As noted previously, those briefs have now been filed. In coming to its conclusions here, the Court has carefully considered those newly-filed briefs and the arguments made in them.

## V. LEGAL ANALYSIS

The issues before the Court on summary judgment are: (i) whether Sam may claim the Beverly Property as exempt under Texas Property Code § 41.001 and, if so, whether the claimed

exemption is subject to the monetary cap imposed by 11 U.S.C. § 522(q)(1),[19] (ii) whether Sam may exempt the Offshore Annuity Payments in an unlimited amount under Texas Insurance Code §1108.051, and (iii) whether Dee may exempt the Roaring Fork Annuity in an unlimited amount under Texas Insurance Code § 1108.051.[20] The Court will address these issues in turn.

### A. Is Sam's Interest in the Beverly Property Exempt Under Texas Law?

As an initial mater, the Court notes that the SEC does not appear to challenge the homestead status of the Beverly Property, instead focusing its efforts on the application of 11 U.S.C. § 522(q)(1) to impose a monetary cap on the amount of Sam's permitted exemption. Even if such an objection were lodged, however, the uncontested summary judgment record conclusively establishes that the Beverly Property is Sam's exempt homestead, as the Court now explains.

In his Amended Schedule C, Sam elected state exemptions, which, under Texas law, define an urban homestead[21] as follows:

> If used for the purposes of an urban home or as both an urban home and a place to exercise a calling or business, the homestead of a family or a single, adult person, not otherwise entitled to a homestead, shall consist of not more than 10 acres of land which may be in one or more contiguous lots, together with any improvements thereon.

TEX. PROP. CODE § 41.002(a).

---

[19] As discussed in more detail in § V.B.2, *infra*, it is unclear whether the SEC is also moving for summary judgment that the savings clause found in § 522(q)(2) is not applicable here. If the Court is unable to tell the extent to which the SEC seeks partial summary judgment, it would be prejudicial to assume that Sam could do so. Accordingly, this Memorandum Opinion only addresses the applicability of the monetary cap imposed by § 522(q)(1), relief clearly sought by the SEC, but not whether Sam is entitled to exempt more value under the savings clause provided by § 522(q)(2).

[20] Sam also requests summary judgment that the assets listed as exempt on his Amended Schedule C [ECF No. 472] to which no objections were lodged are exempt. Because the deadline to object to those exemptions has passed, Sam is entitled to such exemptions as a matter of law. *See* FED. R. BANKR. P. 4003(b)(1). Thus, that portion of his Motion for Partial Summary Judgment is moot.

[21] There is no allegation that the Beverly Property is a rural homestead.

Homestead properties are afforded special protections under the Texas Constitution. Because these rights protect Texans from losing their homes, courts liberally construe constitutional and statutory homestead provisions to protect the homestead. *See Kendall Builders, Inc. v. Chesson*, 149 S.W.3d 796, 807 (Tex. App.–Austin 2004, pet. denied) (citing cases). Generally, whether a property qualifies as a homestead is a fact question that is determined by the court as of the date of the debtor's bankruptcy filing. *AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 698 (5th Cir. 2009).

Establishing homestead status "is accomplished by presenting evidence of both overt acts of homestead usage and the intent to claim the property as a homestead." *Perry v. Dearing (In re Perry)*, 345 F.3d 303, 311 (5th Cir. 2003). As explained by the Fifth Circuit in *Perry*, this burden can be met by proving actual use and occupancy of the home. *Id.* (citing *In re Bradley*, 960 F.2d 502, 507 (5th Cir. 1992) ("Possession and use of land by one who owns it and who resides upon it makes it the homestead in law and in fact."); *In re Kennard*, 970 F.2d 1455, 1459 (5th Cir. 1992) (noting that intent to claim a property as homestead is presumed where the homestead claimant resides on the property); *In re Claflin*, 761 F.2d 1088, 1092 (5th Cir. 1985) (finding that use and occupancy of the property establishes a homestead)).

Under this framework, the Court must determine whether there is sufficient evidence in the summary judgment record to show that, as of the date Sam filed his Case here, there were overt acts of (i) his use of the Beverly Property as his homestead, and (ii) his intent to claim the Beverly Property as his homestead. For the reasons explained below, the Court finds that Sam met his burden.

Sam's uncontested affidavit and related exhibits submitted in support of his Motion for Partial Summary Judgment establish that he purchased the Beverly Property, an urban homestead

of under 10 acres, in 1966 for a price of $150,054.50 and has since continuously occupied the property as his homestead. Affidavit of Sam Wyly [ECF No. 1262] at App. 00002 ¶ 4 & Ex. A. Moreover, Sam has consistently claimed the property as his homestead and intends to continue to do so in the future. *Id.* at App. 00002 ¶ 4 & Ex. B.

Thus, based upon Sam's uncontroverted affidavit testimony, the Court finds that the Beverly Property is Sam's homestead that he may claim as exempt under Texas law.

### B.     Is Sam's Exempt Interest in the Beverly Property Subject to the Monetary Cap Set Forth in 11 U.S.C. § 522(q)(1)?

Except for certain enumerated exceptions not applicable here, in Texas, a family's urban homestead of up to 10 acres is protected from a forced sale for the payment of all debts and is exempt from seizure to satisfy the claims of creditors. *See* TEX. CONST. art. XVI, § 50; *see also* TEX. PROP. CODE §§ 41.001, 41.002. However, a debtor's unlimited Texas homestead exemption may be limited in bankruptcy by the application of 11 U.S.C. § 522(q), which states:

> (q)(1) As a result of electing under subsection (b)(3)(A) to exempt property under State or local law, a debtor may not exempt any amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1)[22] which exceeds in the aggregate [$155,675[23]] if—
>
> ***
>
> (B) the debtor owes a debt arising from--
>
>> (i) any violation of the Federal securities laws (as defined in section 3(a)(47) of the Securities Exchange Act of 1934), any State securities laws, or any regulation or order issued under Federal securities laws or State securities laws;
>
> ***

---

[22] Subsection (p)(1)(A)–(D) of § 522 describes the property subject to the $155,675 cap. Subsection (D) specifically identifies "real or personal property that the debtor or dependent of the debtor claims as a homestead."

[23] Under 11 U.S.C. § 104(a), this amount is adjusted every three years. The adjustment, however, does not apply to cases commenced before the date of an adjustment. *Id.* at § 104(c). Thus, the dollar amount in effect as of Sam's bankruptcy petition date (October 19, 2014) governs.

(2) Paragraph (1) shall not apply to the extent the amount of an interest in property described in subparagraphs (A), (B), (C), and (D) of subsection (p)(1) is reasonably necessary for the support of the debtor and any dependent of the debtor.

Based on the plain language of § 522(q)(1), and given the Court's previous finding that the Beverly Property is Sam's exempt homestead, in determining whether Sam's exempt interest in the Beverly Property is capped at $155,675, this Court must determine: (i) whether Sam owed a "debt" arising from a violation of Federal securities laws on the date he filed the Case, and (ii) if so, whether the savings clause of § 522(q)(2) applies here to increase the monetary cap.  Because it is unclear whether the SEC is moving for summary judgment on the § 522(q)(2) issue (*see* § V.B.2, *infra*), the Court will focus its analysis on whether Sam owed a debt arising from a violation of Federal securities laws on the date he filed the Case.

### 1.    Did Sam Owe a Debt Arising from a Violation of Federal Securities Laws on the Date he filed his Case?

As previously explained, following a jury trial on the liability phase and a bench trial on the remedies phase of the SEC Action, the SDNY Court entered the SDNY Judgment against Sam in the amount of $123,836,958.75, plus prejudgment interest.  Thus, the issue before this Court is whether, as a matter of law, the SDNY Judgment is a debt arising from a violation of Federal securities laws that was owed on the date Sam filed his Case here.  To answer this question, the Court must consider what constitutes a "debt" under § 522(q)(1) of the Bankruptcy Code.

Section 101 of the Bankruptcy Code defines "debt" as "liability on a claim."  11 U.S.C. § 101(12).  In turn, "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."  *Id.* at § 101(5).  As explained by the Supreme Court, "Congress intended this language to adopt the broadest available definition of 'claim.'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991).

Despite this broad definition, Sam argues that the pendency of his appeal of the SDNY Judgment to the Second Circuit prevents this Court from finding that he owed a debt arising from a violation of Federal securities laws on the date he filed his Case here because, depending on the outcome of his appeal, the amount of his ill-gotten gains subject to disgorgement could ultimately be $0. The Court disagrees with Sam's arguments for several reasons.

First, as noted above, the Bankruptcy Code defines the term "claim" very broadly to include claims that are disputed, unliquidated, and/or contingent on the petition date. So, even assuming the SDNY Judgment is reversed in total on appeal, it is a virtual certainty that the Second Circuit would remand the securities fraud case to the SDNY Court for further proceedings consistent with its decision. But, under even this highly favorable scenario to Sam, the SEC held, at a minimum, a disputed right to payment against Sam for his alleged violations of Federal securities laws that was contingent and unliquidated on the date Sam filed his Case here. *See, e.g., Jaurdon v. Cricket Commc'n, Inc.*, 412 F.3d 1156, 1158 (10th Cir. 2005) (although a prepetition claim may be contingent upon the results of a pending appeal, it is nonetheless a "claim").

Second, from a review of Sam's brief on appeal to the Second Circuit, this Court concludes that Sam chose not to appeal the jury's findings that he committed securities fraud,[24] instead focusing his appeal mainly on the SDNY Court's methodology for determining the amounts Sam should be required to disgorge—*i.e.*, the damages calculation. *See* Final Form Brief for Appellants, Case No. 15-2821-cv, ECF No. 92 ("**Sam's Appellate Brief**"), at 14-15 (under "Issues Presented").[25] Thus, even if successful on appeal, Sam's liability for having committed securities

---

[24] *See* SEC Appx. [ECF No. 1251-1] at 008-0029 (Special Verdict Form).

[25] The only jury-related issue on appeal is "4. Whether the jury should have been permitted to decide whether sales of unregistered shares were distributions subject to Section 5 of the Securities Act of 1933," which does not attack the jury's overall findings of securities fraud. Sam's Appellate Brief at 14-15. The Court takes judicial notice of Sam's Appellate Brief.

fraud remains, although the amount of his ill-gotten gains—*i.e.*, the amount he is required to disgorge—may have to be recalculated by the SDNY Court on remand. And, while Sam argues that it is theoretically possible for the SDNY Court to determine on remand that no disgorgement is required, this Court is skeptical of such an outcome—even assuming Sam is successful in reversing the SDNY Court's damages calculations,[26] as $1 in damages would be sufficient to trigger the application of the § 522(q)(1) monetary cap to limit the amount of Sam's homestead exemption in his Case.

Finally, in the event that Sam hits a home run first on appeal and then on remand, Sam suffers no prejudice here because the objecting creditors have agreed that they will not seek to sell the Beverly Property or remove Sam from the Beverly Property pending the outcome of Sam's appeal to the Second Circuit.[27] Thus, should Sam ultimately prevail, he will not have been dispossessed from the Beverly Property and he may seek reconsideration of this Court's determination of the homestead exemption issue as necessary or appropriate.

Thus, for these reasons, the Court concludes that Sam owed a debt arising from a violation of Federal securities laws on the date he filed his Case here, triggering the application of 11 U.S.C. § 522(q)(1) to limit the amount of Sam's exempt interest in the Beverly Property to $155,675.

### 2. Based Upon the Relevant Pleadings, it is Unclear Whether the SEC is Moving for Summary Judgment Under § 522(q)(2).

In their respective pleadings, both the SEC and Sam discuss alleged facts that may be relevant to whether the savings clause found in § 522(q)(2) can be used here to raise the monetary

---

[26] Significantly, the SDNY Court provided two damages calculations. Recognizing that its primary method for calculating the amounts to be disgorged was novel, the SDNY Court provided a more traditional, alternative method of calculating the amount to be disgorged by Sam. *See* Opinion and Order, Case No. 10-05760-SAS (S.D.N.Y.) [ECF No. 563] at 6.

[27] Hr'g Tr. 36:4-8 (A. Dodd) ("We have made it clear to all the parties that we will stand down for the disposition of the homestead until the Second Circuit has ruled. We will not move to sell the homestead or take any action with regard to the homestead until that time.").

cap imposed on Sam's exempt interest in the Beverly Property under § 522(q)(1), although neither presented the Court with any summary judgment evidence on this issue. While Sam does not move for summary judgment on this issue (instead requesting that the Court postpone its consideration of this issue until after the Second Circuit has ruled on his appeal of the SDNY Judgment), it is unclear whether the SEC includes the § 522(q)(2) issue within the scope of its requested summary judgment, as explained below.

Turning first to Sam's request to postpone the hearing on the § 522(q)(2) issue, the Court finds no compelling reason to delay its resolution of the issues that remain in dispute between Sam and his creditors. Indeed, Sam's Case has been pending since October 19, 2014. While it was unreasonable to expect Sam (and Dee) to formulate plans of reorganization until after the IRS' claims against them were liquidated, that has now happened. The debtors can now formulate their respective plans of reorganization and begin to bring the Cases to conclusion. Ideally, the Cases will be resolved through a global settlement among the parties, but the Court cannot compel such a settlement. To date, no such settlement has been reached and the Court must continue to resolve issues in dispute among them so that each party can evaluate the likely outcomes of a litigated conclusion to the Cases as opposed to a consensual global resolution of the Cases. Thus, the Court will continue to set these disputed issues for a contested resolution in order to keep the parties focused on the issues and the stakes involved in a litigated resolution.

Turning next to the lack of clarity in the SEC's Motion for Partial Summary Judgment, after thoroughly reviewing the SEC's pleadings numerous times, the Court is unable to determine whether the SEC is moving for summary judgment on the § 522(q)(2) issue. The lack of clarity arises primarily from the SEC's generic request for summary judgment under "Section 522(q)," which implicitly includes both subsections. *See* SEC's Motion for Partial Summary Judgment

[ECF No. 1249] at 2 ("[T]he SEC respectfully requests that the Court enter an order in favor of the SEC finding that…Section 522(q) of the Bankruptcy Code applies and the Debtor's homestead exemption is capped at $155,675."); *see also* SEC's Memorandum in Support of Motion for Partial Summary Judgment [ECF No. 1250] at 14 ("To the extent that the Debtor believes that he is entitled to more equity because he is accustomed to luxurious surroundings, that claim is unavailing since he has produced no credible evidence to support his assertion that any additional equity is necessary for his basic needs. Accordingly, the undisputed facts show that the elements necessary for application of Section 522(q) have been met and summary judgment in favor of the SEC is proper.").

However, the SEC also alleges that there are genuine issues of material fact that prohibit summary judgment on this issue. *See* SEC's Response to Sam Wyly's Motion for Partial Summary Judgment [ECF No. 1295] at 13 ("There are substantial issues of material fact regarding the Debtor's argument that he needs the homestead to meet his basic needs."). Also, at the Hearing, the SEC did not correct statements by the Court and Sam's counsel, among others, that the § 522(q)(2) issue would remain for trial, regardless of its rulings on the Motions for Partial Summary Judgment. *See, e.g.,* Hr'g Tr. 11:17-25; 40:13-17.

Finally, the SEC objects to Sam's claimed exemptions on three fronts: (i) that the Offshore Annuity Payments are not exempt, (ii) that Sam's homestead exemption is capped at $155,675, and (iii) that "[t]he full interest of the homestead is not reasonably necessary for the support of the Debtor and any dependent of the Debtor." SEC's Objection to Exemptions Claimed by Sam Wyly [ECF No. 1161] at 2-3. Thus, if this Court were to grant the SEC summary judgment on (i) the Offshore Annuity Payments, (ii) application of the § 522(q)(1) monetary cap, and (iii) the inapplicability of the § 522(q)(2) savings clause, that would fully dispose of the SEC's objection

to Sam's claimed exemptions and be contrary to the SEC's request in its motion for *partial* summary judgment.

Because the SEC's pleadings are unclear and arguably inconsistent on whether they are seeking a summary judgment on the § 522(q)(2) savings clause issue, the Court concludes that it is unreasonable to expect Sam to have understood that summary judgment was being sought on this issue. Sam could have easily included the facts he argued in his Response to the Objections to his Amended Schedule C [ECF No. 1224] regarding the savings clause issue in the affidavit he submitted in support of his Motion for Partial Summary Judgment (addressing the homestead status of the Beverly Property), but did not do so presumably because he did not understand that the § 522(q)(2) savings clause issue was before the Court in connection with the Motions for Partial Summary Judgment. Under these circumstances, it is inappropriate to address the § 522(q)(2) savings clause issue summarily.

Accordingly, the Court concludes that the Beverly Property is exempt homestead under Texas law, but the extent of Sam's exempt interest in the Beverly Property is capped at $155,675 by 11 U.S.C. § 522(q)(1). The issue of whether Sam is entitled to more than the capped amount pursuant to 11 U.S.C. § 522(q)(2) will be tried at the evidentiary hearing scheduled for July 13-14, 2016.

### C.    Whether the Offshore Annuity Payments Are Exempt under Texas Law.

Under the Texas Insurance Code,

(a) Except as provided by Section 1108.053,[28] this section applies to any benefits, including the cash value and proceeds of an insurance policy, to be provided to an insured or beneficiary under:

---

[28] Section 1108.053 provides that the exemption provided by § 1108.051 does not apply to: "(1) a premium payment made in fraud of a creditor, subject to the applicable statute of limitations for recovering the payment; (2) a debt of

\*\*\*

(2) an annuity or benefit plan used by an employer or individual.

(b) Notwithstanding any other provision of this code, insurance or annuity benefits described by Subsection (a):

(1) inure exclusively to the benefit of the person for whose use and benefit the insurance or annuity is designated in the policy or contract; and

(2) are fully exempt from:

(A) garnishment, attachment, execution, or other seizure;

(B) seizure, appropriation, or application by any legal or equitable process or by operation of law to pay a debt or other liability of an insured or of a beneficiary, either before or after the benefits are provided; and

(C) a demand in a bankruptcy proceeding of the insured or beneficiary.

TEX. INS. CODE §1108.051.

Regarding Sam's claim of exemption of future Offshore Annuity Payments, the issue before the Court on the cross Motions for Partial Summary Judgment is whether the Offshore Annuity Payments are "benefits…to be provided to [a] … beneficiary under … an annuity … used by an…individual" that is exempt in an unlimited amount under Texas law. In other words, are the Offshore Annuity Payments the type of benefit that the Texas legislature intended to exempt from the claims of Sam's creditors? Due to Sam's systematic control of the Nevada corporations that entered into the Annuity Agreements with him and of the IOM corporations that assumed the annuity obligations thereafter (the "**Annuity Obligors**"), the Court concludes that the Offshore Annuity Payments are not exempt under Texas law, as explained below.

---

the insured or beneficiary secured by a pledge of the insurance policy or the proceeds of the policy; or (3) a child support lien or levy under Chapter 157, Family Code." These exceptions are not applicable here.

In his Motion for Partial Summary Judgment, Sam first provides a brief history of the Texas exemption statutes, explaining that Texas courts interpret the statues broadly in favor of the person claiming the exemption to encourage a fresh start.  *See, e.g., In re Walden,* 12 F.3d 445, 448 (5th Cir. 1994) (explaining Texas' "longstanding admonition that exemption statutes are to be liberally construed in favor of the claimant").   Sam then describes general principles of statutory construction, arguing that this Court should limit itself to the plain and unambiguous language of § 1108.051.   According to Sam, the statutory language, coupled with the terms of the Annuity Agreements, show that the Offshore Annuity Payments he is contractually entitled to receive from the Annuity Obligors are benefits that he may fully exempt under § 1108.051 of the Texas Insurance Code.   Under Sam's proposed approach, the very unique circumstances surrounding his establishment of, control over, and manipulation of the relevant IOM trusts, Annuity Obligors, and Nevada corporations are irrelevant.

In response, the SEC urges this Court to conclude that the Annuity Agreements are self-settled instruments that, under Texas law, cannot be exempted from the claims of Sam's creditors. According to the SEC this is so because, as the Court previously found in the Tax Memorandum Opinion, Sam exercised control over both sides of the annuity transactions, being, on the one hand, the beneficiary under the Annuity Agreements who chose in many instances not to enforce his right to receive annuity payments while, on the other hand, having (i) created the Nevada corporations that initially entered into the Annuity Agreements with him and the IOM corporations that assumed the annuity obligations due to him under those agreements, (ii) exercised control over all of those entities, (iii) dictated the terms of the Annuity Agreements through his control over those entities, and (iv) manipulated the assets of the IOM corporations that owed the annuity obligations to him in such a way as to render certain of them insolvent through, among other things,

the purchase of assets—both real property and personal property—desired by one or more members of his family. Tax Memorandum Opinion at 98-125. In short, the SEC argues that Sam did not treat the Offshore Annuity Payments as real retirement benefits; rather, Sam used the Annuity Obligor's assets in whatever way he wished from the outset, without regard to whether the Annuity Obligors would have sufficient assets with which to make annuity payments to him when they were due.

The SEC leads into its self-settled argument with the statement that "Texas courts have held that the universally-recognized rule against self-settled instruments applies to annuities." SEC's Memorandum in Support of Motion for Partial Summary Judgment [ECF No. 150] at 14 (citing cases). However, the cases the SEC cites are distinguishable and, although informative, not directly on point. *See* SEC Brief in Support of Motion for Partial Summary Judgment [ECF No. 1250] at 14 (citing *In re Shurley*, 115 F.3d 333, 345 (5th Cir. 1997); *Daniels v. Pecan Valley Ranch, Inc.*, 831 S.W.2d 372, 378 (Tex. App.—San Antonio 1992); *In re Robbins*, 211 B.R. 2, 5 (Bankr. D. Conn. 1997)). Other than *Robbins*, a case decided under Connecticut law, the SEC's cases provide policy reasons why self-settled instruments cannot shield assets from creditors. But, none of these cases address allegedly self-settled annuities as directly as the SEC suggests.

The Committee's response to Sam's Motion for Partial Summary Judgment generally aligns with the SEC, arguing that the Offshore Annuity Payments do not qualify as exempt annuity payments because Sam maintained complete control over the Annuity Obligors, including determining whether or not payments due to him pursuant to the Annuity Agreements were made and by retaining beneficial ownership over the securities used to acquire the Annuity Agreements. In support of its argument the Committee cites to *Shurley v. Tex. Commerce Bank—Austin N.A. (In re Shurley)*, 115 F.3d 333, 345 (5th Cir. 1997) for the proposition that highly contingent future

payments do not qualify as an exempt annuity under Texas Insurance Code § 1108.051. According to the Committee, because Sam controlled the flow of payments, *Shurley* supports a finding that the Offshore Annuity Payments are not exempt under Texas law.

Because no party found any controlling authority, this Court independently researched the legal issues and was equally unsuccessful in finding controlling authority. Instead, the potentially relevant case law addresses either (i) self-settled spendthrift trusts, or (ii) agreements whereby a debtor received a right to future annuity payments from an independent third party in exchange for value by giving up control over an asset (be it the money used to fund the purchase price or the right to collect on a judgment). *See, e.g., Walden v. McGinnes (In re Walden)*, 12 F.3d 445 (5th Cir. 1994) (upholding exemption of annuity purchased to obtain release of lien on assets and to fund ongoing payment obligations); *In re Foster,* 360 B.R. 210, 214 (Bankr. E.D. Tex. 2006) (upholding the exemption of an annuity purchased to make payments due to the debtor as a result of winning the Colorado state lottery); *In re Alexander*, 227 B.R. 658 (Bankr. N.D. Tex. 1998) (upholding the exemption of a structured annuity formed as part of an arms' length settlement of litigation); *In re Standel*, 185 B.R. 227 (Bankr. N.D. Tex. 1995) (upholding the exemption of a deferred compensation retirement plan from the beneficiary's employer). Factually, these cases are distinguishable from this one; but, as explained below, the Court finds the policy considerations discussed in these cases informative, particularly since there is no controlling decisional law to guide this Court's analysis.

As briefly explained above, *see* § IV.A, *supra*, and more thoroughly explained in the Tax Memorandum Opinion, Sam wished to move substantial assets offshore, primarily to avoid U.S. tax consequences. Tax Memorandum Opinion at 80. To accomplish this, Sam set up an elaborate web of IOM trusts and corporations, along with certain Nevada corporations, in order to engage in

the highly complex annuity transactions his advisors devised. *Id.* at 59-77. Once the IOM trusts and the IOM and Nevada corporations were established at Sam's direction in 1992, he transferred valuable stock options and warrants issued by one or more public companies on whose board of directors he sat to the Nevada corporations in exchange for the Nevada corporations entering into the so-called Annuity Agreements with him. *Id.* at 18-19, 59-77. These were newly formed Nevada corporations that had no assets or liabilities when Sam caused the stock options and warrants to be transferred to them and he caused them to enter into the so-called Annuity Agreements with him. *Id.* at 59-77, 138. Shortly thereafter, Sam caused the Nevada corporations to transfer the options and warrants they received from him to identically named IOM corporations, which Sam then caused to assume the annuity obligations due to him under the so-called Annuity Agreements. *Id.* at 59-66, 70-71. These IOM corporations were owned by an IOM trust Sam caused to be settled, and the IOM corporations owned the identically name Nevada corporation. *Id.* at 59, 74. However, as found in the Tax Memorandum Opinion, Sam continued to exercise control over all of the entities, directing when the options and warrants were sold and what was done with the monies realized from the sale of the options and warrants, often using that money to buy assets desired by one or more members of his family. *Id.* at 98-110.

Although the structure of the 1996 annuity transactions was different, the effect of those transactions was the same—an IOM corporation controlled by Sam through his control over the IOM trust that owned the IOM corporation entered into a so-called Annuity Agreement pursuant to which Sam is entitled to receive annual payments after reaching a certain age until his death in exchange for the Annuity Obligor's receipt of options and warrants in public companies on whose boards of directors Sam sat. *Id.* at 71-72. But, once again, Sam controlled these IOM corporations,

directing when the options and warrants were sold and what was done with the monies generated from the sale of those options and warrants. *Id.* at 98-110.

Thus, there are several anomalies that distinguish the Annuity Agreements from the types of annuities courts have upheld as exempt. First, and most importantly, Sam did not truly surrender his assets to the Annuity Obligors for them to invest as those entities saw fit in hopes that those entities would invest wisely so that they would be able to pay him in accordance with the terms of the Annuity Agreements when the Offshore Annuity Payments came due during his retirement. *Cf. Samuel v. C.I.R.*, 306 F.2d 682, 687 (1st Cir. 1962) ("in the normal annuity situation, once the annuitant has transferred the cash or property to the obligor and has received his contractual right to periodic payments, he is unconcerned with the ultimate disposition of the property transferred once it is in the obligor's hands.").[29] In fact, as previously found in the Tax Memorandum Opinion, when establishing the offshore system, it was "expressly intended that [Sam] … irrevocably surrender the enjoyment, control, ownership, and all economic benefits attributable to the ownership of the [options] which are sold in exchange for the private annuity." Tax Memorandum Opinion at 80; *see, e.g.,* SEC Appx. [ECF No. 1251-1] at 0031 (Private Annuity Agreement between Sam and East Baton Rouge Limited (IOM)) ("The Annuitant hereby expressly acknowledges that from the effective date of this Agreement the Annuitant shall retain no residual interest of any kind or character in the Securities being transferred and sold hereunder."). Instead, as found in the Tax Memorandum Opinion, Sam (i) exercised control over the Nevada corporations, the IOM corporations, and the IOM trusts at the time the Annuity Agreements were entered into with him; (ii) controlled the sale of the options and warrants he transferred to them in

---

[29] In *Samuel,* the First Circuit recognized the existence of continued control over the transferred assets as an important consideration in finding that the subject transactions were properly characterized as a grantor trust and not as an annuity agreement. Although the overall holding is not applicable to the issue here, the First Circuit's statements regarding the general form of annuities is instructive.

exchange for them entering into the Annuity Agreements or assuming the payment obligations under the Annuity Agreements; (iii) controlled how the sale proceeds were "invested" by the Annuity Obligor; (iv) controlled what assets the Annuity Obligors purchased with the sale proceeds and what member(s) of his family got/gets to use and enjoy possession of those assets; and (v) continued to exercise control over the IOM trusts, the Annuity Obligors, and the assets the Annuity Obligors invested in on the date he filed his Case here. *Id.* at 98-125.

In short, Sam never surrendered control over the options and warrants he transferred in exchange for the Nevada corporations entering into the Annuity Agreements with him, as he continued to control those assets, and ultimately the proceeds generated by the sale of those assets and how those proceeds were "invested." As found in the Tax Memorandum Opinion, that Sam exercised such control through the formality of making his "wishes" known to the applicable IOM trustee of the IOM trust that owned the Annuity Obligor is of no consequence here. *Id.* at 101-105, 114-117, 129-130, 138-139. The IOM trustees never failed to honor a Sam wish, knowing that if they did they would simply be removed and replaced with a trustee who would follow Sam's wishes. *Id.* at 139. Because of Sam's control over the Annuity Obligors through his control of the IOM Trustee and through the manipulation of the Annuity Obligor's assets, he rendered several of them insolvent, leaving them without sufficient assets to make the annuity payments due to him and causing him to agree to forgive their debts to him prior to his bankruptcy filing here or to admit that the annuity receivables owed to him will never be paid. *Id.* at 72-74; 110-125.

Second, the evidence adduced at the Tax Trial supports a finding that Sam did not treat the Annuity Agreements as true annuities. Although the Annuity Agreements and amendments thereto recite that they are to serve as deferred annuities to support Sam in his retirement,[30] Sam's actions

---

[30] *See, e.g.,* SEC Appx. [ECF No. 1251-1] at 0032, 0041, 0045, 0054, 0060, 0073, 0079, 0092, 0098, 00111, 00117, 00129, 00146, 00163, 00180, 00197, 00214 (language in Annuity Agreements and amendments thereto stating that

clearly show that the Annuity Agreements instead served as a means to accumulate substantial wealth offshore. Indeed, contrary to the stated purpose of the Annuity Agreements, Sam used the Annuity Obligors' assets to support his family's lavish lifestyle in the short term with little regard for the long term effect his short term directed purchases would have on the Annuity Obligors' ability to honor their contractual obligations to make annual payments to him once the due dates of the Annuity Agreements were reached during his retirement. *Id.* at 98-125. If Sam chose not to treat the Annuity Agreements as true annuities prior to his bankruptcy filing, there is little reason for the Court to treat them as annuities either.

Finally, the Annuity Agreements fail to satisfy the Fifth Circuit's definition of an annuity—*i.e.*, "[a]n obligation to pay a stated sum, usually monthly or annually to a [stated] recipient." *Cook v. C.I.R.,* 349 F.3d 850, 855 (5th Cir. 2003) (referencing Black's Law Dictionary definition); *see also Young*, 806 F.2d 1303, 1306 (5th Cir. 1987) (citing Black's Law Dictionary definition), *overruled on other grounds by Canfield v. Orso (In re Orso)*, 283 F.3d 686 (5th Cir. 2002); *In re Standel*, 185 B.R. at 232 (same). While the Annuity Agreements may facially appear to satisfy this definition, given Sam's control over the Annuity Obligors and their assets, and his manipulation of the Annuity Obligors and their assets, the Court finds that the Annuity Obligors were never expected to honor their alleged "obligation to pay a stated sum" to Sam. This is demonstrated by, among other things, Sam's willingness to forgive outstanding annuity obligations (after he rendered the Annuity Obligors insolvent through actions he directed be undertaken) instead of demanding payment from them as one would expect in a true debtor/creditor relationship. In short, the Annuity Agreements were simply a means devised by Sam's agents to move significant wealth offshore to avoid U.S. taxes, with any annuity payments

the annuity is intended to constitute a retirement annuity and that Sam desires to ensure that he will receive fixed payments when he retires).

actually being made to Sam a secondary consideration, as evidenced by Sam's control over whether payments were actually made to him or not.

To accept Sam's arguments here would mean that any Texan could establish domestic or offshore entities that he controls, directly or indirectly; transfer significant assets to those entities; cause the entities to enter into contracts with him titled "annuity agreements" in exchange for those assets; continue to have unfettered access to the transferred assets (deciding how and when to invest or otherwise dispose of the so-called annuity obligors' assets), while simultaneously shielding any monies that are paid to him later pursuant to the so-called annuity agreements from his lawful creditors. This cannot be what the Texas legislature intended when enacting the exemption statute.

Although not directly on point, the Court finds the policy considerations noted by the Fifth Circuit in *Milligan v. Trautman (In re Trautman)*, 496 F.3d 366 (5th Cir. 2007) instructive. The issue in *Trautman* was whether money paid to the owner of a surrendered whole-life policy is exempt. In finding the funds were not exempt, the Fifth Circuit stated that:

> We note the perils of the contrary conclusion. Exempting all money traceable to a surrendered whole-life policy would allow people to use such policies merely to avoid creditors. People could place their money in a whole-life policy with the cheapest possible premium, naming as a beneficiary someone to whom they'd want money in a normal savings account to go should they die. Sometime later— presumably even after only a few days—they could withdraw some of the money, or even all of it, forever shielding the money from creditors. That can't be the law. Less insidiously, someone desiring to have a whole-life policy actually for insurance reasons nonetheless could put her extra money into the policy simply to shield it from creditors. That also can't be the law.

*Id.* at 370. Along these same lines, in *Soza v. Hill (In re Soza)*, 542 F.3d 1060 (5th Cir. 2008), the Fifth Circuit noted, albeit in dicta, that:

> Texas cases have to date upheld annuities sharing the characteristics that they were *not self-settled* and they were intended to provide payments for the debtors and their families in the future. *See In re Foster*, 360 B.R. 210, 215 (Bankr. E.D. Tex. 2006) (exempting annuity created to disburse state lottery winnings); *In re Alexander*, 227

B.R. 658, 661 (Bankr. N.D. Tex. 1998) (exempting annuity created to pay out structured tort settlement).

*Id.* at 1069 (emphasis added).

Indeed, the general principal that debtors should not be permitted to manipulate their assets in such a way that they can still enjoy the assets while simultaneously shielding them from creditors is found throughout exemptions-related jurisprudence. *See, e.g., In re Shurley*, 115 F.3d at 337 ("The rationale for this 'self-settlor' rule is obvious enough: a debtor should not be able to escape claims of his creditors by himself setting up a spendthrift trust and naming himself as beneficiary. Such a maneuver allows the debtor, in the words of appellees, to 'have his cake and eat it too.'"); *In re Brooks*, 844 F.2d 258, 261 (5th Cir. 1988) ("Like all other states that recognize spendthrift trusts, however, Texas forbids a person to place his own assets in trust and then, by a spendthrift clause or some other restraint, to shield the trust from claims of his current or future creditors. A person is not allowed to make provision for his own support or comfort to the prejudice of his creditors."); *Judson v. Witlin (In re Witlin)*, 640 F.2d 661, 663 (5th Cir. 1981) ("There is, of course, a strong public policy that will prevent any person from placing his property in what amounts to a revocable trust for his own benefit which would be exempt from the claims of his creditors."); *U.S. v. Estabrook*, 78 F.Supp.2d 558, 561 (N.D. Tex. 1999) ("Defendants created a revocable trust funded by all their present and future assets. They receive net income from the trusts in regular installments and have sole discretion to make use of the trust assets 'as they may deem prudent.' Under these circumstances, the Sunnyvale property and other trust assets are not beyond the reach of creditors.").

Thus, the Court declines Sam's invitation to look solely to the face and terms of the Annuity Agreements and what he characterizes as the plain meaning of the statute, while turning a blind eye to his systematic manipulation of the Annuity Obligors and their assets. Indeed, Sam's

manipulation of the Annuity Obligors and their assets brings to mind the observation in footnote

585 of the Tax Memorandum Opinion, where the Court stated, in relevant part, that:

> [t]he outcome here might have been different if the IOM corporations owing the
> annuity obligations had simply been left alone to invest the money they realized
> from the exercise of the options and sale of the associated stock—even in
> investments Sam "wished" the IOM trustees to make, as he is a savvy and
> successful businessman after all—and then those IOM corporations simply
> transferred the realized profits to other IOM entities to do with what the trustees
> decided (again, even consistent with Sam's "wishes"). In other words, had the IOM
> corporations owing the annuity obligations not been raided to support the families'
> lifestyles, leaving them unable to satisfy their annuity obligations to Sam (and
> Charles until his death) as they came due, and income tax had been paid on all of
> that income when received, we might not be here today."

For all of these reasons, the Court concludes that, under the unique facts of Sam's Case,

the Annuity Agreements are self-settled instruments and that the Offshore Annuity Payments do

not qualify as exempt benefits under Texas Insurance Code § 1108.051.

### D.    Whether the Roaring Fork Annuity is Exempt under Texas Law.

The issue of whether the Roaring Fork Annuity is exempt under Texas Insurance Code §

1108.051 is far simpler because it is undisputed that Dee transferred the Roaring Fork Annuity to

Stargate Investments (Texas) some 15 years prior to her bankruptcy filing and thus no longer

owned the right to receive payments under the Roaring Fork Annuity when she filed her Case here,

as explained below.

In preparing for the weeks-long Tax Trial that preceded entry of the Tax Memorandum

Opinion, the parties submitted the Joint Stipulations, which state in relevant part:

> Effective October 15, 1999, Charles Wyly and [Dee] Wyly transferred to Stargate
> Investments, Ltd., a Texas limited partnership ("Stargate Investments (Texas)")
> formed on October 15, 1999, all the private annuities they had received.

Joint Stipulations ¶ 161. The Court relied upon this stipulated fact when rendering the Tax

Memorandum Opinion, in which it found that:

> Stargate Investments (Texas) was formed on October 15, 1999.  The Charles J. Wyly, Jr. Family Trust and The Caroline D. Wyly Family Trust (together, the "Revocable Trusts") served as both general partners (each holding 1%) and limited partners (each holding 49%) of Stargate Investments (Texas).  As reflected in the partnership agreement for Stargate Investments (Texas), Dee and Charles contributed assets valued at $98,424,589 to it, including their right to receive future payments under (i) all annuity agreements between each of them and the various IOM corporations….

Tax Memorandum Opinion at 277 (footnotes omitted).

Dee's Amended Schedule C [ECF No. 351] acknowledges her transfer of the Roaring Fork Annuity and/or the right to receive payments due under the agreement underlying the Roaring Fork Annuity by listing it as "Roaring Fork Limited annuity as a result of ownership in Stargate Investments, Ltd." with an exempted value of $10,994,451 under Texas Insurance Code § 1108.051.  Notably, however, § 1108.051(b)(1) requires that the annuity benefits "inure exclusively to the benefit of the person for whose use and benefit the insurance or annuity is designated in the policy or contract."  Moreover, property must be "property of the estate" before it may be claimed as exempt.  *See* 11 U.S.C. § 522(b)(1) ("Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph 2 or, in the alternative, paragraph (3) of this subsection.").

Here, Dee contributed the Roaring Fork Annuity to Stargate Investments (Texas), a separate legal entity, some 15 years prior to filing her Case.  Although Dee argues that the contribution did not change the legal characterization of the annuity payments, she cites no persuasive authority for this point, instead relying on the general argument that exemptions must be construed broadly in favor of the claimant.  Dee's Supplemental Brief on Annuity Exemption [ECF No. 1333] at 4-6.  Although the Court agrees that exemptions are to be broadly construed, they cannot be so broad as to include property owned by third parties.  Once Dee contributed the Roaring Fork Annuity to a third party—*i.e.*, Stargate Investments (Texas), she no longer legally

owned the right to receive the resulting annuity payments.  That right belongs to Stargate Investments (Texas), the entity to whom she transferred it.  And, although Dee holds an indirect ownership interest in Stargate Investments (Texas) via her revocable trust, the funds she receives from Stargate Investments (Texas) (regardless of their source) are a partnership distribution to her from Stargate Investments (Texas) and not an annuity payment from Roaring Fork Limited (IOM).

Accordingly, the Court finds that there is no genuine issue of material fact for trial and concludes based upon the facts found in the Tax Memorandum Opinion that the right to receive future payments on the Roaring Fork Annuity was not owned by Dee on the date she filed her Case, having been contributed by her to Stargate Investments (Texas), an entity she only partially owns, some 15 years prior to her bankruptcy filing.  Thus, as a matter of law, Dee cannot exempt annuity payments she no longer has the right to receive in her Case.

## VI.    CONCLUSION

For the reasons set forth above, the Court concludes that: (i) the Beverly Property is Sam's exempt homestead, but his exempt interest in the Beverly Property is subject to the monetary cap imposed by 11 U.S.C. § 522(q)(1);[31] (ii) the Offshore Annuity Payments due to Sam under the Annuity Agreements are not exempt under Texas Insurance Code § 1108.051, and (iii) payments due under the Roaring Fork Annuity are not exempt under Texas Insurance Code § 1108.051 because Dee transferred the Roaring Fork Annuity and/or her right to receive those payments to Stargate Investments (Texas) some 15 years prior to her bankruptcy filing.

The Court hereby directs the parties' counsel to confer with each other and attempt to submit agreed forms of orders to the Court consistent with this Memorandum Opinion within ten days of the date this Memorandum Opinion is entered on the Court's docket.  If no agreement can

---

[31] The issue of whether the savings clause of 11 U.S.C. § 522(q)(2) applies to increase the amount of Sam's exempt interest in the Beverly Property will be taken up at the evidentiary hearing scheduled for July 13-14, 2016.

be reached, each party shall submit its own proposed form of order on or before the fourteenth day following the entry of this Memorandum Opinion on the Court's docket, along with an explanation of why the other side's proposed order is improper.

**# # # END OF MEMORANDUM OPINION # # #**